# EXHIBIT D

IN THE SUPREME COURT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | Superior Court<br>Docket No. 2097 EDA 2001 |
| vs. | Northampton County<br>Court of Common Pleas<br>Criminal No. 829-2000 |
| JOSEPH MICHAEL STROHL,<br>Petitioner | |

## PETITION FOR ALLOWANCE OF APPEAL

Appeal from Judgment of Superior Court dated September 11, 2002, Docket Number 2097 EDA 2001, Affirming Judgment of Court of Common Pleas of Northampton County, denying Petitioner's Motion for Post-Sentence Relief from Judgment of Sentence, entered July 27, 2001, Docket Number 829-2000

ROBERT E. SLETVOLD, ESQ.
*Attorney I.D. 80277*
Attorney for Petitioner
701 Washington Street
Easton, PA 18042
(610) 258-5329

TABLE OF CONTENTS

I.      Order of Superior Court.................................................................................. 4

II.     Statement of Questions Involved.......................................................... 5

III.    Statement of the Case.......................................................................... 6

IV.     Statement of the Reasons for Review................................................... 6

V.      Conclusion............................................................................................21

VI.     Opinion of the Superior Court at 2097 EDA 2000.................................Appendix A

VII.    Opinions of the Court Below............................................................. Appendix B

## TABLE OF CITATIONS

### Cases

Commonwealth v. Evans, 412 Pa. Super. 332, 603 A.2d 608 (1992)............................................20
Commonwealth v. Ford, 539 Pa. 85, 650 A.2d 433 (1994)............................................15
Commonwealth v. Harper, 419 Pa. Super. 1, 614 A.2d 1180 (1992)............................................20
Commonwealth v. Iacobino, 319 Pa. 65, 178 A. 823 (1935)............................................15
Commonwealth v. Lewis 528 Pa. 440, 598 A.2d 975 (1991)............................................21
Commonwealth v. O'Searo, 466 Pa. 224, 352 A.2d 30, 33 (1976)............................................20
Commonwealth v. Prosdocimo, 525 Pa. 147, 578 A.2d 1273 (1990)............................................21
Commonwealth v. Scher, 803 A.2d 1204 (Pa. 2002)............................................7,10,13
Commonwealth v. Smart 368 Pa. 630, 84 A.2d 782, (1951)............................................12
Commonwealth v. Snyder, 552 Pa. 44, 713 A.2d 596, 600 (1998).......  ............................................7
Commonwealth v. Sparks, 342 Pa. Super. 202, 492 A.2d 720 (1985)............................................19
Commonwealth v. Webb, 449 Pa. 490, 296 A.2d 734, (1972)............................................17
In re Petition of Acchione, 425 Pa. 23, 227 A.2d 816, 820 (1967)............................................12
In Re Investigating Grand Jury, 518 Pa. 485, 544 A.2d 924 (1988)............................................12
United States v. Lovasco, 431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977)............................................7
United States v. Marion, 404 U.S. 307, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971)............................................7

### Constitutuions, Statute, Rules

Pa. Const. Article 1,  §9    ............................................7
U.S. Const. Amend. XIV, §1  ............................................7

Pa. R. E. 402  ............................................19
Pa. R. E  403  ............................................19
Pa. R. E. 404  ............................................18,19

## I. ORDER OF SUPERIOR COURT

The Superior Court entered a memorandum opinion in this matter on September 11, 2002 stating:

"Judgment of Sentence Affirmed." (Memorandum Opinion of the Pennsylvania Superior Court, September 11, 2002 at p. 6). Judgment was entered by the Prothonotary that same date. *Id.*

4

## II.  STATEMENT OF THE QUESTIONS INVOLVED

A.  Whether the lower courts erred by concluding that there was no due process violation caused by the pre-arrest delay in prosecution?

B.  Whether the evidence was insufficient to sustain the verdict?

C.  Whether the trial court erred by admitting the defendant's prior conviction?

D.  Whether the trial court erred by admitting the defendant's statement to the grand jury that he pleaded guilty to "an additional burglary"?

E.  Whether the Commonwealth's witnesses were impermissibly allowed to bolster each other's testimony?

F.  Whether the trial court erred in failing to allow the defendant to introduce specific details of a witnesses criminal convictions for burglary and criminal trespass?

G.  Whether the trial court erred in granting the Commonwealth's request for a jury instruction regarding the liability of an accomplice?

All answered in the negative by the court below.

5

### III. STATEMENT OF THE CASE

The action below was a criminal prosecution of Defendant Strohl on the charge of homicide for the death of Ella Wunderly. The action was initiated by an investigative grand jury in 1999 in Northampton County charged with looking into stale cases. Mrs. Wunderly died of bronchopneumonia in 1994 and it was alleged that injuries she sustained in 1986 were the cause of her death, and that the defendant was the one who inflicted the injuries.

The trial judge made prior determinations in this case when he denied the relief requested by Defendant Strohl's Omnibus Pre-trial Motion and Motion for Post-Sentence Relief. The superior court affirmed these decisions.

The Honorable Robert A. Freedberg entered the orders in the trial court; a panel of the superior court consisting of McEwen, P.J.E., Lally-Green and Bender JJ. entered the order that is to be reviewed.

Defendant, Joseph Michael Strohl was tried before a jury on March 5 -- March 15, 2001 on the charge of Homicide. After the jury convicted Mr. Strohl of murder of the second degree, the trial judge sentenced him to life in prison as mandated by statute. Motions for post-sentence relief were filed and denied by the trial judge. This timely appeal followed.

The order of the superior court under review states: "Judgment of Sentence Affirmed."

### IV. STATEMENT OF REASONS FOR REVIEW

The Superior Court has so far departed from accepted judicial practices and abused its discretion as to call for the exercise of this Court's supervisory authority.

This case was tried before a jury on an information charging the defendant with criminal homicide. The Commonwealth's theory was that the victim, Ella Wunderly, was beaten in the

course of a home burglary on December 26, 1986. She died from bronchopneumonia in 1994. In 1999, an investigative grand jury returned a presentment against the defendant. A criminal complaint was filed and the prosecution commenced. A pretrial motion to dismiss for pre-arrest delay was denied. The defendant was convicted of murder of the second degree and sentenced to life in prison. Post-sentencing motions were filed and denied by the trial court and affrimed by the superior court. This petition for allowance of appeal followed.

>  I.  This Court should review the case because the Defendant's Due Process rights were violated by the delay in prosecution and the lower courts committed reversible error in failing to grant Defendant's pretrial motion to dismiss for undue delay in prosecuting the case.

The Due Process Clause of the State[1] and Federal[2] Constitutions "protects defendants from having to defend stale charges, and criminal charges should be dismissed if improper pre-arrest delay causes prejudice to the defendant's right to a fair trial." Commonwealth v. Snyder, 552 Pa. 44, 713 A.2d 596, 600 (1998). The contours of these protections have been described in United States v. Marion, 404 U.S. 307, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971)(the due process clause has a role to play in protecting defendants against oppressive delay such as for the prosecution to gain a tactical advantage) and United States v. Lovasco, 431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977)(holding that the court must determine whether compelling a person to stand trial after governmental pre-arrest delay violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency). This Court has set forth the standard to be applied in the recently decided case of Commonwealth v. Scher, 803 A.2d 1204 (Pa. 2002). In Scher,

---

[1] Article 1, §9
[2] U.S. Const. Amend. XIV, §1

this Court held that "in order to prevail on a due process claim based on pre-arrest delay, the defendant must first show that the delay caused him actual prejudice, that is substantially impaired his or her ability to defend against the charges. The court must then examine all of the circumstances to determine the validity of the Commonwealth's reasons for the delay. Only in situations where the evidence shows that the delay was the product of intentional, bad faith or reckless conduct by the prosecution, however, will we find a violation of due process." As noted in the footnote, "Due process violation will occur in the rarest cases where the Commonwealth's conduct shocks the conscience and offends one's sense of justice.

> A. The lower courts committed reversible error when they failed to conclude that the Defendant suffered actual prejudice due to the passage of time between the crime and the commencement of the prosecution.

The defendant suffered actual prejudice by the delay in prosecuting this case because the victim's medical records and other evidence was lost and the courts were wrong in concluding otherwise. Dr. Fillinger, the Commonwealth's expert, testified that information contained in medical records could be important. N.T. 372. In this case there was circumstantial evidence that these records were in fact important. For instance, it is unusual for a person to live for so many years after the injuries described, N.T. 379. Heart disease was also a contributing factor, N.T. 398. As Dr. Fillinger stated, more information may change an opinion. N.T. 409. See also Omnibus Transcript pp. 20-25. Here not only are the records from the nursing home where the victim was residing at the time of her death missing, but also the records from the Quakertown Hospital that show the victim suffered severe injuries. The victim, depicted by the Commonwealth's experts as an immobile, non-responsive individual was taken to the hospital with a broken arm, a broken leg, had a history of stroke and a history of congestive heart failure. The records from the residential facility would have shown how these injuries occurred, given

8

that they are inconsistent with a patient described as immobile, and how she was being treated afterwards. Also the records would have shown whether the bronchopneumonia had been diagnosed and whether or to what extent it was being treated. Also with the missing physical evidence, the defendant was prejudiced by not being able to have it tested for possible DNA or other scientific or forensic results that could have been helpful to his defense.

The Commonwealth presented Dr. Isidore Mihalakis, Dr. Lucy Rorke, and Dr. Halbert Fillinger, for their expert opinions that the injuries inflicted in 1986 caused the death in 1994. The experts attempted to create "an unbroken chain of events" where the injuries led to the bronchopneumonia which was how Mrs. Wunderly died, ultimately. The injuries alone, however, do not cause pneumonia. N.T. 239-240. There are other circumstances that may also lead to bronchopneumonia, some of these apply to Mrs. Wunderly. According to Dr. Mihalakis, healthy people, alcoholics who aspirate vomitous, elderly people, people with Alzheimer's people in nursing homes are all candidates for bronchopneumonia. N.T. 241-243. In short, anyone who is immobile for extended periods, such as a person who has had a hip injury as Mrs. Wunderly mysteriously suffered, N.T. 873 and has heart disease N.T. 873, as was testified to by the defense expert, Dr. Hoyer is at risk of bronchopneumonia.. The missing records are a gap in the evidence that caused actual prejudice to the defendant. The experts will opine only on the evidence presented to them. Missing evidence effects the opinions and the defendant thus, cannot obtain an opinion based on all the relevant information because so much of it is missing. Thus, the Commonwealth's evidence and experts did not and could not prove beyond a reasonable doubt that the head injuries were a "direct and substantial factor" in causing the death of Mrs. Wunderly. Contrary to the trial court's assertion in its opinion that "the victim was rendered comatose and immobile," Dr. Fillinger admitted that he had not been provided and had

9

not considered Mrs. Wunderly's responsiveness, albeit diminished, to questions and stimuli, N.T. 386--401, such as paging through magazines, answer questions "yes" or "no", folding her hands in prayer, saying "hi", looking out the window when asked about the weather.

To the extent that the opinions attempted to link the head injuries of 1986 to the death from pneumonia in 1994, the opinions were improper and nugatory in the absence of the medical records from the nursing home in which Mrs. Wunderly was living at the time of her death. Lana Snyder testified, N.T. 794-801, there are relatively complete records for Mrs. Wunderly, but only up to 1989, and bits and pieces of records that stop in 1991. There are no records for the last three years of Ms. Wunderly's life and, thus, no record of what condition she was in that may have explained the cause of pneumonia. Additionally, 1992 records from the Quakertown Community Hospital show that Mrs. Wunderly suffered a broken arm, N.T. 373-374, and noted that she had a history of a C.V.A. which Dr. Fillinger explained the layman understands as a stroke, N.T. 374. May 1993 Quakertown Community Hospital Records disclose a history of congestive heart failure and a broken leg. N.T. 374--375. Thus the missing records contained information that would have presented a more accurate picture of Mrs. Wunderly's health, and whether her pneumonia was diagnosed and treated, as well as the additional evidence of injuries, stroke and heart failure. The opinions would have been better informed and the defendant was therefore prejudiced by the delay.

      B. <u>Looking for the reasons for the delay, there was no substantially new evidence produced between the time of Defendant's arrest on the charge of burglary in 1987 and the initiation of the homicide charges</u>

The holding of <u>Snyder</u> suggests that it is not merely new evidence which justifies prosecuting a stale case; rather the new evidence must be substantial. Here the evidence that is

10

supposedly new was the testimony of Shull that on December 27, the day after the alleged events giving rise to this prosecution, he actually went into the house further than he had admitted in connection with his guilty plea for the burglary of the 27th. Also a statement by Bill Notti that Joe supposedly said "shut up or I'll kill you, too, " is claimed to be substantial new evidence. This is not true given the suspect circumstances in which the statement was obtained, discussed below. See also N.T. 748-760.

> C.   The courts' reliance on the hearing testimony of Trooper Vazquez conflicts with the information in Trooper Vazquez's reports and the testimony before the Grand Jury.

At the hearing on defendant's pre-trial motion to dismiss for undue delay, Trooper Vazquez testified that Notti provided information that Joe Strohl said, "shut up or I'll kill you, too." Omnibus Transcript, 164. That information was not what Notti told the grand jury, N.T. 617, does not appear in any other officers reports, and while it is in Trooper Vazquez' notes, the full statement is that Strohl said "shut up or I'll kill you" or "shut up or I'll kill you, too." Thus, this information should not have been characterized as substantially new evidence justifying the instant prosecution.

> D.   The "new information" was the direct result of overzealous and overbearing prosecutorial misconduct and misconduct in eliciting the testimony of William Notti.

Mr. Notti was interviewed several times by the police and appeared three times before the grand jury. It was not until after the District Attorney threatened to haul Mr. Notti before a judge on perjury charges and threatened to incarcerate him until his memory improved, N.T. 624-631, that the statement "Shut up or I'll kill you, too!" is supposed to have been said. However, the last time Notti testified before the grand jury the statement that he now recalls being said was only "shut up or I'll kill you." N.T. 617.

11

The standard of review for examining the discretionary actions in an investigating grand jury should be the same as that which was articulated by this Court In re Petition of Acchione, 425 Pa. 23, 227 A.2d 816, 820 (1967)("the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions"). Here there was such an abuse of discretion. As noted in Commonwealth v. Smart 368 Pa. 630, 84 A.2d 782, n.3 (1951) "The function of the prosecuting officer is to attend on the grand jurors with regard to matters on which they are to pass, to aid in the examination of witnesses, and to give such general instructions as they may require, but he must not attempt to influence their action nor indeed should he be present while they are deliberating on the evidence or voting on a matter under investigation" Thus, this court in In Re Investigating Grand Jury, 518 Pa. 485, 544 A.2d 924, n.6 (1988) found the following questioning by the prosecutor amounted to prosecutorial misconduct:

> Q.      Miss Lees, I just want to remind you of where I'm going because I think I told you this last time, I want to make sure that you remember this. I think that you were at those burglaries and I think I can prove that. I think I can prove it beyond a reasonable doubt and if you had not entered a plea to those offenses that's exactly what the Commonwealth intended to do. I think that Edward Doria was there with you because you can't drive so you can't get there without somebody else and it was Edward Doria's car that was there during those burglaries. If I can prove that you're lying here today or during your prior testimony I am going to try to send you to jail for each time you have lied and I think I can prove that with the testimony of Edward Doria. If I have to I'll make a deal with him, even though I'd prefer to just take testimony from you, let you go home and use the truth against Mr. Doria, but if I have to I'll deal with Mr. Doria and prove that you're lying. Please keep that in mind during the rest of this questioning.
> All right. You say that you have no idea whether you ever participated in a burglary in your life?

Prosecutors are not permitted to attempt to influence a grand jury by expressions of personal opinion, Smart, supra. See also, Gershman Prosecutorial Misconduct, § 2.3(b) (1986) (hostile questioning and implication that witness is lying generally viewed as misconduct).

12

In this case the District Attorney told witness Notti "I want to know the truth, sir, or I will have you before a judge for perjury. Do you understand that.?" N.T. 624; "You are not going to be evasive. You are not going to sit there and lie to this grand jury," N.T. 624; "Are you trying to play dumb" N.T. 628; "I'm asking you questions and I want straight answers," N.T. 629; "I'm trying to find out the truth about what you overheard. I know for a fact that you were present in your car when Strohl [the defendant] was talking to Shull about going in that house and I know for a fact and I want to know why you won't tell us the truth on that." N.T. 629; "I want to know why you won't tell us what you heard them saying," N.T. 629. After being berated in this way, the witness answers, "I didn't hear them saying anything" N.T. 630. The District Attorney then threatens, "Do you think your memory would be refreshed if we had you sit over in Northampton County [Prison] for a couple of days? Do you think we could get your memory a little better then?" N.T. 631. The witness was excused, re-interviewed by the police and brought back before the grand jury at a later date when he testifies about the incriminating statement attributed to the defendant here. N.T. 617. This misconduct tainted the grand jury proceedings to the point where, at the very least, the trial court never should not have used this tainted information as a basis for justifying the delay and denying defendant's motion to dismiss the charges. Thus, a due process violation occurred because here the conduct of the Commonwealth's attorney "shocks the conscience and offends one's sense of justice.

E.  Applying the *Scher* standard, under all of the circumstances, the delay was improper.

The Commonwealth took no absolutely no action whatsoever to charge the defendant either before or at the time of Mrs. Wunderly's death for the burglary or assault that supposedly occurred on the 26th of December.   Additionally, when Mrs. Wunderly died, no records were

collected or preserved and additional time elapsed. As trooper Vazquez testified at the pre-trial hearing, he thought there was enough to arrest Joe Strohl at the time, meaning in 1987, but the Commonwealth chose to wait to see what happened. O.T. 153 et seq. By lying in wait to see whether Mrs. Wunderly would die and thus have a case for homicide instead of merely assault and/or burglary and robbery, evidence was lost forever and that evidence was important to the case. This was reckless conduct and resulted in giving the Commonwealth a tactical advantage at trial. The medical records and the physical evidence, could be and in fact was lost.

Therefore, the defendant suffered actual prejudice due to the behavior of the Commonwealth that was not sufficiently excused by the "new evidence" obtained by the grand jury proceedings. This court should review the matter.

II.     <u>Defendant should have been granted a judgment of acquittal because the evidence produced by the Commonwealth was insufficient to sustain the verdict</u>

In order to convict the defendant of felony murder, the Commonwealth was required to prove first that a felony was committed. The Commonwealth's theory was that Mrs. Wunderly's home was burglarized, initially, on December 26, 1986 and that it was during that burglary that Mrs. Wunderly bas beaten, suffering the injuries described to the jury. Without direct evidence, the Commonwealth attempted to create the inference of a burglary having been committed on the 26th through the testimony of the Cecala Family. N.T. pp. 578 -- 598. The family testified about the specific dates and said that they thought they saw what turned out to be a purse on Saturday, December 27th and picked it up on the 28th, N.T. 580, 594. This set the foundation for the Commonwealth to argue that if the purse was first seen on the 27th, it must have been taken during a burglary the night before; namely on the 26th. The Cecalas' assumptions on the specific dates were refuted, however, by other testimony. The Cecalas themselves testified that they

14

called Richard Wunderly, the victim's son, on the same day that they picked up the purse. N.T. 595. Richard Wunderly then confirmed that the Cecalas called about the purse the 29th, not the 28th, and that he called the police the  same day that the Cecalas called him, which was the day after his mother was discovered on the 28th, N.T. 668-669. Officer Gerancher corroborated this when he testified that he received a call from Richard Wunderly on the December 29th, N.T. 434-435, not the 28th. Therefore, the purse must have been seen on Sunday the 28th and not the 27th, a date that the Cecalas assumed and which the Commonwealth needed to be able to argue that there was a burglary that the defendant was implicated in on December 26. Thus, the burglary William Notti testified to, N.T. 598 --608 was, in fact, the burglary of the 27th, and not a burglary on the 26th.

While Robert Shull testified that on the 27th, "[Mr. Strohl] said that he was in the night before," N.T. 525, this testimony does not prove a burglary occurred on the 26th. To prove burglary, the Commonwealth must prove that the defendant entered a building or a separately secured or occupied portion thereof with intent to commit a crime therein, unless, among other things, the actor is privileged to enter.  Commonwealth v. Ford, 539 Pa. 85, 650 A.2d 433 (1994), citing 18 Pa.C.S. § 3502(a). Specific intent to commit a crime may be established through a defendant's words or acts, or circumstantial evidence, together with all reasonable inferences therefrom. Commonwealth v. Iacobino, 319 Pa. 65, 178 A. 823 (1935).   The most that Shull's testimony, if believed, proves, is that Mr. Strohl entered a building or occupied structure.  But even if Mr. Strohl entered the structure on the 26th, there is no proof, direct, circumstantial, inferential or otherwise, that he had the specific intent to commit a crime therein, as there must be to support a finding that there was a burglary committed by Mr. Strohl on December 26.

15

The fact that the house appeared to have been ransacked when the police initially arrived on the scene does not prove that a burglary was committed on the 26th. By the time the police entered the house on the 28th, the home had been entered any number of times, N.T. 767 and nothing supports a specific entry on the 26th. Finally, there is insufficient evidence that, assuming a burglary was committed on the 26th, that the defendant was involved on the 26th. Therefore, the evidence is insufficient as a matter of law to prove beyond a reasonable doubt that there was a burglary (the predicate felony to the crime of murder of the second degree) on the 26th, or that the defendant was the burglar; therefore, defendant is entitled to a judgment of acquittal.

For these reasons, there is insufficient evidence from which to conclude that a burglary was committed on December 26th, thus, even though the testimony of Dr. Mihalakis was entered to set a window of time in which that injuries occurred, N.T. 208, there is insufficient evidence to suggest that the injuries occurred in the course of or in furtherance of a burglary.

Again Mr. Notti's testimony describes a sequence of events that culminates with an object being thrown from his car, N.T. 608, which, as explained above, turns out to be the purse the Cecalas find on the 28th and pick up the 29th. This burglary of December 27, 1986 was charged in a separate criminal information and is the burglary to which Mr. Strohl and Robert Shull pleaded guilty, a burglary in which the allegations were that Mrs. Wunderly was already injured when Mr. Strohl and Robert Shull entered the home. Neither Mr. Strohl nor Mr. Shull were ever alleged to have injured Mrs. Wunderly during the burglary on the December 27, 1986.

Therefore, the evidence is insufficient that the injuries sustained were inflicted in the course of a burglary on December 26, and the defendant is entitled to a judgment of acquittal.

Causation is an essential element of the charge of criminal homicide, which the Commonwealth must prove beyond a reasonable doubt. Commonwealth v. Webb, 449 Pa. 490, 494, 296 A.2d 734, 737 (1972)

In the present case, the victim was injured in 1986, but did not die until 1994.  The Commonwealth presented Dr. Isidore Mihalakis, Dr. Lucy Rorke, and Dr. Halbert Fillinger, for their expert opinions that the injuries inflicted in 1986 caused the death in 1994.  The experts attempted to create "an unbroken chain of events" where the injuries led to the bronchopneumonia which was how Mrs. Wunderly died, ultimately.   The injuries alone, however, do not cause pneumonia.  N.T. 239-240.  There are other circumstances that may also lead to bronchopneumonia, some of these apply to Mrs. Wunderly.  According to Dr. Mihalakis, healthy people, alcoholics who aspirate vomitous, elderly people, people with Alzheimer's people in nursing homes are all candidates for bronchopneumonia.  N.T. 241-243.  In short, anyone who is immobile for extended periods, such as a person who has had a hip injury as Mrs. Wunderly mysteriously suffered, N.T. 873 and has heart disease N.T. 873, as was testified to by the defense expert, Dr. Hoyer is at risk of bronchopneumonia.

Thus, the Commonwealth's evidence and experts did not and could not prove beyond a reasonable doubt that the head injuries were a "direct and substantial factor" in causing the death of Mrs. Wunderly.  Contrary to the trial court's assertion in its opinion that "the victim was rendered comatose and immobile," Dr. Fillinger admitted that he had not been provided and had not considered Mrs. Wunderly's responsiveness, albeit diminished, to questions and stimuli, N.T. 386--401, such as paging through magazines, answer questions "yes" or "no", folding her hands in prayer, saying "hi", looking out the window when asked about the weather.

17

To the extent that the opinions attempted to link the head injuries of 1986 to the death from pneumonia in 1994, the opinions were improper and nugatory in the absence of the medical records from the nursing home in which Mrs. Wunderly was living at the time of her death. Lana Snyder testified, N.T. 794-801, there are relatively complete records for Mrs. Wunderly, but only up to 1989, and bits and pieces of records that stop in 1991. There are no records for the last three years of Ms. Wunderly's life and, thus, no record of what condition she was in that may have explained the cause of pneumonia. Additionally, 1992 records from the Quakertown Community Hospital show that Mrs. Wunderly suffered a broken arm, N.T. 373-374, and noted that she had a history of a C.V.A. which Dr. Fillinger explained the layman understands as a stroke, N.T. 374. May 1993 Quakertown Community Hospital Records disclose a history of congestive heart failure and a broken leg. N.T. 374--375. Thus, due to the missing records which could have presented a more accurate picture of Mrs. Wunderly's health, and whether her pneumonia was diagnosed and treated, as well as the additional evidence of injuries, stroke and heart failure, the Commonwealth failed to prove causation beyond a reasonable doubt.

III.   <u>The lower courts erred and abused its discretion in allowing the Commonwealth to introduce the defendant's December 27 burglary conviction to show that the defendant had knowledge of Mrs. Wunderly's incapacitated state.</u>

Evidence of other bad acts is inadmissible to prove the character of a person in order show action in conformity therewith, Pa. R. E. 404(b)(1). While such evidence may be admitted for other purposes, such as proof of motive opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, Pa. R. E. 404(b)(2), the evidence of the defendant's plea to a December 27 burglary should not have been admitted, as it was, for the purpose of showing that Mr. Strohl had knowledge of Mrs. Wunderly's condition.

18

First, this type of evidence may be relevant where knowledge is an element of the crime charged. *See* Commonwealth v. Sparks, 342 Pa. Super. 202, 492 A.2d 720 (1985)(In trial for receiving stole property, the Commonwealth was permitted to introduce testimony of defendant's subsequent criminal activity concerning property defendant was told was stolen to rebut defendant's position that he lacked knowledge of subject property being stolen). Here, however, knowledge is not an element of felony murder, nor does knowledge of Mrs. Wunderly's condition fit any of the other exceptions to the rule. Also to the extent relevant, the prejudicial effect of this evidence outweighed it probative value and should have been excluded.

IV.     The trial court erred and abused its discretion in allowing evidence of Defendant's statement to the Grand Jury (that he entered a guilty plea to "an additional" burglary) to be presented by the Commonwealth.

At trial, the Commonwealth was permitted to introduce a statement made by the Defendant to the Grand Jury to the effect that he had committed and pleaded guilty to an "additional burglary" of the victim's house.   N.T. 705-710.   Using this statement, the Commonwealth sought to create the inference that the defendant, by saying "additional" had admitted by necessary implication to having committed an "initial" burglary, being the burglary that was the basis for the felony-murder charge.

This was prejudicial and irrelevant, Pa. R. E., Rules 402, 403, and 404, given the passage of time and well publicized grand jury proceedings. Additionally, at the time defendant pleaded guilty to the burglary of December 27, the Commonwealth made it clear that it was leaving open the possibility of prosecution for crimes suspected to have been committed the day before. See Guilty plea and sentencing colloquy in Northampton County Case No. 226-1987. Thus, the prejudicial effect of this statement outweighed any possible relevance.

19

V.   The court erred and abused its discretion in allowing the Commonwealth's
experts to bolster each other's testimony.

During the trial each of the Commonwealth's experts, Dr. Fillinger and Dr. Mihalakis

were allowed to testify as to whether one's opinions and conclusions were "consistent with" the

other's. It is well-established that an expert witness may not offer testimony which concerns the

issue of a witness' credibility because that testimony improperly encroaches upon the jury's

function. Commonwealth v. Evans, 412 Pa. Super. 332, 603 A.2d 608 (1992). It is an

encroachment upon the province of the jury to permit admission of expert testimony on the issue

of a witness' credibility. Commonwealth v. O'Searo, 466 Pa. 224, 352 A.2d 30, 33 (Pa. 1976),

Indeed, to permit expert testimony for the purpose of determining the credibility of a witness

"would be an invitation for the trier of fact to abdicate its responsibility to ascertain the facts

relying upon the questionable premise that the expert is in a better position to make such a

judgment." Id.

In the instant case, by allowing Dr. Mihalakis to testify that Dr. Fillinger's conclusions as

to the cause of death in 1994 was consistent with what Dr. Mihalakis observed in 1986, N.T.

180--212 was improper bolstering of the credibility of Dr. Fillinger's credibility. Likewise,

allowing Dr. Fillinger to do same with respect to Dr. Mihalakis' report was also impermissible.

N.T. 334-360.

VI.   The trial court erred and abused its discretion in granting the Commonwealth's
request for a jury instruction on accomplice liability.

When reviewing a jury instruction to determine whether an error has been committed by

a trial court, the charge must be considered as a whole and not in isolated excerpts.

Commonwealth v. Harper, 419 Pa. Super. 1, 614 A.2d 1180 (1992). A jury instruction will be

upheld so long as it "sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision." Commonwealth v. Prosdocimo, 525 Pa. 147, 578 A.2d 1273 (1990).

In applying the harmless error analysis in a particular case, it is imperative that the burden of establishing that the error is harmless beyond a reasonable doubt rests upon the Commonwealth. Commonwealth v. Lewis 528 Pa. 440, 598 A.2d 975 (1991).  Here there was insufficient facts to raise the issue of accomplice liability and by instructing the jury so and allowing them to consider this theory allowed the jury to convict the defendant without having to find that he himself committed the acts which caused the injury, a proposition for which there was insufficient basis to form such a conclusion.  The defendant objected to this instruction, N.T. 942-945, but it was given N.T. 1085-1089.

## CONCLUSION

For the forgoing reasons, this matter should be heard by this Court.  Petitioner respectfully requests that he be granted allowance to appeal.

Respectfully submitted,

Robert E. Sletvold, Esq.
*Counsel for Petitioner*

21