# EXHIBIT F

No. _____

_____

IN THE

SUPREME COURT OF THE UNITED STATES

_____

__JOSEPH MICHAEL STROHL__ — PETITIONER
(Your Name)

vs.

COMMONWEALTH OF PENNSYLVANIA— RESPONDENT(S)

ON PETITION FOR A WRIT OF CERTIORARI TO

Superior Court of Pennsylvania
(NAME OF COURT THAT LAST RULED ON MERITS OF YOUR CASE)

PETITION FOR WRIT OF CERTIORARI

JOSEPH MICHAEL STROHL #CM-2097
(Your Name)

1100 PIKE STREET
(Address)

HUNTINGDON, PENNSYLVANIA 16654-1112
(City, State, Zip Code)

NONE
(Phone Number)

# QUESTION(S) PRESENTED

## I.

What is the correct test for determining if prosecutorial pre-indictment delay amounts to a violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution?

## II.

Was the Petitioner denied Due Process by the lower Courts failure to conclude that Petitioner suffered actual prejudice due to the passage of time between the crime and commencement of the prosecution?

## III.

To what extent does the Due Process Clause impose on the State the responsibility of guaranteeing access to evidence after pre-indictment delay has occurred?

## IV.

Is the Standard articulated in MARION/LOVASCO for determining whether pre-indictment delay violates the Due Process Clause synonomous with the TROMBETTA/YOUNGBLOOD standard for determining whether destroyed evidence violates Due Process?

# LIST OF PARTIES

[ ] All parties appear in the caption of the case on the cover page.

[x] All parties **do not** appear in the caption of the case on the cover page. A list of all parties to the proceeding in the court whose judgment is the subject of this petition is as follows:

```
JOHN M. MORGANELLI
DISTRICT ATTORNEY OF NORTHAMPTON COUNTY
NORTHAMPTON COUNTY GOVRNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7492
```

# TABLE OF CONTENTS

OPINIONS BELOW................................................................................. 1

JURISDICTION..................................................................................... 2

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED ........................... 3

STATEMENT OF THE CASE ..................................................................... 4

REASONS FOR GRANTING THE WRIT ....................................................... 5

CONCLUSION..................................................................................... 10

# INDEX TO APPENDICES

APPENDIX A –Decision of the Superior Court of Pennsylvania

APPENDIX B –Decision of the State Trial Court(Opinion & Rationale)

APPENDIX C –Order of Pennsylvania State Supreme Court

APPENDIX D –1987 Guilty Plea Colloquey

APPENDIX E –Motion based on Newly Discovered Evidence

APPENDIX F –Other essential material

# TABLE OF AUTHORITIES CITED

CASES                                                PAGE NUMBER

Alderman v. United States,394 U.S. 165,89 S.Ct. 961,22 L.Ed.2d 176(1968)....40

Arizona v. Youngblood,488 U.S. 51,109 S.Ct. 333,102 L.Ed.2d 281(1988).5,8,9,38

Ashe v. Swenson,397 U.S. 436,90 S.Ct. 1189,25 L.Ed.2d 469(1970)............27

Bank of Nova Scotia v. United States,487 U.S. 250,108 S.Ct. 2369(1988)......31

Brady v. State of Maryland,373 U.S. 83,83 S.Ct. 1194,10 L.Ed.2d 215(1963).5,38

California v. Trombetta,467 U.S. 479,104 S.Ct. 2528,81 L.Ed.2d 413(1984)..5,38

Clark v. State, 774 A.2d 1136 (Md.2001)....................................12

Commonwealth v. Daniels, 480 Pa. 340, 390 A.2d 172 (1978)...................7

Commonwealth v. Rogers, 413 Pa. Super. 498, 605 A.2d 1228(1992)............23

Commonwealth v. Scher, 803 A.2d 1204 (Pa.2002)....................7,8,26,35

Commonwealth v. Smart, 368 Pa. 630, 84 A.2d 782 (1951).....................36

Commonwealth v. Snyder, 552 Pa. 44, 713 A.2d 596 (1998)................6,7,28

Commonwealth v. Webb, 449 Pa. 490, 296 A.2d 734 (1972)....................14

Daubert v. Merrell Dow Pharm.,509 U.S. 579,113 S.Ct. 2786(1993)............15

Dickey v. Florida, 398 U.S. 30,..........................................10

Giglio v. United States,405 U.S. 150,92 S.Ct. 763,31 L.Ed.2d 104(1972)......19

Hoo v. United States,484 U.S. 1035,108 S.Ct. 742,98 L.Ed.2d 777(1988).......8

Howell v. Barker, 904 F.2d 889 (4th Cir.1990)............................15

In Re Grand Jury Proceedings, 813 F.Supp. 1451 (D.Co.1992)................31

In Re Investigating Grand Jury, 518 Pa. 485, 544 A.2d 924 (1988)...........30

In Re Petition of Accehione, 425 Pa. 23, 227 A.2d 816 (1967)..............29

Kyles v. Whitley,514 U.S. 419,115 S.Ct. 1555,131 L.Ed.2d 490(1995)....20,35,37

Napue v. Illinois,360 U.S. 264,79 S.Ct. 1173,3 L.Ed.2d 1217(1959)..........19

People v. Singer, 44 N.Y.2d 241,376 N.E.2d 179,405 N.Y.S.2d 17(1978).........9

Sewell v. State, 592 N.E.2d 705 (Ind. App. Dist. 3 1992)..................24

State v. Hammond, 221 Conn. 264, 604 A.2d 793 (1992)...................24,25

State v. Schwartz, 447 N.W.2d 422 (Min. 1989)............................24

State v. Thomas, 245 N.J. Super. 433, %86 A.2d 252 (1992)..............23,24

United States v. Bazzano, 570 F.2d 1120 (3rd Cir.1977)....................32

United States v. Breslin, 916 F.Supp. 438 (E.D. Pa.1996)................30,31

United States v. Briney, 686 F.2d 102 (2nd Cir.1982)......................11

United States v. Brock, 782 F.2d 1442 (7th Cir.1986).......................9

United States v. Brown, 667 F.2d 566 (6th Cir.1982).......................11

United States v. Burns, 701 F.2d 840 (9th Cir.1983).......................11

United States v. Bruscino, 662 F.2d 450 (7th Cir.1981)....................11

United States v. Calandra,414 U.S. 343,94 S.Ct. 617.......................34

United States v. Comosona, 614 F.2d 695 (10th Cir.1981)...................11

United States v. Crouch, 84 F.3d 1497 (5th Cir.1996)(en banc),cert.denied...12

United States v. Deaner, 1 F.3d 192 (3rd Cir.1993)........................39

United States v. Durin, 632 F.2d 1297 (5th Cir.1980)......................11

United States v. Dyson, 469 F.2d 735 (5th Cir.1972).......................10

United States v. Ewell, 386 U.S. 122, 86 S.Ct. 777.......................19

United States v. Gouvia,467 U.S. 180,104 S.Ct. 2292,81 L.Ed.2d 146(1984).....5

United States v. Ismaili, 828 F.2d 153 (3rd Cir.1987).....................7

United States v. Jackson, 504 F.2d 337 (8th Cir.1974).....................9

United States v. Jenkins, 667 F.2d 850 (10th Cir.1983)....................11

United States v. Juarez, 561 F.2d 65 (7th Cir.1977).......................9

United States v. Lawson, 683 F.2d 688 (2nd Cir.1982)...................11,32

# TABLE OF AUTHORITIES CITED

CASES                                                          PAGE NUMBER

United States v. Leon, 468 U.S. 697,104 S.Ct. 3405,82 L.Ed.2d 677 (1984).....40
United States v. Lewis, 514 F.Supp. 169 (M.D. Pa.1981).....................11
United States v. Lovasco, 431 U.S. 783,97 S.Ct. 2044,52 L.Ed.2d 752(1977)5,7,37
United States v. Marion, 404 U.S. 307,92 S.Ct. 455,30 L.Ed.2d 468(1971)5,6,7,37
United States v. Mays, 549 F.2d 670 (9th Cir.1977)........................8,12
United States v. Mechanic, 475 U.S. 66,106 S.Ct. 938,89 L.Ed.2d 50(1986).....31
United States v. Medina-Arellano, 569 F.2d 349 (5th Cir.1978)..............12
United States v. Mills, 704 F.2d 1553 (11th Cir.1983)......................11
United States v. Moore, 515 F.Supp. 509 (S.D. Ohio 1981)...................10
United States v. Parrott, 248 F.Supp. 196 (D.D.C.1965)......................9
United States v. Peterson, 698 F.2d 921 (8th Cir.1982).....................11
United States v. Radmall, 591 F.2d 548 (10th Cir.1978).....................11
United states v. Richburg, 478 F.Supp. 535 (M.D. Tenn.1979)..............9,11
United States v. Rubin, 609 F.2d 51 (2nd Cir.1979).........................11
United States v. Soberon, 929 F.2d 935 (3rd Cir.1991)......................34
United States v. Sowa, 34 F.3d 447 (7th Cir.1994)..........................12
United States v. Valenzuela-Bernal, 458 U.S. 858,102 S.Ct. 3440 (1982 .....20
United States v. Walker, 601 F.2d 1051 (9th Cir.1979)......................11
Wood v. Georgia, 370 U.S. 375,82 S.Ct. 1364,8 L.Ed.2d 569 (1962)...........34

## CONSTITUTIONS, STATUTES, AND RULES

Pa. Const. Article 1 §9....................................................6
U.S. Const. Amend. V.......................................................5
U.S. Const. Amend. XIV §1................................................5,6

18 Pa.C.S.A. §2502(b).....................................................20
28 Pa. Code §201-211.5.................................................20,38
28 Pa. Code §563.6.....................................................20,38
35 P.S. §10211-10224...................................................20,37
42 Pa.C.S. §5551..........................................................19
Pa. R.Crim. P. 573(B).....................................................21
Title 49 § 21.148(3)(4)(5)................................................20

## OTHERS

42 CFR part 483...........................................................37
Blacks Law Dictionary 7th Ed. 1999........................................36
Elderly Abuse Act......................................................20,37
Gershman Prosecutor Misconduct §2.3(b)(1986)..............................30
License Act #122..........................................................20
North Catasauqua Police Department Policy and Procedures §2300-2400.2.......38

IN THE

SUPREME COURT OF THE UNITED STATES

PETITION FOR WRIT OF CERTIORARI

Petitioner respectfully prays that a writ of certiorari issue to review the judgment below.

## OPINIONS BELOW

[ ] For cases from **federal courts**:

The opinion of the United States court of appeals appears at Appendix _____ to the petition and is

[ ] reported at _____; or,
[ ] has been designated for publication but is not yet reported; or,
[ ] is unpublished.

The opinion of the United States district court appears at Appendix _____ to the petition and is

[ ] reported at _____; or,
[ ] has been designated for publication but is not yet reported; or,
[ ] is unpublished.

[X] For cases from **state courts**:

The opinion of the highest state court to review the merits appears at Appendix __A__ to the petition and is

[ ] reported at _____; or,
[ ] has been designated for publication but is not yet reported; or,
[X] is unpublished.

The opinion of the __State Trial_____ court appears at Appendix __B__ to the petition and is

[ ] reported at _____; or,
[ ] has been designated for publication but is not yet reported; or,
[X] is unpublished.

1.

## JURISDICTION

[ ] For cases from **federal courts**:

The date on which the United States Court of Appeals decided my case was _____.

    [ ] No petition for rehearing was timely filed in my case.

    [ ] A timely petition for rehearing was denied by the United States Court of Appeals on the following date: _____, and a copy of the order denying rehearing appears at Appendix _____.

    [ ] An extension of time to file the petition for a writ of certiorari was granted to and including _____ (date) on _____ (date) in Application No. ___ A _____.

The jurisdiction of this Court is invoked under 28 U. S. C. § 1254(1).

[x] For cases from **state courts**:

The date on which the highest state court decided my case was <u>Feb. 13, 2003</u> A copy of that decision appears at Appendix ___C___.

    [ ] A timely petition for rehearing was thereafter denied on the following date: _____, and a copy of the order denying rehearing appears at Appendix _____.

    [ ] An extension of time to file the petition for a writ of certiorari was granted to and including _____ (date) on _____ (date) in Application No. ___ A _____.

The jurisdiction of this Court is invoked under 28 U. S. C. § 1257(a).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

### Amendment V [1791]

"[n]o person shall...be deprived of life, liberty, or property, without due process of law..." U.S. Const. Amend. V.

### Amendment XIV [1868]

"nor shall any State deprive any person of life, liberty, or property, without due process of law..." U.S. Const. Amend. XIV, §1.

### Pennsylvania Constitution Article 1, §9

"nor can [an accused] be deprived of his life, liberty or property, unless by the judgement of his peers or the law of the land." Pa. Const. Art. 1, §9.

### 18 Pa. C.S.A. §2502(b)

"A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principle or an accomplice in the perpetration of a felony".

### 28 Pa. Code §211.5(c)

"Records shall be retained for a minimum of 7 years following a resident's discharge or death". See Appendix-F pg. 1-3.

### 28 Pa. Code §563.6(a)

"Medical records whether original, reproductions or microfilm, shall be kept on file for a minimum of 7 years following the discharge of a patient".

### Title 49 §21.148 (1) - (5)

"Respect and consider, while providing nursing care, the individual's right to freedom from psychological and physical abuse...Act to safeguard the patient from the incompetent, abusive or illegal practice of any individual ...Safeguard the patient's dignity, the right to privacy and the confidentiality of patient information. This standard does not prohibit or affect reporting responsibilities under 35 P.S. §§10211-10224.Appendix-F;pgs. 4-5.

3

## STATEMENT OF THE CASE

The action below was a criminal prosecution of defendant/petitioner Strohl on the charge of homicide for the death of Ella Wunderly. The action was initiated by an Investigating Grand Jury in 1999 in Northampton County charged with looking into stale cases. Mrs. Wunderly died of bronchopneumonia in 1994 and it was alleged that injuries she sustained in 1986 were the cause of her death, and that the defendant was the one who inflicted the injuries. It was also alleged the victim's residence was entered and burglarized numerous times on different occasions. Specifically, Friday December 26, 1986; Saturday December 27, 1986; and Sunday December 28, 1986.

The Trial Judge made prior determinations in this case when he denied the relief requested by defendant Strohl's Omnibus Pre-Trial Motion and Motion for Post-Sentence Relief. The Superior Court of Pennsylvania affirmed these decisions. The Pennsylvania Supreme Court Denied Allowance of Appeal.

The Honorable Robert A. Freedberg entered the orders in the Trial Court; a panel of the Superior Court consisting of McEwen, P.J.E., Lally-Green and Bender, J.J. entered the order affirming the judgement of sentence in an unpublished opinion at 2097 EDA 2001. A timely Allowance of Appeal was filed with the Pennsylvania Supreme Court on October 16, 2002; that Allowance of Appeal was denied by order on February 13, 2003, No. 806 MAL 2002.

Defendant, Joseph Michael Strohl was tried before a jury on March 5-March 15, 2001 on the charge of Homicide. After the jury convicted Mr. Strohl of Murder of the Second Degree, the Trial Judge sentenced him to "LIFE" in prison as mandated by Statute. Motions for Post-Sentence relief were filed and denied. A direct Appeal was filed to the Superior Court of Pennsylvania and denied. Discretionary Review was denied by the Pennsylvania Supreme Court. This timely appeal followed.

4

## REASONS FOR GRANTING THE PETITION

The Pennsylvania State Courts have departed from accepted Judicial practices, therefore, causing conflict with decisions of the Federal Circuit Courts and the United States Supreme Court as to call for the exercise of this Court's Supervisory Authority to resolve the conflicts among the State and Federal Courts.

There are three sets of legal principles in this case, which overlap one another to some degree. All of which embrace the contours of the Due Process Clause of the Fifth[1] and the Fourteenth[2] Amendments of the United States Constitution. First, the United States Supreme Court has indicated that an inordinate delay between the occurrence of criminal conduct and the return of an indictment could run afoul of the Due Process Clause. **United States v. Lovasco**, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); **United States v. Marion**, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Second, a corollary principle of Due Process is that the defendant is entitled to be made aware of and to use, all evidence which tends to exculpate him of guilt of the charges against him. **Brady v. State of Maryland**, 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Third, is "what might loosely be called the area of Constitutionally guaranteed access to evidence". **Arizona v. Youngblood**, 488 U.S. 51, 55, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); **California v. Trombetta**, 467 U.S. 479, 484, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

Since 1977, the United States Supreme Court has not granted Certiorari to discuss in more depth the Due Process standard as established by **Marion / Lovasco**, and has only tangentially discussed the **Marion/Lovasco** standard in cases involving other issues. See **United States v. Gouvia**, 467 U.S. 180, 192, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)(Involving the right to appointment

---

1. U.S. Const. Amend. V.
2. U.S. Const. Amend. XIV, § 1.

of counsel for prison inmates confined in Administrative custody pending indictment for crimes committed in prison). See also **Youngblood**, supra., 488 U.S., at 57, 109 S.Ct., at 337 (Concerning whether Due Process rights were violated by the police destruction of evidence in the absence of bad faith motives by police). Less clear is the extent to which the Due Process Clause imposes on the State, during pre-indictment delay, the duty to take affirmative steps to preserve evidence on behalf of the defendant and the additional responsibility of guaranteeing criminal defendants access to exculpatory evidence beyond the State's possession.

### I. WHAT IS THE CORRECT TEST FOR DETERMINING IF PROSECUTORIAL PRE-INDICTMENT DELAY AMOUNTS TO A VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION?

The Due Process Clause of the State[3] and Federal[4] Constitutions "protects defendants from having to defend stale charges, and criminal charges should be dismissed if improper pre-arrest delay causes prejudice to the defendant's right to a fair trial". **Commonwealth v. Snyder**, 552 Pa. 44, 713 A.2d 596, 600 (1998). The contours of these protections have been described in **United States v. Marion**, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)(The Due Process Clause has a role to play in protecting defendants against oppressive delay such as for the prosecution to gain a tactical advantage). And **United States v. Lovasco**, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)(Holding that the Court must determine whether compelling a person to stand trial after governmental pre-arrest delay violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the Community's sense of fair play and decency).

---

3. Article 1 § 9
4. U.S. Const. Amend. XIV, § 1

The Pennsylvania State Courts are indecisive in their interpretation and application of the **Marion/Lovasco** standard. The Pennsylvania Supreme Court now departs from its original holdings in **Commonwealth v. Daniels**, 480 Pa. 340, 390 A.2d 172, 179-181 (1978). A case which was a first incursion into the area of pre-indictment delay after **Lovasco**. A case also cited with approval in **Snyder**, supra., at 601. Instead of following its own weight of authority and its own Federal Circuit Court authority, it now adopts a minority approach. See e.g., **United States v. Ismaili**, 828 F.2d 153, 167 (3rd Cir.1987).

Nevertheless, the Supreme Court of Pennsylvania has set forth the standard to be applied in the recently decided case of **Commonwealth v. Scher**, 803 A.2d 1204 (Pa.2002), cert.,_____,_____U.S._____,_____S.Ct._____,_____L.Ed.2d_____ (2003). In **Scher**, the Court held that:

> "In order to prevail on a due process claim based on pre-arrest delay, the defendant must first show that the delay caused him actual prejudice, that is substantially impaired his or her ability to defend against the charges. The Court must then examine all of the circumstances to determine the validity of the Commonwealths reasons for delay. Only in situations where the evidence shows that the delay was the product of intentional, bad faith or reckless conduct by the prosecution, however, will we find a violation of due process." As noted in the footnote, "Due Process Violation will occur in the rarest cases where the Commonwealth's conduct **'shocks the conscience'** and offends one's sense of justice." id. at 1221-1222.

The ambiguity of what the proper standard to apply is amplified by the concurring and dissenting opinions:

> "The lead opinion would adopt a subjective recklessness/conscious - shocking standard. It is here that I part ways...I concur in the judgement, I respectfully disagree with the lead opinions proposed further relaxation of the Marion/Lovasco standard. (Castille,J. concurring), id., at 1232, 1237. I join in the opinion announcing the judgement...except for...the second prong...(Nigro,J. con- curring), id., at 1237. Although I concur in the disposition..., I do not fully agree with the lead opinion analysis and conclusion surrounding the prejudice component...I believe that Appellant satisfied his burden of proving 'actual prejudice'...nevertheless.. a defendant must also demonstrate that the prejudice was substantial

7

(Saylor,J. concurring) id., at 1238. The Commonwealth's delay
in filing charges...deprived [Dr. Scher] of his due process rights
under the Pennsylvania and United States Constitutions." id.,
at 1262 (Zappala,J. dissenting in which Cappy,J. joins).

The United States Supreme Court did not decide whether both prejudice
and an improper delay are necessary to establish a due process violation
or whether one alone will suffice. Nor did the Court determine what constitutes
prejudicial delay or improperly motivated delay or allocate the burden of
proof of a due process violation based on pre-indictment delay. These and
other numerous questions left unanswered have caused discrepancy regarding
the proper test for pre-indictment delay. This is exemplified by Justice
White's dissenting opinion in the Court's denial of Certiorari in **Hoo v. United
States**, 484 U.S. 1035, 108 S.Ct. 742, 98 L.Ed.2d 777 (1988).

Prejudice is one element for determining whether pre-indictment delay
violates due process. Courts recognize only "substantial," "actual," and
"nonspeculative" prejudice. See **Scher**, 803 A.2d at 1230-31 (Castille,J. con-
curring)(citing and comparing the use of "actual" and "substantial" prejudice
among the Federal Circuits and acknowledging the uncertainty of whether a
distinct two-pronged approach is necessary to establish the prejudice prong).
To establish the requisite actual prejudice, the defendant bears the heavy
burden of proving both loss of evidence or the death or incapacitation of
a witness essential to his defense and the importance of that evidence or
witness. Proving the materiality of lost evidence may be impossible because
a defendant may not know, much less be able to prove, what testimony a lost
or dead witness might have given. See **United States v. Mays**, 549 F.2d 670, 682
(9th Cir.1977)(Ely,J. dissenting)("the burden of summoning affidavits from
buried bodies or dimmed minds will be insurmountable"); See also **Youngblood** ,

488 U.S. at 61, 109 S.Ct. at 339 (Stevens,J. concurring)("there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair").

Before indictment, a person has little reason to investigate or preserve facts necessary to a defense. The injustice of such a requirement is magnified since the evidence is lost because of the prosecutor's delay in seeking an indictment. See e.g., **Youngblood**, 488 U.S. at 69, 109 S.Ct. at 343 (Blackmun,J. Brennan,J., Marshall,J., dissenting):

> "rather than allow a State's ineptitude to saddle a defendant with an impossible burden, a court should focus on the type of evidence, the probability it might prove exculpatory, and the existence of other evidence going to the same point of contention in determining whether the failure to preserve the evidence in question violated Due Process."

One Court has concluded that a defendant can prove actual prejudice by "demonstrat[ing] the general content of the lost evidence and show[ing] that it had a material connection with his defense." **United States v. Richburg**, 478 F. Supp. 535, 540 (M.D. Tenn.1979).

Recognizing the difficulty of providing proof several courts will presume actual prejudice under certain circumstances. See e.g., **United States v. Brock**, 782 F.2d 1442 (7th Cir.1986)(two and – one – half year delay presumptively prejudicial); **United States v. Jackson**, 504 F.2d 337 (8th Cir.1974)("We hesitate to say that prejudice could never be presumed in an outrageous case of unjustified delay"); **United States v. Parrott**, 248 F.Supp. 196 (D.D.C.1965) ("[W]here the delay is substantial, prejudice may be presumed"). But see **United States v. Juarez**, 561 F.2d 65, 68 (7th Cir.1977)(refusing to adopt presumption). In **People v. Singer**, 44 N.Y.2d 241, 376 N.E.2d 179, 405 N.Y.S.2d 17 (1978); a similar situation to the case at hand, during a homicide in-

vestigation the police confronted the defendant, informed him that they knew he had committed the crime, but chose to continue the investigation. When the defendant was finally arrested and formally charged with the murder four years later, he claimed that the government deliberately delayed the accusation in order to obtain a confession from him. The Court vacated the conviction and ordered a hearing to allow the prosecutor to establish good cause for the delay. To demonstrate good cause, the prosecutor must establish more than his good faith. E.g., in **Dickey v. Florida**, 398 U.S. 30,      S.Ct.     ,

L.Ed.2d     (1970), the Supreme Court held that when the defendant was in Federal custody and available to the State for seven years, the prosecutor's good faith failure to serve him with a prompt warrant for his arrest was "intolerable as a matter-of-fact and impermissible as a matter of law." See also **United States v. Moore**, 515 F.Supp. 509 (S.D. Ohio 1981)(unexplained inaction creates an inference that delay was intentionally pursued for tactical reasons); **United States v. Dyson**, 469 F.2d 735 (5th Cir.1972)(unexplained inaction "prima facie prejudicial").

As with "actual prejudice," the Supreme Court has not determined what constitutes an impermissible reason for delay. **Marion/Lovasco** explicitly state that intentional prosecutorial delay to gain a tactical advantage or to harass the defendant is impermissible, 431 U.S. at 796 n. 16; **U.S. v. Marion**, 404 U.S. at 234. Aside from permissible investigatory delay and impermissible tactical delay, there are no clear guidelines for determining a due process violation.

Most Courts have ignored the Supreme Court's invitation to asses the propriety of reasons for delay. Instead, they have taken the Courts example of a tactical delay as a prerequisite for finding a due process violation and have routinely rejected due process claims when there is no showing of

an intentional prosecutorial delay to gain a tactical advantage. See e.g.,
**United States v. Mills**, 704 F.2d 1553 (11th Cir.1983); **United States v. Burns**,
701 F.2d 840 (9th Cir.1983); **United States v. Jenkins**, 667 F.2d 850 (10th Cir.
1983); **United States v. Peterson**, 698 F.2d 921 (8th Cir.1982); **United States
v. Lawson**, 683 F.2d 688 (2nd Cir.1982); **United States v. Brown**, 667 F.2d 566
(6th Cir.1982); **United States v. Bruscino**, 662 F.2d 450 (7th Cir.1981); **United
States v. Durin**, 632 F.2d 1297 (5th Cir.1980). This development has prompted one
Court to comment that:

> "[tactical delay] was to be taken as the minimum standard for
> [a] due process violation. It represents only a flagrant example
> of due process abuse...while it is apparent that delay caused
> by an intent to harass the defendant or to gain a tactical ad-
> vantage over him would pass constitutional muster, the [Supreme]
> Court did not rule out the possibility that other unconstitutional
> reasons might exist." **United States v. Radmall**, 591 F.2d 548, 552
> (10th Cir.1978)(McKay,J. dissenting).

In **Lovasco**, the court implied that a reckless delay would be impermissible.
**Lovasco**, 431 U.S. at 795 n. 17. At least one other court has reached the
same conclusion, **United States v. Walker**, 601 F.2d 1051, 1056 (9th Cir.1979).
Others have stated that negligent delay may also be impermissible. See **United
States v. Richburg**, supra.; **United States v. Briney**, 686 F.2d 102, 105 n.1 (2nd
Cir.1982); **United States v. Rubin**, 609 F.2d 51, 66 (2nd Cir.1979)(The court
hinted that delay need not be intentional to be impermissible. It concluded
that delay must be fundamentally unfair, "such as would occur" if it was
intentional and tactical); **United States v. Lewis**, 514 F.Supp. 169, 180 (M.D.
Pa.1981). But see **United States v. Comosona**, 614 F.2d 695, 696 n.1 (10th
Cir.1981)(negligent delay insufficient).

Another area of ambiguity is whether a finding of both actual prejudice
and impermissibly motivated delay, is necessary, or whether one element is

sufficient. The Supreme Court decisions do not resolve this issue. **Marion** ap-
pears to require proof of actual prejudice for a due process violation, **Lovasco**
hinted that there may be exceptions; "Thus, **Marion** makes clear that proof
of prejudice is generally a necessary but not sufficient element of a due
process claim." **Lovasco**, 431 U.S. at 790, 97 S.Ct. at 2048-49. One Court
has concluded from this language that intentional tactical delay violates
due process whether or not it prejudices the defendant. **United States v. Medina-
Arellano**, 569 F.2d 349, 352 n.2 (5th Cir.1978). See also cases cited in **United
States v. Mays**, 549 F.2d 670, 675 n.7 (9th Cir.1977). Since **Lovasco**, however ,
the majority of Circuits require a showing of actual prejudice. **Clark v. State**,
774 A.2d 1136, 1150 (Md.2001)(also citing State court cases at 1156 n.23).
Other decisions have applied a balancing approach, considering the amount
of prejudice to the defendant and the reasons for delay. See **United States v.
Crouch**, 84 F.3d 1497 (5th Cir.1996)(en banc), cert. denied, 519 U.S. 1076,
117 S.Ct. 736, 136 L.Ed.2d 676 (1997); **United States v. Sowa**, 34 F.3d 447 (7th
Cir.1994); **Howell v. Barker**, 904 F.2d 889 (4th Cir. 1990). These diverse
applications and interpretations cannot be in accord with substantial justice.

## II. WAS THE PETITIONER DENIED DUE PROCESS BY THE LOWER COURTS FAILURE TO CONCLUDE THAT PETITIONER SUFFERED ACTUAL PREJUDICE DUE TO THE PASSAGE OF TIME BETWEEN THE CRIME AND COMMENCEMENT OF THE PROSECUTION?

Petitioner points to the following areas as giving rise to actual pre-
judice (i) Lost and destroyed medical records of the victim that are necessary
to prepare a proper defense and obtain a proper opinion as to the cause of
death of the victim; (ii) Lost and destroyed physical evidence; and (iii)
The fading of witnesses memories and the death of the Investigating Officer.

### i. THE MEDICAL RECORDS

The Commonwealth's theory was that the victim was beaten in the course

12

of a home burglary on December 26, 1986. She died from bronchopneumonia in 1994. Dr. Fillinger, the Commonwealth's Expert, testified that information contained in medical records is very important, N.T. 368-73,[5] and more information may change an opinion, N.T. 409. See also O.T. 20-25.[6] Dr. Mihalakas, another Commonwealth expert testified to the importance of the radiology (e.g., CAT Scans and X-Rays) data, N.T. 235-36. In this case there is circumstantial, direct, and documentary evidence that these records were in fact important. For instance, it is unusual for a person to live for so many years after the injuries described, N.T. 379. Heart disease was also a contributing factor, N.T. 398. Here not only are the records from the nursing home where the victim was residing at the time of death missing, but also the records from the Quakertown Hospital that show the victim suffered injuries subsequent to being assaulted. The victim, depicted by the Commonwealth experts as an individual who "remained in a coma until death", N.T. 239, 240, 270, 289, 291, 295, 304-306, 368, 370, was taken to the hospital with a broken arm, a broken leg, had a history of stroke and a history of congestive heart failure. The records from the residential facility would have shown how these injuries occurred, and how she was being treated afterwards; given that they are inconsistent with a patient described as "comatose" and "immobile". Also the records would have shown whether the bronchopneumonia had been diagnosed and whether or to what extent it was being treated.

The Commonwealth presented Dr. Isadore Mihalakas, Dr. Lucy Rorke, and Dr. Halbert Fillinger for their expert opinions that the injuries inflicted in 1986 caused the death in 1994. The experts attempted to create "an unbroken chain of events" which Fillinger characterizes as a "domino effect", N.T.359, where the injuries led to bronchopneumonia which was how the victim died

---

5. The abbreviation "N.T." refers to the Trial Transcripts.
6. The Abbreviation "O.T." refers to the Omnibus Pre-Trial Hearing.

ultimately. The injuries alone, however, do not cause pneumonia, N.T. 239–240. There are also other circumstances that also lead to bronchopneumonia, some of these apply to the victim. According to Dr. Mihalakas, healthy people, alcoholics who aspirate vomitous, elderly people, people with alzheimers, people in nursing homes are all candidates for bronchopneumonia, N.T. 241–243. In short, anyone who is immobile for extended periods, such as a person who has had a hip injury as the victim mysteriously suffered, N.T. 873 and has heart disease, N.T. 873 is at risk of bronchopneumonia. The missing medical records are a gap in the evidence, as well as a gap in the expert's theory of "domino effect". This gap is somewhat synonymous with the dynamics of falling dominoes - i.e., if there is a major gap left between the spacing sequence of the domino, it will eliminate the continuum effect that one is trying to achieve and cause a failure .

The State's experts in this case based their conclusions solely on what was told to them, N.T. 239, 304, 380. The experts will opine only on the evidence presented to them. In Pennsylvania, causation is an essential element of the charge of Criminal Homicide, which the Commonwealth must prove beyond a reasonable doubt. **Commonwealth v. Webb**, 449 Pa. 490, 494, 296 A.2d 734, 737 (1972). Missing evidence effects the opinions and absent supporting medical records, the expert's conclusions are little more than guesswork, guesses, even if educated, are insufficient to prove causation in this case. The guesswork of Dr. Fillinger is supported by his failure to produce any data to support his opinion that "the manner of death, which is a statistical characteristic, is homicide", N.T.401. This contradicts his earlier testimony that "manner of death refers to the circumstances that brought this death about. We may have a person who has a broken leg, but we need to know how

14

he got it broken. Was he hit by a car, did he fall off a tree, what caused the fracture that caused his death " N.T. 361.

"The trial judge must ensure that any and all Scientific testimony or evidence admitted is not only relevant, but reliable. The subject of an experts testimony must be 'scientific...knowledge'. The adjective 'scientific' implies a grounding in the methods and procedures of Science. Similarly, the word 'knowledge' connotes more than <u>subjective belief or unsupported speculation</u>. In order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation, i.e., 'good grounds', based on what is known. In short the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability. <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579, 589-91, 113 S.ct. 2786, 2795, 125 L.Ed.2d 469 (1993).

The missing records are a gap in the evidence that caused actual prejudice to petitioner and thus, he cannot obtain an opinion or comparable evidence, based on all relevant information because so much is missing. Dr. Hoyer, the defense expert, testified and supported the prejudice; contrary to the Superior Court's Opinion. Appendix-A.

> "she acutely dies because she develops pneumonia and in that re-
> spect I'm in agreement with Dr. Fillinger...The question is what
> caused her to have the pneumonia and with absolute certainty we're
> never going to know. Pneumonia is sometimes called the old man's
> friend because it's a very common way for older people to die
> who have almost any other condition or no condition...but not
> real helpful. It explains why she died, it explains the nexus
> of why she died, she died of this infection, but it doesn't tell
> us how she developed this infection, what things made her susceptible
> to infection." N.T. 872.

The resulting prejudice to petitioners defense due to his experts failure

to be able to give an informed opinion was compounded by the Commonwealth's deliberate tactics at trial to disparage the opinions of Dr. Hoyer which were contrary to the State's theory. The Commonwealth flatly contradicted Dr. Hoyer's observations by suggesting to the jury that as a Assistant Medical Examiner he was incompetent to make even the simplest observations and claimed that he was being "paid off" by the defense for his testimony, N.T. 858-864, 874-885. The Commonwealth's evidence and experts did not and could not prove beyond a reasonable doubt that the head injuries were a "direct and substantial factor" in causing the death of the victim. Contrary to the Trial Court's assertion in its opinion that "the victim was rendered comatose and immobile", Appendix-B, pg. 1. Dr. Fillinger admitted that he had not been provided and had not considered the victim's responsiveness, albeit diminished, to questions and stimuli, N.T. 386-401, such as saying "hi", paging through magazines, folding her hands in prayer, answering questions "yes" or "no", looking out the window when asked about the weather, and responding to a question if her arm hurt? She says, "a little bit".

It is true that the prosecutor may be selective and use only that which they believe will have a persuasive effect on the jury. What they may not do is suppress or secrete information known to them which does not fit into the narrative, or which refutes the evidence used to support that narrative, or which may diminish the credibility of the evidence relied on to tell the tale. Stated simply, the prosecutor must not present proof of an historical narrative that they know not to be true. They must disclose to the defense the information known to or available to them which may develop doubt about the truth of the Commonwealth's narrative.

To the extent that the opinions attempted to link the head injuries

of 1986 to the death from pneumonia in 1994, the opinions were improper and nugatory in the absence of the medical records from the nursing home in which the victim was living at the time of her death. Lana Snyder testified, N.T. 794-801, there are relatively complete records for the victim but only up to 1989, and bits and pieces of records that stop in 1991. There are no records for the last three years of the victim's life and, thus, no record of what condition she was in that may have explained the cause of pneumonia. Further, 1992 records from Quakertown Community Hospital show that the victim suffered a broken arm, N.T. 373-74, and noted that she had a history of C.V.A. which Dr. Fillinger explained the layman understands as a stroke, N.T. 374. May 1993 records disclose a history of congestive heart failure and a broken leg, N.T. 374-75.

Dr. Fillinger testified, N.T. 357, there was a depressed skull fracture in the left occipital area in the back of the skull where the bone has been driven into [sic] the brain. Dr. Mihalakas' initial examination and report make no reference to any skull fractures, C.Ex. 1.[7] Without actually observing any skull fracture and relying solely on what was told to them by Dr. Fillinger, both Dr. Rorke, N.T. 300, 306 and Dr. Mihalakas, N.T. 249-50, testify that the victim received a skull fracture. This puts forth the illusion that this skull fracture occurred in 1986, N.T. 306, during the assault of the victim, therefore rendering her comatose for the rest of her life. Contrary to Dr. Mihalakas' own report and observations; also contrary to Dr. Rorke's testimony that the injuries occurred in 1991 or 1992, N.T. 303. Further, this improper bolstering of the credibility of Dr. Fillingers credibility allows both Dr. Rorke, N.T. 296, 299-300, and Dr. Mihalakas, N.T. 180-212, to testify that Dr. Fillinger's conclusions as to the cause of death in 1994 were consistent

7. The abbreviation "C.Ex." refers to the Commonwealth's exhibits at trial.

with what Dr. Mihalakas observed in 1986 and vice-versa, N.T. 334-360.

The Superior Court of Pennsylvania erroneously affirms the judgement and opines that "actual prejudice" cannot be established and this "is sealed by the testimony of four medical doctors at trial that gave testimony that supported the Commonwealth's claim that the victim died from injuries to her head." Appendix-A, pg. 5. However, the Superior Court fails to rule on the merits and sidesteps the real question. That being, which of the injuries caused the death. The ones that occurred at the time of assault or the ones that were inflicted after the assault; and whether the expert's opinions were mere speculation without the appropriate medical records. See Appendix-E, "Motion for New Trial". As Dr. Hoyer testified, contrary to the Superior Court's interpretation; "Without absolute certainty were never going to know," N.T. 872. In short, the victim enters the hospital unconscious with a fractured jaw, a small fracture of the eye socket, facial swelling and contusions, and a bruise behind the left ear, N.T. 198-204; C.Ex. 1. The victim is eventually diagnosed with no other abnormalities to the head and is on a slow uphill course and relocates to LifeQuest, D.Ex. 4.[8] Seven and one-half years later the victim dies of bronchopneumonia due to **multiple** injuries of the head. The victim now has a fractured skull, N.T. 357, a broken arm, N.T. 373-74, a broken leg, N.T. 375, and abnormalities in the front and right side of the head, N.T. 275-76. Only someone regularly caring for the victim has the continuing opportunity to inflict these types of injuries; an isolated contact with a vicious stranger would not result in this pattern of succesive injuries stretching through several years.

These broad sweeping assumptions allow the State to present a false scenerio and create a picture perfect theory based on ipse dixit conclusions

8. The abbreviation "D.Ex." refers to the defense exhibits at trial.

18

by their experts on the essential element of causation. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' non-disclosure of evidence affecting credibility falls within [the] general [Brady] rule." **Giglio v. United States**, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed. 2d 104 (1972), citing, **Napue v. Illinois**, 360 U.S. 264, 269, 79 S.Ct. 1173,1177, 3 L.Ed.2d 1217 (1959). The missing records contained information that would have presented a more accurate picture of the victim's health, and whether her pneumonia was diagnosed and treated, as well as the additional evidence of injuries, stroke and heart failure. Further, these records, CAT Scans, and X-Rays would have revealed when and where these additional injuries were sustained. There was no way of testing the reliability of the State's expert's opinions because of the missing medical data, nor was petitioner afforded the opportunity to present to the jury a proper and conclusive opinion in accord with his defense theory that intervening and superseding injuries caused the death. In turn, depriving the defendant the opportunity to present a full defense and obtain an informed opinion as to the cause of death. The petitioner was therefore, prejudiced by the Commonwealth's delay.

It is ironic **Marion** discusses other mechanisms to guard against possible as distinguished from actual prejudice resulting from pre-indictment delay. Citing, **United States v. Ewell**, 386 U.S. at 122, 86 S.Ct., at 777 as saying 'the applicable Statute of Limitations...is...the primary guarantee against bringing overly stale criminal charges.' **Marion** goes on to say that "such statutes represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice." **Marion** 404 U.S. at 322, 92 S.Ct., at 464. While there is no Statute of Limitations on Murder in Pennsylvania, **42 Pa. C.S. §5551**. There is, however, Statutes of Limitations

for the preservation of medical records, Insurance records, and Department of Health records. The point here is petitioner made numerous attempts to obtain comparable evidence for the missing medical records. Appendix-F, pg. 6-8. Specifically, **Title 28 Pa. Code §§ 201-211.5, 563.6**, requires medical records to be kept for a minimum of seven (7) years after the death of a patient. **Title 49 §21.148(3)(4)** and **"The Elderly Abuse Act"**, 35 P.S.§§10211-10224(App.F) mandates the documenting and reporting of any abuse or accidents which occur while caring for a patient. These Department of Health Records, had they been available would have shown when these accidents or mishaps would have occurred. The insurance records would have also provided somewhat of the same showing. However, everywhere petitioner turned, it was the same ol' story, "We are sorry, we only retain records for seven years". Appendix-F, pg. 7. These Statutes of Limitations provided the defendant with no protections in "receiving justice" because of the Commonwealth's delay.

### ii. The Physical Evidence

Petitioner suffered actual prejudice when the North Catasauqua Police Department destroyed exculpatory evidence in their possession. Specifically, latent fingerprints, the victim's bloody nightgown, a videotape of the crime scene, blood, hair, and fibers. N.T. 916-25. All evidence having been destroyed prevented the defendant from being able to have it tested for DNA or other Scientific or Forensic results which would have aided his defense.

"A corollary principle of Due Process is that the defendant is entitled to be made aware of, and to use, all evidence which tends to exculpate him of guilt of the charges against him. **Kyles v. Whitley**, 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Also, where as here, the State has seized evidence which it believes is probative of guilt, the rules by which our

20

trials are conducted make that evidence available for examination by the defendant so that he may mount any available attack upon its use against him and so that he may use it in his defense if it tends to exculpate him. **Pa. R. Crim. P. 573 (B)**. To this end, a defendant is entitled, with proper restrictions and conditions, to have evidence tested and examined so that he may make any meaningful use of any exculpatory value which it has and so that he may, if possible, counter its inculpatory effects.

During the Grand Jury, Trooper Vazquez testified, there were signs of a severe struggle, GJT. 167, 3/11/99.[9] Dr. Mihalakas' testimony at trial also suggests that a struggle occurred because the victim suffered defensive type bruises-defensive meaning someone is alive and conscious, N.T. 203. As a result of this struggle and assault, blood was observed on the floor and walls of the home, N.T. 696; C.Ex. 33A, and B, and also on the victim's nightgown. Without direct evidence, Trooper Vazquez testified that the blood on the wall and floor was the victim's, N.T. 763, and is evidence that the victim was struck while down, N.T. 729-30. This inference-on-inference created by the State does not pass muster to indicate and support their theory that this blood was only that of the victim and therefore possessed no exculpatory value. One can reasonably infer that this blood belonged to the victim, the assailant, or both. The latter being supported by two facts. First, the house was entered by smashing of a rear door window, N.T. 449. One can infer the assailant was cut in the process of entering the residence. Second, the signs of a severe struggle indicate that the assaulter left some type of inculpatory evidence behind. On this record it is beyond serious question that a reasonable

---

9. The abbreviation "GJT" refers to the Grand Jury notes of testimony.

Law Enforcement Agent would recognize, before the evidence was destroyed, that it was of potentially exculpatory value.

Fingerprints, blood, hair, and tissue samples, as well as other body fluids have been used to implicate guilty defendants and to exonerate innocent suspects. Here what was destroyed was not only impeaching evidence, but also evidence so critical as to call for the possibility of complete exoneration of the defendant. Considering the defendant voluntarily gave police hair and fingerprints, which were found not to match those recovered by police, N.T. 726-27, only supports the constitutionality of the destroyed evidence. E.g., advances in Serology and DNA testing now permit the isolation and iden-tification of additional blood factors, including histocompatibility antigens, blood enzymes, and serum proteins along with the individualizing of other body fluids. Had the bloody nightgown of the victim, along with the blood samples from the wall and floor, and the hairs been available for testing. Comparisons could have been made to actually determine who it belonged too. If tested, the DNA of the unidentified hairs, could have provided a DNA match to blood on the wall or the blood on the nightgown. Completely exonerating the defendant. Likewise, this DNA comparison could have completely inculpated the defendant by a comparison match to his own DNA. The significance of this evidence is highlighted by the Grand Jurors; who were interested to know whose blood was found on the victim's nightgown, GJT. 168, 3/11/99.

The destroyed videotape and latent fingerprint lifts also hinder the defense in this case. The destroyed videotape prevents the defendant from obtaining a blood spatter expert. The shape, position, and extent of blood stains often give valuable information about the circumstances surrounding the commission of a crime. Blood falling from different heights forms stains

of different shapes which are further modified by the angle at which the blood drop hits the surface. The videotape would have also aided the defense in determining whether proper procedures were used in the collection of evidence. It would have provided a more accurate assessment of the crime scene techniques used by police and would have aided the defense in showing the jury why the techniques used by police should be questioned. The State's own use of still photos only brightens the importance of a clear picture to present to the jury and magnifies the import of the videotape to the defense. The 3 X 5 photos do not present a clear description or depiction of the crime scene blood spatter in order to obtain a proper blood spatter opinion. Of equal importance are the latent fingerprint lifts. Trooper McKinnon testified, "the latent fingerprints were compared with the petitioner's, Robert Shull, and the victim's, N.T. 470. They were not run through AFIS (Automated Fingerprint Indexing System) because AFIS was not operational until 1990, N.T. 477. The defendant was denied the opportunity to run the prints through AFIS. The AFIS system would have enabled a computer to scan through hundreds of thousands of fingerprints, possibly obtaining a match instead of relying on the obsolete naked eye technique used by Trooper McKinnon. This is not a farce considering it has been used quite recently to crack a 45 year old murder case, Appendix-F, pg. 9 .

Advances in technology may yield potential for exculpation where none previously existed. The DNA testing process has been acknowledged by the Courts as well as the National Scientific Community for its extraordinary degree of accuracy in matching cellular material to individuals. See **State v. Thomas**, 245 N.J. Super., at 433-34, 586 A.2d at 252-53; **Commonwealth v. Rogers**, 413 Pa. Super. 498, 511, 605 A.2d 1228, 1235 (1992), and the authorities and

literature referenced therein. The primary goals of the Court when confronted with a request for use of a particular discovery device are the facilitation of the administration of justice and the promotion of the orderly ascertainment of the truth. Moreover, where the State possesses exculpatory evidence, such evidence is discoverable. The potential for exculpation by DNA comparison parrallels the potential for accurate identification. **Sewell v. State**, 592 N.E. 2d 705, 707-708 (Ind. App. Dist. 3 1992).

In this case, the defendant requested evidence to be tested during the pre-trial stages. This argument mimics those of numerous State Courts who have considered the question of a defendant's post-conviction entitlement to DNA testing. See **State v. Thomas**, supra., (Discussing DNA testing as well as its evolution as a diagnostic tool in criminal cases and suggesting that the States failure to submit material for DNA analysis may implicate its obligation to reveal exculpatory evidence set forth in **Brady v. Maryland**, id., 245 N.J. Super., at 432-34, 586 A.2d at 252-53. And concluding that consider- ations of fundamental fairness require the DNA testing. id., 245 N.J. Super. at 435-36, %86 A.2d at 254); **Sewell v. State**, supra., at 708 (**Brady v. Maryland** is implicated in post-conviction requests for forensic tests only where a conviction rested largely on identification evidence and advanced technology could definitively established the accused innocence); The Courts of Minnesota and Connecticut have similarly found DNA testing to implicate the concerns at issue in **Brady v. Maryland**; See **State v. Schwartz**, 447 N.W.2d 422, 427 (Min. 1989)(providing that constitutional concerns addressed in **Brady** encompass information relating to DNA testing because such evidence is material to the issue of guilt and could have an impact on the trial outcome; accordingly, such evidence must be disclosed to the defendant); **State v. Hammond**, 221 Conn.

264, 290-96, 604 A.2d 793, 806-08 (1992)(Indicating that the State's failure to have DNA tests performed on the vaginal swabs taken from the victim where DNA tests previously performed on the victim's clothing exculpated the defendant may have constituted a breach of duty to disclose exculpatory evidence which would have affected the outcome of the case); But See **Arizona v. Youngblood**, 488 U.S. 51, 58-59, 109 S.Ct. 333, 337-38, 102 L.Ed.2d 281 (1988)(providing in dicta, that due process clause is not violated when the police fail to use a particular investigatory tool, such as a newer test, on semen samples).

Due Process is not a technical conception with a fixed content unrelated to time, place and circumstances. It is flexible and calls for such procedural protections as the particlar situation demands. Clearly, an advance in technology may constitute such a change in circumstances. Here, the Commonwealth chose to delay the prosection of charges, O.T. 153 et seq. This decision to delay should have surely afforded the defendant the opportunity to take advantage of the technological advances of Science. Clearly a defendant similarly situated, excluding delay, and being tried now would be entitled to DNA testing of the physical evidence. For refutation of the charges, there is no acceptable alternative to Scientific testing by experts of his choice. While it is unclear what DNA testing would ultimately reveal. Had tests been conducted and found to exculpate or exclude the defendant as the perpetrator, admission of the tests results and other evidence may well have provided sufficient reasonable doubt to secure an aquittal. In the alternative, inculpatory results would certainly have strengthened the Commonwealth's case by providing concrete corroberation of the weak inferences used to convict the defendant. If DNA testing could exclude blood from the attacker as belonging to the defendant; it would strongly impeach the credibility of the

already State's shaky witnesses; none of whom were eyewitnesses. To deny the defendant the opportunity to prove his innocence with such evidence simply to ensure finality of conviction is untenable.

It is ironic that prosecutors all over the United States have used DNA to crack old stale cases. Likewise, Inmates, including those on Death Row , have been released and exonerated through such testing, Appendix-F, pg.10 . Yet, an accused, because of a delay; which was no fault of his own, and what may have been nothing more than police and prosecutor ineptitude was denied the same. Fundamental fairness, equality, and the principles of justice require more, and requires this Court to right the miscarriage(s) of justice. It should be concluded that the suppressed medical records and the destroyed physical evidence are each standing alone, sufficiently prejudicial to merit relief under **Brady**, and they are a fortiori sufficiently prejudicial when analysed together.

### iii. The Faded Memories and Death

A defendant who claims actual prejudice from the faded memories of witnesses, must show in concrete terms how the loss of memory has deprived him of the ability to defend against the charges; general allegations of prejudice are not sufficient. **Commonwealth v. Scher**, 803 A.2d 1204, 1229 (Pa. 2002); **United States v. Valenzuela-Bernal**, 458 U.S. 858, 874, 102 S.CT. 3440, 3450, 73 L.Ed.2d 1193 (1982)("At least a 'plausible theory' of how the testimony of the deported witness would be helpful to the defense must be offered").

In order to convict the defendant of Felony Murder, the Commonwealth was required to prove first that a felony was committed, **18 Pa. C.S.A.§2502(b)**. The Commonwealth's theory was that the victim's home was burglarized, initially, on December 26, 1986 and that it was during that burglary that the victim was beaten, suffering the injuries described to the jury. Without direct

26

evidence, the Commonwealth attempted to create the inference of a burglary having been committed on the 26th through the testimony of the Cecala family. N.T. 578-598. The family testified about the specific dates and said that they thought they saw what turned out to be a purse on Saturday, December 27th and picked it up on the 28th, N.T. 580, 594. This testimony based on a process of elimination, reasoning, and speculation, N.T. 584-85, conflicts with the Doctorine of Positivism and is also contrary to their testimony before the Grand Jury. Compare N.T. 578-98; to GJT 3-31 3/8/99; 49-58 4/8/99; and O.T. 36-46. The faded memories of the Cecala's allows the Commonwealth to set the foundation that if the purse was first seen on the 27th, it must have been taken during a burglary the night before; namely on the 26th. But see Strohls negotiated guilty plea colloquey where Strohl plead guilty to Stealing the purse during a burglary on the 27th. Appendix D, pg.3 . See also GJT 59; 65-66, 3/18/99. The faded memories of the Cecalas allow the Commonwealth to use a burglary to which petitioner was already convicted and use that burglary as the underlying felony in the trial for Second Degree Murder. The Doctorine of Collateral Estoppel prohibits this. **Ashe v. Swenson** , 397 U.S. 436, 442-444, 90 S.Ct. 1189, 1193-94, 25 L.Ed.2d 469 (1970). The problem here is only compounded by the death of the lead investigator; considering Officer Snell presented the fact at Strohls Guilty plea hearing.

The faded memory of Larry Krautsack hampered the defense by preventing the petitioner from persuing and presenting evidence that "Mrs. Wunderly [the victim] was dropped on her head while at the nursing home and Richard Wunderly didn't want anyone to know about it because he wanted her death to be attributed to the break-in and Joseph Strohl." Appendix F pg.11,12. ¶11.

### A. LOOKING FOR THE REASONS FOR THE DELAY, THERE WAS NO SUBSTANTIALLY NEW EVIDENCE PRODUCED BETWEEN THE TIME OF DEFENDANT"S ARREST ON THE CHARGE OF BURGLARY IN 1987 AND THE INITIATION OF THE HOMICIDE CHARGES.

The holding of **Snyder** suggests that it is not merely new evidence which justifies prosecuting a stale case; rather the new evidence must be substantial. Here the evidence that is supposedly new was the testimomy of Shull that on December 27, the day after the alleged events giving rise to this prosecution, he actually went into the house further than he had admitted in connection with his guilty plea for the burglary of the 27th. Also a statement by Bill Notti that [Petitioner] said "shut up or I'll kill you, too" is claimed to be substantial new evidence. This is not true given the suspect circumstances in which the statement was obtained, discussed below. See also N.T. 748-760.

### B. THE COURT'S RELIANCE ON THE HEARING TESTIMONY OF TROOPER VAZQUEZ CONFLICTS WITH THE INFORMATION IN TROOPER VAZQUEZ'S REPORTS AND THE TESTIMONY BEFORE THE GRAND JURY.

At the hearing on defendant's pre-trial motion to dismiss for undue delay. Trooper Vazquez testified that Notti provided information that Joe Strohl said, "shut up or I'll kill you, too." O.T. 164. That information was not what Notti told the grand jury, N.T. 617, does not appear in any other officers reports, and while it is in Trooper Vazquez's notes, the full statement is that Strohl said, "shut up or I'll kill you" or "shut up or I'll kill, you too". Thus, this information should not have been characterized as substantially new evidence justifying the instant prosecution.

### C. THE "NEW INFORMATION" WAS THE DIRECT RESULT OF OVERZEALOUS AND OVERBEARING PROSECUTORIAL MISCONDUCT IN ELICITING THE TESTIMONY OF WILLIAM NOTTI.

The transcript of the Grand Jury proceedings reveal what can happen when the prosecutor is to determined to obtain an indictment. Most importantly,

these transcripts reveal many instances of moral turpitude, undue influence, and inducement by police and prosecutors to taint and tamper with the immemorial recollections of witnesses and their prior testimony. All in order to change the status quo ante of the case. In 1986, police interviewed Notti three times, and again in 1996. On all occasions Notti told the police that he knew absolutely nothing. In 1999 Notti testified three times before the grand jury and was interrogated a slew of times by police and prosecutors before, during, and after testifying. Notti was taken to the crime scene, GJT. 105, 6/3/99, and driven to and from the grand jury by Trooper Vazquez, GJT. 124, 6/3/99. Trooper Vazquez also testifies that for a couple of beers he plans to keep in touch with Notti and admits they have been with him on four different occasions already. GJT. 125-26, 6/3/99. But this is not enough, the District Attorney, hereafter "D.A.", admits we have work to do with the witness [Notti]. GJT. 62, 4/22/99. Notti is then given certain instructions by Judge Freedburg. GJT. 81, 6/3/99. It was not until after the D.A. threatened to haul Notti before a judge on perjury charges and threatened to incarcerate him until his memory improved, N.T. 624-631, that the statement "shut up or I'll kill you , too!" is supposed to have been said. However, the last time Notti testified before the grand jury the statement that he now recalls being said was only "shut up or I'll kill you". N.T. 617.

The standard of review for examining the discretionary actions in an investigative grand jury should be the same as that which was articulated by the Court **In Re Petition of Accehione**, 425 PA. 23, 227 A.2d 816, 820 (1967) ("the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the Agency's duties or functions."). Here there was such an

abuse of discretion, as noted in **Commonwealth v. Smart**, 368 Pa. 630, 84 A.2d 782, n.3 (1951). "The function of the prosecuting officer is to attend on the grand jurors with regard to matters on which they are to pass, to aid in the examination of witnesses, and to give such general instructions as they may require, but he must not attempt to influence their actions nor indeed should he be present while they are deliberating on the evidence or voting on a matter under investigation". Thus, the Pennsylvania Supreme Court **In Re Investigating Grand Jury**, 518 Pa. 485, 544 A.2d 924, n.6 (1988) found the following questioning amounted to prosecutorial misconduct:

> Q. Miss Lees, I just want to remind you of where I'm going because I think I told you this last time, I want to make sure that you remember this. I think that you were at those burglaries and I think I can prove that. I think I can prove it beyond a reasonable doubt and if you had not entered a plea to those offenses that's exactly what the Commonwealth intended to do. I think that Edward Doria was there with you because you can't drive so you can't get there without somebody else and it was Edward Doria's car that was there during those burglaries. If I can prove that you're lying here today or during your prior testimony I am going to try to send you to jail for each time you have lied and I think I can prove that with the testimony of Edward Doria. If I have to I'll make a deal with him, even though I'd prefer to just take testimony from you, let you go home and use the truth against Mr. Doria, but if I have to deal with Mr. Doria and prove that you're lying. Please keep that in mind during the rest of this questioning. Allright. You say that you have no idea whether you participated in a burglary in your life?

Prosecutors are not permitted to attempt to influence a grand jury by expressions of personal opinion, **Smart**, supra., See also **Gershman Prosecutor Misconduct**, § 2.3 (b)(1986)(hostile questioning and implications that witness is lying generally viewed as misconduct).

In the Federal System a harmless-error inquiry applies to claims of prosecutorial misconduct before a grand jury. There must be a showing of of actual prejudice to the defendant. **United States v. Breslin**, 916 F.Supp 438

(E.D. Pa.1996), quoting **Bank of Nova Scotia v. United States**, 487 U.S. 250, 255-56, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 288 (1988). There is "prejudice" only "'if it is established that the violation substantially influenced the grand jury's decision to indict' or there is grave doubt that the decision to indict was free from substantial influence of such violations." Id.(citing **United States v. Mechanic**, 475 U.S. 66,78, 106 S.Ct. 938, 945, 89 L.Ed.2d 50 (1986)).[10]

In this case the District Attorney told Notti:

"I am not going to fool around with you, do you understand that. GJT. 80, 3/25/99. I will have you in front of the judge, and you will be sitting in Northampton County Prison for contempt of the grand jury. GJT. 40, 4/22/99. That is not what we heard from ten witnesses. I don't think that ten witnesses are lying. GJT. 40-41, 4/22/99. I want to know the truth sir, or I will have you before a judge for perjury. Do you understand that? N.T. 624. You are not going to be evasive. You are not going to sit there and lie to this grand jury. N.T. 624. Mr. Notti responds, you are trying to put words in my mouth. GJT. 43, 4/22/99. The D.A., not liking Notti's answers continues his gestapo like tactics and tells Notti, Were you just like a dumb person...do you think playing dumb...will get you off the hook? GJT. 44-45, 4/22/99. Are you trying to play dumb N.T. 628. I am asking you questions and I want Straight answers, N.T. 629. I'm trying to find out the truth about what you overheard. I know for a fact that you were present in your car when Strohl [the defendant] was talking to Shull about going in that house and I know for a fact and I want to know why you won't tell us the truth on that, N.T. 629. After being berated, Notti answers, I didn't hear them say anything N.T. 630. The D.A. then threatens, do you think your memory would be refreshed if we had you sit over in Northampton County [Prison] for a couple of days? Do you think we could get your memory a little better then? N.T. 631.

Notti was excused, re-interviewed by police and prosecutors, and brought back before the grand jury at a later date when he testifies about the in-

---

10. Of worthy note is the fact that presentments, while provided for in the 5th Amendment to the U.S. Constitution are now considered obsolete in the Federal System, and they are no longer included by Statute as a charging document. See, In RE Grand Jury Proceedings, 813 F.Supp. 1451, 1462 (D.Co.1992)

criminating statement attributed to the defendant here, N.T. 617.

Notti's grand jury testimony was the product of prosecutor and police intimidation, and was tainted by the prosecutor's inclusion in his questions of incorrect statements of witnesses prior testimony. This is revealed through Notti's own testimony:

> "I knew it from you, you said it was John, you told me it was a John guy, GJT. 91, 6/3/99. What I heard from you. I can't be certain of that. GJT. 103, 6/3/99. I don't know if I read it in the paper or I heard it from you...I may have heard it from the police." GJT. 110, 6/3/99.

There is ample evidence to support the view that an attempt was made by the prosecutors and police to "shape" Notti's testimony and that it was successful, and therefore the improper influence did not affect the credibility , it affected admissibility. Therefore, if it had been stricken or suppressed, there would not have been sufficient evidence to convict. See e.g., **United States v. Bazzano**, 570 F.2d 1120 (3rd Cir.1977). See also Notti's grand jury testimony:

> "It was in the Fall or Winter, He might have had a -- his shirt and something wrapped in his shirt. I can't say for sure, GJT. 87-88, 6/3/99. Q. Did you ever see anyone throwing anything out your car? No, not that I remember. GJT. 108, 6/3/99.

But see and compare Notti's Trial testimony. Notti testified that he saw Strohl on Friday or Saturday around Christmas return to his car with a purse and money. Later that night Notti observed that something was thrown from his car (refering to the purse) as he drove to Emmaus, N.T. 606-608. It should be concluded that Notti was nothing more than the prosecution's "Straw Man". Prejudice of this order cannot be eliminated at trial, and the Court [should] not speculate that the grand jury's decision might have been unaffected by the prosecutor's and police conduct. **United States v. Lawson**, 502 F.Supp. 158, 172 (1980).

Unfortunately, the psychological manipulation of Notti is not the end to the egregious conduct by the prosecution or police to manipulate the perceptions of reality. The record contains ample amounts of official animus directed towards the defendant. Trooper Vazquez testified:

> "If you ask me about the beating about the face, I could tell you something about that, about profiling. GJT. 172, 3/11/99. Joe Strohl's propensity to violence was quite evident. GJT. 202, 3/18/99. I believe it was Joe Strohl. Yes I do believe...and I don't believe it was Bobbyjo Shull, it was Joe Strohl. He is nothing more than a liar. There were people afraid of Joe Strohl...and he was a scrawny punky little kid." GJT. 155-158, 4/15/99.

Without direct or substantial evidence, Richard Wunderly, the victim's son testified, inter alia, that the Strohl family was "dysfunctional," "totally destructive, and did not have any respect for the law". GJT. 19-20, 3/11/99. Wunderly also opines that "there was animosity" between his mother, and the Strohls, and that the victim was afraid of the defendant. GJT. 21-24, 41 3/11/99. He further testified he had received an anonymous telephone call telling him to "check into Joe Strohl", GJT. 24-27, 3/11/99.

Threats and threatening innuendos were used towards witnesses when the prosecutor felt they were being uncooperative and could not remember specific facts that happened some thirteen years before. GJT. 92; 43, 3/25/99. The prosecutor also makes deliberate attempts to mislead the Grand Jury by improperly characterizing evidence and inserting his own opinions regarding the strength and weight of such evidence. E.g., "The judge didn't buy this story that Strohl and Shull were in there and this woman was already beaten up while they were burglarizing her home, did he"? The chief of police responds, "I don't think so". GJT. 61-62, 3/18/99. There is substantial documented evidence to pass muster that the prosecution and police were reckless, misleading, and producing untrue testimony which end result was highly pre-

judicial. Even if one would accept that these misrepresentations were not "knowing," this generous characterization of the misrepresentations in no way reduces the prejudicial effect of the misrepresentations on those it was intended to persuade. False testimony can be just as untruthful and deceptive whether given knowingly or innocently. See **United States v. Soberon** 929 F.2d 935 (3rd Cir. 1991).

The egregious conduct goes unabated because the Grand Jury was uninformed as to their function. The Grand Jurors address the District Attorney on one of the last days of the proceedings:

> "I have a question about our role...people are suspecting maybe some of the witnesses that perhaps were not suspects officially, and we are a investigating Grand Jury, correct. If we think there is a different suspect, do we come to you? So let me get this straight, if we have a different suspect...The District Attorney cuts her off and another juror says, I was wondering if someone impartial could explain to us exactly what our role is as grand jury...I can't seem to quite understand our role exactly and exactly what the law states, what are we supposed to be doing. GJT. 126-132, 6/3/99.

The impartiality and independent nature of the Grand Jury process was seriously impaired by their misunderstanding of their role. See **United States v. Calandra**, 414 U.S. 343, 94 S.Ct., at 617. Also **Wood v. Georgia**, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962)(Explaining why the Grand Jury must be both "independent" and "informed").

What makes the State's threats, intimidation, and knowing use of perjured testimony different is that it involves an element of deceit, which converts the issue from the adequacy of the indictment's evidentiary basis to fraudulent manipulation of the Grand Jury that subverts its independence. The misconduct tainted the grand jury proceedings to the point where, at the very least, the trial Court never should have used this tainted information as a basis for justifying the delay and denying defendant's motion to dismiss the charges.

Thus, a Due Process violation occurred because here the conduct of the State "shocks the conscience" and offends one's sense of justice.

## D. APPLYING THE SCHER STANDARD, UNDER ALL THE CIRCUMSTANCES, THE DELAY WAS IMPROPER.

The Commonwealth took absolutely no action whatsoever to charge the defendant either before or at the time of the victim's death for burglary or assault that supposedly occurred on the 26th of December. Additionally, when the victim died, no records were collected or preserved and additional time elapsed. As Trooper Vazquez testified at the pre-trial hearing, he thought there was enough to arrest Joe Strohl at the time, meaning 1987, but the Commonwealth chose to wait to see what happened. O.T. 153 et seq. By lying in wait to see whether the victim would die and thus have a case for homicide instead of merely assault and/or burglary and robbery, evidence was lost forever and that evidence was important to the case. This was reckless conduct and resulted in giving the Commonwealth a tactical advantage at trial.

Therefore, the defendant suffered actual prejudice due to the behavior of the Commonwealth that was not sufficiently excused by the "new evidence" obtained by the Grand Jury proceedings. This Court should review the matter.

## III. TO WHAT EXTENT DOES THE DUE PROCESS CLAUSE IMPOSE ON THE STATE THE RESPONSIBILITY OF GUARANTEEING ACCESS TO EVIDENCE AFTER PRE-INDICTMENT DELAY HAS OCCURRED?

"[An] individual prosecutor has a duty to learn of any favorable evidence known to others acting on the governments behalf in [the] case, including the police." **Kyles v. Whitley**, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The trial court made a determination in this case that the medical records were not the responsibility of the Commonwealth because there was no showing that the Commonwealth had control over those beyond those that

they had rolled over to the defense, N.T. 823-24. Thus denying an adverse inference jury charge to the defense, N.T. 935.

## A. WAS THE COMMONWEALTH RESPONSIBLE TO OBTAIN AND PRESERVE THE VICTIM'S MEDICAL RECORDS?

Dr. Fillinger testified he was the Coroner's Pathologist in 1994, N.T. 337, and it was the responsibility of the Coroner to retain the medical records, N.T. 371. A Coroner is "a public official whose duty is to investigate the causes and circumstances of any death that occurs suddenly, suspiciously, or violently". **Blacks law Dictionary 7th Ed. 1999.** It can easily be concluded that Dr. Fillinger, the Coroner, and the Coroner's Office were "acting on the governments behalf in this case" considering they authored the reports as to the cause and manner of the victims death, and testified at the trial to such conclusions. N.T. 367; C.Ex. 10, 11, and 12.

In response to a subpoena issued for these records by the defense; Lana Snyder, LifeQuest's Records Keeper responded that these records were destroyed in 1996 or 1997. Appendix-F pg. 13 . Contrary to Dr. Fillinger's testimony, "they weren't available" at the time of death, N.T. 371-72. When asked, "why," Dr. Fillinger responds, "I don't know", N.T. 371. It can be concluded that Dr. Fillinger never even attempted to retain the victims medical records. Nevertheless, at the time of the victims death in 1994; the medical records were apparently available to the Commonwealth, as well as its representatives acting on their behalf, and should have been preserved. These records if given reasonable scrutiny by a trained Law Enforcement Official, such as Dr. Fillinger,[11] teach that evidence of this type here at issue ought not be

11. Dr. Fillinger testified, amongst many other credentials, that he is charged by the Attorney General in Pennsylvania with training all Coroners elected in the State. He teaches law enforcement and is on the consultation staff of nine State Police Units including the Commonwealth of Pennsylvania. N.T. 330-31.

36

destroyed because of its evidentiary value and because of principles of Due Process.[12]

In addressing the trial court's erroneous decision that the Commonwealth should not get "tagged" for the records because they were lost by a third party (LifeQuest), N.T. 823-24. First and foremost, if not for the Commonwealth delaying; the defendant would have had access to these records had he been charged in 1994. Second, the trial Court erroneously concludes that these records had to be turned over to the police in order for them to get "tagged" for them. Contrary to the holding in **Kyles** that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on [his] behalf." 514 U.S. at 437, 115 S.Ct. 1555. In this case it should also be concluded that LifeQuest was also "acting on the [States] behalf". Under both State and Federal Law; LifeQuest is mandated to report and document all abuse or accidents. See **"The Elderly Abuse Act"**, **35 P.S. § 10211-10224** and **42 CFR part 483.** Essentially LifeQuest was acting as the eyes and ears of the State. This insignia of posse comitatus is corroberated by Leslie Spurlin, "We were on standing alert to notify police if strangers became interested." Appendix-F pg. 15 ¶3. Trooper Vazquez verifies this through his testimony,N.T. 747. This status is fulfilled on April 21, 1994 when LifeQuest notified police of the victims death. Therefore, it should be concluded that the Trial Court erroneously ruled that the Commonwealth should not get "tagged" for the records.

**IV. IS THE STANDARD ARTICULATED IN MARION/LOVASCO FOR DETERMINING WHETHER PRE-INDICTMENT DELAY VIOLATES THE DUE PROCESS CLAUSE SYN- ONOMOUS WITH THE TROMBETTA/YOUNGBLOOD STANDARD FOR DETERMINING WHETHER DESTROYED EVIDENCE VIOLATES DUE PROCESS?**

Both the trial court and Superior Courts apply the pre-indictment delay standard articulated in **Marion/Lovasco** to determine whether the destroyed

---

12. Although there is no evidence that Dr. Fillinger or for the matter Life-Quest's subjective purpose of not preserving these medical records was to escape obligations imposed by Brady v. Maryland, that was the result intended or not.

evidence in this case violated the due Process rights of the defendant. See Appendix A and B. Although petitioner's position is that the "Constitutional Materiality" of the destroyed evidence is clear; and regardless of intent or lack thereof, the actions of the State here resulted in the petitioner receiving an unfair trial and constituted a deprivation of Due process. The Petitioner, assuming argument, will undertake the arduous task of showing bad faith. It is undisputed that the evidence is no longer in existence. Accordingly the relevant inquiry should become whether such evidence was destroyed in bad faith. **Arizona v. Youngblood**, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)(Absent bad faith on the part of the police, failure to preserve potential useful evidence does not constitute denial of due process of law); But see, **Brady v. Maryland**, 373 U.S. at 87, 83 S.Ct. at 1196, ( "The suppression by the prosecution of evidence favorable to an accused...violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.").

### A. WAS THE EVIDENCE DESTROYED IN BAD FAITH?

The unacceptable explanations offered by LifeQuest, N.T. 796, Dr. Fillinger N.T. 371, and the police N.T. 918 are all the same. "[We] don't know" what happened to the evidence. But see N.T. 799, "it was the District Attorney's office that had that full chart and turned it over to the defense". These "I don't know" justifications seem to be an acceptable alternative for the Courts as a proper excuse for the failure to preserve potentially useful and exculpatory evidence. These holdings are contrary to the applicable Statutes that Medical Records be preserved for seven years after the death of a patient. **28 Pa. Code §§ 563.6, 211.5.** Also contrary to the North Catasauqua Police Department policy and procedures regarding control of evidence, **§§2300-2400.2.** Appendix-F pg. 16-21 .

The destruction of evidence in accord with some established procedure or regulation forecloses a finding of bad faith unless there is other clear evidence to the contrary. See e.g., **Trombetta**, 467 U.S. at 488, 104 S.Ct. 2528; **United States v. Deaner**, 1 F.3d 192, 200 (3rd Cir.1993). Nor does a showing that the government failed to follow standard procedures ipso facto establish bad faith. **Deaner**, 1 F.3d at 200. However, the failure to follow established procedures is probative evidence of bad faith, particularly when the procedures are clear and unambiguous as are the regulations and Statutes which petitioner relies upon here. The record is also devoid of evidence that the Commonwealth's Agents acted pursuant to any applicable controlling procedure. Where, as here, there is no evidence of an established practice which was relied upon to effectuate the destruction, where the applicable documents teach that destruction should not have occurred, and where the Commonwealth's Agents acted in a manner which was either contrary to applicable policies and common sense assessments of evidence reasonably to be expected of law enforcement officials or was so unmindful of both as to constitute the reckless disregard of both, there is a showing of objective bad faith sufficient to establish the bad faith requirement of the **Trombetta/youngblood** test. A contrary holding would permit law enforcement officials to ignore the clear text of governing regulations on which they say their policy is predicated and to act inconsistently with it. The proposition that a law enforcement official does not recognize such fundamental truths is an incredible one and it should be rejected.

Under the circumstances of this case, the plea that the Commonwealth's Agents did not recognize the potentially exculpatory value of the destroyed evidence is tantamount to permitting the Agents to plead ignorance when the

controlling protocol requires they act with knowledge. Viewed as a whole, neither **Trombetta** nor **Youngblood** nor their progeny requires a defendant to prove the mental state of the law enforcement official at the time of destruction was to foreclose a defense or to deliberately deny the defendant's due process rights. Here, both trial and Superior Courts confine the circumstances to that of the Agent deliberately saying unto himself, "I shall deprive the defendant of due process or hurt his case". If that were the test, there would be no check on the destruction of evidence because law enforcement agents would be able to defend the destruction of evidence by lying about subjective intent or by violating, with impunity, the rules they are obligated to follow. In any event, bad faith exists when conduct is knowingly engaged in or where it is reckless. See **United States v. Leon**, 468 U.S. 697, 922-26, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); See also id., 468 U.S., at 900-901, 104 S.Ct. at 3409 (recognizing general goal of establishing "procedures under which criminal defendants are 'aquitted or convicted on the basis of all the evidence which exposes the truth'")(quoting **Alderman v. United States**, 394 U.S. 165, 175, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1968)).

## CONCLUSION

"What constitutes bad faith for these purposes? Does a defendant have to show actual malice, or would recklessness, or deliberate failure to establish standards for maintaining and preserving evidence, be sufficient? Does 'good faith police work' require a certain minimum of diligence, or will a lazy officer, who does not walk the few extra steps to the evidence refrigerator, be considered to be acting in good faith? While the majority leaves these questions for another day, its quick embrace of a 'bad faith' standard has not brightened the line; it only has moved the line so as to provide fewer protections for criminal defendants." **Youngblood**, 488 U.S. at 66, 109 S.Ct. at 342 (Blackmun,J., Brennan,J., Marshall,J., dissenting). **The Petition for Writ of Certiorari should be granted.**

Respectfully Submitted,

Joseph M. Strohl #CM-2097
1100 Pike St.
Huntingdon, Pennsylvania 16654-1112
(Pro Se)

DATE: March 31, 2003