EXHIBIT I

IN THE SUPERIOR COURT OF PENNSYLVANIA

EASTERN DISTRICT

1954 EDA 2004

---

COMMONWEALTH OF PENNSYLVANIA
Appellee

vs.

JOSEPH MICHAEL STROHL
Appellant

---

## BRIEF OF APPELLANT

---

Appeal from order of court denying Appellant's Petition for
Post-Conviction Collateral Relief entered June 15, 2004 in
the Court of Common Pleas of Northampton County,
Criminal Division, Docket Number 829-2000

Joseph M. Strohl, pro se
# CM - 2097
1100 Pike Street
Huntingdon, PA
16654-1112

# TABLE OF CONTENTS

I.      STATEMENT OF JURISDICTION.......................................1

II.     SCOPE AND STANDARD OF REVIEW....................................1

III.    ORDER IN QUESTION..............................................2

IV.     STATEMENT OF QUESTIONS INVOLVED................................3

V.      STATEMENT OF THE CASE..........................................4

VI.     SUMMARY OF ARGUMENT............................................7

VII.    ARGUMENT FOR APPELLANT.........................................8

   I.  Was Strohl denied his fifth and fourteenth Amendment Rights
       to the United States Constitution by the State's suppression
       of exculpatory evidence in violation of <u>Brady v. Maryland</u>,
       373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its
       progeny? ......................................................8

   A.  Favorability of Evidence.......................................9
   B.  Suppression of Evidence.......................................10

      i.  Did the PCRA Court err and abuse its discretion by ruling
          the Commonwealth had to have actual custody of favorable
          evidence in order to constitute a Brady violation and that
          there is no showing that the Commonwealth knew or should
          have known of the favorable evidence when both the law and
          record indicate otherwise? ................................10

   C.  Prejudice and Materiality.....................................14

   II. Did the PCRA Court err and abuse its discretion when it
       failed to grant Strohl a new trial based on after-discovered
       evidence pursuant to the Post-Conviction Relief Act? .........22

   A.  Did the PCRA court err and abuse its discretion when it ruled
       that the new evidence would not compel a different result when
       the record suggests otherwise? ...............................22

   III. Was trial counsel ineffective for failing to seek preclusion
        of evidence on collateral estoppel grounds introduced at Strohl's
        trial in violation of his fifth Amendment Right against
        Double Jeopardy? ............................................25

   A.  Did the PCRA court err and abuse its discretion by ruling that
       Strohl's guilty plea was to burglary, not theft, when the
       information charging Strohl clearly defined his intent to
       commit theft and charged theft? .............................26

IV.   Was Trial counsel ineffective for failing to request a jury
      instruction on Aggravated Assault because of a misinterpretation
      of the law? ......................................................28

V.    Was trial counsel ineffective for failing to properly object
      to, and preserve for appeal, the Court's material misstatement
      of evidence during its summary of evidence to the jury? ..........31

VI.   Was Counsel ineffective for waiving on Direct Appeal an issue
      of police and prosecutorial misconduct during the Grand Jury
      or alternatively failing to seek suppression of the tainted
      testimony which may have resulted in the quashing of the
      presentment issued as the affidavit of probable cause to arrest
      Strohl? ..........................................................34

      A.   Did the PCRA Court err and abuse its discretion by ruling
           there was no "illegal influence" when the record indicates
           otherwise? ..................................................34

      B.   Does the totality and remaining misconduct require the Court's
           invoking of Supervisory control and warrant the quashing of the
           presentment in the interests of justice and fairness? ..........38

VII.  Was trial counsel ineffective for failing to object, and preserve
      for appeal the trial court's failure to give an adverse inference
      jury instruction regarding the victim's lost and destroyed
      medical records? ................................................41

      A.   Does Due process afford Strohl an adverse inference instruction
           against the Commonwealth for their failure to retain or preserve
           the victim's medical records which were available at the time
           of death, but because of their delay in prosecution and failures
           to perform duties the records were destroyed?  Or alternatively,
           was Strohl entitled to the same against LQNC for destroying
           the records when they had a Statutory duty to preserve them
           and when their conduct was an issue in the case regarding the
           victim's cause of death? ......................................41

VIII. Was trial counsel ineffective for failing to call a potential
      alibi/favorable defense witness? ................................44

      A.   Did the PCRA Court err and abuse its discretion by ruling
           unsupported by the record that Mr. Strohl's testimony could
           not have undermined confidence in the verdict? ................44

VIII.         CONCLUSION..................................................46

IX.           OPINIONS AND ORDERS OF PCRA COURT.........Appendices   A ,B ,C

# TABLE OF CITATIONS

Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).........25

Banks v. Dretke, ___ U.S. ___, 124 S.Ct. 1256, ___ L.Ed.2d ___ (2004).....8,11

Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)........28

Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 90 L.Ed. 350 (1946)..31,33

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)8,10,12,14

Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).....34

Commonwealth v. Abney, 350 A.2d 407 (1976)..................................46

Commonwealth v. Anderson, 253 Pa.Super. 334, 385 A.2d 365 (Pa.Super.1978)...13

Commonwealth v. Anthony, 475 A.2d 1303 (Pa.1984)...........................27

Commonwealth v. Bonaccurso, 625 A.2d 1197 (Pa.Super.1993)...................24

Commonwealth v. Bradney, 126 Pa. 199, 17 A. 600 (1889).....................35

Commonwealth v. Burke, 781 A.2d 1136 (Pa.2001)............................1,8

Commonwealth v. Chamberlain, 557 Pa. 34, 731 A.2d 593 (1999)...............24

Commonwealth v. Cobbs, 759 A.2d 932 (Pa.Super.2000).......................22

Commonwealth v. Crawford, 305 A.2d 893 (1973).............................31

Commonwealth v. Delbridge, 2002 WL 32170269 (Pa.2003).....................37

Commonwealth Dept. of Transp. v. Mitchell, 535 A.2d 581 (Pa.1987)..........27

Commonwealth v. Douglas, 337 A.2d 860 (1975)..............................31

Commonwealth v. Fiore, 780 A.2d 704 (Pa.Super.2001).......................1,22

Commonwealth v. Fuller, 579 A.2d 879 (pa.Super.1990)......................28

Commonwealth v. Goldblum, 447 A.2d 234 (Pa.1982)..........................38

Commonwealth v. Holder, 805 A.2d 499 (Pa.2002); affirmed, 815 A.2d 1115...26

Commonwealth v. Holloman, 621 A.2d 1046 (Pa.Super.1993)...................36

Commonwealth v. Irwin, 431 A.2d 257 (Pa.1981).............................32

Commonwealth v. Kimball, 555 Pa. 299, 724 A.2d 326 (1999).................25

Commonwealth v. Kimball, 683 A.2d 666 (1996)(en banc).....................29

Commonwealth v. Lennox, 428 A.2d 228 (Pa.Super.1981)......................34

Commonwealth v. Lopez, 739 A.2d 485 (Pa.1999).............................44

Commonwealth v. Lopinson, 427 Pa. 284, 234 A.2d 552 (Pa.1967).............34

Commonwealth v. McCloskey, 277 A.2d 764 (Pa.1971).........................34

Commonwealth v. Mosley, 637 A.2d 246 (Pa.1993)............................35

Commonwealth v. Nichols, 692 A.2d 181 (Pa.Super.1997).....................30

Commonwealth v. Robinson, 817 A.2d 1153 (pa.Super.2003)...................30

Commonwealth v. Roxberry, 602 A.2d 826 (1992).............................45

Commonwealth v. Scott, 561 Pa. 617, 752 A.2d 871 (2000)..................1,25

Commonwealth v. Shoup, 620 A.2d 15 (Pa.Super.1993)..................21,24,45

Commonwealth v. Smart, 368 Pa. 630, 84 A.2d 782 (1951)..................35,36

Commonwealth v. Strohl, 813 A.2d 909, 815 A.2d 1042 (Pa.2003)..............4

Commonwealth v. Tolbert, 670 A.2d 1172 (Pa.Super.1995)....................26

Commonwealth v. Twiggs, 331 A.2d 440 (1975)...............................46

Commonwealth v. Valderrama, 479 Pa. 500, 388 A.2d 1042 (Pa.1978)..........24

Daubert v. Merrel Dow Pharm. Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993).....16

Duquesne Light v. Woodland Hills Sc. Dist., 700 A.2d 1038 (Pa.Cmwlth.1997).41

Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)...29

Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.104 (1972).....10

Hollman v. Wilson, 158 F.3d 177 (3rd Cir. 1998)............................10

In re Fifth Statewide Inv. Grand Jury, 44 D&c 3d 339 (1987)................39

In re Investigating Grand Jury, 518 Pa. 485, 544 A.2d 924 (1988)...........36

In re Petition of Acchione, 227 A.2d 816 (1967)...........................35

In re Protyniak's Estate, 235 A.2d 372 (Pa.1967)..........................18

Kimmel v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).....34

iii

Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)...10,14
Lamp v. Pennsylvania RR, 305 Pa. 520, 158 A. 269 (1931).....................17
Magette v. Goodman, 771 A.2d 775 (Pa.Super.2001)...........................41
Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 91967)............17
Nader v. Hughes, 643 A.2d 747 (Pa.Cmwlth.1994)..............................13
Schick v. United States, 195 U.S. 65, 24 S.Ct. 826, 49 L.ed. 99 (1904)......29
Strickland V. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
..................................................................25,30,46
Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).....
................................................................8,12,14
United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)14
United States v. Breslin, 916 F.Supp. 438 (E.D. Pa. 1996)...................40
United States v. Joseph, 996 F.2d 36 (3rd Cir. 1993).....................10,14
United States v. Pellullo, 14 F.3d 881 (3rd Cir. 1994).......................29
United States v. Perdomo, 929 F.2d 967 (C.A. 3 1991)....................10,14
Vujosevic v. Rafferty, 844 F.2d 1023 (3rd Cir. 1988)......................28,30
Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962).........40

## Constitutions, Statutes, and Rules

U.S. Const. Article III §2..............................................29
U.S.C.A. 5 ..............................................................8
U.S.C.A. 6 .............................................................25
U.S.C.A. 14 .............................................................8
16 P.S. §1237, §1242, §1245, §4237..................................11,42
18 Pa. C.S.A. §1102.....................................................8
18 Pa. C.S.A. §2502(b)..................................................8
18 Pa. C.S.A. §2702....................................................28
28 Pa. Code §§ 211.5, 563.6............................................42
35 P.S. §10211-10224...................................................43
42 Pa. C.S.A. §742......................................................1
42 Pa. C.S.A. §4549(a).................................................39
42 Pa. C.S.A. §5551(4).................................................28
42 Pa. C.S.A. §9543 (a)(2)(ii).........................................28
42 Pa. C.S.A. §9543 (a)(2)(vi).......................................1,22
42 CFR 483.13 (c)(1)(ii)...............................................43
Pa. R.A.P. Rule 1925(a).................................................6
Pa. R.A.P. Rule 1925(b).................................................6
Pa. R.Cr.P. Rule 264 (New Rule 231)...................................38
Pa. R.Cr.P. Rule 548..................................................27

## Others

The "Elderly Abuse Act"................................................43
Gershman Prosecutor Misconduct §2.3 (b)(1986).........................36
Pennsylvania Department of Aging Act 13...............................43

# I. STATEMENT OF JURISDICTION:

Pursuant to 42 C.S.A. §742, the Superior Court of Pennsylvania has exclusive jurisdiction over this appeal.

# II. SCOPE AND STANDARD OF REVIEW:

## A. SCOPE:

Appellate review of denial of post-conviction relief is limited to determining whether the record supports the findings of the Post Conviction Relief Act (PCRA) court and whether these findings are free of legal error. 42 Pa.C.S.A. §9541 et seq.; <u>Commonwealth v. Fiore</u>, 780 A.2d 704 (Pa.Super.2001).

## B. STANDARD:

There are three components that demonstrate a violation of the <u>Brady</u> strictures: the evidence is favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice must have ensued. <u>Commonwealth v. Burke</u>, 781 A.2d 1136, 1141 (Pa.2001).

To succeed on a claim for post-conviction relief based on newly discovered exculpatory evidence, the petitioner must establish by a preponderance of the evidence that: the evidence has been discovered after the trial and it could not have been obtained at or prior to trial through reasonable diligence; such evidence is not cumulative; it is not being used solely to impeach credibility; and such evidence would likely compel a different verdict. 42 Pa.C.S.A. §9543 (a)(2)(vi); <u>Fiore</u>, supra., at 711.

To prevail on a claim of ineffectiveness of counsel, Appellant must demonstrate that the underlying claim is of arguable merit, that counsel's actions had no reasonable basis designed to effectuate his interests and that counsel's actions prejudiced him. <u>Commonwealth v. Scott</u>, 707 A.2d 871, 877 (Pa.2000).

1

III.  ORDER IN QUESTION:

"AND  NOW,  this  15th  day  of  June,  2004,  the petition for post-conviction relief is denied."

A  copy  of the PCRA Court's Opinions and Orders are attached hereto as Appendix A, B, and C.

## IV. STATEMENT OF QUESTIONS INVOLVED:

A. Whether exculpatory evidence was suppressed by the prosecution?

   ANSWER: Qualified to suppression.

B. Whether after-discovered evidence warrants a new trial be granted?

C. Whether the PCRA Court erred and abused its discretion by ruling that Trial Counsel did not render ineffective assistance of counsel by:

  i. failing to assert a Double Jeopardy Collateral estoppel claim?

  ii. failing to request an aggravated assault jury instruction?

  iii. failing to object to a material misstatement of the evidence during the Court's instruction to the jury?

  iv. failing to properly raise and challenge prosecutor and police misconduct during the Investigative Grand Jury proceedings?

  v. failing to request an adverse inference jury instruction?

  vi. failing to call a potential alibi/favorable witness?

All answered in the negative by the Court below.

## V.  STATEMENT OF THE CASE:

(1)  This is an appeal from the order denying post-conviction relief from a life sentence for second-degree murder.

In 1999, an Investigative Grand Jury was enpaneled to investigate the death of Ella Wunderly (hereinafter "the victim"). It is alleged that an assault in 1986 caused the victim's death in 1994. Thereafter, a presentment was issued against Appellant Joseph Michael Strohl for criminal homicide. A Pre-trial motion to dismiss the charges for prejudicial pre-arrest delay was denied. A jury trial was held in March 2001, and the jury returned a guilty verdict to second-degree murder. Appellant was sentenced to mandatory life imprisonment. Post-sentence motions were filed and denied.

(2)  On direct appeal, the Pennsylvania Superior Court affirmed judgement of sentence (Unpublished)(2097 EDA 2001). The Pennsylvania Supreme Court denied allocatur per curiam. The United States Supreme Court denied Writ of Certiorari. Commonwealth v. Strohl, 813 A.2d 909; 815 A.2d 1042 (Pa.2003); cert. denied, 123 S.Ct. 2253 (2003).

(3)  The Honorable Robert A. Freedberg, P.J., entered the orders and opinions at both the trial and PCRA stages.

(4)  At 8:51 p.m., Sunday, December 28, 1986, police found the victim lying unconscious on her bedroom floor. The rear door window of the home was smashed, a side-window was open, and parts of her home were in disarray. The victim was transported to Lehigh Valley Hospital Center. N.T. 410-477. Police believing death imminent called Dr. Isadore Mihalakis (State Police Death Investigation Instructor/Forensic Pathologist) to examine, date, and document the victim's injuries. N.T. 179, 237.

Mihalakis opined the injuries were blunt force trauma causing the victim's unconsciousness and occurred 48 to 72 hours prior to his examination. N.T.

205-208. Mihalakis knew of no internal injuries except for broken jaw bones and a fractured orbital plate which were told to him by radiology. N.T. 244-246. Thereafter, Mihalakis had no further contact with the victim. N.T. 252.

Three weeks later, Appellant and Robert Shull were arrested for burglary and other related charges of the victim's home relating to the day after the initial break-in and assault. Their arrests came after Robert Shull wore a "bodywire" revealing both had been in the home on Saturday. The "wire" did not reveal the assaulter. N.T. 539-548. Both pleaded guilty to that burglary. At that time, the Commonwealth made "explicitly clear" that the Appellant was pleading guilty to a subsequent burglary and the Commonwealth wanted nothing to do with the initial break-in or assault. (Case No. 226-1987, Northampton County C.P.)(PCRA Exhibit 14).

In April 1994, the victim died at LifeQuest Nursing Home. Dr. Halbert Fillinger performed an autopsy and determined the cause of death was "Broncho-pneumonia due to multiple injuries to the head." N.T. 358. Fillinger observed injury to the brain but his lack of expertise precluded him from determining when it occurred. He therefore deferred examination of the brain to Dr. Lucy Rorke. N.T. 378. Dr. Rorke could neither determine when the brain injury occurred and opined it could have occurred anytime prior to 1993. N.T.303. Because Fillinger was informed that the victim was assaulted in 1986 and remained in a coma until 1994; both Fillinger and Rorke hypothetically conclude that all the injuries are attributable to the assault in 1986. N.T. 370-371. Dr. Rorke presumed that, because Dr. Fillinger saw a "depressed skull fracture" (which he describes as a bone being driven into the brain, N.T. 357) that the other lesions she saw occurred at the same time; and there was no reason to consider several episodes of trauma because no one ever told her anything like that. N.T. 300, 305-306. Fillinger ruled the manner of death to be

5

a statistical/circumstantial characteristic of homicide. N.T. 400-401. Still, no one was charged with assault, homicide, or the initial break-in of the victim's home.

In 2000, during the preliminary hearing, the victim's son testified that the victim was abused while at the LifeQuest Nursing Home. Preliminary hearing N.T. 27-31; also Trial N.T. 661-678. Thereafter, the defense requested, inter alia, the victim's medical records and Officer William Gerancher's police reports. The prosecutor stated he "provided discovery of the injuries of everything related to the case and supplied all police reports." He also averred an open file discovery policy and that he did not have the victim's medical records, nor did he have to be in possession of them. Further, telling the defense to investigate the allegations [of abuse] themselves. Motion to Compel N.T. 4 et seq.. Afterwards, the prosecutor turned over bits and pieces of the victim's medical records. N.T. 799-801.

After direct appeals were exhausted, new evidence was discovered "that the victim did not have a depressed skull fracture with a portion of the skull driven into the brain at the time of admission to the hospital for treatment [in 1986]." (PCRA opinion at 3)(PCRA N.T. 204-205, 212). Also a withheld police complaint contradicting witnesses testimony offered to support an underlying felony of burglary was uncovered. PCRA Exhibit 2.

(5) The order under review is a denial of a first timely request for post-conviction collateral relief. The PCRA Court substantiates its denial through a twenty-one page opinion attached hereto as Appendix A. The PCRA Court filed a statement pursuant to Pa. R.A.P. Rule 1925(a). Appendix C. The court did not direct the Appellant to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. Rule 1925(b).

## VI. SUMMARY OF ARGUMENT:

The PCRA court erred by ruling the Commonwealth must be in custody of exculpatory evidence in order to constitute a violation of Brady. In contrast, the prosecutor has a duty to learn of any favorable evidence known to the others acting on the State's behalf, including police. The Court further erred by ruling that even though the new evidence is not cumulative or solely impeaching, and it differs from the testimony presented by Commonwealth witnesses, it is irrelevant and insubstantial to compel a different result.

The PCRA court erroneously concluded as a matter-of-law that a guilty plea does not acknowledge certain facts and intent, and does not extend to the facts averred in the information to estop relitigation of evidence in a subsequent prosecution. Which evidence in question was used to establish a underlying felony of burglary.

Trial counsel was ineffective for failing to request an aggravated assault jury instruction because the Statute of limitations had run on the charge, albeit, an issue, and no limitations are applicable.

Trial counsel's failure to object or request a cautionary instruction to a material misstatement of evidence during the Court's instruction infected the jury's truth-determining process.

Counsel was ineffective for failing to request an adverse inference jury instruction regarding lost medical records which were available to the Commonwealth at the time of death and when the conduct of Lifequest was an issue which raised suspicion as to their responsibility for causing death.

Counsel was also ineffective for waiving, and failing to challenge a meritorious issue of prosecutor and police misconduct before the grand jury.

Counsel also failed to call a favorable defense witness which could have cast a shadow of doubt upon the Commonwealth's circumstantial case.

7

## VII. ARGUMENT FOR APPELLANT:

It is alleged the victim was assaulted and left lying on her bedroom floor after her home was broken into on December 26, 1986. The next night, the 27th, Appellant Joseph Michael Strohl (hereinafter "Strohl") and a co-conspirator burglarized the home. Case No. 226-1987 (PCRA Exhibit 14). It is also alleged the home was again entered on the 28th before police discovered the victim that night. N.T. 1021. A trio of experts opined the victim had her skull bone driven into her brain (N.T. 357) rendering her comatose and unconscious for eight years until her death in 1994. N.T. 212, 269-270, 305-306. New evidence reveals the victim did not sustain a fractured skull, nor had a portion of the skull driven into her brain and regained consciousness as early as February 3, 1987 (Appendix B); PCRA N.T. 204-205, 212. No one was ever charged with assault; albeit, Strohl would be charged and convicted over a decade and one-half later for second-degree murder and sentenced to life imprisonment. 18 Pa.C.S.A. §§2502(b); 1102.

I.   Was Strohl denied his Fifth and Fourteenth Amendment Rights to the United States Constitution by the State's suppression of exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny?

The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Id., at 87, 83 S.Ct. 1194. There are three essential elements of a Brady prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently, and prejudice must have ensued." Banks v. Dretke, 124 S.Ct. 1256, 1272 (2004)(quoting Strickler v. Greene, 527 U.S. 263, 281-

282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)); Commonwealth v. Burke, 781
A.2d 1136, 1141 (Pa.2001).

The evidence at issue is two Lehigh Valley Hospital Center Reports
and a Station Complaint authored by Officer William Gerancher of the North
Catasauqua Police Department. Appendix B and D. "The reports were not made
available to [Strohl] at trial, even though requested during discovery."
PCRA Court Opinion, "Op." at 3.

A. Favorability of Evidence:

 1. Lehigh Valley Hospital Center (LVHC) Medical Reports:

"The reports are evidence that the victim did not have a depressed
skull fracture with a portion of the skull driven into her brain at the time
of admission to the hospital for treatment." Op., at 3. Further, the "medical
records are not merely cumulative, nor would they be used solely to impeach,"
and they "differ from the testimony of the Commonwealth's experts at trial."
Op., at 6. The reports are also evidence the victim regained consciousness
as early as February 3, 1987. Appendix B at 2.

 2. The Police Department Station Complaint:

The complaint consists of a half page report which states that Patricia
Cecala phoned the police to report that a purse was found. The form is dated
December 29, 1986, at 7:30 p.m., with a notation "delayed entry." PCRA Exh.
2 (Appx. D). Conversely, Patricia Cecala and her husband (Joseph) testified
they saw a purse Saturday morning and called the police Sunday, December
28, during the daytime. N.T. 579-590, 593-595. The complaint also differs
from Officer Gerancher's testimony and police report that he received a call
from Richard Wunderly about the purse. N.T. 442-443.

Withheld evidence contradicting testimony of witnesses called by the
prosecution is favorable to [Strohl] and involves a corruption of the truth-

seeking function of the trial process. See <u>Giglio v. United States</u>, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Beyond debate, Strohl meets the first <u>Brady</u> component (evidence favorable to the accused).

B. Suppression of evidence:

i. Did the PCRA Court err and abuse its discretion by ruling the Commonwealth had to have actual custody of favorable evidence in order to constitute a Brady violation and that there is no showing that the Commonwealth knew or or should have known of the favorable evidence when both the law and record indicate otherwise?

There is no dispute the station complaint was suppressed by the State. Op., at 4. However, the PCRA court ruled that the medical records do not meet <u>Brady</u> because they "were not in the custody of the Commonwealth" and "there is no showing the Commonwealth knew or should have known of the existence of the reports." Op., at 3. Such a ruling is contrary to law and is not supported by the record here.

An individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including police. <u>Kyles v. Whitley</u>, 514 U.S. 419, 437, 115 S.Ct. 1115, 131 L.Ed.2d 490 (1995). The prosecution is "'obligated to produce certain evidence actually or constructively in its possession or accessible to it.'" <u>Hollman v. Wilson</u>, 158 F.3d 177, 180 (3d Cir.1998); <u>United States v. Joseph</u>, 996 F.2d 36, 39 (3rd Cir.1993)(quoting <u>United States v. Perdomo</u>, 929 F.2d 967, 970 (3d Cir.1991)). In determining whether there has been a <u>Brady</u> violation, Court's inquiry should not be limited to only the prosecutor's complicity, but should extend to information available to the prosecution team, including both investigative and prosecutorial personnel. <u>Perdomo</u>, 929 F.2d at 967.

Dr. Isadore Mihalakis (Forensic Pathologist/Pennsylvania State Police death Investigation Instructor, N.T. 179) assisted police by examining the victim in 1986; wrote a detailed report of his examination, and ultimately

opined as to the cause and manner of death. N.T. 237, 212-213. Mihalakis's trial testimony that, "obviously they have the radiology, CAT Scans, you name it," supports his knowledge of the suppressed records. N.T. 235. His PCRA testimony confirms his knowledge of the records; there availability, importance, and explains the non-disclosure: "they are most certainly [available]" and are "indeed important" ... However, "no one ever asked." PCRA N.T. 157, 161, 171-172. Furthermore, Mihalakis was also the Director of Post-mortem services and legal medicine at the LVHC. N.T. 175. He also is on the LVHC's honorary staff which enables him the "privilege to go in and examine somebody ... and review case[s]." N.T. 177-178.[1] Accordingly, the suppressed medical records were readily "accessible" to the prosecution and "the prosecutor had a duty to learn of the favorable evidence" known of by Mihalakis who was acting on their behalf in this case.

In addition, Dr. Halbert Fillinger (Coroner's pathologist), also underscored the important role medical records play in determining a cause and manner of death. N.T. 370-371. It was his official duty "to examine the charts of patients and monitor causes of death that occur in hospitals or under medical treatment coming under the jurisdiction of the coroner." N.T. 327-328.[2] Ordinarily, we presume that public officials have properly discharged their duties. Banks, 124 S.Ct., at 1275. However, instead of reviewing

1. Dr. Mihalakis's credentials are superb in both the medical field, as well as, the law enforcement field. N.T. 167-180; also Cmwlth Exh. 13.

2. Dr. Fillinger (coroner of Montgomery County N.T. 336) was acting on behalf of the Bucks County Coroner in this case to determine a cause and manner of death because the Bucks County Coroner was a psychiatrist. N.T. 337. Fillinger is also charged by the Attorney General with training all Coroners in the State. They go to "his school, pass his exam, and are certified by him." He also sits on the consultation staff of nine State Police Units and trains police in the investigations of death. N.T. 330-331. See also 16 P.S. §§§§ 1252, 1237, 1242, 1245.

the victim's records, Fillinger abandoned that duty for what police proposed (i.e., the victim was assaulted in 1986 and remained in a coma until death). N.T. 369-371. The ruling of the PCRA court that "there is no showing the Commonwealth knew or should have known of the existence of the reports" is preposterous and should be rejected. Op., at 3.

The Commonwealth cannot be heard to contend that Fillinger or Mihalakis did not recognize or understand the obvious. Nor should the Court sanction an argument which excuses Officials from having to make an assessment of the potential utility of evidence which they ignore. A contrary holding would permit law enforcement officials to ignore the clear text of the governing regulations on which they say their policy is predicated and to act inconsistently with it.

In the State's view, the question of suppression revolves around Strohl's conduct, particularly his lack of appropriate diligence in pursuing a response to a LVHC subpoena for records. Cmwlth's Br. in opp. to PCRA relief (PCRA Court) at 10. This contention is insubstantial in light of the Commonwealth's open file policy and their assertion they "provided discovery of the injuries of everything related." Motion to Compel N.T. 6, 12. And in addition, afterwards, their actual disclosure of bits and pieces of the victim's medical records. PCRA N.T. 234. All of which are fairly characterized as conduct attributable to the State that impeded trial counsel's failure to follow up on a subpoena. As Strickler instructs, Strohl cannot be faulted for relying on those representations. See 527 U.S. at 283-284, n.22-23, 119 S.Ct. 1936 ("If a prosecutor asserts that he complies with Brady through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under Brady").

Further, the prosecutor abandoned his obligation to search for the truth

by telling the defense to "investigate the allegations [of abuse] by Mr. Wunderly." Motion to Compel N.T. 9. Mr. Wunderly provided eyewitness testimony the victim had a broken shoulder, half her ear ripped-off, and a broken hip subsequent to the assault. (Preliminary hearing N.T. 27-31)(Trial N.T. 661-678). Such an investigation which should have been performed in 1994, rather than, in 2000. In fact, "it is mandatory for the coroner to investigate, sudden, violent, suspicious deaths." Nader v. Hughes, 643 A.2d 747 (Pa.Cmwlth. 1994); 16 P.S. §§§ 1237, 1242, 1245; See also Commonwealth v. Anderson, 385 A.2d 365 (Pa.Super.1978)(The coroner is part of the Commonwealth's criminal investigation team and shall consult and advise with the District Attorney). A rule thus declaring the defendant must investigate allegations of elderly abuse, or a homicide, is not tenable in a system constitutionally bound to accord defendants due process.

In sum, the prosecutor chose not to subpoena any records; instead, he chose to rely on records gathered from a civil suit to meet Strohl's discovery request. PCRA N.T. 234-235. Nor, did he inquire of his own experts regarding the victim's medical records. PCRA N.T. 157. Undoubtedly, Dr. Mihalakis could have waltzed right into LVHC and obtained the suppressed records. Ante, at 11. Moreover, he delegated his official duty to investigate and search for truth upon the defense. Such an ineffectual attempt to verify allegations of abuse, or even moreso homicide, amounted to conduct unworthy of the prosecutor's office. It is apparent that such a search was merely a token effort. Thus, by seeking only medical records of a civil proceedings, the prosecutor ignored "the very records likely to reveal germane information." The prosecutor should be charged with "constructive knowledge" of the records and and be unable to avoid its Brady obligations by failing to take the minimal steps necessary to acquire the requested information. Thus, the prosecutor's

13

actions were objectively unreasonable in that the prosecutor should have known of the requested information. Joseph, 996 F.2d at 40 (discussing Perdomo at 929 F.2d at 970). Therefore, Strohl meets the second prong of Brady.

## C. Prejudice and Materiality:

To demonstrate prejudice, Strohl must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S., at 435, 115 S.Ct. 1555. See also id., at 434-435, 115 S.Ct. 1555 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."); accord, Strickler, 527 U.S., at 290, 119 S.Ct. 1936. The "materiality test for determining whether government's non-disclosure of favorable evidence to defendant violates Brady is not sufficiency of evidence test." Kyles, 514 U.S. at 435, 115 S.Ct. 1555. In short, Strohl must show a "reasonable probability of a different result." Id., at 434, 115 S.Ct. 1555 (internal quotation marks omitted)(citing United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

Even absent the suppressed evidence, the State's case here was no smoking gun. They had no eyewitnesses to the assault. N.T. 1044. They had no forensic or physical evidence linking Strohl to the assault. N.T. 1051-1052. In fact, a hair found on a shirt, found with the victim's purse did not match Strohl or the victim. N.T. 854. And although not taking the stand, Strohl stood, and still stands, by his innocence. N.T. 994-997.

The Commonwealth presented a trio of pathologists to prove causation of death. Dr. Mihalakis examined the victim the night she was found and opined the victim sustained blunt force injuries 48 to 72 hours prior to his exam. He also stated the blunt force injuries were the cause of the

victim's unconsciousness. N.T. 205-208. Thereafter, Mihalakis had no further contact with the victim, nor did he review any medical records. N.T. 252. The significance of his testimony to the State's case is best understood by taking the word of the prosecutor:

> "It is to [hypothetically] connect the [external] injuries that Mihalakis saw in 1986 to what Dr. Fillinger found [internally] in 1994. The connection is important. It is essentially offered, your honor, to close the gap between 1986 and 1994. That's an important issue in this case."

N.T. 183 [emphasis added]. After reviewing the autopsy and neuropathologist reports, Mihalakis assumed the victim never regained consciousness and opined that the cause and manner of death, as well as, the internal injuries found by Drs. Fillinger and Rorke are consistent with the external injuries he observed in 1986. N.T. 209-212, 239. His hypothesis is that even though he had no knowledge of the victim's neurological condition [in 1986]; eight years down the road when a neurologist takes a look at the brain, he can put two plus two (2+2) together and say one is related to the other. N.T. 244-245.

Dr. Fillinger performed an autopsy of the victim. N.T. 337. Fillinger stated the victim's eight year survival was unusual and inexplicable. N.T. 387-388. He also testified the victim was well-nourished and well-cared-for prior to death. N.T. 341, 344. However, a broken hip, a broken shoulder, and half an ear ripped-off indicates otherwise. N.T. 373-376, 661-678. Dr. Fillinger observed injuries to the victim's brain including a fractured skull where the bone was driven into the brain. N.T. 357. His lack of expertise precluded him from determining when the injuries occurred. He therefore deferred the examination of the brain to Dr. Lucy Rorke. N.T. 378.

Dr. Rorke assumed the victim was totally unconscious for eight years (i.e., "can't talk" or "respond"). N.T. 269-270, 291. Conversely, new evidence

indicates the victim responding as early as February 3, 1987 (Appendix B).

Rorke observed multiple injuries to different areas of the brain. N.T. 274-277, 295. She neither could tell when the injuries occurred , but opined they could have happened anytime prior to 1993. N.T. 303. Hypothetically, Rorke opined, that what she observed was consistent with the cause of death identified by Fillinger (i.e., "Bronchopneumonia due to multiple injuries of the head." N.T. 358) because there is no reason to think there was several episodes of trauma because no one told her anything like that; and presumably, all the other injuries occurred at the same time because Fillinger observed a fractured skull [where the bone was driven into the brain]. N.T. 305-306.[3]

Dr. Fillinger explained the cause and manner of death as:

"It's a little bit of a domino effect ... She had pneumonia and we know she got pneumonia because she couldn't move around very much or at all and as a result of that, what caused that was impacts to the head, so we have from impacts to the head to immobilization to pneumonia forming a chain of incidents all connected together that lead one from a beating to a death."

N.T. 358-359.[4] He further opined that the manner of death (homicide) is a circumstantial/statistical characteristic. N.T. 400-403.

On the otherhand, Dr. Paul Hoyer testified for the defense that because of the lost medical records, with absolute certainty, we're never going to know what caused the pneumonia. N.T. 872-873. Hoyer also stated that the

---

3. One can reasonably conclude that the trio of expert's opinions linking the internal injuries to the external injuries was nothing more than guesswork. Therefore, the jury's verdict must have been based on a guess. See Daubert v. Merrel Dow Pharmaceuticals, INC., 509 U.S. 579, 590-591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)(Proposed testimony must be supported by appropriate validation-i.e., good grounds, the word knowledge connotes more than subjective belief or unsupported speculation.).

4. In contrast, Dr. Mihalakis testified that anyone is susceptible to Bronchopneumonia; even healthy people. N.T. 241-242.

death was the result of both head injuries and hip fracture (N.T.904), but to what extent normal aging and the hip fracture contributed, he doesn't have sufficient information. N.T. 894.

The suppressed medical reports enabled the Commonwealth to prognosticate a hypothetical cause of death through a trio of experts which could not be substantiated or challenged independently by the defense.

Dr. Tamar Earnest confirmed the victim had neither a skull fracture or a bone driven into her brain in 1986. PCRA N.T. 204-205, 212. See Lamp v. Pennsylvania RR, 305 Pa. 520, 158 A. 269 (1931)(Verdict based on testimony of witness contradicted by incontrovertible physical facts will not be sustained). Even Dr. Mihalakis has his doubts whether there was a fractured skull or a residual of surgery or both. PCRA N.T. 170-171. Hardly coinciding with the hypothetical (2+2) opinion he so confidently asserted at trial. N.T. 245, 249-250.

Indeed, the victim had a hematoma in the left occipital area of the brain and underwent surgery to remove a blood clot. PCRA N.T. 212. This, however, does not negate the State's misrepresentations and exaggerations of crucial evidence presented at trial. In turn, bamboozling the jury with a phantom injury that Strohl brutally drove the victim's skull bone into her brain. See e.g., N.T. 249-250, 306, 357, 1029, 1038. See also Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967)("Where pair of man's under shorts, which were repeatedly described as bloody shorts in prosecution for murder, constituted a vital link in circumstantial evidence on which defendant was convicted, although prosecution knew at trial that shorts were stained with paint, deliberate misrepresentation invalidated conviction.").

In addition, Dr. Earnest questions the red-purple hemorrhage noted at autopsy as possibly being a subsequent head injury. PCRA N.T. 211-212, 215.

17

Strohl now has a compelling argument of intervening and supervening brain injury (i.e., a fractured skull) or injuries that caused death. Besides, if a doctor thought so, a juror could too. Moreover, the contention is substantiated by the Commonwealth's own expert's testimony.

Dr. Rorke testified that bleeding occurs when the brain is injured. In the process of healing the red blood breaks down and becomes a golden color. N.T. 275; accord Fillinger, N.T. 355. The absence of a fractured skull in 1986 coupled with red-purple hemorrhage (fresh blood) at autopsy only supports additional injury occurred. See Cmwlth Exh. 12 at 4. The State would most certainly have a hard time explaining why fresh blood is seen eight years after assault after representing that all the injuries occurred in 1986. Surely, Strohl cannot be responsible for that.

Further supporting the notion of additional injuries is Dr. Mihalakis's testimony confirming that Dr. Rorke saw numerous abnormalities in 1994; but, upon reviewing a CAT Scan from 1987 he admits there is only one abnormality in the brain. PCRA N.T. 189-191. Not at all consistent with the numerous abnormalities described by Rorke at trial. N.T. 274, 282-285, 295. Most certainly, Rorke would have had trouble convincing a jury that "there is no reason to consider several episodes of trauma" with such powerful evidence to the contrary. N.T. 306.

The PCRA court held that the "evidence differs from the Commonwealth's experts." However, its ruling that it is "irrelevant" because it does not alter Dr. Mihalakis's opinion is erroneous. Op., at 6, 8. Such an argument confuses the weight of the evidence with its favorable tendency, and works against the State, not for it. See In re Protyniak's Estate, 235 A.2d 372 (Pa.1967)("Opinion testimony of medical experts is of very little weight or value when opposed to factual evidence."). Anyway, the record belies different.

Dr. Mihalakis testified that hematomas can be caused by blunt force trauma, falls, or strokes. PCRA N.T. 167-168; accord, 203-204. At trial, Mihalakis testified that all the injuries were caused by blunt force trauma. N.T. 205. Now, conversely, Mihalakis cannot say whether the victim was beaten first, suffered a stroke, then was beaten, or even fell and was beaten or vice-versa. PCRA N.T. 176-178.

The lack of contusions and lacerations to the brain only further under-scores the unreliability of the State's expert's opinions that all the injuries occurred in 1986. N.T. 249-50, 305-06, 358-59. Rorke testified that blunt force trauma leaves a "pattern of injury" which produces contusions and lacer-ations on the cortex of the brain. N.T. 292-93, 298. Conversely, there were no contusions found on the cortex or outer portion of the brain in 1986. PCRA N.T. 178-79, 207. In turn, undermining the State's assertion that "the [internal] injuries Drs. Fillinger and Rorke saw in 1994 and they attribute as the cause of death were the same [external] injuries that Dr. Mihalakis saw" in 1986. N.T. 1029. Thus, endorsing Strohl's argument that intervening head injuries caused death. Unquestionably, the Commonwealth would have had a hard time explaining no contusions and lacerations in 1986 versus many in 1994.

The new records also highlight the State's extraordinary shallow attitude to investigate death; in turn, providing either less than totally complete or less than fully informed testimony as well as their bias towards the ac-cused.[5] Damage to the prosecution would not be limited to the cause of death, for an undisclosed station complaint would have devastated the underlying

---

5.   See Dr. Mihalakis ("Can we believe you exactly that you can document that there was a broken leg or broken arm") PCRA N.T. 185-188; but see, ante at 15 (broken arm and broken hip).

felony of burglary as well.

The Cecala's testimony of finding the victim's purse was crucial to the prosecution. Without their testimony the State could not have underscored, as it did, over fifteen times during its summation that, "there can be no doubt there was a Friday burglary ... because the purse is seen Saturday morning." N.T. 1045, 1020-1057.

The complaint would have shown that many of the details the Cecalas so confidently asserted on the stand (such as first seeing the purse Saturday and picking it up Sunday, and calling someone Sunday during the daytime. N.T. 579-590, 593-595) were not only false, but, had apparently escaped their memory from their initial contact with police fifteen years before. That their persuasive account did not come, indeed, until after Patricia Cecala discussed specific days and times with the District Attorney before trial. PCRA N.T. 66. And afterwards, collaberating those days and times with her husband (Joseph). N.T. 583. Raising a substantial implication that the prosecutor had coached them to give such testimony at trial. PCRA N.T. 66. In addition, casting serious doubt on Mr. Cecala's theory of "process of elimination" used for determining that he first saw the purse Saturday morning (inferring a burglary was committed Friday). Moreover, discrediting the prosecutor's spurious contention that "Mr. Cecala's memory, he told you, is confirmed by the [ambiguous] report he made to the police back in December of 1986." N.T. 1031. Mr. Cecala actually testified that Saturday was derived by a process of elimination on two occasions. N.T. 583-584, 590.

The ruling of the PCRA court that the station complaint "did not alter prior testimony" is erroneous. Op., at 9-10. Further, the holding that because Officer Gerancher prepared a detailed report - there is no prejudice; is misleading and contrary to the evidence. In fact, Gerancher's five page

report details his response to the scene and his collection of evidence. His reference to the purse on page 5 of the report is just as minimal as the station complaint. See (Defense Exh. 4 at page 5). In fact, the station complaint contradicts Gerancher's report and trial testimony. N.T. 434-435, 442-443; cf., PCRA N.T. 37.

Had the complaint been disclosed, Strohl had a compelling argument to urge the jury to aquit on the predicate crime of burglary on substantial documented evidence written on the actual day and time in question. Rather than convict on faded inconsistent uncorroborated fallible memories of witnesses. Further raising opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and uncritical attitude on the part of the police investigation. A jury would have been reasonably troubled by the numerous inconsistencies and a reasonable probability exists that the jury would have disregarded such problematic testimony and relied solely on the station complaint to infer that the purse was actually stolen during a Saturday burglary rather than Friday.[6] Essentially, the complaint destroys the Commonwealth's inference that "there can be no doubt ... there was a Friday burglary ... because the purse is seen Saturday morning." N.T. 1045. Indeed, "a jury is free to believe all, part, or none of the evidence." Commonwealth v. Shoup, 620 A.2d 15 (Pa. Super.1993). Here, disclosure of the suppressed medical records and complaint "to competent counsel would have made a different result reasonably probable." Kyles, 514 U.S., at 441, 115 S.Ct. 1555.

---

6. See jury instruction ("When I say the burglary, I'm referring to the first burglary. We know that [Strohl] committed another burglary. He's admitted to that by virtue of his guilty plea. That's not the burglary I'm talking about. I'm talking about the first burglary which is the time when the woman was attacked."). N.T. 1065-1066.

II. Did the PCRA Court err and abuse its discretion when it failed to grant Strohl a new trial based on after-discovered evidence pursuant to the Post-Conviction Collateral Relief Act?

In order to succeed on such a claim, Strohl must establish by a preponderance of the evidence that; 1) the evidence has been discovered after the trial and it could not have been obtained at or prior to trial through reasonable diligence; 2) such evidence is not cumulative; 3) it is not being used solely to impeach credibility; and 4) such evidence would likely compel a different verdict. 42 Pa.C.S.A. §9543 (a)(2)(vi); Commonwealth v. Fiore, 780 A.2d 704, 711 (Pa.Super.2001); Commonwealth v. Cobbs, 759 A.2d 932, 935 (Pa.Super.2000).

The materials forming the basis of Strohl's after-discovered evidence consist of the aforementioned medical records and police complaint. Ante, at 9. The PCRA court ruled the new evidence was discovered after trial and could not have been obtained prior by the exercise of due diligence. The evidence is not cumulative, nor solely impeaching, and differs from the testimony of the Commonwealth's experts offered at trial. Thus, satisfying the first three prongs of §9543 (a)(2)(vi). Op., at 5-6.

A. Did the PCRA Court err and abuse its discretion when it ruled that the new evidence would not compel a different result when the record suggests otherwise?

To eliminate repetition, Strohl respectfully requests this Court to consider and incorporate herein Argument one in its entirety to determine. if such evidence would likely compel a different verdict. Ante, at 8-21. Confidence that the jury's verdict would have been the same cannot survive a recap of the new evidence and its significance for the prosecution. The jury would have been entitled to find

(a) that the phantom bone driven into the brain the Commonwealth so confidently asserted occurred in 1986 was not a fallacy but a subsequent injury

22

inflicted by another that caused death in addition to a residual of surgery. Ante, at 17-18.

(b) that the lack of a fractured skull in 1986 coupled with fresh blood seen at autopsy coupled with a broken arm, a broken hip, and half an ear ripped off substantially supports the contention of subsequent head injuries that caused death. Ante, at 15, 17-18.

(c) that further supporting the contention that subsequent injuries caused death is the victim's consciousness on February 3, 1987; the lack of contusions and lacerations to the cortex of the brain in 1986; and one abnormality in 1986 versus multiple in 1994. Ante, at 15-16, 18-19.

(d) that although Strohl may have assaulted the victim; the new evidence creates a broken chain in the Commonwealth's ("unbroken") theory of causation creating a reasonable doubt as to causation of death. See N.T. 1028-29, 1038.

(e) that the State and their experts had an extraordinary shallow attitude to fulfill their Statutory obligations to investigate death; in turn, providing either less than totally complete or less than fully informed testimony. Ante, at 10-13, 19; see also n.5.

(f) that the Commonwealth overly exaggerated the victim's condition and injuries in order to downplay and mitigate their failure to investigate the abuse/accidents which the defense was asserting as intervening and supervening causes of death. See e.g., N.T. 400-405.

(g) that LifeQuest's destruction of the victim's medical records between the years of 1990 to 1994, but their retention of medical records preceeding those years, raises a reasonable suspicion that LifeQuest was covering up subsequent injuries that played a major role in the victim's death which is supported by one abnormality in 1986 versus multiple in 1994 and moreover by fresh blood at autopsy. See e.g., N.T. 785, 799-801, 1049-1050.

23

(h) that there were no consistencies to the Cecala's version of the sighting and discovery of the victim's purse, and their testimony had been coached and scripted to complement the State's theory of the case. Ante, at 20-21.

(i) that the investigation was strictly limited by the police's animosity and unwillingness to accept anything less than Strohl's culpability. See e.g., ("I believe it was Joe Strohl. Yes I do believe ... he is nothing more than a liar. There were people afraid of Joe Strohl ... and he was a scrawny punky little kid.")(Grand Jury N.T. 4/15/99, 155-158).

The PCRA Court erroneously ruled that Strohl cannot compel a different verdict because the evidence at trial is sufficient to sustain a conviction. Op., at 6-9 (citing Commonwealth v. Shoup, 620 A.2d 15 (Pa.Super.1993)). Conversely, even if other evidence presented at trial was sufficient to sustain a conviction, it does not preclude granting a new trial based on newly discovered evidence. See Commonwealth v. Valderrama, 388 A.2d 1042 (Pa.1978).

Confidence that the verdict would have been unaffected cannot survive when all these possible findings were precluded by the new evidence that supported them. If solely believed, the police complaint negates the State's inference of an underlying felony of burglary. Thus, a change in the degree of guilt from second to third degree murder constitutes exculpatory evidence. Commonwealth v. Bonaccurso, 625 A.2d 1197, 1201 (Pa.Super.1993). In addition, the medical records, which tend to show that someone other than Strohl committed the charged offense are undeniably relevant. See Commonwealth v. Chamberlain, 731 A.2d 593, 597 (1999). It is function of jury to pass upon credibility of witnesses and to determine weight to be accorded evidence produced; jury is free to believe all, part, or none of the evidence. Shoup, 620 A.2d at 15. Strohl should be granted a new trial.

Claims of ineffective assistance of Counsel:

24

Strohl's remaining claims allege ineffective assistance of trial counsel. To establish the claim, Strohl must demonstrate: 1) the claim is of arguable merit; 2) trial counsel had no reasonable basis for his action or inaction; and 3) such action or inaction prejudiced Strohl, there being a reasonable probability that, but for such action or inaction, the outcome of the proceedings would have been different. See Commonwealth v. Scott, 752 A.2d 871, 877 (Pa.2000); See also Commonwealth v. Kimball, 724 A.2d 326, 333 (Pa.1999) (explaining that "but for" prejudice test aligns with the post-conviction requirement of proving that no reliable adjudication of guilt or innocence could have taken place, as both formulations derive from Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Trial counsel is presumed effective, and it is Strohl's burden to prove otherwise.

**III. Was trial counsel ineffective for failing to seek preclusion of evidence on collateral estoppel grounds introduced at Strohl's trial in violation of his Fifth Amendment Right against Double Jeopardy?**

The first prosecution arose in 1987 and resulted in Strohl pleading guilty to a burglary of the victim's home on Saturday, December 27, 1986. The record reveals Strohl stole a TV converter, some coins, and [the victim's] purse. (Negotiated plea at 3)(PCRA Exh. 14). In the second prosecution for murder, the Commonwealth circumvents the plea by asserting the opposite, that Strohl instead stole the victim's purse a day before in order to establish that an underlying felony of burglary was committed:

> "You heard that a purse and money were taken out of the house on Friday and a TV converter and change were taken out on Saturday. [Strohl] was in that house, got Ella Wunderly's purse, and during the perpetration of that felony, that burglary, beat her and that beating caused her death ... there can be no doubt ... there was a Friday burglary ... because the purse is seen Saturday morning." N.T. 1041, 1045.

The doctorine of collateral estoppel is embodied in the Fifth Amendment and was made applicable to the States in Ashe v. Swenson, 397 U.S. 436, 437,

90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). Pennsylvania Courts apply the doctorine when: 1) the issue in the two actions are sufficiently similar and material to justify invoking the doctorine; 2) the issue was actually litigated in the first action; and 3) a final judgement on the specific issue in question was issued in the first action. Commonwealth v. Holder, 805 A.2d 499, 502 (Pa.2002); Commonwealth v. Tolbert, 670 A.2d 1172, 1178 (Pa.Super.1995).

Applying the requirements to this case; first, the issues in the two actions are sufficiently similar. At both the guilty plea and the murder trial, the Commonwealth introduced the same evidence that Strohl stole the victim's purse. Moreover, the admission that Strohl stole the victim's purse was sufficiently material given that the Commonwealth introduced the evidence as a means of proving Strohl's criminal intent to commit a burglary and theft, which in both proceedings was the evidentiary basis presented by the State to prove a burglary and an underlying burglary to murder. (Cmwlth Exh. 27, Criminal Information, No. 226-1987) and (Jury instruction at trial, N.T. 1066-1067). Furthermore, the record firmly establishes that the issue of whether the victim's purse was stolen during a Saturday or Friday burglary was actually and finally litigated by the guilty plea and sentencing colloquy. Accordingly, the Commonwealth was estopped from introducing any theories or evidence that Strohl stole the victim's purse other than during a Saturday burglary.

A. Did the PCRA Court err and abuse its discretion by ruling that Strohl's guilty plea was to burglary, not theft, when the information charging Strohl clearly defined his intent to commit theft and charged theft?

The PCRA court held that, the theft of the purse was not a fact essential to the conviction for burglary. Op., at 12. In contrast, a guilty plea is an acknowledgement by a defendant that he participated in the commission of certain acts with a criminal intent. The plea of guilt admits that the

facts and intent occurred, and is a confession not only of what the Commonwealth might prove, but also as to what the defendant knows to have happened. Commonwealth v. Anthony, 475 A.2d 1303, 1307 (Pa.1984). The fact that [Strohl] pled guilty to one count of the [information] does not produce a different result than if he had been convicted after jury trial, for it is well settled that a guilty plea constitutes an admission to all the facts averred in the indictment. Com., Dept. of Transp. v. Mitchell, 535 A.2d 581, 585 (Pa.1987).

The State cannot now be heard to deny, nor challenge with a forked tongue, that which was established by a prior conviction. There is no doubt that the prosecutor did what every good attorney would do - he worked to his advantage the death of the investigating officer and his inconsistent police report; as well as, inconsistent testimony which evolved from faded memories (N.T. 586-590), and refined his presentation in light of the turn of events of the guilty plea in 1987. This is precisely what the constitutional guarantee forbids. Ashe, supra., at 477, 90 S.Ct. at 1196.

The State had every opportunity in 1987 to amend, reject, and object to any and all parts of the plea. Pa. R.Cr.P. Rule 548. They chose not to, and hence relinquished that entitlement. The Commonwealth may believe it made a strategic miscalculation, but that does not entitle them to collaterally attack an otherwise valid and final judgement.

Constitutional law barred the State from relitigating any theories or evidence contradicting Strohl's theft of the victim's purse other than during the Saturday burglary. Counsel's decision not to seek preclusion was not based on any reasonable trial strategy. In fact, counsel admits Strohl could not steal the purse twice. PCRA N.T. 146-156. Had the State been estopped from relitigating Strohl's theft of the purse other than during the Saturday burglary; there is a reasonable probability the jury would have aquitted

27

of the underlying felony of burglary because the only evidence argued by the Commonwealth to support the predicate crime was the theft of the purse. See Commonwealth v. Kimball, 683 A.2d 666, 669 (1996)(en banc), allocatur granted, 693 A.2d 587 (1997)("A determination that counsel's ineffectiveness would have resulted in a different outcome necessarily renders the truth-determining process unreliable."). In this case, a finding of ineffectiveness is warranted. See 42 Pa. C.S.A. §9543 (a)(2)(ii).

## IV. Was trial counsel ineffective for failing to request a jury instruction on Aggravated Assault because of a misinterpretation of the law?

The jury was charged on second and third degree murder under the doctrine of accomplice liability. N.T. 1063. Counsel contends the court could not instruct on aggravated assault[7] because the Statutes of limitations had run out. PCRA N.T. 87, 83. Conversely, there is no limitations applicable to any felony alleged to have been perpetrated in connection with a murder of the second degree. 42 Pa. C.S.A. §5551(4).

Aggravated assault is lesser included offense of murder. Commonwealth v. Fuller, 579 A.2d 879 (Pa.Super.1990). In both capital and non-capital cases, a court must give a requested instruction on lesser included offenses where it is supported by the evidence. Vujosevic v. Rafferty, 844 F.2d 1023, 1027 (3rd Cir. 1998)(citing Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)). This requirement is based on the risk that a defendant might otherwise be convicted of a crime more serious than that which the jury believes he committed simply because the jury wishes to avoid setting him free. Id.

Sub judice, causation was before the jury. N.T. 1068-69. The fact the

---

7. 18 Pa. C.S.A. §2702

victim had lived for seven years after assault supported a conviction for aggravated assault and also supports a finding Strohl did not cause the death; which would relieve him of liability for homicide. The jury was instructed:

> "The Commonwealth must prove that the assault on [the victim] occurred at sometime during a burglary by [Strohl] earlier than the burglary of December 27 which he pleaded guilty for. The Commonwealth is not saying the assault happened on December 27, the burglary for which the defendant pleaded guilty."

N.T. 1085. Baffling, is how a jury could convict Strohl beyond a reasonable doubt that he committed the crime of assault, which allegedly caused the death, without being instructed on the crime of assault.

Article III §2 of the United States Constitution states that "[T]he trial of all crimes, except in cases of impeachment, shall be by jury." The use of "all crimes" necessarily means "every" crime, and rules out any exception to the right. The Supreme Court has interpreted the term "crime" as not including petit offenses. See Schick v. United States, 195 U.S. 65, 24 S.Ct. 826, 49 L.Ed. 99 (1904), but once it is determined what a crime is, the right to a jury trial is absolute. The language serves to guarantee a right that is absolute in the sense that it applies to all criminal prosecutions or, put differently, to the prosecution of every crime. United States v. Pellullo, 14 F.3d 881, 894-95 (3rd Cir. 1994). The fundamental fairness guarantee of the Due Process Clause requires the prosecution to prove beyond a reasonable doubt every element of the offense. This constitutional principle "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." Francis v. Franklin, 471 U.S. 307, 313, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).

The lack of an aggravated assault instruction unfairly deprived Strohl of his primary defense theory; having gone forward with a theory that Strohl

did not assault the victim, but even if he had, the injuries sustained during assault did not cause death. N.T. 964; PCRA N.T. 128. Strohl was unable to have the jury decide whether his versions of the facts were correct.

The absence also failed to accurately apprise the jury of recklessness required under aggravated assault Statute and failed to inform the jury that if Strohl caused bodily injury, he must have done so intentionally or knowingly to be guilty. Commonwealth v. Nichols, 692 A.2d 181 (Pa.Super.1997). Although circumstances might indeed preponderate sufficiently to allow the factfinder to infer that a party acted with intent to inflict serious bodily injury, the necessity of proving a case by circumstantial evidence does not coincide with suspension of the operable burden of proof. The Commonwealth's reliance upon circumstantial evidence is not a license for the jury or factfinder to speculate and convict upon hunches. Commonwealth v. Robinson, 817 A.2d 1153, 1159 (Pa.Super.2003).

The PCRA court Monday Morning Quarterbacked the jury's verdict to determine counsel's ineffectiveness and prejudice by holding the jury would have returned a verdict of third degree rather than second. Op., at 13-14. The same argument was rejected as a matter-of-law in Vujosevic, supra., at 1027. See also Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

The third degree murder instruction did not offer the jury a rational compromise between second degree murder and aquittal; only an aggravated assault charge could do that. See e.g., Vujosevic, supra., at 1028. The failure to request the instruction reduced the prosecutions burden of per-

suasion to a preponderance. When the trial court failed to deliver the required instruction, counsel had a duty to request it to do so and if the request was denied, to preserve the court's error by an appropriate objection. To fail in this respect was so unreasonable that it must be equated with constitutionally ineffective assistance of counsel.

**V.  Was trial counsel ineffective for failing to properly object to, and preserve for Appeal, the court's material misstatement of evidence during its summary of evidence to the jury?**

There is no question the trial court misstated William Notti's testimony for the benefit of explaining an accomplice charge. The Court stated:

> "There was some testimony from Mr. Notti that on the first night when he drove the car there, Mr. Strohl got out and another person, he didn't remember precisely who it was, went into the [victim's] house."

N.T. 1088. Notti actually testified:

> "It might have been a Friday or Saturday," N.T. 602, and [I] did not see where they went, it was dark out." N.T. 605.

Remarkably, even before the misstatement was made, it was brought to the Court's attention by the defense: "Nobody testified that both people went in the house." N.T. 943-944. Counsel now, however, cannot recall any misstatements being made. PCRA N.T. 87-91, 225-229.

It is within the discretion of trial judges to summarize evidence for the benefit of the jury. Commonwealth v. Crawford, 305 A.2d 893 (Pa.1973). However, the judge must bear in mind that his "influence ... on the jury is necessarily and properly of great weight ... and jurors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word." Bollenbach v. United States, 326 U.S. 607 , 612, 66 S.Ct. 402, 90 L.Ed. 350 (1946). The judge must avoid material misstatements of evidence presented in the case. Commonwealth v. Douglas, 357 A.2d 860 (1975). A material misstatement involves a "variance

31

between the testimony of the witness and the judge's account of it ... of such a nature as [to] seriously ... prejudice the interests of the defendant and deprive him of a fair trial." Crawford, id., 305 A.2d at 895. Where the misstatement involves the most important evidence on a crucial legal question or vital evidentiary point in the case, it may seriously prejudice the defendant's case and is often considered reversible error. See Commonwealth v. Irwin, 431 A.2d 257, 259 (Pa.1981)(citing reversible error cases).

The misstatement occurred while the court instructed on "in furtherance" regarding accomplice liability. N.T. 1088. In order to convict Strohl, the Commonwealth was required to prove beyond a reasonable doubt Strohl "entered the [victim's] residence." N.T. 1066. The misstatement, however, places Strohl and an accomplice directly inside the victim's house on Friday night when the alleged assault occurred. Eliminating an essential element of second degree murder and obviously contrary to Notti's testimony. The only other testimony placing Strohl at the scene on Friday, and nonetheless without an accomplice, was that of Shull. N.T. 525. Even so, Shull's testimony comes from a corrupt and polluted source. N.T. 1070. And further was impeached by his own inconsistent statements. N.T. 559-563. As well as uncorroberated by Strohl. N.T. 541-542. Besides, Notti's own inconsistent testimony was open to suspicion. N.T. 608-631, 803-804, 1070. In addition, the court also precisely pin-points a "first night" when Notti drove the car there. N.T. 1088. Notti never even testified he was there on two nights. Rather he testified "it might have been a Friday or Saturday." N.T. 602.

Compelled to repudiate the misstatements, the PCRA Court presents a laundry list of inferences deduced from testimony at trial to subvert and justify the misstatements. Op., at 15-16. None of which negate the effect the fallacious eyewitness testimony by the court may have had upon the jury.

In fact, the material misstatements bolster the inferences favorable to the Commonwealth and belittles the other inferences favorable to the defense that Strohl actually went into his Mom and Dad's house to get money that night. N.T. 605. Further undermining the defense's contention that Notti was actually talking about the Saturday burglary rather than a Friday burglary. N.T. 971-972.

The PCRA Court now sustains the conviction on the afterthought that the material misstatements did not mean what they said, and while Notti testified inferring, the trial judge replied to him as an eyewitness. Here, the misstatements involved the most important evidence on crucial matters of law and vital evidentiary points, yet, the conviction is sustained on the assumption that the jury was properly guided. The contradiction was of such a nature as seriously to prejudice the interests of Strohl, usurp the jury's truth-determining process, and deny Strohl a fair trial.

The PCRA Court also holds because the jury was instructed that "their recollection as to the facts control" there is no prejudice. Op., at 17. Conversely, the misstatements could reasonably have formed in the minds of the jury a fixed bias towards Strohl and impeded their ability to weigh the evidence and render a true verdict. See e.g., Bollenbach, supra., at 612, 66 S.Ct. at 405 ("If it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge."). Counsel's failure to object or request a cautionary instruction was not based on a reasonable trial strategy to effectuate Strohl's interests. PCRA N.T. 87-91, 225-229. Thus, counsel's failure allowed the misstatements to infect the jury's truth-determining process and denied Strohl the effective assistance of counsel.

VI.   Was Counsel ineffective for waiving on Direct Appeal an issue of police and prosecutorial misconduct during the Grand Jury or alternatively failing to seek suppression of the tainted testimony which may have resulted in the quashing of the presentment issued as the affidavit of probable cause to arrest Strohl?

Counsel raised a similar issue on direct appeal, but the issue was waived by the trial court for failing to cite legal authority or to the record. (Trial Court opinion at page 8, n.1). PCRA N.T. 229-230, 82-96. Defense attorneys are expected to comply with the procedures mandated by the Supreme Court. Commonwealth v. Lennox, 428 A.2d 228 (Pa.Super.1981). Denying all opportunities of entering proper challenge to grand jury constitutes denial of due process of law and grounds for quashing of indictment. Commonwealth v. Lopinson, 234 A.2d 552 (Pa.1967). Further, a convicted defendant aggrieved by illegal actions of the investigative grand jury can obtain appropriate appellate review from judgement of sentence. Commonwealth v. McCloskey, 277 A.2d 764, 773 (Pa.1971). By defaulting the claim, counsel lost the opportunity to obtain review under harmless error standard of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) which requires State to prove that defendant was not prejudiced by the error, by defaulting, counsel shifts burden to Strohl. See Kimmelman v. Morrison, 477 U.S. 365, 382, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986).

A.   Did the PCRA Court err and abuse its discretion by ruling there was no "illegal influence" when the record and law support otherwise?

The transcripts of the grand jury reveal what can happen when a prosecutor is to determined to obtain an indictment. The transcripts reveal instances of moral turpitude, undue influence, and inducement by police and prosecutors to taint and tamper with evidence and the immemorial recollections of witnesses and their prior testimony to change the status quo ante of the case. It is for the jury alone to consider the evidence and to apply it to the

case at hand;  any attempt on the part of the District Attorney to influence their action or to give effect to the evidence adduced, is in the highest degree improper and impertinent. Commonwealth v. Bradney, 126 Pa. 199, 205, 17 A. 600 (1889); Commonwealth v. Smart, 84 A.2d 782, n.3 (1951); In re , Petition of Acchione, 227 A.2d 816, 820 (1967)(scope of review).

**William Notti's grand jury excursions and tainted testimony:**

Police interviewed Notti three times in 1986, and once again in 1996. Notti also testified before the grand jury three times and was interrogated a slew of times before, during, and after testifying. N.T. 610. After his first testimony before the grand jury, the District Attorney ("D.A.") admits they have work to do with [Notti]. (Grand Jury Notes of testimony, "GJ N.T.," 4/22/99 at pg. 62). Thereafter, Notti was taken to the crime scene. GJ N.T. 6/3/99 at 105. And driven to and from the grand jury by Trooper Vazquez. Id., at 124. Vazquez also tells the grand jurors for a couple of beers he plans to keep in touch with Notti and admits being with him on four seperate occassions. Id., at 125-126. Any contact between jurors and other parties, court officers, lawyers, and judges is viewed with disfavor. Commonwealth v. Mosley, 637 A.2d 246, 248 (Pa.1993). The D.A. not liking Notti's uncor-roberating testimony scolds Notti:

> "I am not going to fool around with you ... I will have you in front of the judge, and you will be sitting in Northampton County Prison for contempt ... That is not what we heard from ten witnesses ... I don't think that ten witnesses are lying ... I want to know the truth ... or I will have you before a judge for perjury ... You are not going to be evasive ... You are not going to lie to this grand jury."

GJ N.T. 3/25/99 at 80; 4/22 at 40-50. Notti responded, "You are trying to put words in my mouth. The D.A. still not liking Notti's answers continued his gestapo like tactics and tells Notti:

> "Were you just like a dumb person ... do you think playing dumb ... will get you off the hook? I want straight answers ... everybody else

35

is lying, and you are the only one telling the truth? You have a pretty
poor memory ... I know for a fact that you were present in your car
when Strohl was talking to Shull about going in that house and I know
for a fact and I want to know why you won't tell us the truth? Id.

After being berated, Notti answers, "I didn't hear them say anything." GJ
N.T. 4/22, 44-50. The D.A. then threatens, do you think your memory would
be refreshed if we had you sit over in Northampton County [Prison] for a
couple of days? Do you think we could get your memory a little better then?
Id., at 50.

The day before Notti testifies before the grand jury for a third time
he is interviewed for three and one-half hours in the D.A.'s office by Trooper
Vazquez, Detective Kocevar, and Assistant D.A. Jenkins. N.T. 760. Notti
was excused, brought back before the grand jury the following day and testifies
about an incriminating statement attributed to Strohl. See trial N.T. 617-
631; GJ N.T. 6/3/99 at 87-110. See also Commonwealth v. Holloman, 621 A.2d
1046 (Pa.Super.1993)(Right of defendant to call witnesses favorable to his
defense mandates that such witnesses be free to testify without fear of prose-
cutorial retaliation).

Prosecutors are not permitted to attempt to influence a grand jury by
expressions of personal opinion. Smart, supra.; See also Gershman prosecutor
Prosecutor Misconduct, §2.3(b)(1986)(hostile questioning and implications
that witness is lying viewed as misconduct). In fact, the Pennsylvania Supreme
Court In re Investigating Grand Jury, 518 Pa. 485, 544 A.2d 924 n.6 (1988)
found far less draconian questioning amounting to prosecutorial misconduct.

Notti's grand jury and trial testimony was a product of prosecutor and
police coercion, intimidation, undue influence, and was tainted by the D.A.'s
inclusion in questions of incorrect statements of witnesses prior testimony:

Q. Mr. Strohl told police that you had given him a ride the Friday
after christmas and that Saturday after Christmas. And that you had

been driving around in your pinto, do you remember that?

A. I might have given him a ride, I'm not sure exactly when it was.

GJ N.T. 3/25 at 77. Strohl never told the police no such thing. In fact, Strohl told police he was home on Friday and Notti gave him a ride to Emmaus Saturday. Cmwlth Exh. 36, 37, 38; N.T. 715-718; also GJ N.T. 3/25, 79-80.

There is ample evidence to support the view that an attempt was made by prosecutors and police to shape Notti's testimony and that it was successful

> "I knew it from you, you said it was John, you told me it was a John guy. What I heard from you. I can't be certain of that. I don't know if I read it in the paper or I heard it from you ... I may have heard it from the police."

GJ N.T. 6/3/99, at 91-110.

> "It was in the fall or winter, he might have had a -- his shirt and something wrapped in his shirt. I can't say for sure. I can't remember [seeing anything thrown from the car window]. After we got going a little ways ... he said I wonder if she is okay or alright ... and he told me to shut up and mind my own business or I'll kill you."

GJ N.T. 6/3/99, at 87-110. But cp., Notti's Trial testimony:

> "On Friday or Saturday around Christmas Strohl returned to [Notti's] car with a purse and money. Strohl turned around to a person in the back seat and said, I wonder if she's okay, and the person in the back seat said, Sh-Sh-Sh, and Strohl told me to shut the fuck up, you fat fuck, or I'll kill you, too. Later, while driving down the road I observed something thrown from my car window (the victim's purse).

N.T. 602-608. An allegation that a witness's memory of an event has been tainted raises a red flag regarding competency, not credibility, and where it can be demonstrated that a witness's memory has been affected so that their recall of events may not be dependable, State law charges the trial court with the responsibility to investigate the legitimacy of such an allegation. Commonwealth v. Delbridge, 2002 WL 32170269 (Pa.2003). But see Op., at 18; and PCRA N.T. 93-95.

The prosecutor had the audacity to tell Strohl's jury, "it took the power of the investigative grand jury to force [Notti] to tell the truth."

N.T. 1035. Amazingly, none of Notti's grand jury testimony is interchangeable with that of his trial testimony. What is apparent; is from the grand jury inception, until Strohl's trial, Notti's testimony becomes more refined and exact to suit the Commonwealth's case. See Commonwealth v. Goldblum, 447 A.2d 234, 240 (Pa.1982)(New trial may be appropriate in case where testimony is hopelessly contradictory).

Prejudice of this order cannot be eliminated at trial, and the court should not speculate that the grand jury's decision might have been unaffected by the prosecutor's and police conduct. Without Notti's testimony; the validity of the presentment is called to question; there is no affirmative proof of an accomplice; nor, is there proof of an underlying felony of burglary. Essentially, not enough to convict.[8]

**B. Does the totality and remaining misconduct require the Court's invoking of supervisory control and warrant the quashing of the presentment in the interests of justice and fairness?**

The record contains ample amounts of official animus directed towards Strohl by the unauthorized presence of Trooper Vazquez. Threats and threatening innuendoes are used towards witnesses. Deliberate attempts are made by witnesses and prosecutors to mislead the grand jury. And improper characterizations of evidence and the insertion of opinions regarding the strength and weight of the evidence are apparent.

The "unauthorized presence" and animus (Pa. R.Cr.P. Rule 264)(New Rule 231):

The unauthorized presence of Trooper Vazquez tainted and improperly influenced the grand jury's decision to issue a presentment. Vazquez testified on several occasions and was present while testimony was being given before

---

8. Of worthy note here is that Notti's testimony played a major role in the Trial Court's decision not to dismiss the charges for a prejudicial pre-arrest delay. (February 16, 2001 Rational at pgs. 4-5).

the grand jury. Vazquez's presence allowed his testimony to be tailored to that of other witnesses and enabled him to comment on the veracity of evidence produced before the grand jury through the questioning of the prosecutor. Investigators present pursuant to a Rule 264 order may not address the witnesses, the witness's counsel, or the grand jury. 42 Pa. C.S. §4549(a); In re fifth Statewide Investigating Grand Jury, 44 D$C 3d. 339, 348 (1987). But see Vazquez's testimony:

> "If you ask me about the beating about the face, I could tell you something about that, about profiling. Joe Strohl's propensity to violence was quite evident. All the info we were receiving from the start was it was Strohl. You saw he lies. I believe it was Joe Strohl. Yes I do believe ... and I don't believe it was Bobbyjo Shull, it was Joe Strohl. He is nothing more than a liar. There were people afraid of Joe Strohl ... and he was a scrawny punky little kid."

GJ N.T. 3/11/99, 172-173; 3/18, 202-203; 4/15, 155-158.[9]

**Threats and threatening innuendoes:**

Threats and threatening innuendoes were used towards witnesses when the prosecutor felt they were being uncooperative and could not remember specific facts that happened thirteen years before. See e.g., GJ N.T. 3/25/99 at 43; 3/18 at 92; also ante at 35-36.

**Deliberate attempts to mislead; improper characterizations of evidence; and the insertion of opinions regarding evidence:**

The following exchanges took place between police and prosecutors, but in no way is an exhaustive list of the circumstances:

> Q. So Joe Strohl then would have been home alone from 9:30 to midnight or until whenever his parents got home on Friday?
>
> A. Correct.

GJ N.T. 4/15, at 120. Clearly the evidence shows that Strohl's parents were

---

9. See also Richard Wunderly; The Strohl family was "dysfunctional," "totally destructive," and did not have any respect for the law. My mother was afraid of Strohl. GJ N.T. 3/11/99, at 19-27.

home on Friday night. See e.g., PCRA Exh. 4, 5, 6, and PCRA N.T. 67-70.

Q.   The judge didn't buy this story that Strohl and Shull were in there
     and this woman was already beaten up while they were burglarizing her
     home, did he?

A.   I don't think so.

GJ N.T. 3/18, 61-62; 3/25, 79-80; also ante at 35-37.

Without doubt, had Strohl resorted to even an inkling of these types of tactics to persuade testimony or juror vote in his favor, he would be behind bars with a laundry list of criminal charges pending against him. There is substantial documented evidence to pass muster that the prosecution and police were reckless, misleading, and producing untrue testimony which end result was highly prejudicial. Even if one would accept that these mis-representations were not knowing, this generous characterization of the mis-representations in no way reduces the prejudicial effect of the misrepresenta-tions on those it was intended to persuade. False testimony can be just as untruthful and deceptive whether given knowingly or innocently. See e.g., United States v. Breslin, 916 F.Supp. 438 (E.D. Pa. 1996).

The tactics used here evoke shades of McCarthyism as the abuse becomes lost under the guise of conviction. The egregious conduct goes unabated as the grand jury is uninformed as to their function:

"If we think there is a different suspect, do we come to you? So let me get this straight, if we have a different suspect -- (the D.A. cuts her off) -- I was wondering if someone impartial could explain to us exactly what our role is as grand jury ... I can't seem to quite under-stand our role exactly and exactly what the law states, what are we supposed to be doing? I have a question about our role ... people are suspecting maybe some of the witnesses that perhaps were not suspects officially, and we are a investigating grand jury, Correct?

GJ N.T. 6/3/99, 126-132. The impartiality and independent nature of the grand jury process was seriously impaired by the prosecutor and police action and their misunderstanding of their role. See Wood v. Georgia, 370 U.S. 375

82 S.Ct. 1364, 8 L.Ed.2d 569 (1962)(explaining why the grand jury must be both "independent" and "informed"). Counsel admitted the claim had merit. PCRA N.T. 230. And for the foregoing reasons Strohl shows that he was prejudiced and the prosecutor and police actions undermined the truth—determining process, thus, Counsel was ineffective, and Strohl should be granted relief.

**VII. Was trial counsel ineffective for failing to object, and preserve for Appeal the trial court's failure to give an adverse inference Jury Instruction regarding the victim's lost and destroyed medical records?**

The trial court refused to give an adverse inference jury instruction regarding the victim's destroyed medical records because the Commonwealth had no control over the records. N.T. 823–824. Thus, counsel withdrew the request. N.T. 935. Counsel believes the lost records hurt the defense, but there was no remedy. PCRA N.T. 97–101.

A party cannot benefit from its own withholding or spoilation of evidence. The spoilation doctorine compensates those whose legal rights are impaired by the destruction of evidence by creating an adverse inference against the party responsible for the destruction. Duquesne light v. Woodland Hills Sc. Dist., 700 A.2d 1038, 1050 (Pa.Cmwlth.1997). Where evidence which would properly be part of a case is within the control of the party in whose interest it would naturally be to produce it, and without satisfactory explanation he fails to do so, the jury may draw an inference that it would be unfavorable to him. Magette v. Goodman, 771 A.2d 775, 780 (Pa.Super.2001). Here, both the Commonwealth and LifeQuest Nursing Center (LQNC) are responsible for the destruction.

**A. Does Due Process afford Strohl an adverse inference instruction against the Commonwealth for their failure to retain or preserve the victim's medical records which were available at the time of death, but because of their delay in prosecution and failures to perform duties the records were destroyed? Or alternatively, was Strohl entitled to the same against LQNC for destroying the records when they had a Statutory duty to preserve them and when their conduct was an issue in the case regarding the victim's cause of death?**

Dr. Fillinger testified that medical records are very important to determining a cause and manner of death. N.T. 371.[10] Fillinger also stated he had a duty to review the victim's medical records. N.T. 327-328.[11] Clearly the records were relevant and material evidence. At the time of death, the records were available to the Commonwealth. PCRA Exh. 11, PCRA N.T. 125. However, Fillinger failed to perform his duty to review and acquire the victim's records and instead, chose to rely solely on his training, experience, and what police told him to determine a cause and manner of death. N.T. 370-371. On the otherhand, LQNC was mandated by law to preserve the records for a minimum of seven years after death. 28 Pa. Code §§211.5, 563.6; also PCRA N.T. 26.

Several years after death, LQNC destroyed medical records of the victim from 1991 through 1994. PCRA Exh. 11. As a result, Strohl did not have an opportunity to inspect or investigate documented evidence of the victim's important clinical history. N.T. 368. Instead, Strohl was forced to accept expert opinions that assumed the victim remained in a coma and assumed all the injuries occurred in 1986. N.T. 245, 306.

At trial, the defense argued that additional injuries, attributable to abuse or accidents by LQNC, caused the victim's death or raised a reasonable doubt as to death. N.T. 372-410, 1006-1008. Conversely, the Commonwealth argued the lost records were insignificant. N.T. 1049-1050. If evidence has been destroyed, referral of spoilation issue to jury with accompanying instructions is the proper and advisable course of action. Duquesne light, 700 A.2d at 1041.

---

10. See also Drs. Mihalakis and Rorke (same). N.T. 268, 306; PCRA N.T. 161.

11. See also, Coroner's investigations; Power of Subpoena; and Autopsy; inquest; records. 16 P.S. §1237, §1245, §4237.

Counsel's failure to object to the court's refusal to instruct the jury that it could draw an inference that the records would have been unfavorable to the position of the Commonwealth or LQNC was prejudicial to Strohl and thwarted the purpose of the spoilation doctorine.

The destroyed medical records were material evidence to the defense. LQNC is mandated by law to document abuse and/or accidents to residents at their facility. 35 P.S. §10211-10224 (Elderly Abuse Act); Pa. Dept. of Aging Act 13 (Mandatory Abuse/incident reports); also 42 CFR 483.13 (c)(1)(ii) et. seq.. Without access to the detroyed records the defense was prevented from substantiating its claims that additional injuries or some cause related to abuse caused the victim's death. A compelling argument which is supported by the eyewitness testimony of Richard Wunderly. N.T. 673-678. In addition, Strohl was prevented from corroberating or disputing the Commonwealth's trio of experts who put forth a hypothetical cause and manner of death. N.T. 180-252, 262-308, 334-409. Furthermore, it makes no sense, nor was it in the best interests of Strohl, for defense counsel to assert the claim that the destroyed records were material, but yet, fail to seek an appropriate instruction as to spoilation.

Since the records were available at death, and Fillinger had a duty to review them during his investigation of the death, the Commonwealth should also be held accountable for there destruction. The Commonwealth cannot be heard to contend that Fillinger did not recognize or understand the obvious. That certainly is true here because there is no testimony from Fillinger, or for that matter anybody else, suggesting that he did not recognize the obvious potential for exculpation in the destroyed evidence. Nor should the court sanction the argument which excuses Fillinger from having to make an assessment of the potential utility of evidence which he allowed to be

destroyed because of his failure to perform a duty.

The consequences suffered by Strohl as a result of the destruction of the records clearly required the trial court, in this instance, to instruct the jury that an adverse inference may be implied against LQNC and the Commonwealth if the jury found spoilation. Accordingly, the trial court's refusal to instruct the jury it could infer that the destroyed evidence would have been unfavorable constituted an abuse of discretion and prejudicial error which undermined the truth-determining process. Thus, rendering counsel ineffective. Without the instruction, Strohl here was left without remedy because the State contends he has not been victimized.

**VIII. Was trial counsel ineffective for failing to call a potential alibi/ favorable defense witness?**

To prove counsel was ineffective for failing to call a witness to testify, Strohl is required to demonstrate that: 1) the witness existed and was available; 2) counsel was aware of the existence of the witness or should have known of their existence and availability; 3) the proposed witness was ready, willing and able to testify on behalf of the defendant; and 4) absence of proposed testimony prejudiced him. Commonwealth v. Lopez, 739 A.2d 485, 486 (Pa.1999).

It is undisputed that Strohl meets the first three prongs. Op., at 20. Robert Strohl provided an affidavit and testified at the PCRA hearing. PCRA Exh. 4; PCRA N.T. 67-73. Further, counsel testified they were aware of Robert Strohl. PCRA N.T. 102-105, 232-233. Both attorneys also testified that Mr. Strohl was not a true alibi. Id.

**A. Did the PCRA Court err and abuse its discretion by ruling unsupported by the record that Mr. Strohl's testimony could not have undermined confidence in the verdict?**

Mr. Notti testified that he drove Strohl to the rear of his house on

44

a Friday or Saturday night around 10 p.m. and 12 p.m.. N.T. 602. Notti was the only witness to testify to any specific time or entry into the victim's home. N.T. 598-631.

Unlike Notti's miraculous revived repressed thirteen year memory, Robert Strohl testified at the PCRA hearing consistently with what he told the police in 1986. PCRA N.T. 68-73. Robert Strohl stated he picked his son (Appellant) up from work Friday night around 9:30 p.m.. His son took a shower and went to bed. Robert Strohl stayed awake until 11:15 p.m. and never saw his son leave the house that night while he was awake. Id., at 68-73; PCRA Exh. 5 and 6. No other witness presented by the Commonwealth or the defense could provide a consistent statement to that of what they told police in 1986 except for Robert Strohl had he been called by the defense.

In the court's eyes, Robert Strohl's testimony may not constitute a true alibi. See Commonwealth v. Roxberry, 602 A.2d 826, 828 (1992). If so, it should still find counsel ineffective for failing to call a favorable witness on behalf of Strohl.

Here, the case at hand hinges entirely on the credibility of witnesses. N.T. 935. Only two witnesses place Strohl in the vicinity or create inferences as to Strohl's involvement with the assault or a Friday burglary (i.e., Robert Shull, N.T. 522-577; and William Notti, N.T. 598-631). Both of whose testimony is on very shaky ground. N.T. 1070.

Robert Strohl's testimony, if believed, could have exonerated Strohl. It is for the jury to believe all, part, or none of the evidence. Shoup, supra., 620 A.2d 15. In a case where virtually the only issue is credibility of the Commonwealth's witnesses versus that of the defendant, failure to explore all alternatives available to assure that the jury heard the testimony of a known witness who might be capable of casting a shadow upon the State's

witness's truthfulness is ineffective counsel. <u>Commonwealth v. Abney</u>, 350 A.2d 407, 409 (1976)(quoting <u>Commonwealth v. Twiggs</u>, 331 A.2d 440, 443 (1975)).

Here, Strohl maintained his innocence. Nevertheless, Robert Strohl's testimony, had it been presented by the defense could have only strengthened the defense and weakened the already circumstantial evidence case of the Commonwealth. N.T. 1043-1044, 935. Trial counsel's failure to call Robert Strohl wasn't based on any reasonable trial strategy to benefit Strohl's interest in the outcome. In fact, their decision was based on the fact that Robert Strohl was not an alibi. PCRA N.T. 102-105, 232-233.

Confidence in the outcome is very much undermined. Uncorroborated and inconsistent testimony, uncorroborated by physical or forensic evidence, or a confession, is a thin thread to shackle a man for life. Moreover, it is precisely the sort of evidence that an alibi or favorable witness refutes best. Strohl establishes a reasonable probability that the result would have been different, therefore, also establishing prejudice. Moreover, a "reasonable probability" is simply "a probability sufficient to undermine confidence in the outcome." <u>Strickland v. Washington</u>, 466 U.S. 668, 694, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

## VIII. CONCLUSION:

For the foregoing reasons, the judgement of sentence should be vacated; a new trial granted, or, in the alternative the charges dismissed.

Respectfully Submitted

Joseph M. Strohl, pro se
# CM-2097
1100 Pike St.
Huntingdon, PA 16654-1112

# CERTIFICATE OF SERVICE

I, Joseph M. Strohl, certify that I have this day served the foregoing document to the parties listed below by sending a copy by first class mail, postage pre-paid.

John Morganelli, Northampton County District Attorney
Northampton County Government Center
669 Washington Street
Easton, PA 18042

The Superior Court of Pennsylvania
Office of the Prothonotary
530 Walnut Street   Suite 315
Philadelphia, PA 19106
(1 original and 7 copies)
(certified Return Receipt)
(# 7004 0750 0002 5581 1928)

Date: 11 04 04

Joseph M. Strohl