# EXHIBIT K

IN THE SUPREME COURT OF PENNSYLVANIA

No._____   Allocatur Docket 2005

---

COMMONWEALTH OF PENNSYLVANIA,
                                    Respondent

VS.

JOSEPH MICHAEL STROHL,
                                    Petitioner

---

| | |
|---|---|
| Pa.Super. Court Docket: | 1954 EDA 2004 |
| Trial Court Docket: | 829 - 2000 |
| OTN: | F062691-4 |

---

**PETITION   FOR   ALLOWANCE   OF   APPEAL**

---

Petition for Allowance of Appeal from Order of May, 13, 2005
of the Superior Court at 1954 EDA 2004 affirming the
decision of the Trial Court's denial of
Post Conviction Collateral Relief.

---

Joseph Michael Strohl, pro se
#CM-2097
1100 Pike St.
Huntingdon, PA 16654-1112

Date: June 1, 2005

sent 6/3/05
DA

# TABLE OF CONTENTS

page

I.      Table of Citations...................................i

II.     Opinions Below.......................................1

III.    Order in Question....................................1

IV.     Questions for Review.................................2

V.      Statement of the case...............................3

VI.     Reasons for Allowance of appeal.....................4

1. The lower courts are in conflict with the holdings on
   the issue of suppression of Brady material set forth
   in Kyles v. Whitley, 514 U.S. 419 (1995) that the prose-
   cutor has a duty to learn of any favorable evidence
   known to the others acting on the government's behalf
   in the case, including police...................................4

2. Does decision of lower courts on issue of materiality
   of police complaint conflict with Kyles v. Whitley,
   514 U.S. 419 (1995) by weighing prosecution's and peti-
   tioner's trial evidence rather than determining whether
   evidence undermined confidence in outcome of verdict?..........8

3. Whether the undisclosed medical records were material
   to the defense?.............................................10

4. Whether the lower courts erred in denying petitioner
   a new trial pursuant to 42 Pa. C.S.A. §9543(a)(2)(vi)'s
   fourth prong?...............................................14

5. Whether trial counsel's failure to raise a Double Jeopardy
   Collateral estoppel claim was sufficiently egregious
   to constitute constitutionally ineffective assistance
   of counsel under Strickland v. Washington, 466 U.S.
   668 (1984)?.................................................16

6. Whether trial counsel's failure to request an aggravated
   assault jury instruction because of a misinterpretation
   of the law prejudiced petitioner?..........................19

i. Whether the lower courts committed reversible error
   by holding that a causation instruction was equal too,
   or an acceptable alternative to giving an aggravated
   assault jury instruction?..................................21

7. Whether trial counsel's failure to object to a material misstatements of evidence during the jury charge pre-judiced petitioner?........................................22

8. Whether trial counsel was ineffective for failing to request an adverse inference jury charge regarding lost and destroyed medical records when the defense was arguing there significance and the Commonwealth was arguing that they were insignificant?................................24

9. Whether trial counsel was ineffective for failing to call a favorable defense witness?..........................26

VII.    Conclusion.........................................28

VIII.  Statement regarding in forma pauperis status........29

IV.    Appendix

      a.  Superior Court Opinion..........................A

      b.  PCRA Court Opinion..............................B

      c.  Lehigh Valley Hospital Records..................C

      d.  Police Complaint................................D

X.    Proof of Service

7. Whether trial counsel's failure to object to a material misstatements of evidence during the jury charge prejudiced petitioner?........................................22

8. Whether trial counsel was ineffective for failing to request an adverse inference jury charge regarding lost and destroyed medical records when the defense was arguing there significance and the Commonwealth was arguing that they were insignificant?................................24

9. Whether trial counsel was ineffective for failing to call a favorable defense witness?...........................26

VII.    Conclusion.........................................28

VIII.   Statement regarding in forma pauperis status........29

IV.     Appendix

        a.  Superior Court Opinion..........................A

        b.  PCRA Court Opinion..............................B

        c.  Lehigh Valley Hospital Records.................C

        d.  Police Complaint...............................D

X.      Proof of Service

# I. TABLE OF CITATIONS

page

Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970)........17
Banks v. Dretke, 540 U.S. 668, 124 S.Ct. 1256, 156 L.Ed.2d 1166 (2004)... 6 ,7
Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)........20
Bollenbach v. U.S., 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946)......22,24
Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).2,5,6,7,8
Cmwlth Dept. of Transp. v. Mitchell, 535 A.2d 581 (Pa.1987)................27
Commonwealth v. Anthony,475 A.2d 1303 (Pa. 1984).........................17
Commonwealth v. Bonaccurso,625 A.2d 1197 (Pa.Super.1993).................10,16
Commonwealth v. Chamberlain, 731 A.2d 593 (Pa.1999)..........................16
Commonwealth v. Crawford, 305 A.2d 893 (Pa.1973)...........................22
Commonwealth v. Durant, 460 A.2d 732 (Pa.1988)..............................11
Commonwealth v. Holder, 805 A.2d 409 (Pa.2002); affrmd., 815 A.2d 1115...17,18
Commonwealth v. Irwin, 431 A.2d 257 (Pa.1981)...............................22
Commonwealth v. Lopez, 739 A.2d 485 (Pa.1999)..............................26
Commonwealth v. Nichols, 692 A.2d 181 (Pa.Super.1997).......................21
Commonwealth v. Robinson, 817 A.2d 1153 (Pa.Super.2003)....................21
Commonwealth v. Shoup, 620 A.2d 15 (Pa.Super.1993).........................14
Commonwealth v. Strohl, 813 A.2d 909, 815 A.2d 1042, cert. denied (2003).....1
Commonwealth v. valderrama, 388 A.2d 1042 (Pa.1978)........................14
Code v. Montgomery, 799 F.2d 1481 (11th Cir.1986)..........................27
Duquesne Light v. Woodland Hills Sc. Dist., 700 A.2d 1038 (Pa.Cmwlth.1997)..25
Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.104 (1972)..............19
Jackson v. Leonardo, 162 F.3d 81 (C.A. 2 (N.Y.) 1998)......................19
Kyles V. Whitley,514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).......
.........................................................2,4,5,6,8
Magette v. Goodman, 771 A.2d 775 (Pa.Super.2001)...........................24
Nader v. Hughes, 643 A.2d 747 (Pa.Cmwlth.1994)..............................7
Schick v. U.S., 195 U.S. 65, 24 s.Ct. 826, 49 L.Ed. 99 (1904)..............20
Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)
.................................................................16,26
Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).....
......................................................................6,7,8
U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)........12
U.S. v. Grey, 878 F.2d 702 (3rd Cir.1989)..................................27
U.S. v. Pellullo, 14 F.3d 881 (3rd Cir.1994)...............................20
Vujosevic v. Rafferty, 844 F.2d 1023 (3rd Cir.1988).....................20,21

## Constitutions, Statutes, and Rules involved

U.S. const. Amend. 5.........................................................
U.S. Const. Amend. 6.........................................................
u.S. Const. Amend. 14........................................................

28 Pa. Code 211.5.........................................................25
28 Pa. Code 563.6.........................................................25
42 Pa.C.S.A. §5551(4).....................................................19
42 Pa.C.S.A. §9543(a)(2)(vi)..............................................14

Pa. R.Cr.P. Rule 548.....................................................19

## II.   OPINIONS BELOW

Petitioner Joseph Michael Strohl was convicted by jury of second degree murder and sentenced to life in prison. Following affirmance of his murder conviction on direct Appeal, and denial of post conviction relief, Petitioner seeks Allowance of Appeal. **Commonwealth v. Strohl**, 813 A.2d 909 (Pa.Super.2002) (unpublished memorandum); allowance denied, 815 A.2d 1042 (Pa.2003); cert. denied, 539 U.S. 907 (2003).

The opinions of the Post Conviction Court and Superior Court are un-reported and attached as appendix A and B.

## III.   ORDER IN QUESTION

The Superior Court, Musmanno, Bender, and Tamilia, JJ., held that:

(1)  undisclosed hospital records and a police station complaint did not amount to a Brady violation.

(2)  the trial court correctly addressed defendant's after-discovered evidence claim and adopts the trial court's reasoning.

(3)  defendant failed to establish that he was prejudiced by trial counsel's failure to assert a Double Jeopardy Collateral Estoppel claim.

(4)  defendant failed to prove actual prejudice when trial counsel failed to object to misstatements by the trial court during its jury charge.

(5)  defendant failed to demonstrate actual prejudice as a result of trial counsel's failure to request an aggravated assault jury instruction.

(6)  the issue of trial counsel's failure to challenge prosecutorial and police misconduct before the grand jury is moot.

(7)  trial counsel was not ineffective for failing to request an adverse inference jury instruction concerning the lost medical records; and

(8)  defendant has not demonstrated how he was prejudiced by trial counsel's failure to call a witness.

# IV. QUESTIONS FOR REVIEW

1.  Whether the defense can be charged with equal access to exculpatory <u>Brady</u> material and knew or could have uncovered the evidence with reasonable diligence where the defense subpoenaed all medical records but failed to follow-up on a subpoena because the prosecutor made assurances everything had been provided but failed to ascertain that the evidence was actually readily available and accesible to a Commonwealth Agent who was testifying to a cause of death as an expert?

2.  Does decision of lower Courts on issue of materiality of evidence (police complaint) concealed by the Commonwealth in violation of <u>Brady v. Maryland</u> conflict with <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), by weighing the prosecution's and petitioner's trial evidence rather than determining whether evidence undermined confidence in outcome of verdict?

3.  Whether the undisclosed medical records were material to the defense?

4.  Whether lower courts erred by not granting a new trial based on after-discovered evidence after determining the evidence was: (a) unavailable at trial and could not be obtained prior too by the exercise of due diligence; (b) not cumulative or corroberative; (c) not being used solely for impeachment; and (d) differs from the experts (testifying to a cause of death) at trial?

5.  Whether the lower Courts erred in determining that petitioner was not prejudiced by trial counsel's failure to raise a Double Jeopardy Collateral Estoppel claim that would have estopped the Commonwealth from arguing evidence that contradicted petitioner's 1987 guilty plea?

6.  Whether the lower Courts erred by determining petitioner could not show prejudice by trial counsel's failure to request an aggravated assault jury instruction because of a misinterpretation of the law that the Statutes of limitations had run out, when in fact, no limitations were applicable?

    (i)  Whether the lower courts committed reversible error by holding that a causation instruction was equal too, or an acceptable alternative to an aggravated assault jury instruction?

7.  Whether the lower Courts erred by determining petitioner did not suffer prejudice by trial counsel's failure to object to two material misstatements of evidence during the trial court's jury charge?

8.  Whether the lower courts erred by determining trial counsel was not ineffective for failing to request an adverse inference jury charge regarding lost and destroyed medical records when the defense argued they were material and the Commonwealth argued they were insignificant?

9.  Whether the lower Courts erred by determining trial counsel was not ineffective for failing to call a favorable defense witness?

## A. Facts and Procedural History

Police found Ella Wunderly ("the victim") lying unconscious in her home on December 28, 1986. The rear door window was smashed, a side window was open, and parts of her home was in disarray. She was taken to the Lehigh Valley Hospital Center for treatment. N.T. 410-477. Police called Dr. Isadore Mihalakis to examine, date, and document the victims injuries. N.T. 179, 237. Mihalakis' examination was limited to external injuries only. However, radiology informed him of two broken jaw bones and a fractured orbital plate. N.T. 244-246. Mihalakis opined her injuries were blunt force trauma – causing her unconsciousness – and occurred 48 to 72 hours prior to his examination. N.T. 205-208. Thereafter, Mihalakis had no further contact with the victim.

## B. STROHL I – The guilty plea

On January 15, 1987 Joseph Strohl (petitioner)(hereinafter "Strohl") and Robert Shull were arrested for burglary and other related charges of the victim's home. Their arrests came after Shull wore a bodywire revealing they were in the home. The wire did not reveal the assaulter. N.T. 539-548. During Strohl's guilty plea it was established Strohl stole the victim's purse, a TV converter box, and some coins from the home. (Negotiated Plea at page 3)(PCRA Exhibit 14). The Commonwealth made "explicitely clear" Strohl was pleading guilty to a subsequent burglary and they wanted nothing to do with the initial break-in or assault at the time. (PCRA Exhibits 13 and 14).

## C. The victims eight year survival and death

On April 21, 1994, the victim died at the LifeQuest Nursing Center. Dr. Halbert Fillinger performed an autopsy. He noticed a fractured skull where the bone was driven into the brain along with other injuries. N.T. 357. His lack of expertise prevented him from dating the injuries. Thus,

he deferred examination of the brain to Dr. Lucy Rorke. N.T. 378.

Dr. Rorke could neither determine when the injuries occurred. She opined they could have happened anytime prior to 1993. N.T.303. Both concluded that the injuries were attributable to the beating in 1986 because police had told Fillinger that the victim was beaten in 1986 and remained in a coma until death. N.T. 370, 268-70, 291. Therefore, Fillinger determined the cause of death to be "Bronchopneumonia due to multiple injuries to the head". N.T. 358. He ruled the manner of death a statistical/circumstantial characteristic of homicide. N.T. 400-401.

## D. The Investigative Grand Jury and Trial (Strohl II)

In 1999, an investigative grand jury was enpaneled and a presentment was issued to charge Strohl with the death.

In March 2001, Strohl proceeded to a jury trial. At trial, the Commonwealth presented no eyewitnesses to an assault. N.T. 1044. They had no forensic or physical evidence linking Strohl to an assault. N.T. 1051-52. In fact, a hair found on a shirt, found with the victim's purse did not match Strohl or the victim. N.T. 854. Nonetheless, Strohl was convicted of second degree murder and sentenced to life in prison.

## VI. REASONS FOR ALLOWANCE OF APPEAL

1. The lower Courts are in conflict with the holdings on the issue of suppression of Brady material set forth in Kyles v. Whitley, 514 U.S. 419 (1995) that "the prosecutor has a duty to learn of any favorable evidence known to the others acting on the Government's behalf in the case, including police"

The new evidence at issue is two Lehigh Valley Hospital Center (LVHC) reports. (Appendix C). There is also a police complaint which was suppressed. (Appendix D). There is no dispute that the complaint was suppressed. The reports were not made available at trial, even though requested during discovery. PCRA Court Opinion (PCRA Op.) at 3.

4

(a) PCRA Court on the LVHC Reports

The reports are evidence that the victim did not have a depressed skull fracture with a portion of the skull driven into her brain at the time of admission into the hospital in 1986. PCRA Op. at 3. The reports could not have been obtained by due diligence. They are not cumulative, nor would be used solely to impeach. In fact, they differ from the testimony of the Commonwealth's experts at trial. Id., at 6. Although not addressed by the Court; the reports are evidence the victim regained consciousness as early as February 3, 1987. Nevertheless, the court ruled the records were not in the custody of the Commonwealth and there is no showing the Commonwealth knew or should have known of the existence of the reports which were in the possession of the hospital. Id., at 3.

(b) The Superior Court on the LVHC Reports

On the otherhand, the Superior Court ruled that the LVHC records do not amount to a violation of Brady because a Brady violation does not occur "where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." That petitioner does not claim that the Commonwealth had the LVHC reports in its possession and knowingly withheld them. Rather, Petitioner claims that he did not receive the reports when he requested the reports from the hospital. (Superior Court Opinion at 5).

    i. **The fact that Brady material was in the possession of the LVHC, rather than the prosecutor, is irrelevant to the Commonwealth's responsibilities under Brady.**

In light of Kyles v. Whitley, 514 U.S. 419, 437 (1995) the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that

5

is, a failure to disclose is in good faith or bad faith, see <u>Brady</u>, 373 U.S. at 87, 83 S.Ct., at 1196-97), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable. <u>Kyles</u>, at 437-438.

**ii. Dr. Isadore Mihalakis knew of the reports; but because the prosecutor failed to seek out the information which was readily available and accesible to him the prosecutor never knew.**

At the time of the assault in 1986, police requested Dr. Mihalakis (a forensic pathologist/State police death Investigation Instructor, N.T. 179) examine the victim and date and document her injuries. He wrote a detailed report in 1986 and would concur in the victims'cause of death by testifying 15 years later at trial. N.T. 237, 212-213.

Mihalakis testified he was the Director of Post-mortem Services and legal medicine at the LVHC and that to this day he is on the honorary staff which enables him to go in and examine somebody and review cases. N.T. 175, 177-178.

Mihalakis testified at trial that obviously they have the radiology, CAT Scans, you name it. N.T. 235. Later, at the PCRA hearing he confirmed that medical records are indeed important. That they are most certainly available. However, no one ever asked for them. PCRA N.T. 157, 161, 171-172 . Accordingly, the medical records were readily accessible to the prosecution.

**iii. The fact the defense subpoenaed the records but failed to follow-up on a non-response is irrelevant to the Commonwealth's <u>Brady</u> responsibilities according to <u>Strickler v. Greene</u>, 527 U.S. 263 (1999) and <u>Banks v. Dretke</u>, 540 U.S. 668 (2004).**

After evidence revealed the victim sustained a broken hip, a broken shoulder, and half an ear ripped-off subsequently to being assaulted. The defense filed a discovery request for, inter alia, the victim's medical records. The prosecutor asserted:

(a)  an open file discovery policy;

(b)  that he provided discovery of the injuries of everything related to the case;

(c)  that he did not have the victim's medical records, nor did he have to be in possession of them;(FN 1)

(d)  that the defense should investigate the allegations of elderly abuse/accidents themselves; and (FN 2)

(e)  that he supplied all police reports.

(Motion to Compel Discovery pages 6-16). After the hearing, the Commonwealth turned over bits and pieces of the victim's medical records. PCRA N.T. 234.

All of these assertions are fairly characterized as conduct attributable to the Commonwealth that impeded trial counsel's failure to follow-up on the subpoena. As Strickler instructs, the defense cannot be faulted for relying on those representations. See 527 U.S. at 283-284, n. 22-23, 119 S.Ct. 1936 ("If a prosecutor asserts that he complies with Brady through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under Brady"). See also Banks v. Dretke, 124 S.Ct. 1256, 1275 (2004)(Our decisions lend no support to the notion that defendants must scavange for hints of undisclosed Brady material when the prosecution represents all such material has been disclosed). The prosecutor should be charged with suppression of exculpatory evidence here.

---

1.  But see, Dr. Fillinger,; it was his official duty "to examine the charts of patients and monitor causes of death that occur in hospitals or under medical treatment coming under the jurisdiction of the Coroner. N.T. 327-28.

2.  But see Nader v. Hughes, 643 A.2d 747 (Pa.Cmwlth.1994)("it is mandatory for the coroner to investigate, sudden, violent, suspicious deaths". See also; Banks, 124 U.S. at 1275 (Ordinarily, we presume that public Officials have properly discharged their official duties.

2.  Does decision of Lower Courts on issue of materiality of Police Complaint conflict with <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995) by weighing prosecution's and petitioner's trial evidence rather than determining whether evidence undermined confidence in outcome of verdict?

The Station complaint is a half-page document that states that Patricia Cecala phoned the police to report that a purse was found on Monday December 29, 1986 at 7:30 p.m. and contains the notation "delayed entry." (Appendix D)(PCRA Op. at 4)(Super. Ct. Op. at 5-6).

<u>Kyles</u> instructed that the materiality standard for <u>Brady</u> claims is met when "the favorable evidence could be reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." 514 U.S., at 435, 115 S.Ct. 1555. See also id., at 434-435, 115 S.Ct. 1555 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."); accord, <u>Strickler</u>, 527 U.S., at 290.

The Superior Court agreed with the PCRA Court that because the defense was provided with a more detailed report of Officer Gerancher petitioner cannot prove prejudice. (Super. Ct. Op. at 6 ). In fact, Gerancher's five page police report details his response to the scene and his collection of evidence. His reference to the purse on page 5 of the report is just as minimal as the station complaint. (Defense Exh. 4 at page 5). In fact, the station complaint contradicts Gerancher's report and trial testimony. N.T. 434-435, 442-443; cp. PCRA N.T. 37.

The Superior Court also ruled it cannot determine from the document whether the purse was found after the friday or the Saturday burglary but fails to evaluate the complaint in comparison with the Cecala's testimony which clearly establishes if the Cecala's saw the purse the day before they called police then they must have saw the purse on a Sunday if they called police Monday.

Clearly contradicting their trial testimony that they saw the purse Saturday and called the police on Sunday. N.T. 579-590, 593-595.

The Cecala's testimony of finding the victim's purse was crucial to the prosecution. The Commonwealth underscored during its summation that "there can be no doubt there was a Friday burglary ... because the purse is seen Saturday morning." N.T. 1045.

The complaint would have shown that many of the details the Cecalas so confidently asserted on the stand (such as first seeing the purse Saturday and picking it up Sunday, and calling someone Sunday during the daytime. N.T. 579-590, 593-595) were not only false, but, had apparently escaped their memory from their initial contact with police fifteen years before. That their persuasive account did not come, indeed, until after Patricia Cecala discussed specific days and times with the prosecutor before trial. PCRA N.T. 66. And afterwards, collaberating those days and times with her husband Joseph. N.T. 583. Raising a substantial implication that the prosecutor had coached them to give such testimony at trial. PCRA N.T. 66. In addition, casting serious doubt on Mr. Cecala's theory of "process of elimination" used for determining that he first saw the purse Saturday morning (inferring a burglary was committed Friday). Moreover, discrediting the prosecutor's spurious contention that "Mr. Cecala's memory, he told you, is confirmed by the [ambiguous] report he made to the police back in December of 1986." N.T. 1031. Mr. Cecala actually testified that Saturday was derived by a process of elimination on two occasions. N.T. 583-584, 590.

Had the complaint been disclosed, petitioner had a compelling argument to urge the jury to aquit on the predicate crime of burglary on substantial documented evidence written on the actual day and time in question. Rather than convict on faded uncorroberated inconsistent memories of witnesses.

A jury would have been reasonably troubled by the numerous inconsistencies and a reasonable probability exists that the jury would have disregarded such problematic testimony and relied solely on the station complaint to infer that the purse was actually stolen during a Saturday burglary rather than Friday.[3] The complaint destroys the Commonwealth's inference that "there can be no doubt ... there was a Friday burglary ... because the purse is seen Saturday morning." N.T. 1045. See e.g., <u>Commonwealth v. Bonaccurso</u>, 625 A.2d 1197, 1201 (Pa.Super.1993)(A change in the degree of guilt from second to third degree murder constitutes exculpatory evidence).

**3. Whether the undisclosed Medical Records were material to the defense?**

The Commonwealth presented a trio of experts to prove causation of death. The significance of their testimony to the Commonwealth's case is best understood by taking the word of the prosecutor:

> It is to connect the [external] injuries that Dr. Mihalakis saw in 1986 to what Dr. Fillinger found [internally] in 1994. The connection is important. Its offered to close the gap between 1986 and 1994. That's an important issue.

N.T. 183 [emphasis added]. Dr. Fillinger performed an autopsy and noted that the victim's eight year survival was unusual and inexplicable. N.T. 387-388. He testified the victim was well-cared-for prior to death. N.T. 341, 344. However, unbeknown to Fillinger at the time, a broken hip, a broken shoulder, and half an ear ripped-off indicates otherwise. N.T. 373-376, 661-678. Fillinger testified he observed a fractured skull where the bone was driven into the brain. N.T. 357. His lack of expertise prevented him from

---

3. See Jury instruction: "When I say the burglary, I'm referring to the first burglary. We know that defendant committed another burglary. He's admitted to that by virtue of his guilty plea. That's not the burglary I'm talking about. I'm talking about the first burglary which is the time when the woman was attacked." N.T. 1065-1066.

determining when the injuries occurred and he deferred examination of the brain to Dr. Lucy Rorke. N.T. 378.

Dr. Rorke could not determine when the injuries occurred either, but opined they happened sometime prior to 1993. N.T. 303. Rorke opined that considering Fillinger observed a fractured skull, and the victim was in a coma for eight years, all the other injuries must have occurred at the same time [in 1986]. She also concluded that there is no reason to think there was several episodes of trauma because no one told her anything like that. N.T. 305-306. Rorke concurred with Fillinger's cause of death that the victim died from "bronchopneumonia due to multiple injuries of the head" that are attributable to the beating in 1986. N.T. 358-359.

Dr. Isadore Mihalakis also agreed with Drs. Fillinger and Rorke that the beating caused the victim to never regain consciousness and therefore develop bronchopneumonia and ultimately die. N.T. 209-212, 239. His hypothesis is that even though he had no knowledge of the victim's neurological condition [from 1986 to death]; eight years down the road when a neurologist takes a look at the brain, he can put two plus two together and say one is related to the other. N.T. 244-245.

A. Causation issues are to be determined solely by the fact-finder. Commonwealth v. Durant, 460 A.2d 732 (1988). The undisclosed medical records contradict the Commonwealth's theory of causation and support the defense theory at trial and is now substantiated by the Commonwealth's own expert's testimony.

The PCRA Court has already determined the medical records differ from the expert testimony presented at trial. PCRA Op. at 6. The records also show that the victim did not remain in a coma as a result of the attack in 1986 by stating the victim regained consciousness as early as February 3, 1987. (Appx. C). The reports are also evidence that the victim did not have a depressed skull fracture with a portion of her skull bone driven into her

11

brain in 1986. PCRA Op. at 3. "Knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves 'a corruption of the truth-seeking function of the trial process.'" <u>United States v. Bagley</u>, 473 U.S. 667, 679, 105 S.Ct. 3375 (1985).

**B. The suppressed medical records enabled the Commonwealth to prognosticate a hypothetical cause of death through a trio of experts which could not be substantiated or challenged independently by the defense.**

Dr. Tamar Earnest confirmed the victim had neither a skull fracture or a bone driven into her brain in 1986. PCRA N.T. 204-205, 212. Even now, Dr. Mihalakis, has his doubts whether there was a fractured skull or a residual of surgery or both. PCRA N.T. 170-171. Hardly coinciding with the hypothetical (2+2) opinion he so confidently asserted at trial. N.T. 245, 249-250.

Indeed, the victim had a hematoma in the left occipital area of the brain and underwent surgery to remove a blood clot. PCRA N.T. 212. This, however, does not negate the Commonwealth's misrepresentations and exaggerations of crucial evidence presented at trial. In turn, bamboozling the jury with a phantom injury that petitioner brutally drove the victim's skull bone into her brain. See e.g., N.T. 249-250, 306, 357, 1029, 1038.

Mihalakis testified that hematomas can be caused by blunt force trauma, falls, or strokes. PCRA N.T. 167-168; accord 203-204. At trial, he testified that all the injuries were caused by blunt force. N.T. 205. Now, conversely, Mihalakis cannot say whether the victim was beaten first, suffered a stroke, then was beaten, or even fell and was beaten or vice-versa. PCRA N.T. 176-178.

Dr. Earnest also questioned the red-purple hemorrhage noted at autopsy as possibly being a subsequent head injury. PCRA N.T. 211-212, 215. Petitioner now has a compelling argument of intervening and supervening brain injury (i.e., a fractured skull) or injuries that caused death. Besides, if a doctor thought so, a juror could too. Moreover, the contention is substantiated

by the Commonwealth's own experts testimony.

Dr. Rorke testified that bleeding occurs when the brain is injured. In the process of healing the red blood breaks down and becomes a golden color. N.T. 275. The absence of a fractured skull in 1986 coupled with red-purple hemorrhage (fresh blood) at autopsy only supports additional injury occurred. See Cmwlth Exh. 12 at page 4. The Commonwealth would most certainly have a hard time explaining why fresh blood is seen eight years after the beating after representing that all the injuries occurred in 1986.

The notion of additional injuries is only confirmed by Dr. Mihalakis' testimony that Dr. Rorke saw numerous abnormalities in the brain in 1994. But, upon reviewing a CAT Scan from 1987, he admits there is only one abnormality in the brain. PCRA N.T. 189-191. Not at all consistent with the numerous abnormalities described by Rorke at trial. N.T. 274, 282-285, 295. Most certainly, Rorke would have had trouble convincing a jury that there is no reason to consider several episodes of trauma with such powerful evidence to the contrary. N.T. 306. One might say, well when did these other injuries occur? The perfect response is when the victim had half her ear ripped-off, her broken hip, and her broken shoulder. Injuries nonetheless, that were never investigated by the Commonwealth.

The lack of contusions and lacerations to the brain only further underscores the unreliability of the experts opinions that all the injuries occurred in 1986 and were caused by blunt force trauma. N.T. 249-250, 305-306, 358-359. Rorke testified that blunt force trauma leaves a "pattern of injury" which produces contusions and lacerations on the Cortex of the brain. N.T. 292-293, 298. Conversely, there were no contusions found on the cortex or outer portion of the brain in 1986.PCRA N.T. 178-79, 207. Unquestionably, the Commonwealth would have had a hard time explaining no contusions and

lacerations in 1986 versus many in 1994. The records only highlight the Commonwealth's extraordinary shallow attitude to investigate death; in turn, providing either less than totally complete or less than fully informed testimony. Thus, here, in order for petitioner to have received a fair trial, the jury was entitled to hear all relevant evidence relating to causation.

4. Whether the lower Courts erred in Denying Petitioner a new trial pursuant to 42 Pa. C.S.A. §9543 (a)(2)(vi)'s fourth prong?

> A. The lower court's decision that petitioner cannot compel a different verdict because the evidence at trial is sufficient to sustain a conviction conflicts with the holding of Commonwealth v. Valderrama, 388 A.2d 1042 (Pa.1978).

The lower court's ruled that petitioner cannot compel a different verdict because the evidence at trial is sufficient to sustain a conviction. PCRA Op., at 6-9 (citing Commonwealth v. Shoup, 620 A.2d 15 (Pa.Super.1993)). Conversely, even if other evidence presented at trial was sufficient to sustain a conviction, it does not preclude granting a new trial based on newly discovered evidence. Commonwealth v. Valderrama, 388 A.2d 1042 (Pa.1978).

The materials forming the basis of petitioner's after-discovered evidence consist of the aforementioned medical records and police complaint. ante at 4--14. Confidence that the jury's verdict would have been the same cannot survive a recap of the new evidence and its significance for the prosecution. The jury would have been entitled to find

(a) that the phantom bone driven into the brain the Commonwealth so confidently asserted occurred in 1986 (by petitioner) was not a fallacy but a subsequent injury inflicted by another that caused death in addition to a residual of surgery. Ante, at 12-13.

(b) that the lack of a fractured skull in 1986 coupled with fresh blood seen at autopsy; coupled with a broken arm, a broken hip, and half an ear ripped-off substantially supports the contention of subsequent head injuries

that caused death.    Surely petitioner cannot be responsible for that. Ante, at 12–13.

(c)    that further supporting the contention that subsequent injuries caused death is the victim's consciousness on February 3, 1987; the lack of contusions and lacerations to the cortex of the brain in 1986; and one abnormality in 1986 versus multiple in 1994. Ante, at 13.

(d)    that although petitioner may have assaulted the victim; the new evidence creates a broken chain in the Commonwealth's theory of causation creating a reasonable doubt as to causation of death. See e.g., N.T. 1028–1029, 1038.

(e)    that the Commonwealth and their experts had an extraordinary shallow attitude to fulfill their statutory obligations to investigate death; in turn, providing either less than totally complete or less than fully informed testimony. Ante, at 5–7.

(f)    that the Commonwealth overly exaggerated the victim's condition and injuries in order to downplay and mitigate their failure to investigate the abuse/accidents which the defense was asserting as intervening and super- vening causes of death. See e.g., N.T. 400–405.

(g)    that LifeQuest's destruction of the victim's medical records between the years of 1990 to 1994, but their retention of medical records preceeding those years, raises a reasonable suspicion that LifeQuest was covering-up subsequent injuries that played a major role in the victims death which is supported by one abnormality in 1986 versus multiple in 1994 and moreover by fresh blood at autopsy. See e.g., N.T. 785, 799–801, 1049–1050.

(h)    that there were no consistencies to the Cecala's version of the sighting and discovery of the victim's purse, and their testimony had been coached and scripted to Complement the Commonwealth's case. Ante, at 8–10.

(i) that the investigation was strictly limited by the police's animosity and unwillingness to accept anything less than petitioners culpability. See e.g., ("I believe it was Joe Strohl. Yes I do believe ... he is nothing more than a liar. There were people afraid of Joe Strohl ... and he was a scrawny punky little kid.")(Grand Jury N.T. 4/15/99, 155-158).

Confidence that the verdict would have been unaffected cannot survive when all these possible findings were precluded by the new evidence that supported them.

If solely believed, the police complaint negates the Commonwealth's inference of the underlying felony of burglary. Thus, a change in the degree of guilt from second to third degree murder constitutes exculpatory evidence. Commonwealth v. Bonaccurso, 625 A.2d 1197, 1201 (Pa.Super.1993). In addition, the medical records, which tend to show that someone other than petitioner committed the charged offense are undeniably relevant. See Commonwealth v. Chamberlain, 731 A.2d 593, 597 (1999). Petitioner should be granted a new trial.

5. Whether trial Counsel's failure to raise a Double Jeopardy Collateral Estoppel claim was sufficiently egregious to constitute constitutionally ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984)?

The first prosecution arose in 1987 and resulted in petitioner pleading guilty to a burglary of the victim's home on Saturday, December 27th, 1986. The record reveals petitioner and Commonwealth agreed petitioner stole a TV converter box, some coins, and the victim's purse. (Negotiated Plea at 3)(PCRA Exh. 14).

In the second prosecution for second degree murder, the Commonwealth violated the plea agreement by asserting that petitioner now stole the victim's purse a day before in order to establish that an underlying felony of burglary

was committed:

> "You heard that a purse and money were taken out of the house on Friday and a TV converter and change were taken out on Saturday." N.T. 1041, 1045.

Collateral estoppel is embodied in the Fifth Amendment and made applicable to the States in _Ashe v. Swenson_, 397 U.S. 436, 437 (1970). The Pennsylvania Courts apply the doctorine when: 1) the issues in the two actions are sufficiently similar and material to justify invoking the doctorine; 2) the issue was actually litigated in the first action; and 3) a final judgement on the specific issue in question was issued in the first action. _Commonwealth v. Holder_, 805 A.2d 499, 502 (Pa.2002)(citing _Ashe_ supra.).

**A. The lower Courts are in conflict with the standard set forth in Holder determining whether collateral estoppel applies.**

    **i. The PCRA Court ruled petitioner's guilty plea was to burglary, not theft, when the information charging petitioner clearly defined his intent to commit theft and charged theft when it determined petitioner's collateral estoppel claim. Albeit, such a holding is contrary to the holdings of _Commonwealth v. Anthony_, 475 A.2d 1303, 1307 (Pa.1984) and _Com., Dept. of Transp. v. Mitchell_, 535 A.2d 581, 585 (Pa.1987).**

The PCRA Court held that the theft of the purse was not a fact essential to the conviction for (the 1986) burglary. PCRA Op., at 12. In contrast, a guilty plea is an acknowledgement by a defendant that he participated in the commission of certain acts with criminal intent. The plea of guilt admits that the facts and intent occurred, and is a confession not only of what the Commonwealth might prove, but also to what the defendant knows to have happened. _Anthony_ supra., at 1307. The fact that petitioner pled guilty to one count of the [information] does not produce a different result than if he had been convicted after jury trial, for it is well settled that a guilty plea constitutes an admission to all the facts averred in the indictment. _Mitchell_ supra., at 585.

The Superior Court, relying on a different rational (See FN 4 at 9),

without even addressing the three prongs of Holder, held that because evidence at trial established petitioner confessed to his cohort during the Saturday burglary that he had kicked the victim in the head during the Friday burglary, which resulted in blood being spattered on the wall, precluded the collateral estoppel claim. Evidence, nonetheless, which had nothing to do with whether the Commonwealth was barred from re-arguing whether the victim's purse was now stolen during a Friday burglary instead of a Saturday burglary concluded by a final judgement (the 1987 guilty plea).

Applying the standard of Holder to this case; First, the issue in the two actions are sufficiently similar. At both the guilty plea and the murder trial, the Commonwealth introduced the same evidence that petitioner stole the victim's purse. Moreover, the admission that petitioner stole the victim's purse was sufficiently material given that the Commonwealth introduced the evidence as a means of proving petitioner's criminal intent to commit a burglary and theft, which in both proceedings was the evidentiary basis presented by the Commonwealth to prove a burglary (Strohl I) and an underlying burglary to murder (Strohl II). (Cmwlth Exh. 27, Criminal Information, No. 226-1987) and (Jury instruction at trial N.T. 1066-1067)("that the defendant entered with the intent, that is, the conscious object or the purpose in mind, to commit the crime of theft ... that the defendant took certain items"). And furthermore, the record firmly establishes that the issue of whether the purse was stolen during a Friday or Saturday burglary was actually and finally litigated by the guilty plea and sentencing colloquy. Accordingly, the Commonwealth was estopped from introducing any theories or evidence that Strohl stole the victim's purse on any other day than during the Saturday burglary.

The Commonwealth had every opportunity in 1987 to amend, reject, and

object to any and all parts of the plea. Pa. R.Cr.P. Rule 548. They chose not to, and hence relinquished that entitlement. The Commonwealth may believe it made a strategic miscalculation, but that does not entitle them to collaterally attack an otherwise valid and final judgement.

By prior Judicial determination, the evidence submitted was necessarily false. Accordingly, the prosecutor in charge of Strohl II knowingly used false evidence to obtain the conviction and sentence in Strohl II. See e.g., Giglio v. United States, 405 U.S. 150 (1972)("Deliberate deception of a court and jurors by presentation of known false evidence is incompatible with rudimentary demands of justice").

Counsel's decision not to seek preclusion was not based on any reasonable trial strategy. In fact, counsel admits petitioner could not steal the purse twice. PCRA N.T. 146-156. Besides, physics will not permit it.

The Commonwealth was estopped from relitigating any theories or evidence which contradicted petitioner's theft of the victim's purse other than during the Saturday burglary. Had the Commonwealth been estopped, there is a reasonable probability the jury would have acquitted of the underlying felony of burglary because the only evidence argued by the Commonwealth to support the predicate crime was the theft of the purse. Ante, at 16-17. See e.g., Jackson v. Leonardo, 162 F.3d 81, 87 (C.A. 2 (N.Y.) 1998)("no good explanation readily springs to mind for the failure to raise [a] double Jeopardy argument).

**6. Whether trial counsel's failure to request an aggravated assault jury instruction because of a misinterpretation of the law prejudiced petitioner?**

Counsel contends the court could not instruct on aggravated assault because the Statutes of limitations had run out. PCRA N.T. 87, 83. Conversely, there is no limitations applicable to any felony alleged to have been perpetrated in connection with second degree murder. 42 Pa. C.S.A. §5551(4).

In both capital and non-capital cases, a court must give a requested instruction on lesser included offeses where it is supported by the evidence. Vujosevic v. Rafferty, 844 F.2d 1023, 1027 (3rd Cir. 1998)(citing Beck v. Alabama, 447 U.S. 625 (1980)). This requirement is based on the risk that a defendant might otherwise be convicted of a crime more serious than that which the jury believes he committed simply because the jury wishes to avoid setting him free.Id.

Causation was before the jury here. N.T. 1068-1069. The fact the victim lived for seven years after assault supported a conviction for aggravated assault and also supports a finding petitioner did not cause the death; which would relieve him of liability for homicide. The jury was instructed:

"The Commonwealth must prove that the assault on [the victim] occurred at sometime during a burglary by [Strohl] earlier than the burglary of the 27th which he pleaded guilty for. The commonwealth is not saying the assault happened on December 27, the burglary for which the defendant pleaded guilty." N.T. 1085.

**A. Baffling, is how a jury could convict Strohl beyond a reasonable doubt that he committed the crime of assault, which allegedly caused the death, without being instructed on the crime of assault.**

The Supreme Court has interpreted the term "crime" as not including petit: offenses. See Schick v. United States, 195 U.S. 65 (1904), but once it is determined what a crime is, the right to a jury trial is absolute. The language serves to guarentee a right that is absolute in the sense that it applies to all criminal prosecutions or, put differently, to the prosecution of every crime. United States v. Pellullo, 14 F.3d 881, 894-95 (3rd Cir.1994).

The lack of an aggravated assault instruction unfairly deprived petitioner of his primary defense theory; having gone forward with a theory that the petitioner did not assaault the victim, but even if he had, the injuries sustained during assault did not cause death. N.T. 964; PCRA N.T. 128. The

petitioner was unable to have the jury decide whether his versions of the facts were correct.

The lower Courts Monday morning Quarterback the jury's verdict to determine counsel's ineffectiveness and prejudice by holding the jury would have returned a verdict of third degree rather than second. PCRA Op., at 13-14. That same holding was rejected as a matter-of-law in Vujosevic, Supra., at 1027. The third degree murder instruction did not offer the jury a rational compromise between second degree murder and aquittal; only an aggravated assault charge could do that. See e.g., Vujosevic, supra., at 1028.

i. Whether the lower Courts committed reversible error by holding that a causation instruction was equal too, or an acceptable alternative to giving an aggravated assault jury instruction?

The PCRA court, and the Superior Court affirmed that because the petitioner was given a causation instruction there is no basis to find that the jury would have resolved causation differently with an aggravated assault charge. PCRA Op., at 13.

The absence failed to accurately apprise the jury of recklessness required under aggravated assault and failed to inform the jury that if the defendant caused bodily injury, he must have done so intentionally or knowingly to be guilty. Commonwealth v. Nichols, 692 A.2d 181 (Pa.Super.1997). Although circumstances might indeed preponderate sufficiently to allow the factfinder to infer that a party acted with intent to inflict serious bodily injury, the necessity of proving a case by circumstantial evidence does not coincide with suspension of the operable burden of proof. The Commonwealth's reliance upon circumstantial evidence is not a license for the jury or factfinder to speculate and convict upon hunches. Commonwealth v. Robinson, 817 A.2d 1153, 1159 (Pa.Super.2003). The failure to request the instruction reduced the prosecutions burden of persuasion to a preponderance.

7. Whether trial counsel's failure to object to material misstatements of evidence during the jury charge prejudiced petitioner?

There is no question the trial court misstated William Notti's testimony for the benefit of explaining an accomplice charge. The Court stated:

"There was some testimony from Mr. Notti that on the first night when he drove the car there, Mr. Strohl got out and another person, he didn't remember precisely who it was, went into the [victim's] House."

N.T. 1088. Notti actually testified:

"It might have been a Friday or Saturday," N.T. 602, and [I] did not see where they went, it was dark out." N.T. 605.

Remarkably, even before the misstatements were made, it was brought to the Courts attention: "Nobody testified that both people went in the house." N.T. 943-944. Counsel now, cannot recall any misstatements. PCRA N.T. 87-91.

It is within the disrection of trial judges to summarize evidence for the benefit of the jury. Commonwealth v. Crawford, 305 A.2d 893 (Pa.1973). However, the judge must bear in mind that his "influence ... on the jury is necessarily and properly of great weight ... and jurors are ever wathchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word." Bollenbach v. United States, 326 U.S. 607, 612 (1946). Where the misstatement involves the most important evidence on a crucial legal question or vital evidentiary point in the case, it may seriously prejudice the defendant's case and is often considered reversible error. See Commonwealth v. Irwin, 431 A.2d 257, 259 (Pa.1981)(citing reversible error cases).

The misstatement occurred while the court instructed on "in furtherance" regarding accomplice liability. N.T. 1088. To Convict, the Commonwealth was required to prove beyond a reasonable doubt defendant "entered the victim's residence." N.T. 1066. The misstatement places defendant and an accomplice directly inside the house on Friday night when the alleged assault occurred.

Eliminating an essential element of second degree murder and obviously contrary to Notti's testimony.

The only other testimony placing defendant at the scene on Friday, and nonetheless, without an accomplice, was that of Shull. N.T. 525. Even so, Shull's testimony comes from a corrupt and polluted source. N.T. 1070. And further was impeached by his own inconsistent statements. N.T. 559-563. As well as, uncorroberated by petitioner. N.T. 541-542.

In addition, the court precisely pin-points a "first night" when Notti drove the car there. N.T. 1088. Notti never even testified he was there on two nights. Rather he testified "it might have been a Friday or Saturday." N.T. 602.

Compelled to repudiate the misstatements, the court presents a laundry list of inferences deduced from testimony at trial to subvert and justify the misstatements. PCRA Op., at 15-16. None of which negate the effect the fallacious eyewitness testimony by the court may have had upon the jury.

The material misstatements, in fact, bolstered the inferences favorable to the Commonwealth and belittled the other inferences favorable to the defense that defendant actually went into his own home to get money from his parents that night. N.T. 605. Further undermining the defenses' contention that Notti was actually talking about the Saturday burglary and not the Friday burglary. N.T. 971-972.

The court now sustains the conviction on the afterthought that the material misstatements did not mean what they said, and while Notti testified inferring, the trial judge replied to him as an eyewitness. Here, the misstatements involved the most important evidence on crucial matters of law and vital evidentiary points, yet, the conviction is sustained on the assumption that the jury was properly guided.

The court holds because the jury was instructed that "their recollection as to the facts control" there is no prejudice. PCRA Op. at 17. Conversely, the misstatements could reasonably have formed in the minds of the jury a fixed bias towards defendant and impeded their ability to weigh the evidence and render a true verdict. See e.g., <u>Bollenbach</u>, supra., at 612, 66 S.Ct. at 405 ("If it is a specific ruling on a vital issue and misleading, the error is not cured by prior unexceptional and unilluminating abstract charge"). Furthermore, counsel's failure to object or request a cautionary instruction was not based on a reasonable trial strategy to effectuate defendant's interests. PCRA N.T. 87-91, 225-229.

**8. Whether trial counsel was ineffective for failing to request an adverse inference jury charge regarding lost and destroyed medical records when the defense was arguing their significance and the Commonwealth was arguing that they were insignificant?**

Where evidence which would properly be part of a case is within the control of the party in whose interest it would be naturally be to produce it, and without satisfactory explaination he fails to do so, the jury may draw an inference that it would be unfavorable to him. <u>Magette v. Goodman</u>, 771 A.2d 775, 780 (Pa.Super.2001).

Several years after the death, LifeQuest Nursing Center (LQNC) destroyed the victim's medical records from 1991 through 1994. PCRA Exh. 11. As a result, petitioner did not have an opportunity to inspect or investigate documented evidence of the victim's important clinical history. N.T. 368. Instead, petitioner was forced to accept expert opinions that assumed the victim remained in a coma and assumed all the injuries occurred in 1986. N.T. 245, 306.

Dr. Fillinger testified that the records are very important to determine a cause and manner of death. N.T. 371. Fillinger also stated he had a duty

to review the victim's medical records. N.T. 327–328. Clearly, the records were relevant and material evidence.

At the time of death, the records were available to the Commonwealth. PCRA N.T. 125, PCRA Exh. 11. However, Fillinger failed to perform his duty to review and acquire the records and instead chose to rely solely on his training, experience, and what police told him to determine the cause of death. N.T. 370–371. On the otherhand, LQNC was mandated by law to preserve the records for a minimum of seven years after death. 28 Pa. Code §§211.5, 563.6; also PCRA N.T. 26. Here, both the Commonwealth and LQNC should be held accountable.

At trial, the defense argued that additional injuries attributable to abuse or accidents by LQNC caused the death or raised a reasonable doubt as to the death. N.T. 372–410, 1006–1008. That the lost records were very important to the defense. Conversely, the Commonwealth argued the lost record were insignificant. N.T. 1049–1050. See Duquesne light v. Woodland Hills, 700 A.2d 1038, 1041 (Pa.Cmwlth.1997)(If evidence has been destroyed, referral of spoilation issue to jury with accompanying instructions is proper and advisable course of action).

The destroyed records were material evidence to the defense. Without access to the destroyed records the defense was prevented from substantiating its claims that additional injuries or some cause related to abuse caused the death. A compelling argument supported by the testimony of the victim's own son. N.T. 673–678. In addition, the defendant was prevented from cor-roberating or disputing the Commonwealth's trio of experts who put forth a hypothetical cause of death. N.T. 180–252, 262–308, 334–409. Counsel be-lieves the lost records hurt the defense, but there was no remedy. PCRA N.T. 97–101. It was not in the best interest of the defendant for defense counsel

25

to assert the claim that the destroyed records were material, but yet, fail to seek an appropriate instruction as to spoilation. Without the instruction, defendant here was left without remedy because the Commonwealth contends he has not been victimized.

## 9. Whether trial counsel was ineffective for failing to call a favorable defense witness?

To prove counsel was ineffective for failing to call a witness to testify, defendant must demonstrate: 1) the witness existed and was available; 2) counsel was aware of the existence of the witness or should have known of their existence; 3) the proposed witness was ready, willing and able to testify; and 4) absence of proposed testimony prejudiced him. Commonwealth v. Lopez, 739 A.2d 485, 486 (Pa.1999).

There is no dispute that petitioner meets the first three prongs. PCRA Op., at 20. The only question is whether there is a reasonable probability that counsel's failure to call Robert Strohl affected the outcome of the proceedings. Petitioner, however, does not have to show by a preponderance of the evidence that the result in his case would have been different but for counsel's errors. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694 (1984).

William Notti testified that he drove the petitioner to the rear of his house on a Friday or Saturday night around 10 p.m. and 12 p.m.. N.T. 602. Notti was the only witness to testify to any specific time or alleged entry into the victim's home. N.T. 598-631.

Robert Strohl testified at the PCRA hearing consistently with what he had told the police in 1986. PCRA N.T. 68-73. Robert Strohl stated he picked his son (petitioner) up from work Friday night around 9:30 p.m.. His son

took a shower and went to bed. Robert Strohl stayed awake until 11:15 p.m. and never saw his son leave the house that night while he was awake. PCRA Exh.'s 5 and 6.

The missing testimony of Robert Strohl would have altered significantly the evidentiary posture of the case. Certainly his testimony tends to support defendant's version of his actions on Friday night. N.T. 539-548. Had Robert Strohl appeared, the jury would have had to balance more evenly divided evidence to reach its verdict. Petitioner's own testimony would have appeared more credible because it coincided in important respects with that of Robert Strohl. The prosecutor would have been unable to attack petitioner's testimony on the ground that it was uncorroberated. It is not certain, of course, that the jury would have chosen to believe petitioner and Robert Strohl and discredit the prosecution witnesses, but there were sufficient inconsistencies in the prosecution evidence to make that result sufficiently probable to undermine confidence in the outcome of the trial. The prosecution witnesses were criminals themselves, there were alot of inconsistencies in their testimony and in their first reports to the police.

The lower courts concluded that Robert Strohl would not have helped the defense because his testimony was vague with regard to time. PCRA Op., at 20. However, his testimony was consistent with the defendant's account that he did not participate in the burglary or assault of the victim and her home that Friday night. Because his testimony buttressed petitioner's account on this crucial point, it creates a reasonable probability that the fact-finder would have entertained a reasonable doubt concerning guilt. See United States v. Gray, 878 F.2d 702, 713-14 (3d Cir.1989). As it was, without any corroberating witnesses, petitioner's bare testimony left him without any effective defense. See Code v. Montgomery, 799 F.2d 1481, 1484 (11 Cir.1986).

**VII.  CONCLUSION**

For the foregoing reasons the Court should grant the petitioner the Allowance to Appeal.

Respectfully Submitted,

Joseph M. Strohl, pro se
#CM-2097
1100 Pike St.
Huntingdon, PA 16654-1112

June 1, 2005