**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BLAKE J. ROBBINS, et al., | : | Civil Action |
| | : | |
| Plaintiffs, | : | No. 10-665 |
| | : | |
| v. | : | Hon. Jan E. DuBois |
| | : | |
| LOWER MERION SCHOOL DISTRICT, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR INTERIM ATTORNEYS' FEES PURSUANT TO 42 U.S.C. § 1988**

Date:  August 12, 2010

Arthur Makadon
Henry E. Hockeimer, Jr.
Paul Lantieri III
William B. Igoe
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Tel.    215.665.8500
Fax    215.864.8999
Makadon@ballardspahr.com
HockeimerH@ballardspahr.com
LantieriP@ballardspahr.com
IgoeW@ballardspahr.com

## TABLE OF CONTENTS

*Page*

I.      INTRODUCTION ...................................................................................... 1

II.     STATEMENT OF FACTS ......................................................................... 4

    A**.**     The District's Remote Monitoring of Student Laptops ....................... 4

    B.     Procedural History ............................................................................. 7

        1.      Plaintiffs' Complaint and Injunction Motion ............................ 7

        2.      The District's Immediate Response to this Lawsuit ................... 8

        3.      Informal Discovery .................................................................. 9

        4.      Depositions .............................................................................. 10

        5.      Intervention Motions ................................................................ 12

        6.      The May 14, 2010 Equitable Relief Order ................................ 13

        7.      Plaintiffs' Opposition to the Wortley Intervention Motion ...... 15

        8.      Plaintiffs' Counsel's Work Explicitly Devoted to Damages Issues ......... 16

        9.      Plaintiffs' Continuing Focus on Additional Forensic Computer Analysis ........ 17

        10.     Class Certification Motion ....................................................... 18

        11.     Other Unnecessary Work ......................................................... 19

    C.     Plaintiffs' Motion for Fees and Costs ................................................ 19

III.    ARGUMENT .............................................................................................. 22

    A.     The Stringent Standards Applicable to Fee-Shifting Requests ............ 22

    B.     Plaintiffs Have Failed to Demonstrate the Reasonableness and Necessity of the Vast Bulk of the Fees and Costs They Seek to Shift to District Taxpayers .... 27

        1.      Plaintiffs' Unreasonable and Unnecessary Fees ...................... 27

            (a)     Work Explicitly Devoted to Damages Claims and Issues ........... 27

            (b)     Work Performed After May 14, 2010 ........................... 29

DMEAST #12759205

(c)     Depositions Irrelevant to the Equitable Relief .............................. 30

(d)     Plaintiffs' Opposition to the Wortley Intervention Motion .......... 31

(e)     Work Performed by Fee Earners Not Referenced in the Motion or Certifications .......................................................................... 31

(f)     Fees for Preparing Discovery Papers That Plaintiffs Never Filed or Served .............................................................................. 31

(g)     Plaintiffs' Motion for Class Certification ..................................... 32

2.     Plaintiffs' Non-Reimbursable Costs ...................................................... 32

(a)     Plaintiff's Computer Consultant's Fees ........................................ 33

(b)     "IT Acceleration" Costs ................................................................ 35

(c)     Deposition Costs ............................................................................ 35

(d)     Legal Research Costs ..................................................................... 36

C.     Plaintiffs' Request for Substantially More Than $15,000 in Connection with Their Motion For Fees and Costs Is Excessive and Unreasonable .............. 36

IV.     CONCLUSION ................................................................................................. 38

DMEAST #12759205

# TABLE OF AUTHORITIES

*Page*

*Cases*

Abrams v. Lightolier, 50 F.3d 1204 (3d Cir. 1995)……………………………………………...32

Alyeska Pipeline Serv. Co. v Wilderness Soc'y, 421 U.S. 240 (1975)………………………….22

A.V. v. Burlington Tp. Bd. of Educ., No. 06-1534, 2008 WL 4126254
(D.N.J. Sept. 3, 2008)…………………………………………………………………………….25

American Atheists, Inc. v. City of Starke, 509 F.Supp. 2d 1221 (M.D. Fla. 2007)…………….36

Brennan v. Springfield Tp., No. Civ. A. 97-5217, 1998 WL 792180
(E.D. Pa. November 10, 1998)…………………………………………………………………...34

Brown v. City of Pittsburgh, No. 06-393, 2010 WL 2207935 (W.D. Pa. May 27, 2010)…...30, 32

Brown v. Continental Casualty Co., No. Civ. A. 99-6124, 2005 WL 1949610
(E.D. Pa. Aug. 11, 2005)…………………………………………………………………………37

Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res., 532 U.S. 598
(2001)………………………………………………………………………………...……22, 23

Disciullo v. D'Ambrosio Dodge, Inc., No. 06-1775, 2008 WL 4287319
(E.D. Pa. Sept. 18, 2008)……………………………………………………………………..25, 31

Enright v. Springfield School Dist., No. 04-CV-1653, 2008 WL 696845
(E.D. Pa. Mar. 13, 2008)…………………………………………………………………………37

Feldman v. Philadelphia Housing Auth., No. Civ. A. 91-5861, 1993 WL 373971 (E.D. Pa. Sept.
21, 1993)…………………………………………………………………………………………37

Goddard v. Babbitt, 547 F. Supp. 373 (D. Ariz. 1982)………………………………………..23

Graphic Arts Mutual Insurance Co. v. Lower Merion Sch. Dist., No. 10-1707 (E.D. Pa.)
(DuBois, J.)………………………………………………………………………………….....1

Griffith v. Mt. Carmel Medical Center, 157 F.R.D. 499 (D. Kan. 1994)………………………..35

Halderman v. Pennhurst State School & Hosp., 49 F.3d 939 (3d Cir. 1995)………………….9, 31

Hasan v. Lower Merion Sch. Dist., No. 10-3663 (E.D. Pa.)...…………………………..…...16

Hensley v. Eckerhart, 461 U.S. 424 (1983)…………………………………………...….…25, 36

iii

Holmes v. Millcreek Township School District, 205 F.3d 583 (3d Cir. 2000)…………..…23, 24

In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305 (3d Cir. 2008)…………………….……32

Institutionalized Juveniles v. Secretary of Public Welfare, 758 F.2d 897
(3d Cir. 1985)………………………………………………………………………….25, 30, 36

Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694 (3d Cir. 2005)……………………26

InvesSys, Inc. v. McGraw-Hill Companies, Ltd., 369 F.3d 16 (1st Cir. 2004)…………………36

John T. v. Del. County Intermediate Unit, 318 F.3d 545 (3d Cir. 2003)………………...……23

Key Tronic Corp. v. United States, 511 U.S. 809 (1994)…………………………………………..22

Maldonado v. Houstoun, 256 F.3d 181 (3d Cir. 2001)……………………………………..passim

McKenna v. City of Phila., 582 F.3d 447 (3d Cir. 2009)…………………………………24, 25

Migis v. Pearle Vision, Inc., 135 F.3d 1041 (5th Cir. 1998)……………………………………35

Penn. Envt'l Defense Found. v. Canon-McMillan Sch. Dist., 152 F.3d 228 (3d Cir. 1998)…….26

Public Interest Group of N.J. v. Windall, 51 F.3d 1179 (3d Cir. 1995)…………………………26

Rapp v. Cameron, No. 00-1376, 2002 WL 254504  (E.D. Pa. Feb. 20, 2002), aff'd sub
nom Rapp v. City of Easton, 77 Fed. Appx. 88 (3d Cir. Sept. 17, 2003) (unpublished)…….25, 31

Robinson v. Burlington Northern Ry. Co., 963 F. Supp. 691 (N.D. Ill. 1997)…………………35

Rode v. Dellarciprete, 892 F.3d 1177 (3d Cir. 1990)……………………………………….......25

Singer Mgmt. Consultants, Inc. v. Migram, ___ F.3d. ___, 2010 WL 3037394
(3d Cir. 2010)………………………………………………………………………………22

Surgner v. Blair, Civ. A. No. 95-5331, 1996 WL 284993 (E.D. Pa. May 20, 1996)……………34

Truesdell v. Philadelphia Housing Authority, 290 F.3d 159 (3d Cir. 2002)……………………22

Vassallo v. Fox, No. Civ. A. 04-697, 2005 WL 757353 (E.D. Pa. April 4, 2005)………………33

Vialpando v. Johanns, 619 F. Supp. 2d 1107 (D. Colo. 2008)…………………………………..36

West Virginia Univ. Hosps. v. Casey, 885 F.2d 11, 32-35 (3d Cir. 1989), aff'd 499 U.S. 83
(1991)………………………………………………………………………..…33, 34

iv

Wheeler v. Towanda Area School Dist., 950 F.2d 128 (3d Cir. 1990)…………………………..24

***Statutes***

28 U.S.C. § 1920………………………………………………………………………….…*passim*

42 U.S.C. § 1981……….……………………………………………………………....22, 33, 34

42 U.S.C. § 1981a………………………………………..……………………………22, 33, 34

42 U.S.C. § 1983………………………………………………………………………*passim*

42 U.S.C. § 1988………………………………………………………………………*passim*

DMEAST #12759205

Defendants, Lower Merion School District, the Board of Directors of the Lower

Merion School District, and Christopher W. McGinley (collectively, the "District"), respectfully

submit this memorandum in opposition to Plaintiffs' Motion for Interim Attorneys' Fees

Pursuant to 42 U.S.C. § 1988 ("Motion").

## I.    INTRODUCTION

Plaintiffs ask the Court to award their counsel $418,850 in fees and costs incurred

thus far in this litigation – to be paid by Lower Merion taxpayers to the extent not covered by

insurance – for their "prevailing" role in bringing about the agreed-upon equitable relief that the

Court has entered.[1]  While plaintiffs deserve some credit for bringing to light the District's

remote monitoring of certain of the laptops that the District issued to its high school students

("Student Laptops"), plaintiffs' fee request far exceeds the bounds of reasonableness.

Plaintiffs acknowledge that they bear the burden of demonstrating that their

request is reasonable.  Yet they do not, because they cannot, make any serious effort to explain

how all of the work they did from November 2009 through July 2010 reasonably relates to the

relief entered by the Court.  Indeed, in their Motion plaintiffs extol the equitable relief granted by

the Court because that is what they claim entitles them to a fee award, but they barely say

anything about what exactly their counsel did.  Plaintiffs' counsel's invoice tells the real story:  it

reveals that the overwhelming majority of the work for which plaintiffs seek reimbursement was

not related or necessary to the equitable relief, but rather directed to the pursuit of individual

damages claims or otherwise outside the scope of fees that plaintiffs are entitled to recover.

---

[1]     The District's insurer has filed an action in this Court contending that it has no duty to defend or indemnify the District for this lawsuit.  *See* <u>Graphic Arts Mut. Ins. Co. v. Lower Merion Sch. Dist., et al.</u>, No. 10-1707 (E.D. Pa.) (DuBois, J.).

As an initial matter, it bears noting that according to their invoice, plaintiffs' counsel began working on this matter on November 13, 2009 – *i.e.*, two days after plaintiffs allegedly learned that the District had remotely monitored the Student Laptop issued to Blake Robbins, but ***more than three months before they brought their allegations to light by filing suit***. Thus, while plaintiffs claim credit for protecting the putative class by stopping the District's allegedly "outrageous" and continuing conduct – and ask the Court to shift their fees onto the community that includes that very class – they let 94 days elapse (and $44,000 in fees accrue) before taking action. As early as November 13, 2009, upon learning of the tracking of their son's computer, the Robbinses simply could have notified the District of the issue and their concerns rather than announce them quite publicly with their lawsuit three months later. Had they done so, they unquestionably would have accomplished, at less expense to taxpayers, the same result that their lawsuit immediately prompted:  the District would have discontinued use of TheftTrack (as it did on the morning it learned of this lawsuit) and commissioned an investigation (which the District did voluntarily one day after learning of this lawsuit).

As it happened, plaintiffs filed their complaint, which sought no specific equitable relief, on February 16, 2010.  Less than one week later, on February 22, 2010, the District entered into a stipulated order pursuant to which it agreed that it would not remotely activate webcams on, or remotely capture screenshots from, Student Laptops.  And on May 14, 2010, by agreement of the parties and with meaningful contributions from the proposed intervenors, the Court entered an order providing comprehensive equitable relief that plaintiffs' counsel described publicly as the "pinnacle of what it is [plaintiffs] needed to put this to rest." (*See* § II(B)(6), *infra*.)  Nevertheless, plaintiffs seek more than $125,000 in fees and costs incurred after May 14.  And while the District itself has moved to make the relief entered on May 14

2

permanent, plaintiffs are pursuing a course – class certification – that will extend the litigation unnecessarily.

A large portion of the work that plaintiffs' counsel performed before May 14, 2010 was likewise unnecessary for the equitable relief and thus is not reimbursable. This is not surprising given that plaintiffs prosecuted this case as it was filed – *i.e.*, as a class action for damages – until they decided in May to pursue only equitable relief on a class-wide basis while preserving their purported individual damages claims for further litigation.

Specific examples of work for which plaintiffs should not be reimbursed, which are discussed more fully below, include the following.

- Plaintiffs seek $87,925 as a line-item expense for their computer consultant without providing any detail about what the consultant did or why his work was supposedly necessary or reasonable.

- Contrary to their assertion that "there has not been any time devoted to an assessment of damages with respect to any individual members of the proposed class" (Pls. Mem. at 15 n.12) – as opposed to work purportedly directed toward obtaining equitable relief – plaintiffs' counsel billed at least $9,000 for work that they explicitly described as related to damages.

- Plaintiffs seek to shift the fees incurred in taking five depositions – which total more than $27,000 – that largely focused on plaintiffs' individual damages claims and that were entirely unnecessary for the crafting of equitable relief. And, they spent several thousand dollars more videotaping the depositions.

- While plaintiffs acknowledge the contributions of the proposed intervenors to the May 14 equitable relief order, their counsel accrued more than $17,000 in fees opposing intervention by a group that has the support of nearly *a quarter* of the class that plaintiffs and their counsel purport to represent. Plaintiffs' efforts to keep a such large portion of the putative class at bay should not be funded by those very same people.

- Plaintiffs seek at least $6,000 in fees for drafting discovery requests and motions that they never served or filed.

- Plaintiffs seek well in excess of $15,000 for 60 hours of attorney time spent drafting and filing the instant Motion for fees.

3

Accordingly, plaintiffs have failed to carry their burden to demonstrate the reasonableness of their fee request.  The Court should deny their motion and order them to submit a more reasonable and better supported request, or in the alternative grant the motion only to the extremely limited extent it seeks fees that plaintiffs have demonstrated are reasonable with respect to the equitable relief that the Court has entered.

## II.    STATEMENT OF FACTS

### A.    The District's Remote Monitoring of Student Laptops

The lawsuit arises from the District's use of TheftTrack, a feature of the LANrev computer management software installed on the Student Laptops that the District issued to its high school students as part of its One-to-One laptop program.  The following facts are taken from the Report of Independent Investigation Regarding Remote Monitoring of Student Laptop Computers by the Lower Merion School District ("Investigation Report"), dated May 3, 2010.[2]

When activated for a particular computer, TheftTrack was capable of recording at a set interval:  (i) the Internet Protocol ("IP") address at which the computer was connected to the Internet; (ii) a photograph taken by the computer's Web camera ("webcam") of whatever was in front of the webcam; and (iii) an image reflecting whatever was on the computer's screen (a "screenshot").  (Investig. Rept. at 1, 19-20.)

The District did not disclose the existence or capabilities of TheftTrack when it issued Student Laptops.  (See id. at 2, 25, 36.)  Nor did it adopt official policies or regulations governing the use of TheftTrack by the District's Information Services ("IS") personnel.  (See id.

---

[2]    The Investigation Report is attached to the District's response to plaintiffs' motion for class certification [Doc. No. 81] as Exhibit A.  Both the Report and its voluminous Appendix, which contains supporting documents, are available at the District's website at http://www.lmsd.org/sections/laptops/default.php?&id=1258.

at 2, 42-48.)  The informal procedures that IS personnel used varied over time and were not followed consistently.  (*See* id. at 2, 42-48.)

As shown by the forensic data and other evidence reviewed and analyzed by the District's counsel and computer forensic specialist, IS personnel activated the image-capturing features of TheftTrack (*i.e.*, the webcam photograph and screenshot capabilities) 76 times on Student Laptops during the 2008-2009 and 2009-2010 school years.  (Id. at 52-60; *see also* Lower Merion School District Forensics Analysis, Initial LANrev System Findings, dated May 2010, prepared by L-3 Services, Inc. ("L-3 Report"), at 22-36.[3])  As a result of the activations that could have resulted in the collection of images from Student Laptops, electronic copies of a total of approximately 58,000 webcam photographs and screenshots existed in the District's computer systems as of February 23, 2010, when the District shut down the LANrev server.  (*See* Investig. Rept. at 52-60, L-3 Rept. at 22-36.)

These TheftTrack activations can be grouped into six general categories:  (i) stolen laptops; (ii) laptops not returned by students who withdrew from school; (iii) missing laptops; (iv) uninsured loaner laptop brought off campus; (v) mistaken activations; and (vi) reason for activation unknown.[4]  (Investig. Rept. at 52-60.)

Image-tracking was activated on only one Student Laptop that was uninsured and brought off campus:  a loaner laptop issued to plaintiff Blake J. Robbins.  (*See* id. at 56-58.)  On October 20, 2009, Mr. Robbins brought his Student Laptop to the IS help desk with a broken screen and was issued a loaner laptop.  (*See* E-mails dated Oct. 20, 2009, Investig. Rept. App.

---

[3]     The L-3 Report is attached to the District's response to plaintiffs' motion for class certification [Doc. No. 81] as Exhibit B, and is available publicly as Tab 1 of the Appendix to the Investigation Report.

[4]     The bulk of these activations were for Student Laptops reported stolen or missing.

Tabs 60-61.)  After certain District personnel conferred and agreed that the loaner laptop should not have been issued in light of outstanding insurance fees, IS personnel activated TheftTrack. (*See* id.)  There is a conflicting evidence in the record about how and why the District activated TheftTrack in this instance.  In any event, tracking was deactivated when Mr. Robbins returned the loaner laptop on November 4, 2009.  (*See* Investig. Rept. at 57.)

A member of the District's IS Department testified that he observed a screenshot captured from Mr. Robbins's laptop while TheftTrack was activated, and that the screenshot included an on-line chat that concerned him.[5]  He then set up a folder in the District's network home directory of Harriton High School Principal Steve Kline and Assistant Principal Lindy Matsko to enable them to view the images captured from the laptop issued to Mr. Robbins.  (*See* E-mails dated Oct. 30, 2009, Rept. App. Tab 63.)  Ms. Matsko testified that she ultimately decided that it was appropriate to discuss certain seemingly troubling images with Mr. Robbins and/or his parents.

Plaintiffs allege that they first learned of the District's remote monitoring of Student Laptops on November 11, 2009, when Ms. Matsko "informed minor Plaintiff that the School District was of the belief that minor Plaintiff was engaged in improper behavior in his home, and cited as evidence a photograph from the webcam embedded in minor Plaintiff's personal laptop issued by the School District."  (Compl. [Doc. No. 1], ¶ 23.)  There is no evidence that any District personnel ever discussed any images captured by TheftTrack with any other members of the putative class.

---

[5]  Given the nature of the deposition testimony referenced in this paragraph, the District has not filed the transcripts herewith to protect plaintiffs' privacy.

6

B.     **Procedural History**

Tellingly, in the background section of their Motion, plaintiffs describe the agreed-upon equitable relief orders, but they say little further about the procedural history of this action.  That history demonstrates that much of plaintiffs' counsel's work was not directed toward obtaining equitable relief.

### 1.     Plaintiffs' Complaint and Injunction Motion

Plaintiffs filed their complaint on February 16, 2010 purportedly on behalf of a putative class "consisting of Plaintiffs and all other students, together with their parents and families . . . who have been issued a personal laptop computer equipped with a web camera ('webcam') by the Lower Merion School District."  (Compl. ¶ 1.)  The complaint asserts claims for invasion of privacy, violation of plaintiffs' Fourth Amendment rights, violation of Section 1983 of the Civil Rights Act, and violations of four state and federal statutes.  (Compl. ¶¶ 27-77.)  It primarily seeks compensatory, punitive, and liquidated damages and attorneys' fees, and also seeks unspecified "declaratory and injunctive relief."  (Compl., Prayer for Relief.)

Promptly after learning of the complaint on the morning of February 18, 2010, the District discontinued use of TheftTrack.  (*See* Letter from District Superintendent Christopher W. McGinley to District Parents/Guardians, dated Feb. 19, 2010, Report of Independent Investigation Regarding Remote Monitoring of Student Laptop Computers by the Lower Merion School District ("Investigation Report"), App. Tab 27; *see also* Investig. Rept. at 8-9.)  The District also removed the permissions required to activate TheftTrack from the two IS staff members who had those permissions.  (*See* id.)

On February 19, 2010, Plaintiffs filed a motion for a TRO to enjoin the District from remotely activating webcams on Student Laptops, contacting members of the proposed

class, and taking possession of or altering Student Laptops, and requiring the District to preserve pertinent evidence.[6]  (*See* Doc. No. 2.)

Three days later, the District entered into a stipulated order pursuant to which it agreed that it would, *inter alia*:  (i) not remotely activate webcams on, or remotely capture screenshots from, Student Laptops; (ii) not contact members of the putative class about the lawsuit; and (iii) preserve pertinent evidence.  (Order, entered Feb. 23, 2010 [Doc. No. 11], ¶ 1.) Accordingly, plaintiffs' motion for TRO was marked "withdrawn without prejudice."  (Order, entered Feb. 23, 2010 [Doc. No. 14].)

### 2.      The District's Immediate Response to this Lawsuit

As noted, the District discontinued use of TheftTrack on February 18, 2010, the day it learned of the complaint in this action.  (*See* § II(B)(1), *supra*.)  The next day, the District retained Ballard Spahr LLP to conduct an investigation into the District's remote monitoring of Student Laptops, and to report the results of its investigation to the District's Board and make appropriate recommendations.  (Id. at 1.)  And on February 22 and 23, 2010, L-3, the District's

---

[6]      The District, of course, was obligated to preserve potentially pertinent data in light of the litigation in any event, and it took steps to do so promptly upon learning of the lawsuit (*see* Investig. Rept. at 8).  In that regard, although it is irrelevant to the instant Motion, the District cannot leave unaddressed plaintiffs' sensational suggestion that L-3 did not recover all of the webcam photographs and screenshots that were recoverable at the time of its investigation because such data was deleted on February 18, 2010.  (Pls. Mem. at 4 n.5.)  Plaintiffs do not bother to cite the L-3 report.  As the District advised plaintiffs' counsel when it previously made this claim, the L-3 Report reveals that the District routinely purged tracking data when it deactivated TheftTrack for a particular computer. (*See* L-3 Report at 16.)  And, more importantly – as explained in detail in the L-3 Report – on February 20, 2010, District IS personnel created an archive file with eight days of backups of the LANrev server databases.  (Id. at 17.)  Thus, there is no question that L-3 was able to recover and analyze ***all*** of the tracking data that existed at the time this lawsuit was filed.  (*See* id.)

computer forensic specialist, powered down and took physical custody of the servers through which TheftTrack was administered for review and analysis.[7]  (*See* L-3 Rept. at 3.)

### 3.  Informal Discovery

In their Motion, plaintiffs take credit for "[s]etting up a procedure with Defendants to allow for the most immediate exchange of relevant information to enable the parties, in the most cost-effective manner possible, to identify crucial witnesses and essential information."  (Pls. Mem. at 17.)  Indeed, in the absence of formal document requests, the District voluntarily provided plaintiffs' counsel with thousands of pages of documents, and the District's computer forensic consultant shared information about its investigation with plaintiffs' computer forensic consultant.  This one-sided provision of information, however, was by no means limited to the parties' efforts to craft appropriate equitable relief.  In fact, the parties, with the approval of the Court, agreed to this arrangement long before plaintiffs decided in or around May 2010 – close to the time the Court entered the May 14, 2010 comprehensive equitable relief order – to pursue only equitable relief on a class-wide basis.  (*See* Stipulated Order, entered March 10, 2010 [Doc. No. 19], at 1 ("The parties are hopeful that this information will enable an

---

[7]     Plaintiffs and their counsel, meanwhile, launched a media blitz that included, among others, appearances on:  the CBS Nightly News on February 19; CBS's Early Show Saturday Edition on February 20; Good Morning America on February 22; NBC's Philadelphia affiliate on February 22; a press conference on February 24; the Dom Giordano show on WPHT 1210 AM on March 1; Good Day Philadelphia on March 12, 2010; Good Morning America on April 17; and Good Day Philadelphia on May 4.  In each of these appearances, plaintiffs and/or their counsel emphasized the Robbinses' individualized allegations, and they frequently showed certain images captured by TheftTrack from Blake Robbins's laptop.  The Third Circuit has held that fees for such time are not recoverable.  *See* Halderman v. Pennhurst State Sch. & Hosp., 49 F.3d 939, 942 (3d Cir. 1995) (reviewing a fee petition under section 1988 in the "more generous" context of a contempt proceeding and rejecting a claim for fees relating to time spent addressing the media because "the proper forum for litigation is the courtroom, not the media").  Plaintiffs' counsel appear largely to have excluded time for media appearances from their invoice.  (*But see* Lamm Rubenstone Invoice at 5, 6.)

expeditious and cost-effective resolution of this action that is in the best interests of the parties and LMSD students, parents, and taxpayers.").)

### 4.    Depositions

Plaintiffs' earlier strategy of litigating their damages claims – whether on a class-wide basis or solely on behalf of the Robbinses – was apparent in the five depositions plaintiffs took at an expense of more than $34,000 in fees and costs.

Plaintiffs' counsel deposed five current or former District LMSD employees: Harriton High School Assistant Principal Lindy Matsko; former Director of Technology Virginia DiMedio; Information Systems Coordinator Carol Cafiero; Network Technician Michael Perbix; and Building-Level Technician Kyle O'Brien.  With the exception of the deposition of Ms. DiMedio (who no longer worked for the District at the time Blake Robbins's laptop was tracked), each deposition included extensive questioning about the circumstances surrounding the tracking of the laptop issued to Blake Robbins.  For example, plaintiffs' counsel questioned: Ms. Matsko about the tracking of Mr. Robbins's laptop and her interactions with Mr. Robbins and his parents with respect to TheftTrack images captured from it; Ms. Cafiero about the circumstances surrounding the tracking of Mr. Robbins's laptop and the TheftTrack images captured from it; Mr. Perbix about the circumstances surrounding the tracking of Mr. Robbins's laptop and the TheftTrack images captured from it; and Mr. O'Brien about the circumstances surrounding the tracking of Mr. Robbins's laptop.[8]

---

[8]    In light of the nature of the testimony concerning the circumstances surrounding the tracking of Mr. Robbins's laptop, the District has not filed the transcripts herewith to protect plaintiffs' privacy.  In any event, plaintiffs bear they burden of demonstrating the reasonableness of their request for fees for the deposition, and in their Motion they make no attempt to satisfy that burden.

Plaintiffs' counsel also focused extensively on other issues that had no bearing on the equitable relief – which, as discussed further in Section II(B)(6), below, applies prospectively to ensure that the conduct that gave rise to this action never happens again.  For example, plaintiffs' counsel questioned Ms. DiMedio at length about what the Board knew about TheftTrack and when they knew it, and whether Board members ever saw TheftTrack images. Plaintiffs' counsel also questioned Ms. Cafiero extensively about what high school administrators and IS staff members knew about the TheftTrack program and when they knew it. And it bears noting that although they sought to do so earlier, plaintiffs' counsel ultimately deposed Ms. Cafiero on June 8, 2010 – several weeks after the Court entered its May 14, 2010 equitable relief order.[9]

Moreover, plaintiffs' counsel spent thousands of dollars on videographers to videotape the depositions (*see* Lamm Rubenstone Invoice, Ex. D to Pls. Mem., at 58-59) notwithstanding that at the first deposition, when the District's counsel first became aware that

---

[9]     It is telling that plaintiffs' "statement of predicate facts" (Pls. Mem. at 2-4) is drawn directly from the District's Investigation Report; plaintiffs do not cite a single deposition. In fact, their only reference to particular depositions is in a footnote in which they suggest, without citation, that the testimony of Ms. DiMedio and Ms. Cafiero "call[s] into question" the veracity of the Investigation Report with respect to the Board's knowledge of the capabilities and use of TheftTrack.  (*See* Pls. Mem. at 2-3 n.3; *see also* Investig. Rept. at 36-37 (concluding, based on, *inter alia*, interviews of all nine Board members and numerous other witnesses, and the review of tens of thousands of pages of documents, that "to the extent certain Board members . . . had some knowledge of the District's ability to track laptops, they did not seek further information or advice, or sufficiently voice concerns they may have had").)  In any event, plaintiffs' footnote only underscores the nature and extent of plaintiffs' litigiousness with respect to issues unrelated to the equitable relief that is already in place.

11

plaintiffs' counsel planned to videotape the depositions, the District's counsel asked plaintiffs'

counsel to reconsider doing so in light of the expense.[10]

The depositions also gave rise to extensive motion practice for which plaintiffs

seek to bill the District.  Plaintiffs' filings for those motions included:  (i) a motion to compel

and for sanctions against Ms. Cafiero [Doc. No. 20]; (ii) a response to the motion to quash the

subpoena issued to Ms. Cafiero [Doc. No. 33]; (iii) a second motion for sanctions against Ms.

Cafiero [Doc. No. 44] (seeking, *inter alia*, production of Ms. Cafiero's personal computers),

which motion the Court denied [Doc. No. 53].  Plaintiffs' counsel's fees for these matters totaled

at least $19,000.  (*See* Lamm Rubenstone Invoice at 20-35.)

### 5.      Intervention Motions

Meanwhile, two groups of proposed intervenors sought to join this action.  A

group of six parents of District high school students filed a motion to intervene in March 2010.

(Motion of Colleen and Kenneth Wortley, Frances and David McComb, and Christopher and

Lorena Chambers (the "Wortley Intervenors") for Intervention, filed March 18, 2010  ("Wortley

Intervention Motion"), [Doc. No. 21].)  Their proposed complaint seeks only equitable relief,

including an order:  (i) prohibiting the District from remotely activating webcams on student

laptops; (ii) prohibiting the District from using laptop tracking technology that can compromise

students' and families' privacy; and (iii) requiring the District to create and implement policies

---

[10]     Although plaintiffs conducted five depositions (one of which was conducted over two
days), their counsel's invoice includes seven separate entries for videotaping fees.  Those
entries, in the order listed on the billing statement, are:  videotape deposition on 4/7/10 --
$685.00; videotape deposition on 4/9/10 -- $790.00; videotape deposition on 5/12/10 --
$440.00; videotape deposition on 4/8/10 -- $685.00; videotape deposition of Kyle
O'Brien on 4/9/10 -- $575.60; videotape deposition of Lynn Matsko on 4/7/10 --
$848.15; and videotape deposition of Michael Perbix on 4/8/10 -- $812.60.  (*See* Lamm
Rubenstone Invoice at 58-59.)  Plaintiffs have not explained the two entries for April 7,
2010, when only Ms. Matsko was deposed.

12

and practices for the District's administration of student laptops.  (Proposed Complaint in Intervention, attached to Wortley Intervention Motion ("Wortley Complaint"), at 11-12.)  The motion was supported by a very substantial percentage of the putative class:  460 parents of between 500 and 600 District high school students.  (Decl. of Michael J. Boni, attached to Wortley Intervention Motion ("Boni Decl."), ¶ 4.)

In addition, another District high school student and his parents filed a motion to intervene in April 2010.  (Emergency Motion of the Neill Family (the "Neill Intervenors") to Intervene and for a Protective Order, filed April 5, 2010 ("Neill Intervention Motion") [Doc. No. 36].)  Their proposed complaint seeks only equitable relief:  namely, an injunction permanently prohibiting the District from remotely accessing laptops "in a manner that constitutes an unreasonable search of students and their families," and a declaration restricting the dissemination of images captured by TheftTrack.  (Proposed Complaint in Intervention, attached to Neill Intervention Motion as Ex. A, at 16.)

In light of the Neill Intervention Motion, the District conferred with counsel for the Neill Intervenors and agreed with plaintiffs that any photographs and screenshots obtained through means of the LANrev software, except for those from the laptops issued to Mr. Robbins or his sister, would not be disclosed to persons other than counsel for defendants.  (*See* Order, entered April 15, 2010 [Doc. No. 43], ¶ 1.)

### 6.    The May 14, 2010 Equitable Relief Order

On April 15, 2010, as proposed by the District, the Court ordered counsel for the parties to meet and confer with counsel for proposed intervenors "in an effort to reach agreement on the form of order which will ensure that . . . equitable relief to which the parties may agree as part of a resolution of this action addresses the concerns of all the proposed interveners."  (Order, entered April 15, 2010 [Doc. No. 43], at 2.)  The comprehensive equitable relief order that the

13

Court entered on May 14, 2010 arose from a series of discussions with counsel for the proposed intervenors. In fact, the starting point for the order the parties proposed to the Court was the prayer for relief in the Wortley Complaint. (*See* Wortley Compl. at 11-12.) The May 14, 2010 Order also includes a number of specific, additional provisions suggested by counsel for each group of proposed intervenors. (*See* District's Resp. to Wortley Intervention Mot. & Neill Intervention Mot., filed May 11, 2010 [Doc. No. 62], at 1-2.)

By agreement of the parties, the May 14, 2010 Order:

(i)     enjoins the District from remotely activating webcams on Student Laptops;

(ii)    enjoins the District from purchasing technology that allows for the remote activation of webcams on Student Laptops, with certain defined exceptions;

(iii)   enjoins the District from remotely capturing screenshots from Student Laptops, with certain defined exceptions;

(iv)    imposes specific, detailed requirements for any theft tracking technology the District may use for Student Laptops;

(v)     enjoins the District from accessing or reviewing any student-created files contained on Student Laptops, except in specifically defined circumstances;

(vi)    requires the District to adopt official policies and regulations before the start of the 2010-2011 school year governing Student Laptops, the privacy of student data in such laptops, the training of District IS personnel with respect to Student Laptops and privacy, and the administration, oversight, and enforcement of such policies and regulations;

(vii)   imposes numerous, specific requirements for the policies and procedures to be adopted pursuant to the Order;

(viii)  requires the District – to the extent it is in possession of webcam photographs or screenshots from certain student laptops resulting from the District's use of TheftTrack – to provide the students who possessed those laptops while tracking was activated, and/or their parents or guardians consistent with the terms of the process described herein, an opportunity to view such images pursuant to a

14

process to be developed under the auspices of, and supervised and approved by, this Court and Chief Magistrate Judge Thomas J. Rueter (*see also* Order, entered by Judge Rueter on May 14, 2010 [Doc. No. 67] (establishing viewing process));[11]

(ix)    requires that all images referred to in (viii) shall be permanently destroyed by a date to be established by further order of the Court after the viewing process is completed and no pending governmental investigation or litigation requires the preservation of such images; and

(x)    enjoins the District from otherwise disseminating or permitting access to any webcam photographs or screenshots, or any information contained therein, that the District obtained remotely from student laptops.

(Order, entered May 14, 2010 [Doc. No. 68], ¶¶ 2-9.)  The Order provides that it "shall be enforceable by any persons adversely affected by any violations of [the] Order, including parents or guardians of adversely affected individual who is then a minor." (Id. ¶ 10.)  As plaintiffs' counsel publicly conceded on the day the order was entered, with the agreed-upon equitable relief in place, "I think we've really reached the pinnacle of what it is we needed to reach to put this to rest." (Judge Bans Webcam Spying on Students, Assoc. Press, May 14, 2010, Ex. A hereto.)  A review of plaintiffs' counsel's invoice suggests that they billed about $17,000 in fees related to the negotiation of the May 14 order.  (*See* Lamm Rubenstone Invoice at 30-43.)

### 7.    Plaintiffs' Opposition to the Wortley Intervention Motion

Even though plaintiffs worked with the proposed intervenors to develop the equitable relief agreed upon by the parties – a point plaintiffs emphasize in their Motion (*see* Pls. Mem. at 6-7, 17) – on May 11, 2010 they filed a response to the intervention motions [Doc. No. 63] in which they supported the Neill Intervention Motion but opposed the Wortley Intervention

---

[11]    This process began almost immediately after entry of the May 14, 2010 order and is substantially complete.

Motion.  The principal ostensible basis for their position was that both groups sought the same relief, and while one intervenor would be helpful, more would multiply the litigation.  (*See* Doc. 63 at 2, 9-10.)  Yet, it was plaintiffs' counsel who billed at least $17,000, reflected in nearly 30 different time entries (*see* Lamm Rubenstone Invoice at 20-43), in their efforts to oppose the Wortley Intervention Motion.  Particularly in light of the central role the Wortley Intervenors played in the development of the May 14, 2010 equitable relief order (*see* § II(B)(6), *supra*), plaintiffs' selectivity with respect to further participation in the litigation by members of the class they seek to represent raises questions about the actual motivation for their opposition.

> **8.      Plaintiffs' Counsel's Work Explicitly Devoted to Damages Issues**

Despite plaintiffs' contention that "***there has not been any time spent devoted to an assessment of damages with respect to any individual members of the proposed Class***" (Pls. Mem. at 15 n.12 (emphasis added)), their counsel's invoice includes at least 13 time entries totaling approximately $9,000 explicitly for work related to damages issues.  (*See, e.g.*, Lamm Rubenstone Invoice at 11 ("Legal research re: possible damages caps"); 46 ("Research re: jury awards in invasion of privacy cases"); 31 ("legal research analysis cont'd re: speculative damages").)  In addition, the invoice includes fees for a July 16, 2010 telephone conference with the mother of another District high school student, Jalil Hasan, on whose behalf plaintiffs' counsel filed a separate damages action eleven days later.  (Id. at 55 (block billing 4.6 hours for the conference and other work).)  *See* Hasan v. Lower Merion Sch. Dist., et al., No. 10-3663 (E.D. Pa.) (DuBois, J.).  Plaintiffs' counsel's preparation of that action, which names as defendants two District employees who are not named as defendants in this case, clearly was supported by the work for which plaintiffs now seek reimbursement from the District.

**9.      Plaintiffs' Continuing Focus on Additional Forensic Computer Analysis**

Notwithstanding that on May 3, 2010 the District made public the Investigation Report and the separate report of L-3, which reflected months of intensive forensic analysis of the District's use of TheftTrack (and resulted in the recovery of nearly 58,000 images captured by TheftTrack from Student Laptops), plaintiffs have continued to push for additional forensic computer analysis, both by L-3 and their own consultant.   Plaintiffs have fairly contended that they are entitled to have their consultant (John Steinbach) perform some work to "validate" L-3's results, and the District agreed to make available to Mr. Steinbach data from one of the computers used by District Network Technician Mr. Perbix so that Mr. Steinbach could, *inter alia*, determine using methods of his choosing whether the number of TheftTrack images he found on that computer is consistent with the number recovered by L-3.   (*See* Stipulated Order entered June 9, 2010 [Doc. No. 74], ¶ 2.)   But that work – which accounts for $15,675 of Mr. Steinbach's fees, including $4,000 in travel time alone, and approximately $9,000 billed by plaintiffs' counsel (*see* Mr. Steinbach Invoice at 3-4;[12] Lamm Rubenstone Invoice at 43-52) – is not geared toward equitable relief.   The May 14, 2010 equitable relief order had already been in place for weeks when the work started.   Instead, the work is geared solely toward supporting individual damages claims of the Robbinses or others.   Indeed, even if Mr. Steinbach found additional TheftTrack images, the finding would have no effect on the equitable relief

Notably, the District's understanding is that Mr. Steinbach did confirm within a high degree of statistical accuracy that his and L-3's numbers of images were consistent, but Mr. Steinbach has not issued a report and plaintiffs have not disclosed his findings.   In that regard,

---

[12]      Plaintiffs did not file with their Motion any breakdown of Mr. Steinbach's fees, but later provided the District with the "interim billing" statement attached hereto as Exhibit B.

plaintiffs' suggestion that "Mr. Steinbach's efforts have been halted as a result [of]" the District's opposition to plaintiffs' class certification motion (Pls. Mem. at 4 n.5) proves only one thing: plaintiffs realize that this additional analysis is being performed not for the benefit of the community that benefits from the equitable relief, but for the benefit of a much narrower group of individuals who are pursuing or may pursue damages claims.

Similarly, plaintiffs pressed for analysis of Ms. Cafiero's personal home computers even though no evidence suggested that she ever used them to run LANrev. After the District's counsel met and conferred with counsel for plaintiffs and Ms. Cafiero, they agreed that the computers would be turned over to Mr. Steinbach for forensic preservation, and then analysis by L-3 at the District's expense. (*See* Stipulated Order, entered April 28, 2010 [Doc. No. 57].) L-3 found no evidence of TheftTrack images or even that LANrev was ever installed on either of Ms. Cafiero's computers. As with the additional analysis of the computer used by Mr. Perbix discussed above, the results of this analysis would not in any event have had any effect on the equitable relief. Nevertheless, plaintiffs seek more than $3,000 in fees and costs arising from this work. (*See* Lamm Rubenstone Invoice at 35; *see* Mr. Steinbach Invoice at 3.)

### 10.    Class Certification Motion

Plaintiffs' counsel began work on their motion for class certification, which the District has opposed as unnecessary and counterproductive (*see* Doc. No. 81), in March 2010. Plaintiffs seek at least $27,000 for their counsel's work on that motion, which is two pages and supported by a 12-page memorandum (*see* Doc. No. 73).

Among the fees plaintiffs seek to recover in connection with the class certification motion are more than $1,000 in fees that they incurred solely because their counsel declined to provide the District's counsel the professional courtesy of a one-week extension of time to file its response. (*See* Lamm Rubenstone Invoice at 53-54 (billing time for, *inter alia*, discussions

among themselves and a conference with the Court necessitated by plaintiffs' opposition, and

billing $340 for a 48-minute "Telephone conference with client regarding update on recent Court

Order regarding extension of time").)

>	**11.**	**Other Unnecessary Work**

>	Plaintiffs seek to recover fees incurred in connection with discovery requests and

motions that they never served or filed.  (*See* Lamm Rubenstone Invoice at 2, 4, 12-13, 15.)  The

work includes researching case law with respect to discovery stays and drafting unfiled motions

to expedite and compel discovery.  (*See* id.)

>	**C.**	**Plaintiffs' Motion for Fees and Costs**

>	Although the litigation has not been resolved, plaintiffs contend in their Motion

that they are entitled to an interim award of "their attorneys fees and costs incurred to date in this

litigation, and are further entitled to recover additional counsel fees extended [*sic*] in their pursuit

of the instant Motion," in the amount of $418,850.60.  (Pls. Mem. at 2, 14.)  They rely on

Section 1988 of the Civil Rights Act, 42 U.S.C. § 1988, under which "the court, in its discretion,

may allow the prevailing party" in litigation brought under certain federal civil rights statutes,

including Section 1983, "a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988.

>	Plaintiffs contend that they are "prevailing parties" in light of the equitable relief

that the Court has entered.  Plaintiffs repeatedly acknowledge that they are not entitled to

reimbursement for costs incurred in pursuing individual damages claims.  (*See, e.g.*, Pls. Mem. at

7 ("It is in the context of" the District having been 'judicially enjoined' that "Plaintiffs now bring

their Interim Motion for Attorneys' Fees."); 12 (Because of the "injunctive relief" in place,

"there can be no question but that Plaintiffs" qualify as prevailing parties) (emphasis in

original).)  According to plaintiffs, had "it not been for Blake Robbins' Complaint, the District's

spying activities would have continued *ad infinitum*, with similarly resulting harm to the members of the Class and others." (Id. at 6 (emphasis in original).)

Plaintiffs take credit for the equitable relief that the Court entered on February 23, April 15, and May 14, 2010. (*See* Pls. Mem. at 5-7.) But they do not and cannot point to or take credit for any relief obtained after May 14, 2010.

Plaintiffs' counsel's invoice, however, covers time and expenses from November 2009 through July 23, 2010. (*See* Lamm Rubenstone Invoice at 1-59.) Yet, without citation, plaintiffs state in a footnote that "it is fair to say that ***all of the time*** evidenced on [their Invoice] has been incurred with [*sic*] relation to Plaintiffs' gathering of facts sufficient to support its [*sic*] claim for equitable relief and the relief obtained." (Id. at 15 n.12 (emphasis added).) They further conclusorily state that the "efforts expended by Plaintiffs' counsel as set forth in [their invoice] were ***all*** necessary and proper to obtain the injunctive relief awarded to Plaintiffs." (Id. at 16 (emphasis added).)

Plaintiffs seek $316,707.50 in attorneys' fees and $102,143.10 in costs. (*See* Lamm Rubenstone Invoice at 1.) Of the fees, $201,280 were accrued by Mark S. Haltzman, Esquire, $76,807.50 were accrued by Frank Schwartz, Esquire, $19,285 were accrued by Stephen Levin, Esquire, and $19,355 were accrued by seven other timekeepers.[13]

Of the costs they seek to shift onto the District, $87,925 are reflected in a single, four-word line item on the final page of plaintiffs' counsel's invoice: "Computer consultants,

---

[13]     Plaintiffs attach to their Motion signed certifications for the three named attorneys but not for any of the others. (*See* Pls. Mem., Exs. E, F, & G.) In addition, plaintiffs attach a certification from Cletus P. Lyman, a lawyer who purports to be experienced in civil rights cases and knowledgeable with respect to attorneys' rates. (*See* id., Ex. H.) Mr. Lyman opines on the fairness and reasonableness only of the rates charged by Messrs. Haltzman, Levin, and Schwartz. (*See* id. ¶ 5.)

Steinbach; Steinbach." (Lamm Rubenstone Invoice at 59.) Some of Mr. Steinbach's work is discussed above. (*See* pp. 17-18.) In their attempt to justify their request for Mr. Steinbach's fees, however, plaintiffs refer to him in two footnotes in their Motion. In one, they suggest that without his forensic computer expertise, plaintiffs would not "have been able to understand the nature and extent of Defendants' use of its computers to commit its civil rights abuses of the students." (Pls. Mem. at 15 n.13.) In the second, without explanation, they suggest that District's decision to oppose class certification caused Mr. Steinbach to stop his work in July 2010. (Id. at 4 n.5; *see also* p. 18, *supra*.)

For their work on their Motion for an award of fees and costs, Plaintiffs seek well in excess of $15,000 for about 60 hours of work. (*See* Lamm Rubenstone Invoice at 50-57.)

At the end of their Motion, plaintiffs attempt to justify the size of their request by characterizing it as a "small fraction" of fees and costs the District has incurred. (Pls. Mem. at 19 n.15.) Putting aside that $420,000 is not a "small" amount, the District notes that scope of work performed by its counsel and computer consultants far exceeds the defense of this litigation. Most substantially, counsel and L-3 conducted an intensive, 10-week investigation that involved, among other things, the collection and analysis of more than 18.95 terabytes of electronic data, the review of approximately 500,000 pages of documents, and 42 witness interviews. Counsel's investigation resulted in a 69-page report and a 925-page, 206-document appendix, and L-3 separately produced a highly technical, 44-page report on computer issues. (*See* Investig. Rept. & L-3 Rept.) The District's counsel also have dealt with a host of other non-litigation issues on behalf of the District, including a Government investigation. Moreover, the District has incurred substantial legal fees and costs as a result of plaintiffs' own litigation tactics

described herein.  Thus, the fact that plaintiffs' request approaches half of the District's costs, if anything, undermines any claim that the request is reasonable.

## III.     ARGUMENT

### A.     The Stringent Standards Applicable to Fee-Shifting Requests

Pursuant to the "'American rule,' parties are ordinarily responsible for their own attorney's fees."  Truesdell v. Philadelphia Housing Auth., 290 F.3d 159, 163 (3d Cir. 2002) (quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975)).  Thus, there is "a general practice of not awarding fees to a prevailing party 'absent explicit statutory authority.'"  KeyTronic Corp. v. United States, 511 U.S. 809, 819 (1994) (quoting Alyeska, 421 U.S. at 262).  Here, plaintiffs rely on Section 1988 of the Civil Rights Act, which provides that in

> any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title…, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988(b).  One of the claims plaintiffs asserted in their complaint was for violation of Section 1983 of the Civil Rights Act.

Although the Court has not ruled on any of plaintiffs' claims, plaintiffs contend that they are prevailing parties because this action brought about the agreed-upon equitable relief that the Court has entered.[14]  When litigation has not "progress[ed] to a final judgment on the merits, a party seeking 'prevailing party' status must demonstrate a 'judicially sanctioned change in the legal relationship of the parties.'"  Singer Mgmt. Consultants, Inc. v. Migram, ___ F.3d. ___, 2010 WL 3037394, at *5 (3d Cir. 2010) (quoting Buckhannon Bd. & Care Home v. W. Va.

---

[14]     Plaintiffs insinuate (see Pls. Mem. at 12 and 12 n.10) that the District conceded legal liability in its response to plaintiffs' motion for class certification.  It did not.  What it has done is agreed to the equitable relief embodied in the Court's orders and argued that that relief leaves nothing to be resolved insofar as plaintiffs seek equitable relief.

Dep't of Health & Human Res., 532 U.S. 598, 605 (2001)).  A party does not prevail for purposes of Section 1988 and other federal fee-shifting statutes when the defendant voluntarily ceases the complained-of conduct, even when the complaint serves as the "catalyst" for the change in behavior.  Buckhannon, 532 U.S. at 622.  Courts have relied on this principle in refusing to grant prevailing party status when, for example, a legislative body amends a statute in response to a complaint, *see* id., or when litigants reach the resolution that the plaintiff seeks through voluntary negotiations.  *See* John T. v. Del. County Intermediate Unit, 318 F.3d 545, 560-61 (3d Cir. 2003).  In their Motion, plaintiffs assert that the equitable relief orders entered by the Court accord them prevailing party status.

In the event the Court finds that plaintiffs are "prevailing parties," plaintiffs still must comply with stringent requirements to receive an award of fees and costs under Section 1988.  As an initial matter, the Court should take into consideration that any fees shifted here will be borne by taxpayers.  Indeed, the Third Circuit has cautioned that "the prospect of payment by a defendant with a deep pocket or a defendant with tax collecting powers should not encourage" excessive billing practices.  Maldonado v. Houstoun, 256 F.3d 181, 184, 185 (3d Cir. 2001); *see also* Goddard v. Babbitt, 547 F. Supp. 373, 378 (D. Ariz. 1982) ("While all of the attorneys involved in the prosecution of this action did a first-rate job, the requests of the applicants will be slashed in recognition that it is the taxpayer who must bear the expense of this litigation.").

The Court also should take into account the District's cooperation with plaintiffs at each step of the litigation.  (*See* § II, *supra*.)  The Third Circuit's decision in Holmes v. Millcreek Township School District, 205 F.3d 583, 596 (3d Cir. 2000) – in which the Third Circuit reversed the District Court's award of $141,070 and granted only $35,267 – is

instructive.  In that case, the plaintiffs filed several administrative actions to rectify perceived

deficiencies in the education plans that the defendant school district developed for their hearing-

impaired daughter.  *See* id. at 586-89.  Upon obtaining some of the relief they sought, plaintiffs

sued for attorneys' fees and costs under the Individuals with Disabilities Education Act.  *See* id.

at 593.  The Third Circuit drastically reduced the size of the District Court's award.  It noted that

the district worked with plaintiffs at every step to craft an education plan for their daughter that

met her needs, and explained that "this is not a case in which the school district has been

intransigent or willfully undermining a disabled student's education."  Holmes, 205 F.3d at 596.

Rather, when plaintiffs identified flaws in the plan, the district worked with them to develop

satisfactory solutions, even if the parties did not always agree on specific measures.  *See* id. at

586-89.  In addition, the court found that the plaintiffs and their counsel "contributed to the

needlessly protracted proceedings" and spent excessive time on various tasks.  *See* id. at 594-96

(internal quotation marks omitted).

        In addition, courts should not allow prevailing parties to treat a fee request as an

"initial bargaining position in the same way that an attorney for a plaintiff in a personal injury

case might make a grossly inflated opening demand in negotiations for settlement."  McKenna v.

City of Phila., 582 F.3d 447, 457 n.11 (3d Cir. 2009) (affirming fee award of $27,178,75 when

request was for $181,340).

        In any event, prevailing parties may receive fees only for litigation that "was a

material contributing factor in bringing about the events that resulted in obtaining the desired

relief."  Wheeler v. Towanda Area School Dist., 950 F.2d 128, 132 (3d Cir. 1990).  Thus, courts

disallow fees billed ***after*** the plaintiff has achieved the success for which he claims prevailing

party status "because the expenditure of such time is equivalent to expending time litigating

24

particular claims that are unrelated to the relief ultimately obtained." <u>Institutionalized Juveniles</u> <u>v. Secretary of Public Welfare</u>, 758 F.2d 897, 920 (3d Cir. 1985); *see also* <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 435 (1983) (stating that "work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved'") (internal citation omitted); <u>A.V. v.</u> <u>Burlington Tp. Bd. of Educ.</u>, No. 06-1534, 2008 WL 4126254, at *6 (D.N.J. Sept. 3, 2008) ("work expended after the sole source of success was achieved likewise cannot be thought of as having contributed to that success").

Moreover, the Court must take into the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." <u>Hensley</u>, 461 U.S. at 433. Plaintiffs must establish the reasonableness of both their rates and the hours for which they seek an award. *See* <u>Rode v. Dellarciprete</u>, 892 F.3d 1177, 1183 (3d Cir. 1990). When considering whether fees were "reasonably expended," courts strip out "hours that are excessive, redundant, or otherwise unnecessary." <u>Hensley</u>, 461 U.S. at 434; *see also* <u>McKenna</u>, 582 F.3d at 455 (3d Cir. 2009) (stating that "courts are to exclude from the determination of the lodestar any hours not reasonably expended"); <u>Rode</u>, 892 F.3d at 1183 ("The district court should exclude hours that are not reasonably expended."). Courts may also reduce fees "[w]here the documentation of hours is inadequate."[15] <u>Hensley</u>, 461 U.S. at 433.

---

[15]     In addition, when plaintiffs fail to submit appropriate evidence of the reasonableness of the rate charged by a fee earner, courts may reduce or decline to award the fees sought. For example, Chief Magistrate Judge Rueter reduced fees requested for certain fee earners by half in light of the requesting counsel's failure to submit any affidavits attesting to their role or experience in <u>Rapp v. Cameron</u>, No. 00-1376, 2002 WL 254504, at *6 (E.D. Pa. Feb. 20, 2002), *aff'd sub nom* <u>Rapp v. City of Easton</u>, 77 Fed. Appx. 88 (3d Cir. Sept. 17, 2003) (unpublished). *See also* <u>Disciullo v. D'Ambrosio Dodge, Inc.</u>, No. 06-1775, 2008 WL 4287319, at *3-4 (E.D. Pa. Sept. 18, 2008) (reducing the amount of fees sought by attorneys who submitted no evidence of their experience).

DMEAST #12759205

In light of these standards, the Third Circuit has noted that District Courts "have a positive and affirmative function in the fee fixing process, not merely a passive role." Maldonado v. Houstoun, 256 F.3d at 184.  A fee award unsupported by detailed factual findings will not withstand scrutiny.  For example, the Third Circuit remanded a case in which the District Court did not conduct a potentially "arduous" and "adversarial" fact-finding process with respect to a fee award.  *See* Penn. Envt'l Defense Found. v. Canon-McMillan Sch. Dist., 152 F.3d 228, 232 (3d Cir. 1998).  Similarly, it reversed a fee award when a magistrate judge did not consider the defendant's specific objections to plaintiff's request and "was reluctant to second guess counsel's judgment about what time and attention particular legal problems should be given." Public Interest Group of N.J. v. Windall, 51 F.3d 1179, 1189 (3d Cir. 1995); *see also* Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 713-14 (3d Cir. 2005) (ruling that the District Court did not satisfy its "obligation to conduct a searching review" of a fee request).

Relying on these principles, courts in the Third Circuit routinely award fees in amounts significantly less than requested.  As noted above, the Third Circuit in Holmes, 205 F.3d at 596, cut the District Court's award by 75% in light of the defendants' cooperativeness and other factors.  And in Maldonado, a Section 1983 case, the Third Circuit cut more than 300 hours from the prevailing party's request, ruling that even though the party's counsel "presented an excellent case and a high qualify brief," its fees were excessive.  256 F.3d at 185-88 (noting that if "a private client had agreed to pay for [excessive] services, so be it. . . .  [b]ut in fee shifting, there are standards to be maintained").

Applying these principles here demonstrates that plaintiffs have not met, and cannot meet, their burden of demonstrating the reasonableness of their request for an award of

nearly $420,000.  The bulk of the fees and costs they seek were unnecessary and unrelated to the equitable relief for which they claim credit.

**B.      Plaintiffs Have Failed to Demonstrate the Reasonableness and Necessity of the Vast Bulk of the Fees and Costs They Seek to Shift to District Taxpayers**

Plaintiffs' attempt to satisfy their burden boils down to little more than an argument that "the Court entered equitable relief so our fees and costs to date are reasonable." As set forth above, plaintiffs make no serious effort to say how they used their time and how their bill reached almost $420,000.  Instead, they conclusorily assert that "[t]he efforts expended by Plaintiffs' counsel as set forth in [their invoice] were all necessary and proper to obtain the injunctive relief awarded to Plaintiffs.  Plaintiffs' successful efforts have resulted in the following . . . ."  (Pls. Mem. at 16; *see also* id. at 15 n.12 ("all the time spent set forth in [plaintiffs' counsel's invoice] has been spent with respect to establishing the nature and scope of Defendants' invasion of Plaintiffs' privacy; there has not been any time devoted to an assessment of damages with respect to any individual members of the proposed Class").)  Applying the type of rigorous scrutiny that the Court must apply to Plaintiffs' request reveals otherwise.

In the sections below, the District first addresses several categories of fees to which plaintiffs are not entitled, and then addresses the flaws in plaintiffs' request for costs.

**1.      Plaintiffs' Unreasonable and Unnecessary Fees**

**(a)      Work Explicitly Devoted to Damages Claims and Issues**

Plaintiffs' counsel's invoice includes the following entries explicitly related to claims for damages:

| Date | Description | Timekeeper | Hours | Cost |
|------|-------------|------------|-------|------|
| 2/26/10 | "Legal research re: possible damages caps" | F. Schwartz | 1.9 (block billed with other time) | $522.50 |
| 3/8/10 | "Research damages issue including available damages under Civil | D. Klebanoff | 2.0 | $550.00 |

| Date | Description | Timekeeper | Hours | Cost |
|---|---|---|---|---|
| | Rights Act, implications of sovereign immunity and Pa. Political Subdivision Tort Claims Act" | | | |
| 3/10/10 | "Research liability and damages issue.  Begin drafting memo summarizing research" | D. Klebanoff | 2.4 | $660.00 |
| 3/16/10 | "Conference with M. Haltzman re: recovery of expert fees in 1983 actions and need to research damages recoverable under Pennsylvania constitution." | F. Schwartz | .3 | $82.50 |
| 3/17/10 | "Legal research re: possible claims for invasion of privacy under Pennsylvania Constitution and remedies available; Conference with M. Haltzman re: monetary damages pursuant to Pennsylvania Constitution; Legal research re: personal property exception to sovereign immunity of Commonwealth actors; Draft Memorandum re: scope of exception to sovereign immunity" | F. Schwartz | 6.8 | $1,870 |
| 4/13/10 | "Review research on issue of damages" | M. Haltzman | 5.2 (block billed with other time) | $2,210.00 |
| 4/16/10 | "Review case law re: damages" | M. Haltzman | 7.2 (block billed with other time) | $3,060 |
| 4/16/10 | "Research re: jury awards in invasion of privacy cases" | F. Schwartz | 6.4 (block billed with other time) | $1,760.00 |
| 4/19/10 | "Research whether there is a statutory limit on compensatory damages for section 1983 action" | D. Klebanoff | 1.4 | $385.00 |
| 4/20/10 | "Continue research on issues under section 1983 claim" | D. Klebanoff | .5 | $137.50 |
| 6/2/10 | "legal research analysis cont'd re: speculative damages" | J. Master | 5.0 block billed | $1,250.00 |
| 6/9/10 | "legal research and analysis of necessity for proof of damages or bar to recovery if speculative" | J. Master | 4.7 block billed | $1,175.00 |
| 6/10/10 | "Extensive research and analysis and preparation of a memorandum | J. Master | 8.4 | $2,100.00 |

28

| Date | Description | Timekeeper | Hours | Cost |
|------|-------------|------------|-------|------|
|      | of cases and statutes regarding the issue of speculative damages in the context of invasion of privacy and the fear of future disclosure" |      |       |      |

Excluding the entries that were block billed with other time, as well as a number of other entries that do not explicitly refer to damages but given the context of the invoice most likely relate to damages (*see, e.g.*, Lamm Rubenstone Invoice at 16-17 (March 9, 2010 entry for $632.50 labeled "Research remedies under Civil Rights Act and other related issues")), this work – which plaintiffs claim their counsel did not do – totals 21.8 hours and $6,005.

The District also has not included here a host of entries that suggest plaintiffs' counsel was working on issues unique to the Robbinses' claims (including a number of conferences with the Robbinses that far exceeds the number of conferences one would expect a class action lawyer to have with the representative plaintiffs). (*See, e.g.*, Lamm Rubenstone Invoice at 3-4 (January 26, 2010 entry for a conference with client on possible case outcome); 6 (February 19, 2010 entry on legal research for potential emotional distress claims); 16 (March 9 conference on various causes of action).) Indeed, it is evident from the record that plaintiffs' counsel have devoted much of their time since November 2009 working on the Robbinses' individual claims. (*See generally* Section II, *supra*.) As Plaintiffs concede, they cannot shift their fees and costs for such work to the District.

### (b)    Work Performed After May 14, 2010

To the extent plaintiffs are prevailing parties, that status is based on the entry of the order providing comprehensive equitable relief on May 14, 2010. Nothing their counsel has done since then was necessary to the equitable relief, and indeed all of the substantive work they have done since then has been done in support of individual damages claims. (*See* § II(C),

*supra*.)  Thus, to the extent plaintiffs seek to shift to the District approximately $60,000 in fees

accrued after May 14, 2010, their request should be denied.  (That amount does not include their

work on the instant Motion, which is discussed separately in Section III(C), below.)  *See*

Institutionalized Juveniles, 758 F.2d at 920 (fees accrued after prevailing party achieves success

are not recoverable).

       The post-May 14, 2010 work for which plaintiffs' counsel seeks reimbursement

includes the following:

- Plaintiffs' counsel has focused extensively on additional forensic computer analysis – including through numerous conferences with their computer consultant[16] – that is geared solely toward supporting individual damages claims (*see* § II(B), *supra*);

- Plaintiffs' counsel apparently spent several thousand dollars working on a motion to compel with respect to certain of Mr. Perbix's computers (*see* Lamm Rubenstone Invoice at 42-52) yet they never filed such a motion;[17]

- Plaintiffs' counsel devoted substantial time after May 14 to Ms. Cafiero's deposition, which was focused on Robbins-specific claims and otherwise unrelated to the equitable relief (*see* § II(B)(9), *supra*); and

- Plaintiffs' counsel worked on an unnecessary class certification motion from March 2010 through June 2010 (*see* § II(B)(10), *supra*).

### (c)      Depositions Irrelevant to the Equitable Relief

       As discussed in Section II(B)(4), above, plaintiffs' counsel took five depositions

that were largely focused on issues and prior conduct relevant to the Robbinses' and/or others'

---

[16]    *See* Halderman, 49 F.3d at 942 (rejecting a request for $40,107.59 in attorneys' fees for time spent consulting with an expert witness when the prevailing party failed to explain why such consultation was necessary).

[17]    Work on unfiled motions should not be credited in plaintiffs' request.  *See* Brown v. City of Pittsburgh, No. 06-393, 2010 WL 2207935, at *15 (W.D. Pa. May 27, 2010) ("The Court further finds that the City should not be required to reimburse Brown's counsel for their preparation of a motion that was never filed, and thus, did not add value to Brown's case.").

individual damages claims, not the forward-looking equitable relief at issue here.  Moreover, plaintiffs' counsel's invoice reflects a number of excesses in connection with the depositions, including attorney time billed for looking up addresses.  (*See* Lamm Rubenstone Invoice at 20-21.)  *See* <u>Halderman</u>, 49 F.3d at 942 ("when a lawyer spends time on tasks that are easily delegable to non-professional assistance, legal services rates are not applicable").

### (d)   Plaintiffs' Opposition to the Wortley Intervention Motion

From March through May, plaintiffs' counsel spent an inordinate amount of time and money, reflected in more than 30 time entries, unnecessarily opposing the Wortley Intervention Motion.  (*See* Section II(B)(5), *supra*.)  As Plaintiffs tacitly concede, opposing the motion in no way furthered the equitable relief; to the contrary, plaintiffs acknowledge, as they must, that the Wortley Intervenors contributed substantially to the equitable relief for which plaintiffs take credit.  (*See* Pls. Mem. at 17.)

### (e)   Work Performed by Fee Earners Not Referenced in the Motion or Certifications

Plaintiffs seek $19,355 in fees accrued by seven timekeepers for whom they have supplied no information beyond the fact that they work at the same firm.  Plaintiffs do not reference them in their Motion and have not provided the requisite certifications.  The Court should disallow or reduce these fees.  (*See* n.15, *supra* (citing <u>Rapp</u>, 2002 WL 254504, at *6, and <u>Disciullo</u>, 2009 WL 4287319, at *3-4).)  In the alternative, the Court should require plaintiffs to submit appropriate evidence.

### (f)   Fees for Preparing Discovery Papers That Plaintiffs Never Filed or Served

Plaintiffs seek more than $6,000 in fees for drafting written discovery requests, researching case law with respect to discovery stays, and drafting motions to expedite discovery.  (*See* Lamm Rubenstone Invoice at 4,11-12, 14, 15.)  Plaintiffs did not serve written discovery

31

requests or move to stay or expedite discovery.  Needless to say, this work does not relate to the entry of equitable relief.  It should not be reimbursed.  *See* <u>Brown</u>, 2010 WL 2207935, at *15.

<b>(g)      Plaintiffs' Motion for Class Certification</b>

In addition to being unnecessary (*see* § II(B)(10), *supra*), plaintiffs' counsel's fees for the motion for class certification are excessive.  Plaintiffs seek to recover more than $27,000 in fees for the motion, which was two pages and supported by a 12-page memorandum of law (*see* Doc. No. 73).  Moreover, as defendants argued in response to the motion (*see* Doc. No. 81), the memorandum fell far short of the satisfying the evidentiary standard of <u>In re Hydrogen Peroxide Antitrust Litigation</u>, 552 F.3d 305 (3d Cir. 2008).  The few facts set forth in the memorandum do not pertain to the requirements for class certification, but rather to counsel's purported achievements.  (*See* Doc. No. 73 at 7-10.)

<b>2.      Plaintiffs' Non-Reimbursable Costs</b>

In addition to attorneys' fees, a prevailing party on a Section 1983 claim may recover the types of costs enumerated in 28 U.S.C. § 1920.  *See* <u>Abrams v. Lightolier</u>, 50 F.3d 1204, 1224 (3d Cir. 1995) (stating that costs in section 1988 "refer[] to the taxable costs… enumerated in 28 U.S.C. § 1920").  These costs are limited to:

(1)      Fees of the clerk and marshal;

(2)      Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3)      Fees and disbursements for printing and witnesses;

(4)      Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5)      Docket fees under section 1923 of this title;

(6)      Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses and costs of

32

> special interpretation and services under section 1828 of
> this title.

28 U.S.C. § 1920.  Section 1920 excludes overhead expenses that are not normally billed directly

to a client but instead are incorporated into the hourly rate charged by counsel.  *See* <u>Maldonado</u>,

256 F.3d at 184 ("Hours that would not generally be billed to one's own client are not properly

billed to an adversary.") (internal citation omitted).  Accordingly, the Court should deny

plaintiffs' motion to the extent it requests the costs discussed below.

### (a)       Plaintiff's Computer Consultant's Fees

Plaintiffs may not recover the $87,925 in fees accrued by their computer

consultant, Mr. Steinbach.  Pursuant to Section 1988(c), in

> [a]warding an attorney's fee under subsection (b) of this section in
> any action or proceeding to enforce a provision of section ***1981 or***
> ***1981a*** of this title, the court, in its discretion, may include expert
> fees as part of the attorney's fee.

42 U.S.C. § 1988(c) (emphasis added).  Thus, Section 1988, by its plain language, limits the

award of expert fees to claims brought under Sections 1981 and 1981a.

Courts have relied on the language of Section 1988(c) to deny a requests for

expert fees made by prevailing parties in other types of cases.  For example, in <u>Vassallo v. Fox</u>,

No. 04-697, 2005 WL 757353, at *3 (E.D. Pa. April 4, 2005), Judge Robert F. Kelly denied a

Section 1983 plaintiff's request for expert fees.  The court explained that the "provisions of 42

U.S.C. § 1988 which provide for the recovery of expert witness fees [do] not apply to an action

brought under 42 U.S.C. § 1983."  <u>Id.</u> (citing <u>W. Va. Univ. Hosps. v. Casey</u>, 885 F.2d 11, 32-35

(3d Cir. 1989), *aff'd*, 499 U.S. 83 (1991)).[18]  Judge Bartle reached the same conclusion in

---

[18]     In <u>Casey</u>, decided in 1991, the Supreme Court held that the phrase "attorney's fees" in
         section 1988(b) does not include expert fees, and that a prevailing party cannot shift those
         expenses to its opponent.  *See* <u>id.</u> at 102.  Subsequently, Congress enacted Section

         (continued...)

Surgner v. Blair, Civ. A. No. 95-5331, 1996 WL 284993, at *5 (E.D. Pa. May 20, 1996)

("Except to the extent provided in § 1920 and § 1821, there is no statutory authority, pursuant to

42 U.S.C. § 1988, to shift the cost of expert fees to the losing party in a § 1983 civil rights

action."). *See also* Brennan v. Springfield Tp., No. 97-5217, 1998 WL 792180, at *5 (E.D. Pa.

Nov. 10, 1998) (stating that in a Section 1983 action, expert "fees are not recoverable under 42

U.S.C. § 1988").

Thus, there is no authority for shifting Mr. Steinbach's fees to the District, and the

Court should deny Plaintiffs' request for them as a matter of law.

Even if such authority existed, awarding plaintiffs Mr. Steinbach's fees would not

be appropriate.  Plaintiffs provide no specificity about what Mr. Steinbach has done, and he has

not produced a report.  Moreover, of the 351.7 hours listed on Mr. Steinbach's invoice, 161.8

hours – *i.e.*, 46% – were incurred ***after*** the entry of the May 14, 2010 equitable relief order.  (*See*

Mr. Steinbach Invoice at 3-4.)  And, little of the time spent prior to May 14, 2010 could be

interpreted as necessary or relevant to the equitable relief.  Instead, as discussed above, much of

the computer analysis plaintiffs have pursued has been aimed at advancing individual damages

claims.  (*See* § II(B)(9), *supra*.)  And, Mr. Steinbach's invoice includes 25.9 hours of travel time

at a cost of $6,475.[19]

---

(...continued)

1988(c) to expand the definition of "attorney's fees" to include "expert fees" only with
respect to actions brought under Sections 1981 and 1981a.  Thus, Casey remains good
law with respect to Section 1983 actions.  *See* Brennan v. Springfield Tp., No. 97-5217,
1998 WL 792180, at *5 n.12 (E.D. Pa. Nov. 10, 1998).

[19]   Because Section 1920 does not apply to travel costs, the travel costs for neither Mr.
Steinbach nor plaintiffs' counsel (*see* Lamm Rubenstone Invoice at 58-59) should be
awarded.

**(b)** **"IT Acceleration" Costs**

Plaintiffs seek $419.23 in consulting services for "IT Acceleration."  (*See* Lamm Rubenstone Invoice at 58.)  (Id.)  Plaintiffs' Motion does not explain this cost.

**(c)** **Deposition Costs**

Given that the depositions plaintiffs took were not necessary to obtain injunctive relief, the Court should deny plaintiffs the stenographic expenses for the depositions that total $7,790.  (*See* Lamm Rubenstone Invoice at 58-59.)

At a minimum, the Court should reject plaintiffs' request for the $4,836 paid to videotape the depositions.  Section 1920 provides for reimbursement of costs associated with "the stenographic transcript necessarily obtained for use in the case."  28 U.S.C. § 1920(2).  Thus, when considering fees associated with videotaping depositions, courts assess whether videotaping was actually necessary.  For example, courts have concluded that a prevailing party cannot shift videotaping expenses when "there was no indication that [the deposed witnesses] would be unable to testify at trial."  Griffith v. Mt. Carmel Med. Ctr., 157 F.R.D. 499, 502-503 (D. Kan. 1994); *see also* Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1065 (5th Cir. 1998) (cost of videotaping deposition of witness available for trial not taxable); Robinson v. Burlington N. Ry. Co., 963 F. Supp. 691, 693 (N.D. Ill. 1997) (declining to award costs for videotaping because "reading [the deposition] into the record would have accomplished the same result as displaying the videotape").  Plaintiffs do not and cannot contend that videotaping was necessary for any of their five depositions.

In addition, plaintiffs' counsel's invoice appears to include an extra, unexplained charge for deposition videotaping.  (*See* § (II)(B)(4), *supra*.)

           **(d)**       **Legal Research Costs**

Plaintiffs seek to recover $3,097 in Westlaw charges.  (*See* Lamm Rubenstone

Invoice at 58-60.)  Although not among the costs listed in section 1920, some courts have shown

a willingness to include electronic research charges as attorneys' fees when the prevailing party's

counsel normally bills them to a client.  *See, e.g.*, InvesSys, Inc. v. McGraw-Hill Co, Ltd., 369

F.3d 16, 22 (1st Cir. 2004) (electronic research costs may be shifted "where ordinarily billed

directly to the client").  But, if the fee petition does not "describe the manner in which Plaintiff's

counsel accounted for such costs," or "establish that such charges are normally billed to the

client," courts will not shift such costs to an adversary.  Vialpando v. Johanns, 619 F. Supp. 2d

1107, 1130 (D. Colo. 2008); *see also* Am. Atheists, Inc. v. City of Starke, 509 F. Supp. 2d 1221,

1229 (M.D. Fla. 2007) (attorneys "have already been handsomely compensated for the time they

spent researching matters in this case").  Plaintiffs do not provide the requisite information about

their counsel's billing practices.  Nor do they identify the purpose of the charges.  Given that

much of plaintiffs' counsel's research concerned damages (*see* § III(B)(1), *supra*), it is likely that

much of the Westlaw charges are not recoverable here.  Thus, the Court should deny the request

for these costs.

      **C.**      **Plaintiffs' Request for Substantially More Than $15,000 in Connection with Their Motion For Fees and Costs Is Excessive and Unreasonable**

While plaintiffs correctly note that they may recover reasonable costs associated

with a successful fee petition, the Third Circuit has instructed courts to "treat the fee petition

litigation as a separate entity subject to lodestar and Hensley reduction analysis."

Institutionalized Juveniles, 758 F.2d at 924.  Thus, the Court should conduct the same rigorous

analysis as when analyzing the fees requested for the underlying litigation, weeding out costs

devoted to unsuccessful portions of the fee petition and analyzing the extent to which the remaining fees claimed are excessive, unnecessary, or unreasonable.  Id. at 924-25.

Indeed, courts in Third Circuit often reduce excessive requests for fees associated with fee petitions.  In Maldonado, in which the prevailing party's attorneys billed 550 hours to a successful appellate defense, the court deemed 25 hours associated with the fee petition excessive and cut the award in half.  *See* 256 F.3d at 187-88.  Similarly, in an ERISA case, Judge Schiller reduced the fees requested for a fee petition by 80%.  *See* Brown v. Continental Cas. Co., No. 99-6124, 2005 WL 1949610, at *3, *4 (E.D. Pa. Aug. 11, 2005) (holding that an "attorney litigating an ERISA claim in the number of hours, and at the hourly rates, requested here, should require only minimal time to research and craft the legal argument necessary to support a request for attorney fees"); *see also* Enright v. Springfield Sch. Dist., No. 04-1653, 2008 WL 696845, at *4 (E.D. Pa. Mar. 13, 2008) ("The fee petitions, while admittedly lengthy, are not so complex or unusual as to justify nearly two full days of attorney time."); Feldman v. Phila. Housing Auth., No. 91-5861, 1993 WL 373971, at *5 (E.D. Pa. Sept. 21, 1993) (reducing the hourly rate on two-thirds of the hours spent preparing the fee petition because that "work could have been done by a paralegal").

These cases demonstrate the unreasonableness of plaintiffs' request to shift the cost of 60 hours of work by three lawyers on plaintiffs' Motion (*see* Lamm Rubenstone Invoice at 50-57) to the District.  The billing entries devoted exclusively to the fee petition total 52.5 hours, with fees totaling $15,152.50.  (*See* id.)  The bills also include three block-billed entries totaling 11.8 hours and $5,015 for time spent on the fee petition.  (*See* id.)  Plaintiffs do not and cannot justify this expense.  Moreover, as set forth herein, plaintiffs should not "prevail" on any more than a small portion of their Motion.

37

Accordingly, the Court should deny or at least drastically reduce the fees sought for plaintiffs' Motion.

## IV.    CONCLUSION

Plaintiffs have not demonstrated the reasonableness of their fee request, and they cannot do so.  For these and all the foregoing reasons, the Court should deny plaintiffs' motion and order plaintiffs to submit a more reasonable and better supported request, or in the alternative grant the motion only to the extremely limited extent it seeks fees that plaintiffs have demonstrated are reasonable with respect to the equitable relief that the Court has entered.

Respectfully submitted,

Date:  August 12, 2010

/s/ *Paul Lantieri III*
Arthur Makadon
Henry E. Hockeimer, Jr.
Paul Lantieri III
William B. Igoe
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Tel.    215.665.8500
Fax     215.864.8999
Makadon@ballardspahr.com
HockeimerH@ballardspahr.com
LantieriP@ballardspahr.com
IgoeW@ballardspahr.com

*Attorneys for Defendants, Lower Merion
School District, the Board of Directors of
the Lower Merion School District, and
Christopher W. McGinley*

38

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I caused a true and correct copy of the foregoing

Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Interim Attorneys'

Fees Pursuant to 42 U.S.C. § 1988 to be served upon the below-listed counsel by the means

indicated below:

**By ECF, and such document is available for viewing and downloading from the ECF system:**

Mark S. Haltzman
Stephen Levin
Frank Schwartz
Lamm Rubenstone LLC
3600 Horizon Boulevard, Suite 200
Trevose, PA 19053
Tel.     215.638.9330
Fax      215.683.2867
MHaltzman@lammrubenstone.com
SLevin@lammrubenstone.com
FSchwartz@lammrubenstone.com

*Attorneys for Plaintiffs, Blake J. Robbins, Michael E. Robbins, and Holly S. Robbins*


Larry D. Silver
David E. Romine
Langsam Stevens & Silver LLP
1616 Walnut St.
Suite 1700
Philadelphia, PA 19103
Tel.     215.732.3255
Fax      215.732.3260
dromine@langsamstevens.com

Bart D. Cohen
Neill W. Clark
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103
Tel.     215.875.4602
bcohen@bm.net
nclark@bm.net

1

Michael J. Boni
Boni & Zack LLC
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
Tel.    610.822.0200
Fax     610.822-0206
mboni@bonizack.com

Thomas F. Grady
Law Office of Thomas F. Grady, P.C.
The Bye-Benson House
2033 Walnut Street
Philadelphia, PA  19103
Tel.    215.977.7400
Fax     215.977.8160
grady@tfgrady.com

*Attorneys for Proposed Intervenors
Colleen and Kenneth Wortley, Frances
and David McComb, and Lorena
Chambers*

Theresa E. Loscalzo
Stephen J. Schapiro
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.    215.751.2000
Fax     215.751.2205
tloscalzo@schnader.com
sshapiro@schnader.com

*Attorneys for Proposed Intervenors
Evan A. Neill, Richard A. Neill, and
Elaine Louise Reed*

**By e-mail and first-class mail:**

Witold J. Walczak
American Civil Liberties Foundation of
Pennsylvania
313 Atwood Street
Pittsburgh, PA 15213
Tel.    412.681.7864
Fax     412.681.8707
wwalczak@aclupa.org

Mary Catherine Roper
American Civil Liberties Foundation of
Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106
Tel.    215.592.1513
Fax     215.592.1343
mroper@aclupa.org

*Attorneys for Proposed Intervenors
Evan A. Neill, Richard A. Neill, and
Elaine Louise Reed*

Date:  August 12, 2010

/s/ *Paul Lantieri III*

Paul Lantieri III

2