## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BLAKE J. ROBBINS,** a Minor, by his Parents and Natural Guardians, **MICHAEL E. ROBBINS** and **HOLLY S. ROBBINS,** Individually, and on Behalf of all Similarly Situated Persons, Plaintiffs, | : : : : : : | CIVIL ACTION |
| v. | : : : | NO. 10-0665 |
| **LOWER MERION SCHOOL DISTRICT,** and **THE BOARD OF DIRECTORS OF THE LOWER MERION SCHOOL DISTRICT,** and **CHRISTOPHER W. McGINLEY,** Superintendent of Lower Merion School District, Defendants. | : : : : : : : : : | |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THE POSITION THAT FINDINGS OF FACT AND CONCLUSIONS OF LAW ARE REQUIRED TO BE MADE PRIOR TO THE ISSUANCE OF A PERMANANT INJUNCTION, REGARDLESS OF WHETHER SAID INJUNCTION IS OPPOSED OR ISSUED BY CONSENT

### INTRODUCTION

In response to Plaintiffs' Motion for Certification of a Class Action for Equitable Relief only, the School District responded by asserting that class certification is not needed contending that the entry of a Permanent Injunction against the School District would satisfy the need of the class members. The School District then filed a Cross Motion for entry of a Permanent Injunction against itself. However, the School District has made it clear that it wants the Court to enter the Permanent Injunction <u>without</u> the Court making any determination that the School District has violated the civil rights of

the students and their families, and/or violated other state and federal laws as alleged in Plaintiffs' complaint.[1]

The Court, by Order dated July 30, 2010, has requested respective counsel for Plaintiffs and Defendants to submit legal memoranda as to whether findings of fact and conclusions of law are required to be made before the Court can issue permanent injunctive relief, either by consent of all parties, at the request of Defendants, or if opposed.  For the reasons more fully set forth below, the Court must exercise independent judgment in making findings of fact and conclusions of law -- including a finding that Plaintiff's have succeeded on the merits of one or more of their claims --, which support the Court's issuance of permanent injunctive relief, regardless of whether said injunction is issued via Consent Order or otherwise.

## SUMMARY OF ARGUMENT

Two Rules impact upon the question of whether a district court must render findings of fact and conclusions of law in support of the issuance of a permanent injunction, be it by consent or otherwise; Rule 52(a)(2) and Rule 65(d)(1)(A).  Both Rules work in conjunction and require that **any** order granting injunctive relief must be supported by findings of fact and conclusions of law made by the Court and not by the parties.  For the Court to either grant permanent injunctive relief without making findings of fact and conclusions of law, or to simply adopt findings of fact and conclusions of law prepared by the parties without evidence of the exercise of independent judgment as to their validity, constitutes an abuse of discretion which will subject the permanent injunction to reversal on appeal.

---

[1] It is suspected, however, that once the Court rules that findings of fact and conclusions of law are required before entry of a permanent injunction, the School District will "change its mind" about its request for a permanent injunction and withdraw its Motion.

Moreover, given the nature and significance of this matter, involving the fundamental rights of school children vis-à-vis cutting edge invasive technology, it is not difficult to envision the array of related and future proceedings – motions to enforce, motions to modify or terminate the injunction, and new claims – all of which would seek to rely upon the factual and legal underpinnings of this Court's injunction order as an aid in understanding the basis for the relief, in much the same way as would an appellate court. Also in this case, even if findings of fact and conclusions of law were not required, which they are, it would be especially important to have such findings and conclusions in the event the Court were to deny Plaintiff's motion for class certification. In that event, as discussed further herein, affected non-parties may be required to initiate separate proceedings and would need to rely on this Court's findings based on evidentiary materials and resources that may no longer be available or accessible to such claimants.[2]

## LEGAL ARGUMENT

A.    **Federal Rule Of Civil Procedure 52(a)(2) Applies To The Issuance Of A Permanent Injunction And Requires The Trial Court To Make Findings Of Fact And Conclusions Of Law Which Adequately Support The Court's Decision.**

Federal Rule of Civil Procedure 52(a)(1) requires, in pertinent part, that: "[i]n an action tried on facts without a jury or with an advisory jury, the court **must** find the facts specially and state its conclusions of law separately," and, more to the point here, that "*in granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.*" (emphasis added).   Moreover, "the

---

[2] For example, it is unclear that affected non-parties would have the benefit of offensive issue preclusion, which is discretionary, in a subsequent proceeding if this Court fails to make adequate and independent findings of fact and conclusions of law that a subsequent court might rely upon to preclude relitigation of issues. *See* Univac Dental Co. v. Dentsply Intern. Inc., 2009 WL 6315330, *14-18 (M.D.Pa. 2010).

Federal Rule 52(a) requirement that the trial court find the facts specifically and state separately its conclusions of law is mandatory and must be fairly observed by district judges." 9C Wright and Miller, *Fed. Prac. & Proc. Civ.* §2574 (3rd ed.).

Although Rule 52(a)(2) refers expressly to interlocutory injunctions, it is well-settled that it applies to the grant or denial of permanent injunctive relief. *See Hook, et al. v. Hook & Ackerman*, 213 F.2d 122, 130 (3rd Cir. 1954) ("a permanent injunction, when issues of fact determine whether or not it should be granted, comes within the quoted scope Rule 52"); *Tribune Review Publishing Company v. Thomas*, 153 F.Supp. 486, 495 (W.D. Pa. 1957) ("a permanent injunction, when issues of fact determine whether or not the permanent injunction should be granted, comes within the purview of Rule 52(a)..."); *Chas. Pfizer and Co., Inc. v. Zennith Laboratories, Inc.*, 339 F.2d 429, 430 (3rd Cir. 1964) (when issues of fact determine whether or not a permanent injunction should be granted, permanent injunction comes within the scope of Rule 52). *See also Educational Testing Services v. Katzman*, 793 F2d 533, 537 (3rd Cir. 1986) ("reiterat[ing] the need for parties to raise their objections in the district court in the first instance and for the courts to follow the explicit requirements of Rules 52(a) and 65(d) as to fact finding before entering injunctive orders.") Accordingly, "findings also must be made if the grant or denial of a permanent injunction turns on issues of fact." 9C Wright and Miller, *Fed. Prac. & Proc. Civ.* §2576 (3d ed.).

**B.     Even If A Permanent Injunction Is Granted By Consent, Findings Of Fact And Conclusions Of Law In Support Thereof Must Be Made Independently By The Court In Order To Satisfy The Requirements Of Rule 52(a).**

There is no clear authority for the proposition that merely because the parties consent to entry of injunctive relief, findings of fact and conclusions of law are no longer

required – particularly where requested by one of the parties.[3]   Not only does the possibility of appeal still exist -- either by the parties, intervenors or intended beneficiaries --, and the consequent need for the appellate court to have the benefit of adequate findings of fact and conclusions of law to understand the basis for the relief, but such findings and conclusions also would be equally necessary (and required) for purposes of future requests to terminate or modify the injunction order and for the benefit of all those affected by the order – either enjoined by or intended to benefit from the injunction -- in connection with related or subsequent proceedings.[4]

While some commentators have cited the footnote in *White v. Beal*, 413 F.Supp. 1141, 1145 n.1 (E.D. Pa. 1976) *affd.*, 555 F.2d 1146 (3rd Cir. 1977), that "there is some authority that no findings of fact under Fed. R.Civ. P.52(a) need to be made where there is no dispute as to the facts...," *see, e.g.*, 33 Fed. Proc., L. Ed. §77:332, there is no direct authority to support this position.  A reading of the *Beal* case itself also does not support the conclusion that the requirement for findings of fact and conclusions of law for entry of permanent injunctive relief was altered by the *dicta* in a footnote of the opinion. Unlike the instant matter, the *Beal* case involved a motion for summary judgment as well as for preliminary injunction.  In footnote 1, the *Beal* Court stated that "because material facts are not in dispute and relief is more in the nature of declaratory relief and permanent

---

[3]A separate issue worth noting is whether, absent class certification, Plaintiffs even have the authority to consent to entry of a permanent injunction order for the benefit of a class of persons who are not parties to the proceedings. Equally unclear absent class certification is whether affected non-parties would be able to enforce any order that is in the nature of a consent decree, which has been viewed solely as a contract between the parties. See <u>U.S. v. New Jersey</u>, 2010 WL 1253043, *5 (3rd Cir. 2010).

[4] Also as a matter of public policy, given the time, effort and resources committed to this action by the Court, parties and others, and the major and constitutional import of this matter on an issue of great public interest and concern, it would seem senseless and wasteful to have a permanent injunction order of some major significance without benefit of the supporting findings of fact and conclusions of law.

injunction rather than preliminary injunction, no findings of fact are necessary under Rule 52... Notwithstanding this language, the court in *Beal* itself recognized the need for supporting findings of fact and conclusions of law in ruling that that "to the extent that an appellate court may decide formal findings of fact and conclusions of law are required, the facts and conclusions set forth in this memorandum shall be deemed findings of fact and conclusions of law." *Beal* is also distinguishable because the *Beal* Court relied upon the provision in Rule 52 relating to Summary Judgment, which specifically does not require findings of fact and conclusions of law in a decision, whereas this case does not involve a motion for summary judgment but rather, a request for permanent injunction.

The more recent and better practice with respect to the grant of permanent injunctive relief in the context of a consent order where facts are not in dispute has been for the trial court to make its own findings of fact and conclusions of law in support thereof, thereby satisfying the requirements of Rule 52(a) and avoiding any possible claims of abuse of discretion. In *Commodity Futures Trading Commission v. Eustace*, 2008 W.L. 4274398, (E.D. Pa. 2008), Judge Baylson entered a Supplemental Consent Order Setting Judgment for Restitution and Civil Monetary Penalty Against Defendant Paul M. Eustace ("Supplemental Order"), which was supported by the court's explicit findings of fact and conclusions of law with respect thereto. The Supplemental Order was with respect to an original Consent Order of Permanent Injunction and Other Equitable Relief Against Defendant Paul M. Eustace ("Original Consent Order"), a true copy of which is attached hereto as Exhibit "A." Despite the consensual nature of the Original Consent Order, such that no facts were in dispute, it is supported by ninety-one separate findings of fact and thirty-one distinct conclusions of law. Clearly, Judge

Baylson was of the opinion that even where the issuance of a permanent injunction is by consent of the defendant, Rule 52(a) requires that it be adequately and specifically supported by appropriate findings of fact and conclusions of law.

The same is true with respect to Judge Connor in the Western District of Pennsylvania. In *U.S. Commodity Futures Trading Commission v. Healy*, 2010 W.L. 2836760 (W.D. June 27, 2010), the Court issued a Consent Order of Permanent Injunction against defendants "solely to effect settlement of the matters alleged in the Complaint in the action without a trial on the merits, any further judicial proceedings, or presentation of any additional evidence... ." *Id.* at *1. Despite the fact that the Consent Order for Permanent Injunction was entered at the request of defendants, it is fully supported by thirty-nine findings of fact and eight conclusions of law.

It is respectfully suggested that under Rule 52(a) and the applicable case law, this Court must exercise its independent judgment via the making of findings of fact and conclusions of law which are specific enough to adequately state the factual and legal basis for the Court's decision to grant permanent injunctive relief, even if said relief is at the request of Defendants. It is the Court, and not the Defendants, who enters the Order. Therefore, it is for the Court, and not Defendants, to justify its Order with specific findings of fact and conclusions of law as required by Rule 52(a). This Court should not abdicate to Defendants its responsibility to conform to the requirements of Rule 52(a). This position is bolstered by the trial court's conduct in Eustace and Healy, supra.., where said courts made detailed findings of fact and conclusions of law despite the fact that the permanent injunctions were issued at the request of defendants. To do otherwise would subject this Court's grant of permanent injunctive relief to reversal for an abuse of

discretion pursuant to Rule 52(a). (a district court "abuses its discretion where its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Danvers Motor Co., Inc. v. Ford Motor Co.,* 543 F.3d 141, 147 (3d Cir. 2008) (internal citation omitted)).

> **C.      Pursuant To Rule 65(d)(1)(A), An Order For Permanent Injunctive Relief, Whether By Consent Or Otherwise, Must State The Reasons For It's Issuance, One Of Which Must Be Success On The Merits Of Plaintiff's Claims.**

Like Rule 52, Federal Rule of Civil Procedure 65(d)(1)(A) also provides that every order granting injunctive relief must, *inter alia* "state the reasons why it's issued: ..." "The requirements contained in Rule 65(d) have been treated as mandatory ..." 11 A Wright and Miller, *Fed. Prac. & Proc. Civ.* §2955 (2nd ed.). *See also Mayflower Industries v. Thor Corp.,* 182 F.2d 800, 801 (2nd Cir. 1950), cert. denied 71 S. Ct. 610, 341 U.S. 903 (1951) ("The thing we cannot escape from is the mandatory language of Rule 65(d)."). "As a general rule, when the court's findings of fact and conclusions of law are sufficient to meet the requirements of Rule 52(a), they, almost of necessity, also state reasons for the injunctions issuance that are sufficient to satisfy Rule 65(d)." 11 A Fed. Prac. & Proc. §2955 (2nd ed.). Accordingly, Rule 52(a) and 65(d) operate in conjunction to require that findings of fact and conclusions of law sufficient to support issuance of a permanent injunction be made. A trial court's failure to do so will violate both rules and subject the injunction to reversal on appeal for abuse of discretion. Id. *See also, Insight v. The Spamhaus Project,* 500 F.3rd 594 (7th Cir. 2007) (Where a trial court failed to set forth in its order specific reasons for permanent injunctive relief, the trial court abused its discretion).

At the very least, every order for permanent injunction, whether entered at the request of defendants, by consent or otherwise, must contain a statement as to why all of the essential prerequisites for permanent injunctive relief have been met.[5] Hence, "[i]n deciding whether a permanent injunction should be issued, the court must determine if the Plaintiff has actually succeeded on the merits (i.e. met its burden of proof). If so, then the Court must consider the appropriate remedy." *Ciba-Geigy Corporation v. Bolar Pharmaceutical Co.*, 747 F.2d 844, 850 (3rd Cir. 1985), *citing Evans v. Buchanan*, 555 F.2d 373 (3rd Cir. 1977). Accordingly, in the instant case, an essential prerequisite to the Court's issuance of an Order for permanent injunction, either by consent or otherwise, is a finding of Plaintiffs' success on the merits with respect to one or more of Plaintiff's claims set forth in Plaintiff's Complaint. In other words, the Court must find that defendants violated either the civil rights of the students and their families, and/or other state and federal laws as alleged in the complaint. Moreover, it is well settled that the standards for issuing a preliminary injunction and a permanent injunction differ, and that a finding of likelihood of success on the merits, sufficient to support a preliminary injunction, "neither constitutes nor substitutes for an actual finding that Plaintiff's **have** succeeded on the merits and are entitled to permanent relief." *American Civil Liberties Union of New Jersey v. Blackhorse Pike Regional Board of Education*, 84 F.3rd 1471, 1477 (3rd Cir. 1996) (emphasis original). Accordingly, this Court cannot rely upon its prior issuance of preliminary injunctive relief to justify the grant of permanent injunctive relief, even if Defendants consent thereto. This Court must make an independent

---

[5] In addition to success on the merits of Plaintiff's claim, the other elements for the grant of permanent injunctive relief are irreparable harm, the inadequacy of any remedy at law, and a balancing of competing claims of private injury and public interest. Temple University v. White, 941 F.2d 201, 215 (3rd Cir. 1991); A-1 Mortgage Corporation v. Day One Mortgage, LLC, 2007 WL 30317, *8 (W. D. PA 2007).

conclusion that Plaintiffs have succeeded on the merits of one or more claims set forth in Plaintiff's complaint, and have also satisfied the other required elements for permanent injunctive relief. Otherwise, where "there is no evidence in the record that the District Court ever applied the legal standard for granting a <u>permanent</u> injunction or otherwise based its decision upon an assessment of the merits of the case," <u>Id.</u>, (emphasis original), it is subject to appellate review and possible reversal. <u>Id</u>.

It is respectfully suggested that under Rule 65(d)(1)(A), just like under Rule52(a), this Court must exercise its independent judgment via the makings of findings of fact and conclusions of law which are specific enough to adequately state the factual and legal basis for the Court's decision to grant permanent injunctive relief, even if said relief is at the request of Defendants. As previously noted, it is the Court, and not the Defendants, who enters the Order and in so doing, the Court must justify its Order with specific findings of fact and conclusions of law as required by Rule 62.

**D.**      **In Any Event Entry Of A Permanent Injunction Would Not Eliminate The Need For Class Certification**

The foregoing discussion regarding the requirement and necessity for making findings of fact and conclusions of law incident to entry of a permanent injunction highlights the need for class certification even if a permanent injunction is entered, notwithstanding defendants' argument to the contrary. Problems such as the unavailability or accessibility of evidence and resources, and issues such as whether any consent decree applies to non-parties and whether offensive issue preclusion is available to non-parties are avoided if the affected non-parties are certified as a class.

Moreover, although courts have denied class certification on the ground that individual injunctive relief would effectively benefit everyone affected by the challenged practice so there is no need to certify a class action, it appears that the Third Circuit has not taken a clear position on the issue of whether a trial court's broad discretion in deciding whether to certify a class action includes the power to consider the need for class certification, which consideration is completely outside the express and detailed parameters of Rule 23,. *See Clark v. McDonald's Corp.*, 213 F.R.D. 198, n.25 (D.N.J.2003)(emphasis added) ("At oral argument, counsel for McDonald's took the position that the Plaintiff Class is unnecessary because when an individual plaintiff sues under the ADA as to architectural barriers, he or she "gets relief for the entire group of people who have the same disability who visit [the offending] restaurant." . . . This "lack of need" or "necessity doctrine" approach to Rule 23(b)(2) . . . *is unsettled in this Circuit*).[6]

In *Bacal v SEPTA*, 1995 WL 299029 (E.D.Pa. 1995), in which plaintiffs brought a class action based upon alleged violations of the Americans with Disabilities Act, this Court rejected defendants' argument that class certification would only be an unnecessary "formality" because any injunctive relief obtained by the named plaintiffs would equally impact all others similarly situated. The Court opined as follows:

> In making this argument, defendants are asking this Court to adopt a "lack of need" approach to Rule 23(b)(2) which has been used by a number of courts of appeals, though not the Court of Appeals for the Third Circuit; this approach allows district courts to deny class certification if that certification is not needed in order for plaintiffs to obtain the desired class-wide relief. . . .[citations omitted].   Under any conditions, these

---

[6]The Seventh Circuit has expressly rejected the use of this additional need-based prerequisite holding that if the requirements of Rule 23 are met a district court is not free to deny class certification simply because there is no "need" for it. Brown v. Scott, 602 F.2d 791, (7th Cir. 1979), *aff'd on other grounds sub nom.*Carey v. Brown, 447 U.S. 455 (1980).

courts of appeals appear to have only applied this approach when affirming the denial of a class certification, as opposed to when overruling a district court's decision to certify a class, and so these courts appear to consider "need" only one factor that a district court may legitimately consider in deciding, in its discretion, whether to certify a class. This has resulted in the situation where, as one commentator has noted, "[l]ike Newton's Law of Thermodynamics, for every class denial on the basis of lack of need, one is able to find a decision, or several decisions, often in the same circuit, where other courts have certified Rule 23(b)(2) classes under virtually the same circumstances." . . . [citation omitted]

It is far from clear that under existing Court of Appeals for the Third Circuit precedents I am free to adopt this "lack of need" approach. . . . More recently, however, the Court of Appeals for the Third Circuit has held that the Rule 23(b)(2) requirement "is almost automatically satisfied in actions primarily seeking injunctive relief. When a suit seeks to define the relationship between the defendant(s) and the world at large, ... [Rule 23](b)(2) certification is appropriate." . . . [citation omitted].

Even if these Court of Appeals for the Third Circuit decisions did not indicate that I should reject this "lack of need" approach, I am not confident that Rule 23 allows consideration of "need" when deciding whether to certify an injunctive class. My specific concern is that if this "lack of need" approach were carried to its logical extreme it might render Rule 23(b)(2) superfluous. . . . [citations omitted]. In addition, this approach would undermine some of the protections that Rule 23 provides for absent injunctive class members, such as court review of the any proposed settlements. . . .

Numerous other case have rejected similar "lack of necessity" arguments against class certification, finding that although the particular equitable relief imposed would benefit the putative class in any event, class certification was still necessary for a variety of reasons that apply equally in this case including:

- It will ensure availability of evidentiary materials

- Additional equitable relief could be requested depending upon later factual developments (such as, in this case, additional pictures of students surfacing)

- There is a risk that the conduct in question may still occur as new policies and requisite training are implemented

- Class certification is needed to expand the precedential force of the decision

- Class certification is needed to safeguard the interests of the class

- Class membership is fluid so class certification avoids mootness issues

- The injunction is easier to enforce in the future

- Class certification avoids repetitious litigation and potentially inconsistent results

- Plaintiff is entitled to have the full scope of the decree made explicit and unmistakable

*See, e.g., Ollier v. Sweetwater Union High School Dist.,* 251 F.R.D. 564 (S.D.Cal. 2008) (certification of proposed class of high-school students was not precluded on the ground that class certification was not necessary because all class members would benefit from an injunction issued on behalf of the named plaintiffs even if the class was not certified, as class certification was warranted by other considerations such as mootness, suspension of the statute of limitations, notice to the class members, and an availability of evidentiary materials that otherwise might be excluded.); *Nehmer v. U.S. Veterans' Administration,* 118 F.R.D. 113 (D.C.Cal 1987) (Vietnam veterans challenging Veterans' Administration's implementation of the Veteran's Dioxin and Radiation Compensation Standards Act demonstrated need for class certification, even though the veterans were seeking primarily equitable relief that would equally benefit parties and nonparties, when the veterans asked the court to void all prior benefit denials made under the VA dioxin regulation so as to allow the parties, including unidentified class members, to reapply to gain back benefits beginning from the time of their initially denied application); *Freeman v. Hayek,* 635 F.Supp. 178 (D.C.Minn. 1986)(class certification of past and present customers of city water works was needed to enforce final judgment in a civil-rights action alleging defendants' policies and procedures for termination of water and sewer

service violated due process and equal protection, seeking declaratory and injunctive relief, as well as compensatory and punitive damages, attorney's fees and costs, even though the city adopted a new ordinance containing detailed provisions for predetermination notices and administrative hearings, when problems similar to those encountered by class representatives were still occurring, the city conceded it would take time to train personnel to administer new procedures and there was no showing that class certification was unduly burdensome to defendants); *Koster v. Perales*, 108 F.R.D. 46 (D.C.N.Y. 1985)(certification of a class in a class action against the state and county seeking to enjoin policies and practices whereby needy and homeless families were unable to receive adequate housing was not rendered unnecessary on the ground that a declaratory judgment issued in favor of the individual plaintiff would benefit the whole class, when both the state and county defendants denied liability and the state was unlikely to act in response to a declaratory judgment); *Coleman v. Block*, 562 F.Supp. 1353 (D.C.N.D.1983)(class action needed to expand the precedential force of decision); *Kozlowski v. Coughlin*, 539 F.Supp.852, 855 (D.C.N.Y. 1982)(court certified a class of all present prison inmates and their visitors in an action challenging the constitutionality of a statewide regulation pertaining to an inmate visitation program at the state correctional facilities, stating: "(w)hile defendants contend that class certification is unnecessary because a judgment in favor of the individual plaintiffs would run to the benefit of those similarly situated to plaintiffs, we find certification in this case 'advisable to cautiously safeguard the interests of the entire class by ensuring that any order runs to the class as a whole.' "); *Bossier City Medical Suite, Inc. v. City of Bossier City*, 483 F.Supp. 633 (D.C.La. 1980)(in cases involving sensitive and highly personal matters,

such as abortion cases, the reasons for certifying a class become more cogent; further anonymity can be guaranteed in a class action, and, furthermore, it may be that a class could be assembled whose fluid membership always could include some women with viable claims thereby guaranteeing a case or controversy and pretermitting mootness); *Founding Church of Scientology of Washington, D.C.,Inc. v. Director, FBI*, 459 F.Supp. 748 (D.C.D.C. 1978)(in action brought against the United States and public officers of the United States by a religious organization which alleged that it was the subject of a government-wide conspiracy to destroy religion, the proposed class would be conditionally certified for purposes of the injunctive relief sought, in view of the fact *inter alia* that treating the action as a class action would make it easier for members of the class to enforce an injunction in the future should one be issued); *Laurido v. Simon*, 489 F.Supp. 1169, 1174(D.C.N.Y.1980) (Plaintiff, the members of the putative class, and the State defendants are entitled to have the full scope of such judgment as may be entered herein made explicit and unmistakable and considerations of judicial economy also militate in favor of treating the issue raised in this litigation on a dispositive class-wide basis, so as to avoid repetitious litigation and potentially inconsistent results); *Rodriguez v. Percell*, 391 F.Supp. 41 n.2 (D.C.N.Y. 1975) ("Defendants point out that the City may be relied upon to obey any final decree in this case, suggesting that it is therefore unnecessary to hold the action to be on behalf of a class. The same may be said, however, in the great bulk of cases for which [Rule 23(b)(2)] was written. The least that can be said on the other side is that the rule plainly applies, that there is no discernible prejudice to defendants in applying it, and that plaintiffs are entitled to have the full scope of their decree made explicit and unmistakable."). *See also* Wright and Miller, *Federal*

*Practice and Procedure* §1759, n.27 (citing cases supporting proposition that "[a]lthough district court has broad discretion in determining whether a particular action complies with all four requirements of Rule 23(a), application of those requirements should not be so strictly applied that the policies underlying class actions would be undermined") and §1785.2 n.4 (collecting cases refusing to impose a need requirement); and Note, There is Always a Need: The "Necessity Doctrine" and Class Certification Against Government Agencies, 103 Mich.L.Rev. 1018 (2005) (arguing that district courts should rarely if ever refuse to certify classes based on necessity doctrine).

## CONCLUSION

The applicable rules of civil procedure require the Court to make findings of fact and conclusions of law in support of any permanent injunction order. Permanent injunctive relief, either by request of Defendants, by consent of all parties or otherwise, must be based upon findings and conclusions demonstrating that (1) Plaintiffs have succeeded upon the merits of their claim or claims; (2) Plaintiffs have suffered irreparable harm for which there is no adequate remedy at law, and (3) greater harm will result from the denial of permanent injunctive relief than from its grant. Because Rules 52(a) and 65(d), both mandatory, require that **any** grant of permanent injunctive relief be supported by findings of fact and conclusions of law specific enough to adequately state the factual and legal basis for said relief, this Court cannot simply convert its prior grant of preliminary injunctive relief, which was based upon a different standard, to a permanent injunction, without satisfying the requirements of Rules 52(a) and 65(b). To do so would constitute grounds for reversal. The required findings of fact and conclusions of law are necessary not only to aid the appellate court but, especially in this case, to

benefit future claimants, parties who seek subsequent relief related to the injunction order and affected non-parties – particularly if they are not afforded Rule 23 class action safeguards, which they should be inasmuch as class certification will best achieve the intended result that the proposed permanent injunction benefit all affected parties and non-parties.

Respectfully submitted,

LAMM RUBENSTONE LLC

By: _____
     Mark S. Haltzman, Esquire (#58957)
     Frank Schwartz, Esquire (#52729)
     3600 Horizon Blvd., Suite 200
     Trevose, PA  19053-4900
     215-638-9330 / 215-638-2867 Fax

DATED: August 18 , 2010

414735-1

17

EXHIBIT "A"

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 19 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 1 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 1 of 32

*9*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

COMMODITY FUTURES TRADING ) 
COMMISSION, )
                              ) Case No. 05-CV-2973 (MMB)
               Plaintiff, )
                              )
        v. )
                              )
PAUL M. EUSTACE, AND )
PHILADELPHIA ALTERNATIVE ASSET )
MANAGEMENT COMPANY, LLC )
                              )
               Defendants. )
                              )

**FILED**

JUL 1 3 2007

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

## CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST DEFENDANT PAUL M. EUSTACE

On June 22, 2005, Plaintiff Commodity Futures Trading Commission ("Commission")

filed an injunctive action against Defendants Paul M. Eustace ("Eustace") and Philadelphia

Alternative Asset Management Company, LLC ("PAAM"), seeking injunctive and other equitable

relief, as well as the imposition of restitution and civil monetary penalties, for violations of the

Commodity Exchange Act, as amended ("Act"), 7 U.S.C. §§ 1 *et seq.* (2002), and the Commission

Regulations promulgated thereunder ("Regulations"), 17 C.F.R. §§ 1 *et seq.* (2004).

On June 23, 2005, the Hon. John R. Padova issued an *ex parte* statutory restraining order

freezing assets under the control of the Defendants, prohibiting the destruction of documents and

appointing a temporary Receiver.

On July 8, 2005, the Hon. Paul S. Diamond amended the statutory restraining order to

allow the liquidation of Defendant Eustace's personal trading account at Velocity Futures, LP.

Case 2:10-cv-00665-JD    Document 90    Filed 08/18/10    Page 20 of 51

Case 2:05-cv-02973-MMB    Document 426    Filed 07/13/07    Page 2 of 32
Case 2:05-cv-02973-MMB    Document 270-2    Filed 10/16/2006    Page 2 of 32

On August 2, 2005, the Commission filed a First Amended Complaint against Defendants

Eustace and PAAM, along with a Motion for a Preliminary Injunction and Second Amended

Statutory Restraining Order ("Complaint" shall refer to the Complaint and the First Amended

Complaint collectively).

On September 22, 2005, the Hon. Michael M. Baylson entered a Consent Order of

Preliminary Injunction and Other Equitable Relief, which continued the freeze of assets under

the control of the defendants and the prohibition of the destruction of documents, as well as the

appointment of a permanent Receiver.

## I.

## CONSENTS AND AGREEMENTS

1.      To effect settlement of the matters alleged in the Complaint in this action without

a trial on the merits or any further judicial proceedings, Defendant Eustace consents to the entry

of this *Consent Order of Permanent Injunction and Other Relief Against Defendant Paul M.*

*Eustace* ("Order").

2.      Eustace admits that this Court has jurisdiction over him and the subject matter of

this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), which authorizes the

Commission to seek injunctive relief against any person whenever it shall appear to the

Commission that such person has engaged, is engaging, or is about to engage in any act or

practice constituting a violation of any provision of the Act or any rule, regulation or order

thereunder.

3.      Eustace admits that venue properly lies with this Court pursuant to Section 6c of

the Act, 7 U.S.C. §13a-1 (2002), in that certain of the acts and practices alleged in the First

Amended Complaint for Injunctive and Other Equitable Relief occurred in this District.

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 21 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 3 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 3 of 32

4.      In addition, Eustace waives: (a) all claims which he may possess under the Equal

Access to Justice Act, 5 U.S.C. § 504 (2000) and 28 U.S.C. § 2412 (2000), to seek costs, fees

and other expenses relating to, or arising from, this action; (b) the entry of findings of fact and

conclusions of law in this action as provided by Rule 52 of the Federal Rules of Civil Procedure,

except as provided below in Section II; (c) any claim of Double Jeopardy based upon the

institution of this proceeding or the entry in this proceeding of any order imposing a civil

monetary penalty or any other relief; and (d) all rights of appeal from this Order.

5.      By consenting to the entry of this Order, Eustace neither admits nor denies any of

the findings made in this order or the allegations contained in the Complaint, except as to

jurisdiction and venue, which he admits.  However, Eustace agrees that the allegations of the

Complaint and all of the Findings of Fact made by this Court and contained in Part II of this

Order shall be taken as true and correct and be given preclusive effect, without further proof, for

the purpose of any bankruptcy proceeding filed by, on behalf of, or against Eustace, whether

inside or outside of the United States, or to enforce the terms of this Order.  Eustace also shall

provide immediate notice of any bankruptcy filed by, on behalf of, or against him in the manner

required by Part V, paragraph 4 of this Order.

6.      Eustace agrees that neither he nor any of his agents, servants, employees,

contractors nor attorneys shall take any action or make any public statement denying, directly or

indirectly, any allegation in the Complaint or findings or conclusions in the Order or creating, or

tending to create, the impression that the Complaint or this Order is without a factual basis;

provided, however, that nothing in this provision shall affect Eustace's (a) testimonial

obligations; or (b) right to take legal positions in other proceedings to which the Commission is

not a party.  Eustace shall take all necessary steps to ensure that all of his agents, servants,

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 22 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 4 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 4 of 32

employees, contractors and attorneys understand and comply with this agreement.

7.     Eustace agrees that he has read this Order and agrees to this Order voluntarily and that no promise or threat has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Order, other than as set forth specifically herein.

8.     Eustace consents to the continued jurisdiction of this Court in order to implement and carry out the terms of all orders and decrees that may be entered herein, to entertain any suitable application or motion for additional relief within the jurisdiction of this Court, and to assure compliance with the Order.

9.     The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of findings of fact, conclusions of law and a permanent injunction and ancillary equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), as set forth herein.

## II.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**FINDINGS OF FACT**

A.     **Defendant Eustace Fraudulently Operated the Option Capital Fund**

1.     Commencing in at least the spring of 2001, Eustace solicited individuals to invest in the Option Capital Fund LLC ("Option Capital Fund"), which was a commodity pool created to trade primarily commodity futures and options.

2.     Prior to forming Option Capital Fund, Eustace was trading commodity futures and options with personal funds and incurred multi-million dollar trading losses. Eustace never

4

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 23 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 5 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 5 of 32

disclosed this losing track record to prospective participants or participants in any of the commodity pools he operated or managed, or for whom he conducted trading.

3.   Eustace was the General Partner and operator of the Option Capital Fund and exercised complete control of the Fund.

4.   Eustace solicited at least $4 million from at least 12 individuals to participate directly in the Option Capital Fund.

5.   Commencing in at least July 2001 and continuing through May 2005, Eustace created and issued false account statements to Option Capital Fund participants that reflected the overall profitable trading of commodity futures and options on behalf of the Option Capital Fund.

6.   The only commodity futures and options accounts held in the name of Option Capital Fund were opened by Eustace, and Eustace had the sole trading authority over those accounts.

7.   Eustace maintained those Option Capital Fund accounts from approximately October 2000 through March 2003.

8.   During the time these Option Capital Fund accounts were opened, Eustace created and issued account statements to the Option Capital Fund participants reflecting the cumulative profitable trading of commodity futures and options.

9.   After March 2003, all of the commodity trading accounts in the name of the Option Capital Fund were closed.

10.   Those trading accounts resulted in net losses of approximately $1 million.

11.   After those trading accounts were closed, from March 2003 through May 2005, Eustace continued to create and issue account statements to Option Capital Fund participants

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 24 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 6 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 6 of 32

showing the cumulative profitable trading of commodity futures and options for the Option
Capital Fund.

     12.  Eustace claims that in September 2002, he, as the General Partner, purportedly
entered into an agreement with Option Capital Fund that caused a debtor/creditor relationship to
be established between Option Capital Fund and Eustace by creating a promissory note pursuant
to which Eustace could borrow capital from the Fund.  Any capital Option Capital Fund lent
purportedly bore interest at the rate of return reported to the participants and was secured by
Eustace's interest in the Fund, all trading accounts he held and any other pool investment he
held.

     13.  Eustace never disclosed to Option Capital Fund participants that he had entered into
such a purported agreement or otherwise disclosed that he had loaned himself the funds of the
Option Capital Fund.

     14.  Throughout the operations of the Option Capital Fund, Eustace transferred funds
belonging to Option Capital Fund participants into his personal trading accounts, which accounts
overall lost money trading commodity futures and options.

     15.  Since March 30, 2000, Eustace sustained an aggregate trading loss of more than $20
million in his personal commodity futures and options trading accounts.  In 2005 alone, he
suffered substantial overall trading losses:  in January 2005, he sustained more than $15 million
in losses, and between January and May 2005, his net trading losses exceeded $22 million in his
personal trading accounts.

     16.  From 2002 through 2004, Eustace used approximately $500,000 of funds belonging
to Option Capital Fund participants and other commodity pool participants to settle a state court
action brought against Eustace by a Futures Commission Merchant ("FCM") based upon

Eustace's failure to pay on a promissory note of approximately $630,000 that he had entered into regarding losses he had incurred in trading proprietary accounts of the FCM.

17.  Despite the fact that Option Capital Fund had no trading accounts in its name, and the fact that he incurred massive losses in his personal trading accounts, Eustace continued to prepare and issue account statements to Option Capital Fund participants showing overall profitable trading.  For example, in the last account statement received by participants, Eustace falsely represented that the Option Capital Fund pool had a net positive return of 6.45 % year to date as of May 2005.

18.  As another example of Eustace's false statements, one Option Capital Fund participant received an account statement from Eustace showing that as of May 31, 2005, his net return since inception of account was over $258,000, or 70.27% and that he had a net asset value of over $1.1 million.

19.  In providing false account statements containing false trading results to Option Capital Fund participants, Eustace intended that the Option Capital Fund participants would rely upon those misrepresentations in making their investment decisions.

20.  Option Capital Fund participants relied upon the false account statements and the false trading results reflected in those statements in making their investment decisions.

21.  Eustace never registered with the Commission as a commodity pool operator for the Option Capital Fund.

B.    **The Defendant Eustace Fraudulently Operated the LP Fund and Issued False Statements to Participants**

22.  In August 2002, Eustace formed, with the assistance of others, Defendant PAAM for the purpose of managing commodity futures and options trading for others.  Eustace was President of PAAM.

7

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 26 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 8 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 8 of 32

23.   Beginning in at least the fall of 2002, Eustace fraudulently solicited and accepted at least $28 million from at least ten investors for participation in a commodity trading pool, Philadelphia Alternative Asset Fund, LP (the "LP Fund"), a purported hedge fund operated by PAAM and traded by Eustace.  Eustace established the LP Fund to trade, among other things, commodity futures and options contracts.  PAAM was the General Partner of the LP Fund.

24.   Eustace was the sole signatory on bank accounts held in the name of the LP Fund and had exclusive control over the assets and trading of the LP Fund.

25.   Eustace successfully solicited investors to participate in the LP Fund by providing, among other information, a purported trading record of the Option Capital Fund.  Eustace routinely represented that the Option Capital Fund consisted only of personal or family money, and that it was closed.

26.   Eustace intended that prospective investors would rely upon the purported trading record of Option Capital Fund in making their investment decisions.

27.   That record purported to show cumulative, profitable futures and options trading results for the Option Capital Fund for the period of June 2001 through July 2002, when in fact neither of the commodity futures and options accounts held in the name of the Option Capital Fund nor any of his personal trading accounts had achieved those overall results.

28.   Investors relied upon this false information in making the decision to invest in the LP Fund.

29.   Eustace also solicited prospective investors using purported actual trading results for the LP Fund (the "LP Fund trading chart").  The trading chart stated that "the Fund commenced trading under the direction of the Manager in October 2002.  The Fund had no transaction history

8

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 27 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 9 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 9 of 32

prior to this." The trading chart further stated "[p]ast performance may not be indicative of future performance."

30.    Investors receiving this trading chart believed the results were the actual trading results for the LP Fund, which they understood from Eustace to be trading futures and options, and relied upon that chart in making their investment decisions.

31.    In providing the trading chart for the LP fund, Eustace intended prospective investors to rely upon it in making their investment decisions.

32.    The LP Fund, however, never traded commodity futures and options in its own name, and thus had no trading record.  To the extent that the purported trading record reflected trading Eustace did on behalf of Option Capital Fund, or trading in his personal accounts, Eustace had not achieved the profitable results reflected on the trading chart.

33.    From at least October 2002 through May 2005, Eustace prepared and sent, or caused to be prepared and sent, to LP Fund participants fictitious monthly trading account statements purporting to show that the LP Fund participants' investments were increasing in value from the profitable trading of commodity futures and options.

34.    During the time that the LP Fund participants were receiving these fictitious account statements, the Defendants never managed accounts that directly traded commodity futures or options in the name of the LP Fund.

35.    Without disclosing to prospective investors or the LP Fund participants, Eustace invested the funds of the LP Fund into bank accounts of the Option Capital Fund and thereafter traded commodity futures and options with those funds either in accounts in the name of the Option Capital Fund, until those accounts were closed, or in his personal trading accounts.

9

Case 2:10-cv-00665-JD    Document 90    Filed 08/18/10    Page 28 of 51
Case 2:05-cv-02973-MMB    Document 426    Filed 07/13/07    Page 10 of 32
Case 2:05-cv-02973-MMB    Document 270-2    Filed 10/16/2006    Page 10 of 32

36.    In response to inquiries by the National Futures Association ("NFA") concerning the operations of PAAM, in mid-June 2005, Eustace represented that he had executed a swap agreement between the Option Capital Fund and LP Fund, pursuant to which Eustace transferred the funds of the LP Fund to the Option Capital Fund in exchange for a return stream based upon the performance of PAAM trading strategies. The purported swap agreement submitted by Eustace was signed by him in his capacity as the General Partner of the Option Capital Fund and as the President of PAAM, the General Partner of the LP Fund. The board of directors of PAAM did not authorize any such swap agreement.

37.    The purported swap agreement provided to the NFA by Eustace reflects that the agreement was executed in September 2002. Neither at the time that Eustace solicited LP investors in the fall of 2002, nor going forward, did Eustace ever disclose the existence of this purported swap agreement, and Eustace did not otherwise disclose that the assets of the LP Funds would be deposited via the Option Capital Fund into Eustace's personal accounts. Eustace never disclosed this transparent conflict of interest and self-dealing.

38.    As found above, all trading done in the name of or for the benefit of Option Capital Fund, either directly in trading accounts in the name of Option Capital Fund, in Eustace's personal trading accounts or in any trading accounts Eustace managed or controlled, sustained net losses from the trading of commodity futures and options.

39.    In providing false account statements containing false profitable trading results to LP Fund participants, and in providing false trading records as part of his solicitation of participants, Eustace intended that the LP Fund participants would rely upon those misrepresentations when making their investment decisions.

10

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 29 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 11 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 11 of 32

40. LP Fund participants relied in part upon the false account statements and the false trading results reflected in those statements when making their investment decisions.

41. Participants invested in the LP Fund commencing in October 2002 and continuing through June 2005.

C.   **Defendant Eustace Issued False Statements to Participants and Posted False Trading Results on PAAM's Website for an Off-Shore Commodity Pool**

42. From approximately June 2004 through June 2005, Defendants Eustace and PAAM operated two other commodity pools, the Philadelphia Alternative Asset Fund, Ltd., an off-shore fund ("Off-Shore Fund"), and the Philadelphia Alternative Asset Feeder Fund LLC ("Feeder Fund"), a domestic fund. The Feeder Fund was an investor in the Off-Shore Fund, which allowed customers in the United States to participate in the Off-Shore Fund. The Off-Shore Fund was launched in June 2004 and the Feeder Fund was in operation as of October 2004.

43. The Defendants accepted over $280 million from pool participants for the LP Fund, Off-Shore Fund, and Feeder Fund. Those funds traded, among other things, commodity futures and options on United States futures and options markets through accounts held at FCMs registered with the Commission

44. The Feeder Fund did not maintain any trading accounts in its own name.

45. Those pools traded commodity futures and options through entities registered in the United States or, in other words, on United States futures exchanges. The pools also traded foreign currencies and engaged in the exchange of futures for physicals.

46. In soliciting prospective investors for both the Feeder Fund and the Off-Shore Fund, Eustace provided or caused to be provided the false track records of the Option Capital Fund and the LP Fund which showed the consistently profitable trading of commodity futures and options.

11

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 30 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 12 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 12 of 32

Eustace represented that the Option Capital Fund consisted of personal and family money and that he had closed the Fund prior to or around the same time as he was forming PAAM.

47.   Prospective investors in the Feeder and Off-Shore Funds relied upon the purported track records of Option Capital Fund and the LP Fund in making their investment decisions.

48.   Eustace intended for prospective investors to rely upon those track records in making their investment decisions.

49.   Eustace opened one trading account at UBS Securities, LLC and several accounts at Man Financial Inc. ("Man Financial") in the name of the Off-Shore Fund.   Eustace had sole trading authority over those Off-Shore Fund accounts.

50.   In opening the initial trading account at Man Financial, denominated the 159 15910 account ("10 account"), Eustace represented that he was President of the Off-Shore Fund.   He was not.   The Off-Shore Fund had an independent board of directors and Eustace held no position on the board and was not an officer of the Fund.

51.   Eustace subsequently opened another trading account at Man Financial in March 2005, denominated the 159 15950 account ("50 account").

52.   The Off-Shore Fund had an administrator, UBS Fund Services (Cayman) Ltd. ("UBS"), which prepared and issued account statements to Off-Shore Fund investors.

53.   UBS prepared the monthly account, or Net Asset Value ("NAV"), statements primarily based upon Off-Shore Fund account information it accessed through websites maintained at UBS Securities, LLC and Man Financial.   At Man Financial, the system is known as the E-Midas system.   Eustace knew that UBS relied upon the E-Midas system for account information for the Off-Shore Fund.

12

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 31 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 13 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 13 of 32

54. Eustace prepared and issued account statements directly to the Feeder Fund participants on Feeder Fund letterhead, reflecting Eustace's name and title as President of the Feeder Fund.

55. Beginning in January 2005 and continuing through June 2005, the Off-Shore Fund sustained severe trading losses in the accounts held at Man Financial, which totaled more than $147 million.

56. In 2005, Eustace posted or caused to be posted on PAAM's website, www.paamcollc.com, reports of profitable net returns for the Off-Shore Fund. In or about May 2005 the Defendants posted on their website the following 2005 net returns for the Off-Shore Pool: 0.88% in January; 1.25% in February; 1.56% in March; 1.69% in April; and a year-to-date net return of 5.5%.

57. Eustace represented that the LP Fund was to trade *pari passu* (i.e., in equal proportion) with the Off-Shore Fund. LP Fund investors thus looked at the website postings regarding the Off-Shore Fund as confirmation of their returns.

58. Throughout 2005, Eustace caused account statements to be issued to Feeder Fund participants showing overall profitable trading of futures and options. For example, in or about May 2005, Eustace issued account statements to Feeder Fund participants showing a monthly net return for April 2005 of 1.69%.

59. Throughout 2005, Eustace caused UBS to prepare and issue account or NAV statements to Off-Shore Fund participants that reflected the overall profitable trading of futures and options, and that the individual participants' interests in the Fund were increasing in value. The account statements for May 2005 reflected that the Off-Shore Fund had a net asset value of over $260 million at the end of May.

13

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 32 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 14 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 14 of 32

60.   In fact, the Off-Shore Fund's commodity futures and options trading accounts had sustained the following approximate losses in 2005:  January -$1.0 million (-0.56 %); February -$19.2 million (-10.2%); March - $6.6 million (-3.85%); April - $34.4 million (-16.43%); and May - $87.8 million (-46.19%).  The actual net asset value of the Off-Shore Fund at the end of May 2005 was approximately $103 million.

61.   Eustace masked the massive trading losses from the Off-Shore Fund participants through two primary means.

62.   Throughout at least 2005, Eustace manipulated the information provided to UBS concerning the trade execution dates for certain exchange of futures for physicals ("EFPs"), transactions intended to bolster artificially profits or minimize losses for certain months in the "10" account.

63.   Eustace formulated this scheme in 2004 and used it at least once in October 2004 to improve the apparent performance of the Off-Shore Fund.  In October, UBS reported net asset value as $97.6 million and the actual net asset value was approximately $96.3 million.

64.   An EFP is a form of privately negotiated physical settlement of long and short futures positions held by two parties. Generally, the parties take an exchange traded futures position, and privately negotiate their physical trade.  Then, instead of offsetting their futures positions with subsequent trades on the exchange, they inform the exchange that they want to transfer the futures from one party to the other at an agreed upon price, thus offsetting and closing out their respective positions.

65.   As an example, Eustace executed several EFPs on February 1 using the knowledge of the settlement prices for January 31 to set the futures prices on the EFPs.  Eustace manipulated the information sent to UBS to have it appear that the EFPs were executed on January 31, not

14

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 33 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 15 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 15 of 32

February 1. Because he was able to do this, he was able to select prices for the EFPs executed on February 1 based upon the January 31 settlement prices, and thus have profitable EFPs posted for January to improve the apparent performance for that month. This improved the results reported to UBS for January by $2.6 million and resulted in UBS reporting a positive return. Without these EFPs posted to January 31, UBS would have reported a negative return for the Off-Shore Fund in January.

66.  In the foregoing example, Eustace caused an employee at Man Financial to send information to UBS setting forth a purported processing delay of the EFPs at Man Financial to explain the EFPs posting to the February 1 Man Financial daily account statement, and representing that the trade execution date was January 31, not February 1.

67.  In other instances, Eustace falsified information Man Financial had provided Eustace. Eustace then forwarded the falsified information to UBS as trading information Man Financial had provided. Eustace again did this to make it appear that the EFPs at issue had been executed on the last trading day of the prior month, thereby increasing apparent profits or minimizing losses in that month.

68.  In March 2005, Eustace opened the "50" subaccount for the purported, but not uncommon, purpose of trading a new strategy and wanting separately to track the results of that strategy.

69.  Eustace immediately took steps to ensure that no one would have access to the new subaccount via E-Midas by asking a Man Financial employee to restrict access only to him. UBS and others, including key PAAM personnel, did not have access to the 50 subaccount through the E-Midas system. It was only through the E-Midas system that UBS received account

information.  UBS learned of new accounts or subaccounts being opened in the name of PAAF from Eustace or PAAM personnel.  Eustace never informed UBS of the 50 subaccount.

70.  Upon the opening of the 50 subaccount, Eustace immediately used fictitious trades in the 10 account and the 50 subaccount to offset a substantial portion of a losing bond position in the 10 subaccount, and to establish the long bond position in the 50 subaccount, which resulted in a loss of approximately $14 million being reflected in the 50 subaccount, rather than in the 10 account.

71.  Eustace thereafter transferred losing positions from the 10 subaccount to the 50 subaccount by cancelling the trades in 10 account and moving them into the 50 subaccount with the original trade noted.

72.  Eustace also moved profitable positions from the 50 account to the 10 account to offset existing positions in the 10 account.

73.  Eustace also placed trades into the 50 subaccount that became losing positions.

74.  From March 2005 through June 2005, Eustace sustained losses in the 50 account of more than $179 million; from January 2005 through June 2005, the 10 account reflected a gain of $31.7 million.

75.  By providing false trading results to Off-Shore Fund and Feeder Fund participants through false account statements and false website postings, Eustace intended that Off-Shore Fund and Feeder Fund participants, as well as the LP Fund investors, would rely upon those misrepresentations in making their investment decisions.

76.  Off-Shore Fund and Feeder Fund participants, as well as the LP Fund investors, did in fact rely upon Eustace's misrepresentations in making their investment decisions.

Case 2:10-cv-00665-JD    Document 90    Filed 08/18/10    Page 35 of 51
Case 2:05-cv-02973-MMB    Document 426    Filed 07/13/07    Page 17 of 32
Case 2:05-cv-02973-MMB    Document 270-2    Filed 10/16/2006    Page 17 of 32

77.  From January through June 2005, investors deposited more than $127 million in additional assets into the Off-Shore Fund and Feeder Fund.  In addition, based on the profitable results of the Off-Shore Fund as well as the LP Fund, LP Fund investors made additional investments from March through June 2005.

**D.    Defendant Eustace Misappropriated Pool Participants' Funds**

78.  At the same time that Eustace was issuing or causing to be issued false account statements showing profitable trading for the Option Capital Fund, Eustace was earning incentive fees based upon the purported profits, as well as management fees based upon the purported lawful operation of the Option Capital Fund.

79.  Eustace also moved Option Capital Fund and LP Fund participants' funds into his personal trading and banking accounts.

80.  As a result, Eustace misappropriated funds belonging to at least the Option Capital Fund and LP Fund participants.

81.  At the same time that Defendants were issuing or causing to be issued false account statements showing profitable trading for the LP Fund, Feeder Fund and Off-Shore Fund, Defendants were earning incentive fees based on the purported profits as well as management fees based on the purported lawful operation of the pools.

82.  As a result, Eustace misappropriated funds of the LP Fund, Feeder Fund and Off-Shore Fund.

**E.    Defendant Eustace Did Not Disclose the Existence and Operation of the LP Fund to NFA**

83.  In or around September 20, 2004, NFA conducted an audit of PAAM.

84.  Eustace was the person at PAAM who responded to all of NFA's questions concerning PAAM.

17

85.  Throughout the audit process, which continued into May 2005, Eustace did not disclose the existence of the LP Fund until late May, 2005, when NFA specifically asked Eustace about the LP Fund.  Eustace falsely stated that it contained only personal money and might have been traded at FC Stone.

86.  Eustace changed his story a few days later, claiming that the LP Fund never traded commodity futures and options but instead had engaged in "swap transactions."

87.  In response to NFA inquiries concerning the Off-Shore Fund, Eustace provided false account information on June 21, 2005 by failing to include information concerning the "50" subaccount, and representing the value of the Off-Shore Fund to be over $230 million.

**F.      Defendant Eustace Acted with Scienter and is the Controlling Person of PAAM**

88.  In making the misrepresentations, omissions and false statements identified above, Eustace acted knowingly or with reckless disregard for the truth of those matters.

89.  Eustace was President of PAAM and controlled its overall day-to-day operations. Eustace is the only registered associated person and listed principal of PAAM, and controlled the trading conducted by PAAM on behalf of the LP Fund, Feeder Fund and Off-Shore Fund.

90.  As the General Partner of the Option Capital Fund, Eustace had exclusive control over the operations, trading and management of the Option Capital Fund.

91.  Eustace failed to act in good faith or knowingly induced, directly or indirectly, the violations detailed herein.

**CONCLUSIONS OF LAW**

1.   This Court has jurisdiction over the subject matter of this action pursuant to Section 6c of the Act, which authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging or is about to engage

18

in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

    2.    Venue properly lies with this Court pursuant to Section 6c of the Act.

    3.    This Court has personal jurisdiction over Defendant Eustace, who has acknowledged service of the Complaint and consented to the Court's jurisdiction.

    4.    The Commission and Defendant Eustace have agreed to this Court's retention of continuing jurisdiction over the Defendant for the purpose of enforcing the terms of this Order.

    5.    Beginning in the spring of 2001 and continuing through June 2005, Defendant Eustace, with respect to the Option Capital Fund, violated Section 4b(a)(2)(i) - (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) - (iii) (2002), inasmuch as he has: (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) willfully made or caused to be made false reports or statements to other persons; and/or (3) willfully deceived or attempted to deceive other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of any other persons, where such contracts for future delivery were or might be used for the purposes set forth in Section 4b(a) of the Act, 7 U.S.C. § 6b(a).

    6.    Beginning around March 2003 and continuing through June 2005, Defendant Eustace, with respect to the LP Pool, Feeder Fund and Off-Shore Fund, violated Section 4b(a)(2)(i) - (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) - (iii) (2002), inasmuch as he (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) willfully made or caused to be made false reports or statements to other persons; and/or (3) willfully deceived or attempted to deceive other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of any other

19

persons, where such contracts for future delivery were or might be used for the purposes set forth

in Section 4b(a) of the Act, 7 U.S.C. § 6b(a).

7.   Defendant Eustace, knowingly or with reckless disregard for the truth, violated

Section 4b(a)(2)(i) - (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) - (iii) by, among other things (a)

issuing false account statements to Option Capital Fund participants showing false trading

results; (b) omitting to inform Option Capital Fund participants of the material information that

defendants had not engaged in any futures trading in the name of the Option Capital Fund after

March 2003; and (c) misappropriating Option Capital Fund and LP Fund by transferring the

Option Capital Fund and LP Fund into Eustace's personal trading or banking accounts, and by

collecting incentive and management fees that he had not earned and was therefore not entitled

to collect.

8.   Eustace, with respect to the LP Fund, Feeder Fund, and Off-Shore Fund,

knowingly or with reckless disregard for the truth, violated Section 4b(a)(2)(i) - (iii) of the Act, 7

U.S.C. § 6b(a)(2)(i) - (iii) by, among other things (a) issuing false account statements to LP Fund

participants showing fictitious futures trading; (b) omitting to inform LP Fund participants of the

material information that defendants had not engaged in any futures trading in the name of the

LP Fund or LP Fund participants; (c) providing false trading results to solicit LP Fund

participants, showing profitable actual trading; (d) providing false account statements to Feeder

Fund pool participants showing profitable actual trading; (e) causing false statements to be

issued to Off-Shore Fund investors; (f) posting false trading results for the Off-Shore Fund on

the website; (g) misappropriating funds of the LP Fund by depositing funds of the LP Funds into

his personal bank and trading accounts; and (h) misappropriating funds of the LP Pool, Feeder

Case 2:10-cv-00665-JD    Document 90    Filed 08/18/10    Page 39 of 51
Case 2:05-cv-02973-MMB    Document 426    Filed 07/13/07    Page 21 of 32
Case 2:05-cv-02973-MMB    Document 270-2    Filed 10/16/2006    Page 21 of 32

Fund and Off-Shore Fund by collecting incentive and management fees he had not earned and therefore was not entitled to collect.

9.    In addition to his direct liability, Defendant Eustace, directly or indirectly, controlled PAAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting PAAM's violations, and therefore Defendant Eustace is liable for PAAM's violations of Section 4b(a)(2)(i) - (iii) of the Act, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002).

10.    Beginning in the spring of 2001 and continuing through June 2005, Defendant Eustace has, with respect to the Option Capital Fund: (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) made or caused to be made to other persons false reports or statements thereof; and/or (3) deceived or attempted to deceive other persons, in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, commodity option transactions, all in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10, 17 C.F.R. § 33.10.

11.    Beginning around March 2003 and continuing through June 2005, Defendant Eustace has, with respect to the LP Fund, Feeder Fund and Off-Shore Fund: (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) made or caused to be made to other persons false reports or statements thereof; and/or (3) deceived or attempted to deceive other persons, in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, commodity option transactions, all in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10, 17 C.F.R. § 33.10.

12.    Defendant Eustace has, with respect to the Option Capital Fund, knowingly or with reckless disregard for the truth, violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and

Case 2:10-cv-00665-JD    Document 90    Filed 08/18/10    Page 40 of 51

Case 2:05-cv-02973-MMB    Document 426    Filed 07/13/07    Page 22 of 32
Case 2:05-cv-02973-MMB    Document 270-2    Filed 10/16/2006    Page 22 of 32

Regulation 33.10, 17 C.F.R. § 33.10, by, among other things: (a) issuing false account statements to Option Capital Fund participants showing false trading results; (b) omitting to inform Option Capital Fund participants of the material information that defendants had not engaged in any futures trading in the name of the Option Capital Fund after March 2003; and (c) misappropriating Option Capital Fund funds by transferring Option Capital Fund and LP Fund into Eustace's personal trading or banking accounts; and by collecting incentive and management fees that he had not earned and was therefore not entitled to collect.

13.    Defendant Eustace has, with respect to the LP Pool, Feeder Fund and Off-Shore Pool, knowingly or with reckless disregard for the truth, violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10(a) – (c), 17 C.F.R. § 33.10 (a) – (c) by, among other things: (a) issuing false account statements to LP Fund participants showing fictitious commodity options trading; (b) omitting to inform LP Fund participants that defendants had not engaged in any commodity options trading in the name of the LP Fund or LP Fund participants; (c) providing false trading results to solicit LP Fund participants showing profitable trading; (d) causing false statements to be issued to Off-Shore pool participants; (e) providing false account statements to Feeder Fund pool participants; (f) posting false trading results for the Off-Shore Fund on their website; (g) misappropriating funds of the LP Fund by depositing funds of the LP Funds into his personal bank and trading accounts; and (h) misappropriating funds of the LP Fund, Feeder Fund and Off-Shore Pool by collecting incentive and management fees he had not earned and therefore was not entitled to collect.

14.    Defendant Eustace directly or indirectly controlled PAAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations of PAAM,

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 41 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 23 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 23 of 32

and thereby Eustace is liable for PAAM's violations of Section 4c(b) of the Act and Regulation 33.10 (a) – (c), pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b).

15.     Beginning in the spring of 2001 and continuing through June 2005, Defendant Eustace, although not registered as such, acted as a CPO for the Option Capital Fund by soliciting, accepting or receiving funds from others and engaging in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in commodities for future delivery or options on futures contracts on or subject to the rules of a contract market.

16.     Beginning around March 2003 and continuing through June 2005, Defendant PAAM was a registered CPO and acted as a CPO by soliciting, accepting or receiving funds from others and engaging in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in commodities for future delivery or options on futures contracts on or subject to the rules of a contract market.  Defendant Eustace was a registered AP of a CPO, PAAM, and acted as an AP of a CPO by soliciting prospective pool participants.

17.     Beginning in the spring of 2001 and continuing through June 2005, Defendant Eustace, while acting as a CPO for the Option Capital Fund, knowingly or with reckless disregard for the truth, employed a device, scheme or artifice to defraud Option Capital Fund pool participants, in violation of Section 4$o$(1)(A) of the Act, 7 U.S.C. § 6$o$(1)(A).

18.     Beginning around March 2003 and continuing through June 2005, Defendant Eustace, while acting as an AP of PAAM, knowingly or with reckless disregard for the truth, employed a device, scheme or artifice to defraud LP Fund participants and prospective LP Pool,

Off-Shore Pool and Feeder Fund pool participants, in violation of Section 4o(1)(A) of the Act, 7

U.S.C. § 6o(1)(A), and Commission Regulation 4.41(a)(1), 17 C.F.R. § 4.41(a)(1).

19.     Beginning in the spring of 2001 and continuing through June 2005, Defendant

Eustace, while acting as a CPO for the Option Capital Fund, engaged in a transaction, practice or

course of business which has operated as a fraud or deceit upon Option Capital Fund pool

participants and prospective Option Capital Fund pool participants, in violation of Section

4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B).

20.     Beginning in or about March 2003 and continuing through June 2005, Defendant

Eustace, while acting as an AP of PAAM, engaged in a transaction, practice or course of

business which has operated as a fraud or deceit upon LP Pool, Off-Shore Pool and Feeder Fund

pool participants and prospective LP Pool, Off-Shore Pool and Feeder Fund pool participants, in

violation of Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B), and Commission Regulation

4.41(a)(2), 17 C.F.R. § 4.41(a)(2).

21.     Defendant Eustace, with respect to the Option Capital Fund, knowingly or with

reckless disregard for the truth, violated Sections 4o(1)(A) and (B) of the Act, by, among other

things: (a) issuing false account statements to Option Capital Fund participants showing false

trading results; (b) omitting to inform Option Capital Fund participants of the material

information that defendants had not engaged in any futures trading in the name of the Option

Capital Fund after March 2003; and (c) misappropriating funds of the Option Capital Fund by

transferring Option Capital Fund and LP Fund into Eustace's personal trading or banking

accounts; and by collecting incentive and management fees that he had not earned and was

therefore not entitled to collect.

24

22.     Defendant Eustace, with respect to the LP Pool, Feeder Fund and Off-Shore Fund,
knowingly or with reckless disregard for the truth, violated Sections $4o(1)(A)$ and (B) of the Act
by, among other things: (a) issuing false account statements to LP Fund participants showing
fictitious commodity futures and options trading; (b) omitting to inform LP Fund participants
that the Defendants had not engaged in any commodity futures or options trading in the name of
the pool or the pool participants; (c) providing false trading results to at least one prospective LP
Fund participant showing profitable trading; (d) causing false statements to be issued to Off-
Shore Fund participants; (e) providing false account statements to Feeder Fund pool participants;
(f) posting false trading results for the Off-Shore Fund on their website; (g) misappropriating
funds of the LP Fund by depositing funds of the LP Funds into his personal bank and trading
accounts; and (h) misappropriating funds of the LP Pool, Feeder Fund and Off-Shore Fund by
collecting incentive and management fees he had not earned and was therefore not entitled to
collect.

23.     Defendant Eustace, knowingly or with reckless disregard for the truth, violated
Commission Regulations 4.41(a)(1) and (2), 17 C.F.R. § 4.41(a)(1) and (2) by, among other
things:  (a) posting false trading results for the Off-Shore Pool on the pool's website, and (b)
providing false trading results to LP Fund participants.

24.     Defendant Eustace, directly or indirectly, controlled PAAM and did not act in
good faith or knowingly induced, directly or indirectly, the acts constituting PAAM's violations,
and thereby Defendant Eustace is liable for PAAM's violations of Section $4o(1)(A)$ and (B) of
the Act, and Commission Regulation 4.41(a)(1) and (2), pursuant to Section 13(b) of the Act.

25.     Defendant Eustace, with respect to the Option Capital Fund, used the mails or
instrumentalities of interstate commerce in or in connection with his business as a CPO while

failing to register with the Commission as a CPO, in violation of Section 4m(1) of the Act, 7

U.S.C. § 6m(1).

26.   By depositing Option Capital Fund pool funds into his personal accounts and not

into accounts in the name of the Option Capital Fund pool, Eustace, as the pool operator, failed

to operate the Option Capital Fund as a legal entity separate from himself, in violation of

Commission Regulation 4.20(a), 17 C.F.R. § 4.20(a).

27.   Eustace, while operating as a CPO, accepted pool funds in his own name, in

violation of Commission Regulation 4.20(b), 17 C.F.R. § 4.20(b).

28.   Eustace commingled the pool funds with his own property, in violation of

Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c).

29.   Under the totality of the circumstances, there is a reasonable likelihood of future

violations of the Act and Regulations by the Defendant. Therefore, a permanent injunction should

issue in this action.

30.   Based upon the foregoing facts and principles of equity, there is good cause for entry

of an order directing the Defendant to make restitution to the defrauded investors in an amount to

be determined by the parties and agreed to in a subsequent consent order, or as ordered by the

Court, pursuant to hearing or otherwise, together with prejudgment interest, plus post-judgment

interest at the statutory rate, for distribution to investors in a manner approved by the Court.

31.   There is good cause for entry of an order requiring the Defendant to pay a civil

monetary penalty to be determined by the parties and agreed to in a subsequent consent order or

as otherwise ordered by the Court.

## III.

## ORDER FOR PERMANENT INJUNCTION

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.       Defendant Eustace shall be permanently restrained, enjoined and prohibited from directly or indirectly engaging in conduct violative of Sections 4b(a)(2)(i) - (iii), 4c(b), 4m(1), and 4o(1) (A) and (B) of the Act and Sections 4.20, 4.41 and 33.10 of the Commission's Regulations, including, but not limited to, the conduct described in the Findings of Fact and Conclusions of Law, above.

2.       Defendant Eustace shall be permanently restrained, enjoined and prohibited from engaging in any commodity-related activity, including (1) soliciting new pool participants, managed accounts or pool or managed funds, and (2) engaging in, controlling or directing the trading of any commodity futures, security futures, options on foreign currency, options on futures, or foreign currency futures or options account, directly or indirectly for himself or on behalf of any other person or entity, whether by power of attorney or otherwise.

3.       Defendant Eustace shall be permanently restrained, enjoined and prohibited from applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9), or acting as a principal, agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9). This includes, but is not limited to, soliciting, accepting or receiving any funds, revenue or other property from any person, giving commodity trading advice for compensation, except as provided for in Regulation 4.14 (a)(9), 17 C.F.R.

27

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 46 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 28 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 28 of 32

§ 4.14(a)(9), or soliciting prospective customers, related to the purchase or sale of any commodity futures, security futures, options on foreign currency, options on futures, or foreign currency futures.

IV.

**EQUITABLE RELIEF**

**IT IS FURTHER ORDERED THAT:**

1.      Defendant Eustace shall pay full restitution to each participant in the Option Capital Fund, the LP Fund, the Feeder Fund and the Off-Shore Fund, the amounts to be specified once the Receiver completes his determination as outlined in paragraph 17 of this Court's December 29, 2005 Order (Doc. # 117).  If the parties do not file a Consent Order specifying the amount the parties agree is full restitution within thirty days of the Receiver completing said determination, the Court will schedule a hearing to determine the appropriate amount of restitution.  All payments made pursuant to this Order by Defendant Eustace shall first be paid to the Receiver appointed by this Court in this case for distribution to pool participants and, after the termination of the Receivership, to the pool participants for restitution on a pro rata basis until those amounts are fully satisfied.  All payments after satisfaction of the restitution shall be applied to the civil monetary penalty amount set forth below

2.      Defendant Eustace shall pay a civil monetary penalty in an amount to be specified at the time the parties specify the amount agreed to as full restitution as set forth in paragraph IV(1) above.  Again, if the parties do not file a Consent Order specifying the amount the parties agree is an appropriate civil monetary penalty within thirty days of the Receiver completing his determination as outlined in paragraph 17 of this Court's December 29, 2005 Order (Doc. # 117), the Court will schedule a hearing to determine the appropriate civil monetary penalty.

28

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 47 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 29 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 29 of 32

3.      Defendant Eustace shall cooperate fully and expeditiously with the Commission,

including the Commission's Division of Enforcement, the Receiver and his counsel, and the

Joint Liquidators in any current or future investigation, civil litigation or administrative matter

related to the subject matter of this action.  As part of such cooperation, Defendant Eustace shall

comply, to the full extent of his ability, promptly and truthfully with any inquires or requests for

information including but not limited to, requests for production and authentication of

documents, shall provide assistance at any trial, proceeding, or investigation, including but not

limited to, requests for testimony, depositions, and/or interviews, and shall testify completely and

truthfully in any such proceeding, deposition, trial, or investigation consistent with, but not

limited to, the statements and information he represented as true and provided to the Commission

on a voluntary basis on February 15, 2006.  In that regard, Defendant Eustace is directed to

appear in this judicial district, or in a suitable judicial district agreed to by the parties, to provide

deposition and trial testimony in the case *C. Clark Hodgson v. Man Financial, Inc. et al.*, Civil

Action No. 06-01944-MMB should a party to that case determine such testimony is necessary.

Defendant Eustace shall be entitled to the fees and expenses provided for by *Federal Rule of*

*Civil Procedure* 45(b) and may petition the Court for payment of other reasonable and necessary

expenses he may incur in connection with such appearance.  Defendant Eustace shall also

cooperate with the Receiver in the manner set forth above in the Receiver's administration of the

Receivership estate, including, but not limited to, cooperating with the Receiver in tracing,

locating and marshalling assets, and in any additional action(s) filed by the Receiver.  Defendant

Eustace shall also cooperate with the Receiver and Joint Liquidators in the manner set forth

above in connection with his bankruptcy proceeding currently pending in Canada.  Should the

Commission, the Receiver, or the Joint Liquidators file any additional action(s) related to the

subject matter of this action, Defendant Eustace is directed to appear in the judicial district in which such action(s) is pending, or in a suitable judicial district agreed to by the parties, to provide deposition testimony and trial testimony should a party to such action(s) determine that such testimony is necessary. Defendant Eustace shall be entitled to the fees and expenses provided for by *Federal Rule of Civil Procedure* 45(b) and may petition the Court for payment of other reasonable and necessary expenses he may incur in connection with such appearance.

## V.

## MISCELLANEOUS PROVISIONS

1.       If any provision of this Order or the application of any provision or circumstance is held invalid, the remainder of this Order, and the application of the provision to any other person or circumstance, shall not be affected by the holding.

2.       Upon being served with copies of this Consent Order after entry by the Court, the Defendant shall sign an acknowledgment of such service and serve such acknowledgment on the Commission within seven (7) calendar days.

3.       This Court shall retain jurisdiction of this action in order to implement and carry out the terms of all orders and decrees, including orders setting the appropriate amounts of restitution and civil monetary penalty, that may be entered herein, to entertain any suitable application or motion for additional relief within the jurisdiction of this Court, and to assure compliance with this Order.

4.       All notice required to be given by any provision in this Order shall be sent by certified mail, return receipt requested, as follows:

30

Case 2:10-cv-00665-JD    Document 90    Filed 08/18/10    Page 49 of 51
Case 2:05-cv-02973-MMB    Document 426    Filed 07/13/07    Page 31 of 32
Case 2:05-cv-02973-MMB    Document 270-2    Filed 10/16/2006    Page 31 of 32

Notice to the Commission:   Michael J. Otten, Esq.
                             Commodity Futures Trading Commission
                             1155 21st Street, NW
                             Washington, D.C. 20581

Notice to the Defendant:   Paul M. Eustace
                             c/o Jonathan H. Marler
                             McWilliams & Marler LLP
                             418 North Service Road East, Suite 3D
                             Oakville, ON L6H 5R2

5.     In the event that the Defendant changes his residential or business telephone number(s) and/or address(es) at any time, he shall provide written notice of the new number(s) and/or address(es) to the Commission within ten calendar days thereof.

**SO ORDERED**, this /Y day of July, 2006.

                                 MICHAEL M. BAYLSON
                                 UNITED STATES DISTRICT JUDGE

Consented to and approved for entry by:

Defendant:

Paul M. Eustace, *pro se*
c/o Jonathan H. Marler
McWilliams & Marler LLP
418 North Service Road East, Suite 3D
Oakville, ON L6H 5R2
Phone – (905) 338-6195
Facsimile – (905) 338-6413

31

Case 2:10-cv-00665-JD   Document 90   Filed 08/18/10   Page 50 of 51
Case 2:05-cv-02973-MMB   Document 426   Filed 07/13/07   Page 32 of 32
Case 2:05-cv-02973-MMB   Document 270-2   Filed 10/16/2006   Page 32 of 32

Attorneys for Plaintiff:

_M J Otten_

Gretchen L. Lowe, DC Bar No. 421995
Michael J. Otten, VA Bar No. 42371
Glenn I. Chernigoff, DC Bar No. 488500
Division of Enforcement
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581
Phone – (202) 418-5000
Facsimile – (202) 418-5523

mail

CC: Eustace
Rosenfield
Cornehls
Murphy
Sexton
Lowe
Longwitz
Wirt
Coberly
Philippi
Chernigoff
Crawford
Horn
Rosengard
Greenspan
Dorval
Cordone
Otten
Orloff
Bergman
Doherty
Stansfield

32

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BLAKE J. ROBBINS, a Minor, by his Parents  :
and Natural Guardians, **MICHAEL E.**         :
**ROBBINS** and **HOLLY S. ROBBINS,**
Individually, and on Behalf of all Similarly  :
Situated Persons,
                        Plaintiffs,  :

                v.               :

**LOWER MERION SCHOOL DISTRICT,**  :
      and
**THE BOARD OF DIRECTORS OF THE**  :
**LOWER MERION SCHOOL DISTRICT,**
      and                        :
**CHRISTOPHER W. McGINLEY,**
Superintendent of Lower Merion School  :
District,
                Defendants.  :

CIVIL ACTION

NO.  2:10-cv-00665-JD

### CERTIFICATE OF SERVICE

    I, Mark Haltzman, Esquire, hereby certify that on this 18th day of August, 2010, I have served a true and correct copy of the foregoing Plaintiffs' Memorandum of Law In Support of the Position that Findings of Fact and Conclusions of Law are Required to be Made Prior to the Issuance of a Permanant Injunction, Regardless of Whether Said Injunction is Opposed or Issued by Consent, by the electronic filing system, upon the following:

Arthur Makadon, Esquire
Henry E. Hockeimer, Jr., Esquire
Paul Lantieri, III, Esquire
William B. Igoe, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
igoew@ballardspahr.com
Attorneys for **Defendants**

Mark S. Haltzman, Esquire