## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BLAKE J. ROBBINS**, a Minor, by his Parents and Natural Guardians, **MICHAEL E. ROBBINS** and **HOLLY S. ROBBINS**, Individually, and on Behalf of all Similarly Situated Persons,<br><br>Plaintiffs, | : : : : : : : : | CIVIL ACTION |
| v. | : : | NO. 2:10-cv-0665-JD |
| **LOWER MERION SCHOOL DISTRICT**, and **THE BOARD OF DIRECTORS OF THE LOWER MERION SCHOOL DISTRICT**, and **CHRISTOPHER W. McGINLEY**, Superintendent of Lower Merion School District,<br><br>Defendants. | : : : : : : : : : : | |

### PLAINTIFFS' AMENDED REPLY TO DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR INTERIM FEES PURSUANT TO 42 U.S.C. §1988

Plaintiffs, Blake J. Robbins, a Minor, by his Parents and Natural Guardians, Michael E. Robbins and Holly S. Robbins, Individually, and on behalf of all similarly situated persons hereby reply to specific issues raised in Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Interim Attorneys' Fees Pursuant to 42 U.S.C. §1988 (Doc.No.88)("Defendants' Opposition").

### A.      Introduction:

In a bold move to attempt to sway public opinion and to deflect responsibility for its actions, Defendants' Response is drafted for the sole

purpose of attempting to cast Plaintiffs and their counsel as the wrongdoers, and tries to excuses the School Districts actions as innocent mistakes not worthy of a lawsuit.   Nothing could be further from the truth.  In the words of the School District's own insurance carrier, this lawsuit is about the School District's "intentional acts of surreptitious video voyeurism.... " on its students and their family.  Even after the lawsuit was filed, the School District continued to assert, falsely, that webcam pictures and screenshots were only secretly taken when a laptop was lost or stolen.  If not for the Robbins lawsuit, who knows how many pictures in excess of the 66,000 secretly recorded webcam pictures and screenshots would have been taken and, who knows what would have happened to all of those images.  Temple Law Professor Burton Caine in an editorial published in the *Mainline Times* on March 17, 2010 addressed the type of tactic used by Defendants stating:

> It is astounding that intelligent members of our community aim their criticism of official invasions of privacy at the victims rather than the violators. This is the familiar and wholly despicable technique of killing the messenger, which goes back at least three thousand year.....They ignore the gross violations of constitutional rights by their representatives in township government primarily because they don't want to accept responsibility for the egregious misconduct and pay the damages that the judicial process should award. From the voices I have heard, it goes further than that and encourages the school — and according to recent reports, the police too — to spy on people in their homes in clear violation of the Constitution and statutes.....We the people should pay damages in towering amounts if we do not rise up and stop our servants from debasing our civil liberties.

The Robbins' Family, the Hasan Family, and the other victims that will come forward, all agree that the taxpayers should be angry, but not at them as they are

the victims.[1]  The taxpayers should be angry with those within the School District who allowed the Theft Track technology to be used by school personnel to spy on students and their families, regardless of the reason it was being done.  There was never a legitimate reason to use the software in the manner in which it was used, and there was never a legitimate reason not to have told the students and their families about the fact that the School District had the ability to enter into theirs homes whenever the School District chose to do so.[2]

## B.   Defendants' Contention That Had Plaintiffs Contacted the District In Advance Of Filing The Lawsuit, The Lawsuit Would Have Been Unnecessary Is Not Supported By The Facts Or Legally Relevant to the Issue of Entitlement to Fees.

The School District argues at page 2 of its submission, without any legal, or factual, support for its position, that Plaintiffs should be denied their statutorily mandated legal fees because the "Robbinses simply could have notified the District of this [violation of the civil rights of the School District's students and families on a regular basis through the use of District-mandated laptops with undisclosed and activated spying capabilities]  ." and thereby "unquestionably" accomplish the same result at less expense to taxpayers.   Not only is this argument factually inaccurate, as Plaintiffs did attempt to notify the school but

---

[1] Another benefit of the lawsuit is that it forced the School District to notify all of the others students who had been spied upon and gave those students an opportunity to view the images.

[2] Plainly the purpose of Defendants' introduction in its Opposition Brief was to have the taxpayers shift their anger from the School District to the victims, i.e., the Robbins family, the Hasan family, and all the other students and their families who were spied upon by the School District.  This is unfortunate, since it is clearly the Defendants which has brought upon the School District the two lawsuits because of its failure to adequately implement a technology which it fully appreciated, but chose not to regulate.  Further, while it is Plaintiffs' normal practice to keep settlement discussions confidential, because Defendants suggest that it is Plaintiffs who are delaying resolution of this matter, Defendants should come clean with the taxpayers about their failure to take advantage of the opportunity to amicably resolve this matter long before the majority of the fees at issue in the instant Motion were incurred.

their efforts went unanswered, but as set forth in detail below, the School District's Director of Information Systems, George Frazier, was also unable get the School District to stop using the Theft Track software to take screenshots and webcam pictures of students.  Surely if the School's own IT Director was unable to stop the practice, what chance did a mom have to get the surreptitious surveillance stopped?

What may be even a more important reason not to have notified the School District in advance of its illegal activities is the fact that, based upon the conduct that occurred immediately after this lawsuit was filed (see Carol Cafiero's Deposition testimony set forth below concerning the deletion of pictures after the lawsuit was filed), it is not unreasonable to conclude that without the protection of a Court Ordered Injunction to preserve evidence, that the School District, once notified of it illegal conduct, would have taken whatever steps were necessary to eliminate the evidence of their unlawful  conduct, such as deleting all of the images and other evidence, including emails.

The *Philadelphia Inquirer* described Lower Merion School District's Response to Plaintiffs' Counsel's Request to be paid for the legal time and costs as one of "Go Pound Sand."  Actually, this phrase, "Go Pound Sand" could be better used to describe the School District's response to every effort made by students and faculty to stop the use of its Theft Track to spy on students in their home prior to the filing of the lawsuit.  These efforts are chronicled in the *May 3, 2010* Report prepared by Ballard Spahr (the "Ballard Report") and numerous newspaper articles covering the litigation  and can be summarized as follows:

On August 11, 2008, weeks before the district handed the laptops out to students, a Harriton High School student interning in the school's IT Department sent an email to DiMedio, with the subject line: "1:1 concern (Important)". (see Fernandez, Bob (May 2, 2010). "Student foresaw Web-cam troubles". The Philadelphia Inquirer; Martin, John P. (February 22, 2010), "Laptop camera snapped away in one classroom". The Philadelphia Inquirer; and the Ballard Report). He said that he had recently learned of the district's purchase of LANrev, and had researched the software. *Id.* He had made the "somewhat startling" discovery that it would allow school employees to monitor students' laptops remotely. (see Gregg Keizer (May 4, 2010). "Report blames IT staff for school Webcam 'spying' mess".)

He wrote:

I would not find this a problem if students were informed that this was possible, for privacy's sake. However, what was appalling was that not only did the District not inform parents and students of this fact ... [W]hile you may feel that you can say that this access will not be abused, I feel that this is not enough to ensure the integrity of students, and that even if it was no one would have any way of knowing (especially end-users). I feel it would be best that students and parents are informed of this before they receive their computers.... I could see not informing parents and students of this fact causing a huge uproar. (see Ballard Report ).

DiMedio responded:

[T]here is absolutely no way that the District Tech people are going to monitor students at home.... If we were going to monitor student use at home, we would have stated so. Think about it—why would we do that? There is no purpose. We are not a police state.... There is no way that I would approve or advocate for the monitoring of students at home.

I suggest you take a breath and relax. *Id.*

DiMedio then forwarded the e-mails to District Network Technician Perbix, who suggested a further response to the student intern. With DiMedio's approval, Perbix e-mailed the student intern, also dismissing the student's concern:

[T]his feature is only used to track equipment ... reported as stolen or missing. The only information that this feature captures is IP and DNS info from the network it is connected to, and occasional screen/camera shots of the computer being operated.... The tracking feature does NOT do things like record web browsing, chatting, email, or any other type of "spyware" features that you might be thinking of.

Being a student intern with us means that you are privy to some things that others rarely get to see, and some things that might even work against us. I assure you that we in no way, shape, or form employ any Big Brother tactics, ESPECIALLY with computers off the network. *Id.*

In addition, two members of the Harriton High School student council twice privately confronted their Principal, Steven Kline, more than a year prior to the suit. They were concerned "that the school could covertly photograph students using the laptops' cameras." *Id. See also*, Martin, John P. (March 21, 2010). "How a lawsuit over school laptops evolved". The Philadelphia Inquirer. Students were particularly troubled by the momentary flickering of their webcams' green activation lights, which several students reported would periodically turn on when the camera wasn't in use, signaling that the webcam had been turned on. *Id.* Student Katerina Perech recalled: "It was just really creepy". *See* Moore, Martha T. (May 3, 2010). "Pa. school district's webcam surveillance focus of suit". USA Today.   Some school officials reportedly denied that it was anything other than a technical glitch, and offered to have the laptops examined if students were concerned. Kline says that he admitted that the students' suppositions were true, and the students told him they were worried about privacy rights. The students also asked whether the school system read the saved files on their computers, and said that students should be notified. At the end of the day, however, no such action was taken. *See* Martin, John P. (February 22, 2010). "Laptop camera snapped away in one classroom". The Philadelphia Inquirer; *see also* the Ballard Report.

In addition to the efforts of students to stop the practice of using the students' laptops to spy on them in their homes, **even the head of the IT Department's efforts to stop the practice were rebuffed.** Carol Cafeiro testified in her deposition, under oath, that the Director of Information Systems, George Fraser, in November, 2010, attempted to stop the use of the Theft Track because of a lack of policies and procedures but his efforts were dismissed by Steve Kline, Principal of Harrington, Shawn Hughes, Principal of Lower Merion High School, and Assistant Principal Marseille Wagner.   Cafieoro's testimony was as follows:

> **Question:**   Now who were the principals that were at this meeting that you're talking about?

> **CAFIERO:**   Steve Kline, principal of Harriton, Shawn Hughes, principal of Lower Merion High School, and Marseille Wagner, an assistant principal at Lowere Merion High School.

> ........

**Question:** So your recollection is there was generally just a conversation in which the principals talk about they like the way tracking was -- was being used and they wanted to continue to use it and George Fraser's position was we should stop using until we get a policy and procedures in place so that everybody knows what their doing and how to do it; is that a fair statement?

**CAFIERO:** That's fair. And the principals especially, they all -- when the – during the discussions, they were speaking intelligently about the product, the Theft Track product. Nobody seemed to be unclear or needed explanation of what is that your talking about. Everybody seemed to be fully aware of what their – what they were talking about.

**Question:** So you didn't -- at the meeting it didn't appear that anybody needed to be explained how the system really worked, what it could do, its capabilities? From the conversations, you were lead to believe that the principals who were there understood all that?

**CAFIERO:** Yes. (see Cafiero Deposition page 47, ln 3, through page 50, ln 4 which are attached hereto as Exhibit "A". The entirety of Carol Cafiero's deposition is not being produced at this time. If the Court desires the entire transcript, it will be provided)

Based upon the above, it is reasonable to conclude that Mrs. Robbins' efforts after her son was spied upon to get some resolution of the use of the Theft Track to access student laptops fell upon "deaf ears", just like everybody else's previous efforts to stop the practice.

While the foregoing evidence confirms that notifying the School District in advance would not have accomplished the desired result of cessation of use of the invasive software and other necessary protections, it more than likely would have resulted in the destruction of the evidence of the spying. In this case, even after the lawsuit was filed, it appears that the School District attempted to destroy

evidence of the images that it had captured through its spying activities. This deletion of files was noted by the District's own investigative report, the L3 Report. (*See* L-3 Report, page 16). In fact, Carol Cafiero, in her deposition, took great pains to make it clear that while she was ordered to turn off tracking on the date the School District learned of the lawsuit (i.e. February 18, 2010), she did so without activating the button used to purge the information on the system. Notwithstanding this, the day after she turned off the tracking, the information on the system had been purged. In questions relating to the L-3 Report, Carol Cafiero testified as follows:

> **Cafiero:** This is the L3 Report prepared for Ballard Spahr, page 16. At the bottom of the page, the paragraph titled LANrev February 18, 2010 record deletion.

> **Mr. Haltzman:** O.K.

> **Cafiero:** The paragraph indicates that data had been deleted from the LANrev database as observed by a difference in the file size between February 18th and 19th and I did not delete any data from the LANrev database. I don't know who did or could have but I did not delete anything. ...

> **Question:** O.K. What this Report is saying, Mrs. Cafiero, is that somebody, according to this Report, deleted Tracking records, i.e., the pictures?

> **Cafiero:** That's the way I read it.

> **Question:** That's how you read it?

> **Cafiero:** That's how I read it and I'm stating that it was not me. I did not delete anything.

> **Question:** O.K. It doesn't say in the L3 Report that it was you who did it, it just says someone deleted something?

> **Cafiero:** That's correct.

**Question:** And you just want to make it clear that it wasn't you?

**Answer:** Correct.

**Question:** But Michael Perbix also had access to the system, correct?

**Cafiero:** Yes. (*see* Cafiero Deposition page 294, ln 16, through page 296, ln 12 attached hereto as Exhibit "A")

Based upon the above conduct by someone in the School District to attempt to destroy evidence after the lawsuit was filed, it is fair to assume that had the School District been given advance notice of the illegal activity that had been occurring for almost two years, it would have immediately taken steps to delete all evidence of its illegal activity, including purging files and other documentary evidence, including emails, which, because of the lawsuit, and the injunction that was entered by the Court at the very beginning of the case, have been somewhat preserved.

Notwithstanding the above, and as the Defendants are well aware, there is no legal authority for the proposition that a Plaintiff has an obligation to notify the Defendants of the its illegal conduct before bringing a lawsuit or that the failure to notify the Defendants prevents counsel in a civil rights case from being able to recover legal fees under the fee shifting provisions of §1988 and the other statutes on which Plaintiffs' claims are based.

### C. Contrary To Defendants' Contentions, Plaintiffs' Computer Consulting Fees Are Recoverable Under §1988

Defendants argue that §1988(c) limits the award of expert witness fees to claims brought under §§1981 and/or 1981(a), and because Plaintiffs' action is

brought pursuant to §1983, "there is no authority for shifting Mr. Steinbach's fees to the District." (Defendants' Opposition p.34). To the contrary, there is authority for the proposition that plaintiff may recover fees of *consulting* experts, who are not testifying expert witnesses in the traditional sense, who assist the attorney in preparing the case and understanding the relevant subject matter – in this case complex computer technology  -- thereby serving in essence as a substitute for lawyer time and enhancing the efficient prosecution of the matter.[3]

For example, in an analogous situation in *Interfaith Community Organization v. Honeywell International, Inc.*, 236 F.Supp. 2d 370 (D.N.J. 2004)[4], the court granted petitioner's request for compensation for non-testifying consultants reasoning that:

> This was a very complex environmental matter, and the attorneys involved were simply not equipped with the technical and scientific expertise necessary to efficiently deal with the complex environmental issues that arise on a day to day basis – this is precisely the reason that law firms often hire consultants. Consultants retained ICO and ECARG were necessary to prosecution of the RCRA claims and compensation for their services was appropriate as their services are necessary to the effective prosecution of ICO and ECARG's RCRA claims, and reasonable given the high degree of scientific complexity of this case.

*Id.* at 400. On appeal, the The Third Circuit observed that:

---

[3] It bears noting that none of the cases on which Defendants rely in this section of their Opposition involved non-testifying consultants.

[4] In *Interfaith* plaintiffs, as part of their fee petition in an action brought pursuant to the Resource Conservation and Recovery Act ("RCRA") sought to recover, *inter alia*, fees incurred by non-testifying consultants who provided expert guidance to plaintiff's counsel in a complicated environmental litigation.  Section 7002(e) of the RCRA provides that a court "may award costs of litigation fees (including reasonable attorneys' fees and expert witness fees) for any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate." Defendant argued that plaintiff should not be permitted to recover for the time and expense of three non-testifying consultants, asserting that said time and expense was not recoverable under the statutory fee provision.

The Supreme Court has held that the phrase "reasonable attorneys' fee" can encompass work performed by individuals who are not attorneys.  See *Missouri v. Jenkins ex.rel. Agyei*, 491 U.S. 274, 285, 109 S.Ct.2463, 105 L. Ed. 2d 229 (1989).  In Jenkins, the court observed: "clearly, a reasonable attorney fee cannot have been meant to compensate only work performed personally by members of the bar.  Rather the term must refer to a reasonable fee for the work product of an attorney." *Id.*  In light of Jenkins, ICO has a strong claim that it is entitled to compensation for the work of the non-testifying experts, as they assisted the attorneys in preparing their ultimate work product.

*Interface Community Organization v. Honeywell International, Inc.*, 426 F.3d 694,

716 (3rd Cir. 2005).

In affirming the District Court's conclusion that the fees of non-testifying

consulting experts were recoverable by prevailing plaintiffs, the Court of Appeals

reasoned further that:

Experts are not only hired to testify; sometimes they are hired, also or instead, to educate counsel in a technical matter germane to the suit.  The time so spent by the expert is a substitute for lawyer time, just as paralegal time is, for if prohibited (or deterred by the cost) from hiring an expert, the lawyer would attempt to educate himself about the expert's area of expertise.  To forbid the shifting of the expert's fee would encourage under specialization and inefficient trial preparation, just as to forbid shifting the cost of paralegals would incur lawyers to do paralegal work.

*Id.* at 716, quoting *Friedrich v. Chicago*, 888 F.2d 511, 514 (7th Cir. 1989).

The Third Circuit went on to state:

The purposes of the RCRA fee shifting provision would not be well served by prohibiting reimbursement for fees of non-testifying experts, at least to the extent that these experts "educate counsel in a technical manner germane to the suit."  It is not unreasonable to expect that attorneys will rely on experts to educate them as to scientific and technical issues involved in a given case.  Indeed, as the Seventh Circuit observed, prohibiting reimbursement for the fees of non-testifying experts would simply encourage attorneys to educate themselves, undoubtedly at a higher cost.  Thus, we will affirm the District Court on this point.

*Id.* at 716-717. Although *Interfaith* did not involve a civil rights claim, similar reasoning has been applied in the context of a §1983 action as well. *See BD DeBuono,* 177 F.Supp2d 301 (S.D.N.Y.2001)(awarding attorneys fee including fee for trial consultants in §1983 action; reasoning that "[t]hey are consulted by litigators to hone their trial skills in the context of a particular case. It seems to this Court that litigation consultants, used in the manner that plaintiffs' counsel used them here, are the equivalent of additional attorneys or legal para-professionals. The services they provide are not those of an expert witness, which has been the traditional purview of 'expert fees.'" [Consultant] provided neither substantive testimony nor information relating to the underlying dispute. Therefore, even though they are expert at what they do, they do not fall within the rubric of "experts" as that term traditionally has been used."). *See also. Guillemard Ginorio v. Contreras,* 603 F.Supp.2d 301 (D.Puerto Rico 2009) (in §1983 action court agreed with defendant that recovery of payments to constitutional law consultant was unnecessary but only because plaintiff hired an expensive attorney because of his own expertise in civil rights litigation).

In this case, Plaintiffs' use of a computer consultant is synonymous with petitioner's use of consultants in *Interface Community Organization* and *BD DeBuono.* The instant case presents highly technical forensic computer issues, of which counsel for Plaintiffs was not knowledgeable. Mr. Steinbach's work clearly served the purpose to "educate counsel in a technical manner germane to the suit." Without the benefit of Mr. Steinbach's services, Mr. Haltzman would not have been capable of understanding exactly what conduct by the District was

deserving of injunctive relief, nor the scope of the injunctive relief required to ensure that such wrongful conduct never happened again. Mr. Steinbach's reasonable time and fees are fully recoverable on that basis.[5]

**D.    The Consultant Fees Are Also Recoverable Under The Fee Shifting Provision Of The Electronic Communications Privacy Act And The Stored Communications Act.**

Moreover, the fees at issue are also recoverable under the fee shifting provisions of the Electronic Communications Privacy Act and the Stored Communications Act. Plaintiffs' Complaint sets forth claims pursuant to both the Electronic Communications Privacy Act, 18 U.S.C. §2511, *et seq.* ("ECPA") and the Stored Communications Act, 18 U.S.C. §2701, *et seq.* ("SCA"). Section 2520 of the ECPA provides:

> (a)    Except as provided in §2511(2)(a)(ii) [not applicable] any person whose wire, oral or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may, in a civil action, recover from the person or entity which engaged in that violation such relief as may be appropriate.
>
> (b)    In an action under this section, appropriate relief includes –
>
>     1.    such preliminary and other equitable or declaratory relief as may be appropriate;
>
>     2.    damages under such subsection (c) and punitive

---

[5] Mindful of the Court's suggestion that it may not be necessary to "redo in the entirety" the L3 investigation, Plaintiffs' computer consultant only investigated <u>one</u> of four computers owned by Michael Perbix.  The School District position is that Plaintiffs should not recover for the cost for an independent investigation to "test" the accuracy of L3 findings and to have sufficient information to formulate permanent injunctive relief.  This position is solely without merit as for Plaintiffs not to have performed testing on at least one of the computers involved in the surreptitious activities would have been to abdicate the responsibilities to protect the class members from the Plaintiffs to the Defendants.  Plaintiffs have not and will not allow Defendants to "investigate themselves" without oversight.  Further, the investigation done by Plaintiff's consultant has revealed discrepancies in L-3 findings which will necessitate the need to do further investigation of the information already obtained from Perbix's computer.  This need for additional information will be the basis of a forth coming motion if Defendants and Plaintiffs are unable to agree on a methodology to allow Plaintffs' computer consultant to do the required follow up analysis.

damage for appropriate case; and

      3.    a reasonable attorneys' fee and other litigation costs reasonably incurred.

Accordingly, in the instant case, to the extent that relief was or will be granted on the claim that Plaintiffs' electronic communications were intercepted and disclosed in violation of the ECPA, Plaintiffs may recover, *inter alia*, a "reasonable attorneys' fee and other litigation costs reasonably incurred."[6]

Likewise, Section 2707 of the SCA provides:

(a)    Except as provided in §2703(e) [not applicable] any provider of electronic communication service, subscriber or other person agreed by any violation of this chapter in which the conducts constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity which engaged in that violation, such relief as may be appropriate.

(b)    In an action under this section, appropriate relief includes –

      1.    such preliminary and other equitable or declaratory relief as may be appropriate;

      2.    damages under such subsection (c) and punitive damage for appropriate case; and

      3.    a reasonable attorneys' fee and other litigation costs reasonably incurred.

Accordingly, to the extent relief has been granted, or will be granted, under the SCA by the District, Plaintiffs may obtain, *inter alia*, a reasonable attorneys' fee and "other litigation costs reasonably incurred." There are no express limitations

---

[6] It bears noting that the allocation of attorneys' fees and costs to recovery under the various statutes alleged to have been violated is yet another reason why findings of fact and conclusions of law are critical to entry of permanent injunctive relief. See Plaintiffs' prior submission on issue of requirement of findings of fact and conclusion of law for Permanent Injunctive Relief.

in either the ECPA or the SCA with respect to the "other litigation costs" obtainable by prevailing plaintiffs.

In sum, Plaintiffs' Mr. Steinbach's consulting fees are clearly recoverable pursuant to the ECPA and/or SCA.

**E.   Because Plaintiffs' Taking of Depositions Was Essential To A Full Understanding Of The Manner And Method By Which The District Invaded Students' Privacy, And Was Therefore Essential To The Crafting of Appropriate Injunctive Relief, Plaintiffs' Fee Petition With Respect To The Costs Incurred With Respect Thereto Should Be Granted.**

Defendants argue that Plaintiffs' Fee Petition should be denied with respect to all time incurred in the taking of five depositions, related motion practice and the video taping of said depositions, on grounds that said depositions were directed solely to issues of damages and unrelated to Plaintiffs' equitable claims.[7] (Defendant's Opposition pp.10-13)  In reality, nothing could be further from the truth.

The five depositions taken by Plaintiffs' counsel were specifically directed to gain an understanding, from the very persons actually involved, as to the specific manner and methods by which they were able to violate student privacy rights via the use of the LANrev software.  In stark contrast to the **forty four** persons Defendants interviewed according to the Ballard Report, pursuant to the Court's directive, Plaintiff limited its depositions to five persons whom Plaintiffs were led to believe had the most knowledge of how the LANRev was used to spy on the Students.  While some of the questioning was indeed directed to the

---

[7] Plaintiffs' counsel deposed five individuals: Lindy Matsko, Harriton High School Assistant Principal, Janet DiMedio, former Director of Technology, Carol Cafiero, Information Systems Coordinator, Michael Perbix, Network Technician, and Kyle O'Brien, Building Level Technician.  At the time of the depositions of Perbix and Cafiero, they were on administrative leave.

circumstances surrounding the surreptitious surveillance of Blake Robbins, this was only a small portion.  In fact, two of the witnesses, DiMedio and Cafiero, had no involvement on spying on Blake Robbins but had knowledge of the policy and procedures for activating the webcam and taking screen shots.   The others deponents, Perbix, Matsko and O"Brien, while having information about the spying on Blake Robbins, also had general information on how LANRev was used to spy on other students.  It was reasonable to assume that the same or similar methods used to spy on Blake Robbins were also used with respect to all other students who were spied upon. In contrast, as noted above, the District interviewed 44 individuals who they believed had information about the allegations in the lawsuit.

As this Court is well aware, a full appreciation by Plaintiffs' counsel of the manner and methods of Defendants use of the LANrev technology was an essential pre-requisite to the drafting of appropriate equitable relief.  How were Plaintiff's counsel and/or this Court to know precisely **what** conduct needed to be enjoined prior to discovery of the scope of Defendants' wrongful conduct? Appropriate injunctive relief cannot be drafted in a factual or legal vacuum. Rather, it must be premised upon facts, not supposition, and broad enough to enjoin all of Defendants' wrongful conduct.   Without a full appreciation of the nature and scope of Defendants' conduct, which appreciation was gained by, *inter alia,* the taking of the five depositions, sufficiently broad injunctive relief could never have been framed.  Accordingly, the taking of the five depositions was a necessary predicate to the drafting of appropriate equitable relief.

Because the knowledge derived from these five depositions was crucial to the drafting of appropriate injunctive relief, all of the time incurred with respect thereto, including the required motion practice, was necessary, reasonable and should be recoverable by Plaintiffs.   That the depositions taken by Plaintiffs' counsel produced needed information is buttressed by the fact that the District Court cited to the deposition testimony in the Ballard Report to show the completeness of its investigation: "We reviewed the deposition testimony given in the Robbins  Litigation by Ms. Cafiero, Ms Matsko, Mr. Perbix and Mr. O'Brien" (see Ballard Report, page 13) and later, on p57 of the Ballard Report, the Ballard Report highlights the contradictory deposition testimony between O'Brien and Matsko.

Defendants also argue that the expense of videotaping the five depositions was unnecessary and therefore not recoverable. (Defendants' Opposition pp.11-12). However, there were good and sufficient reasons for Plaintiffs' decision to videotape all deponents.  First, Cafiero and Perbix were placed on administrative leave by the District, and there was no assurance that said deponents would be retained and therefore still be available to testify at time of trial.  Moreover, DiMedio was an ex-employee of the District whose whereabouts at time of trial could not be certain.  Accordingly, the videotaping of the depositions of Cafiero, Perbix and DiMedio were done as a precautionary measure to insure, if they left the area prior to trial, their testimony would be preserved.  Related to this issue of preservation of testimony is the fact that the Court could have ordered a preliminary injunction hearing at any time, and the

availability of all five witnesses at the time and date chosen by the Court for said hearing was also uncertain. Finally, if any or all of these witnesses were unavailable at time of trial and/or hearing, an assessment of their credibility is far more effectively made based upon a videotaped deposition than upon the reading of a dry transcript. Accordingly, the cost of videotaping the five depositions was reasonable and necessary and therefore should be recoverable by Plaintiffs.

### F.    Plaintiffs Can Recover Now For Legal Services Performed After The Date Of Last Court Order Entered.

Beginning at page 29 Defendants argue that Plaintiffs are not entitled to recover attorneys' fees for any work performed after May 14, 2010, when they prevailed in obtaining preliminary injunctive relief. The only authority defendants present is the decision in *Institutionalized Juveniles,* 758 F.2d, 897, 920 (3rd Cir. 1985), in which the appellate court merely stated, in a case that had already been litigated to final judgment, that it was within the district court's discretion to disallow fees for time spent litigating the case "after the last benefit is won from the defendant because the expenditure of such time is equivalent to expending time litigating particular claims that are unrelated to the relief ultimately obtained." *Id.*[8] Far from mandating the result Defendants' seek here, however, the Third Circuit Court of Appeals emphasized that it is improper to decide whether or not

---

[8] The case involved an action by institutionalized juveniles challenging Pennsylvania law related to mental health facility admission and commitment proceedings. After the Commonwealth enacted laws which effectively granted the relief sought, the claim was determined to be moot and judgment was entered in defendants' favor, but plaintiffs were considered prevailing parties for purposes of their entitlement to reasonable attorneys' fees. It was in this context that the district court found that the last benefit received by plaintiffs came as a result of the promulgation of regulations in 1976 and that time spent after that was not compensable. Plaintiffs in the *Robbins* case have not received their last benefit under any reasonable interpretation of the matter.

plaintiffs prevailed as to specific hours, but rather the disallowance of hours is pursued under the mandate of the United States Supreme Court, "to ensure that the final award of fees is reasonable in light of the benefits received by plaintiffs." *Id* at 919 (*citing Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed. 40 (1983)). Not only does the *Juveniles* opinion not establish any bright line test of the date on which attorneys fees are no longer recoverable, and make the point that the disallowed fees in that case were for work *unrelated* to the relief obtained – not the case here[9] -- but also the ruling is expressly "**limited to cases which have been litigated to a final judgment** prior to the consideration of the application for fees." *Id.* at n. 36 (emphasis added). Indeed, the court expressly noted that the result might very well be different if the court were considering an award of fees [as here] "in a case that involved the ongoing enforcement of a structural (institutional reform) injunction, when enforcement, after final judgment, may come in discrete stages." Id.

More pertinent to the facts in this case are the authorities holding that time spent post relief is compensable where the time is spent related in part to the relief, such as to implement, monitor and enforce the relief. These authorities confirm that, contrary to Defendants' argument, compensable attorneys' fees do not automatically cease on the date that a favorable judgment is entered. *See, e.g.,* 42 U.S.C.A. §1988, Annotations (*citing CJS Civil Rights §502* (*citing cases

---

[9] Here, plaintiffs seek to recover attorneys' fees for services that are related to the May 14, 2010 relief. For instance, included in the actions post the May 14, 2010 Court Order is the time spent to confer with defense counsel and meeting with Magistrate Judge Rueter to address the issue of what to do about those families that have not responded to the letters sent giving them the opportunity to view the images surreptitiously taken. Those discussions resulted in the drafting of an additional letter, in which plaintiff's counsel participated, and ultimately with a culmination of that activity. See letter to Judge Dubois dated July 29, 2010 setting forth the status of the efforts to notify students and families attached hereto as Exhibit "B".

to support principle that ("time spent on post judgment activities such as the monitoring, implementation and enforcement of a judgment are compensable where reasonable and necessary.") and *Federal Procedure, Lawyers Edition* §11:82 (citing cases to support proposition that "In the context of fee requests under 42 U.S.C.A. §1988 post judgment monitoring of a consent decree and efforts to enforce the defendant's compliance with the judgment are compensable activities for which counsel is entitled to a reasonable fee."))[10].

**G.     Plaintiffs' Counsel's Work In Furtherance Of Obtaining Equitable Relief Has Been, To Date, Inextricably Intertwined With Any Work Related To An Assessment Of Damages, Such That Said Work Cannot Be Parsed As Argued By Defendants.**

As set forth above with respect to the five depositions taken by Plaintiffs' counsel, Defendants bald assertion that said depositions were "irrelevant to equitable relief" (Defendants' Opposition p.30) is without merit.   Similarly, Defendants' assertion that Plaintiffs' Interim Fee Request should be greatly reduced because "the overwhelming majority of the work for which Plaintiffs seek reimbursement was not related or necessary to equitable relief, but rather directed to the pursuit to individual damages claims..." (Defendants' Opposition p. 1) is hyperbole and is also wholly without merit.

In reality, all of the work of Plaintiffs' counsel to date has been done with respect to the case as a whole, in an effort to discover and understand the parameters of Defendants' wrongful conduct.   Moreover, at this early stage of the litigation, where Plaintiffs' counsel's time has been predominately spent

---

[10] Defendants' argument is meritless for another reason; inasmuch as Defendants have conceded the propriety of entry of a permanent injunction order, the legal services at issue also could fairly be characterized as pre-judgment services.

uncovering the nature and scope of Defendants' wrongful conduct, it is difficult if not impossible to separate the liability issues from the limited amount of time spent on damage issues. While some of the discovery completed to date will be useful in a later assessment of individual damages by those members of the class who file lawsuits for damages, that **same discovery** was needed to justify and define the Court's imposition of Preliminary Injunctive Relief. Where, at this early stage of the litigation, issues of liability and damages are inextricably intertwined, it would be most inappropriate to separate the inseparable: that is the work related to liability from the work related to damages. *See Norton v. Wilshire Credit Corp.*, 36 F.Supp. 2d 216, 220 (D.N.J. 1999) (In the context of plaintiff's petition for an award of attorney's fees pursuant to the Fair Debt Collection Practices Act, "[T]he work done by the petitioner on separate claims was inextricably intertwined and it is unnecessary, in this case, for the plaintiff to document exactly which claim is being worked on. No reduction will be made on this basis.").

As this Court is well aware, the current Motion for Class Certification is for Equitable Relief only and not damages. While there may come a time later in this litigation when the effort of Plaintiffs' counsel will focus upon the issue of damages if this case is not certificated as a Class Action, such time has not yet occurred.[11]   Accordingly, Defendants' argument that Plaintiffs' counsel's time

---

[11] To support Defendants' contention that "work [was] explicitly devoted to damages claims and issues" (Defendants' Opposition p. 27), Defendants cite to 21.8 hours at a cost of $6,005.00 with respect to legal research pertaining to damages. A substantial part of this research was done in response to the Court's direction that the parties attempt to settle prior to class certification. This research was necessary in order for Plaintiffs understand and argue precisely what damages they were entitled to pursuant to the claims made in Plaintiffs' Complaint. Plaintiffs should not be penalized for work performed in furtherance of the Court's directive.

directed to damages claims should be parsed out of Plaintiffs' interim fee award should be rejected.

As this Court is also well aware, Plaintiff litigated this case in a manner that would limit the amount of depositions taken, and the amount of discovery done, in an effort to reduce the legal fees and costs incurred.  Plaintiffs worked with defense counsel in formulating several preliminary injunctions without the need to ever have a formal hearing which would have surely caused additional legal time for both parties.  In fact, Plaintiffs ultimately dropped the demand for damages for the entire class, and, based upon conferences with all parties, moved forward with certifying a class for equitable relief only, so that this case could be quickly resolved for the benefit of all affected students and their families. It is the Defendants that have now taken upon themselves to "change their minds", no longer want a class to be certified, but want to "substitute" for the class a permanent injunction, but only if the Court enters the permanent injunction without making any findings that the School District violated any law.

H.     **Plaintiffs are a Prevailing Party.**

It is clear for the reasons set forth in the original Motion for Interim Fees that Plaintiffs were the prevailing party in obtaining all of the relief that has been obtained, including the fact that, as a direct result of Plaintiffs' work, Defendants now seek to convert all of the Preliminary Injunctive Relief obtained into a permanent injunction.  Defendants' Response "raises" the prevailing party issue but does not set forth any legal or factual basis to support a denial of Plaintiffs' Prevailing Party Status.  Further, based upon the conference held with this Court

on Monday, August 16, 2010, it is Plaintiffs' understanding that no further argument or legal research needs to be done on this issue.[12]

## I.  Plaintiff Has Adequately Set Forth The Qualifications Of Those Time Keepers Most Involved In The Litigation.

Defendants' complain that the Plaintiffs have not adequately set forth the criteria of all the lawyers involved in working on this matter and therefore, should be denied compensation.   In an effort to minimize the cost, Plaintiff merely provided Affidavits as to the three main attorneys who were involved in this litigation.   A   simple   view   of   Plaintiffs'   law   firm's   website   at www.lammrubenstone.com would have given Defendants access to background information on all the attorneys within Lamm Rubenstone LLC.   Rather than take this simple step, Defendants decided to spend taxpayers' money by objecting to something that they could have easily checked.   In fact, the time that it would have taken for them to go to the Lamm Rubenstone website would have been substantially less than the time the Defendants spent complaining about this "failure" to provide the additional information.[13]

---

[12] Plaintiffs continue to be mindful of using their best efforts, as they have through the initial stage of this litigation, to minimize the legal expenses which will ultimately be borne by the School District since it is clear that the School District violated, at a minimum, the civil rights of its students and their families through the surreptitious use of laptops to capture pictures and communications.  If Plaintiffs have misunderstood the Court's directive on the prevailing party Issue, however, it is respectfully requested that Plaintiffs be given the opportunity to reply to the assertion that Plaintiffs are not prevailing parties for purposes of recovering attorneys' fees.

[13] Attached hereto as Exhibit "C", is the biographical information on all the attorneys that had any involvement with working on this case, with the exception of Julie B. Master, who was only with the firm a short period of time before accepting an in house position with a local company. Mrs. Master was a 1999 graduate of Temple Law School and was admitted to the Bar of Pennsylvania and the Bar of New Jersey.

**J.** **All Costs Listed On The Interim Fee Are The Type Of Costs Normally Billed To Clients.**

Defendants object to payment of the "costs" set forth in the Motion because no place within the actual Motion for Interim Fees, was it specifically stated that the "costs" were the type of "costs" that Lamm Rubenstone typically charges to its clients. Since the billing of these types of costs to clients is the norm within the legal community, it would not surprising to find that these same "costs" were included in the bills the School District submitted to its insurance carrier, Graphic Arts, for payment. Again, Defendants argument on this issue is clearly frivolous. To the extent that it was not specifically stated in the Motion, all of the "costs" set forth in the Motion for Interim Fee are the type of costs which Lamm Rubenstone normally charges through to its client on a regular basis.[14]

**K.** **Plaintiffs Are Entitled To Recover Fees For Legal Work Even If That Legal Work Was For Motions Not Actually Filed.**

Defendants again waste taxpayers' money by asserting the argument that Plaintiffs should not recover for legal time spent preparing Motions which it did not ultimately file. Such a result is preposterous. To accept the Defendants' argument is to encourage Plaintiffs to never work out any dispute once it has already started drafting a Motion to enforce a particular right. In fact, under the Defendants' argument, Plaintiff should have filed all of the motions that it

---

[14] Defendants raise an issue that the costs include invoices for depositions transcript and videotaping in excess of the amount of depositions taken. There were actually 6 depositions as Ms. Cafiero's deposition was taken twice. This is exactly the type of issue that could have been addressed without the need to include it in Defendants' Opposition had Defendants raised it with Plaintiff's during the Court ordered meet and confer. Plaintiffs have emailed to Defendants the actual invoices to try to resolve this issue. If an error was made, Plaintiffs will make the necessary correction.

prepared, and then Defendants would have to spend even more taxpayers' dollars responding to those motions, and on the hearing that the Court would have been required to hold. Instead, as is the custom and practice with most attorneys who regularly practice litigation, when a dispute arises a motion is begun in the event that a dispute cannot be amicably resolved. This was particularly true as the parties were working under a very short window to conduct the initial discovery phase. In fact, in this case, when Plaintiff would advise Defendants that it had prepared and was ready to file a motion for a particular relief, it was only then that Defendants either voluntarily agreed to what the Plaintiffs were seeking or sent a letter to the Court requesting a "conference" to avoid the filing of that motion, because Defendants did not want the "publicity" that would result if the Motion was filed.

## L.     IT Acceleration Costs Was Clearly Known To Defendants.

In another waste of time and money, Defendants complain about the charge of $419.23 to IT Acceleration. Defendants are well aware that this "cost" was fifty percent of the charge for IT Acceleration to take possession of and make a duplicate copy of the hard drive of Blake Robbins computer. Defendants know this because Defendants were billed by IT Acceleration for the other fifty percent. Again, Defendants waste taxpayers' money complaining about a charge in which they fully knew all about.[15]

---

[15] . Again, this is exactly the type of issue that could have been addressed without the need to include it in Defendants' Opposition had Defendants raised it with Plaintiff's during the Court ordered meet and confer.

**M.**   **Plaintiffs Are Entitled To Recover Fees For Work Performed Opposing The Wortley Intervention Motion**

At page 31 of the Opposition Brief, Defendants argue that Plaintiffs unnecessarily opposed the Wortley intervention motion and that it did not contribute to Plaintiff's success in obtaining equitable relief. To the contrary, this was not a situation in which a third party sought to intervene and Defendants took no position on the issue that might subject them to liability for Plaintiffs' legal fees in opposing the intervention. Rather, in this situation, the Defendants actively supported the intervention of the Wortley's Intervenors because their interests were aligned with Defendants against Plaintiffs. This was not the case with the Neill Family Intervenors who Plaintiffs did not oppose as they were not aligned with Defendants, but only sought to insure that the civil rights of the LMSD students and their families were protected. Given the alignment of the Wortley intervenors with Defendants, Plaintiffs were compelled to oppose the Wortley intervention in order to successfully prosecute their claim. The fact that Plaintiffs took into account the position of the Wortley intervenors in connection with the entry of preliminary injunctive relief is further evidence of Plaintiffs desire and willingness to avoid contention where possible, and is by no means a basis to deny Plaintiffs their statutory mandated attorneys fees.

**N.**   **Plaintiffs Are Entitled To Recover Fees For Work in Drafting the Motion for Class Certification.**

Defendants also want to complain that the time spent drafting the Motion for Class Certification was "unnecessary and counterproductive". (see p18 of

Defendants Opposition). As this Court is well aware, during several conferences with the Court, it was specifically discussed that the case would be moving forward with the Plaintiffs filing a Motion for Class Certification for Equitable Relief Only. At no time during any of these conferences with the Court did Defendants ever suggest to the Court or Plaintiffs that they were not in agreement that the best way to proceed to provide all the students and their families was not through a equitable class. Plaintiffs should not be penalized for proceeding with preparing documentation in accordance with its understanding of how all the parties desired this case to proceed. Further, as a direct result of the filing of the Motion for Class Certification, the Defendants filed a cross motion seeking to have the Court enter against them a Permanent Injunction solely to avoid having the class certified. As such, the work on the Motion for Class Certification has already served a tangible benefit.

### O.    Plaintiffs Are Entitled To Recover Their Legal Fees In Preparing This Reply To Defendants' Response To It.

In the same manner as the case law set forth in the original Motion for Interim Fees, the legal fees incurred in filing this reply are also recoverable. This is particularly true in this situation in which the scope and breadth of Defendants Opposition was entirely unnecessary and contrary to the tenor in which the Court had requested that this case proceed. In fact, after the Opposition was filed, this Court gave Defendants a second opportunity to work out something with Plaintiffs to avoid the need for Plaintiffs to incur the additional legal time to file a Reply. The Defendants declined.

Attached hereto as Exhibit D is the Detailed Billing Report for legal time

necessary to prepare the Reply to the Defendants' Opposition Memorandum of Law.   The Opposition Memorandum was 38 pages long, cited to 39 cases and five statutes.   In addition to the legal citations, the Opposition Memorandum cited to alleged factual information which was contained in the 69 page Ballard Report and the 44 page L-3 Forensics Analysis.   Due to the length and breadth of the factual and legal arguments made in the Opposition Memorandum, and the refusal of Defendants to concede on <u>any</u> of the issues raised when given the opportunity by the Court during the telephone conference which was held after the Opposition was filed, the time spent was reasonable and necessary to prepare a complete Reply to all the issues raised.

**P.     Conclusion:**

For all of the reasons set forth above and in the Motion for Interim Fees, the Plaintiffs respectfully request that the Court enter an Order granting to Plaintiffs all of the attorneys fees and costs incurred by Plaintiffs' counsel as set forth in Plaintiffs' Motion for Interim Fees, as amended for the additional attorney fees incurred to prepare this Reply.

Respectfully submitted,

**LAMM RUBENSTONE LLC**

By:

Mark S. Haltzman, Esquire (#38957)
Frank Schwartz, Esquire (#52729)
3600 Horizon Blvd., Suite 200
Trevose, PA  19053-4900
215-638-9330 / 215-638-2867 Fax

DATED: August 2*Y*, 2010

# EXHIBIT "A"

1

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3                * VOLUME II *

               - - -

4 BLAKE J. ROBBINS, a Minor  :NO. 00665-JD
   by his Parents and Natural  :
5   Guardians, MICHAEL E.     :
   ROBBINS and HOLLY S.      :
6   ROBBINS, individually, and  :
   on behalf of all Similarly  :
7   Situated Persons,        :

8            Plaintiff,      :

9          vs.           :
                         :
10 LOWER MERION SCHOOL      :
   DISTRICT, THE BOARD OF    :
11 DIRECTORS OF THE LOWER    :
   MERION SCHOOL DISTRICT and  :
12 CHRISTOPHER W. McGINLEY,   :
   Superintendent of Lower    :
13 Merion School District,    :

14           Defendants.   :

15                - - -

16             TUESDAY, JUNE 8, 2010

17                - - -

18            Videotaped deposition of CAROL A.
   CAFIERO, held at the offices of Lamm Rubenstone, 3600
19 Horizon Boulevard, Suite 200, Trevose, Pennsylvania,
   commencing at 10:15 a.m., on the above date, before
20 Kimberly A. Hussey, Certified Shorthand Reporter and
   Notary Public.

21

22 ----------------------------------------------------------

23      B & R SERVICES FOR PROFESSIONALS, INC.
           235 SOUTH 13TH STREET
24       PHILADELPHIA, PENNSYLVANIA  19107
      (215) 546-7400  FAX (215) 985-0169

COPY

CAROL CAFIERO-VOLUME II                    47

1    Q        Did -- were you there at that meeting?

2    A        Yes.

3    Q        Who were the principals that were there at

4    this meeting that you're talking about?

5    A        Steve Kline, principal of Harriton, Shawn

6    Hughes, principal of Lower Merion High School, and

7    Marseille Wagner, an assistant principal at Lower

8    Merion High School.

9    Q        Now, at this meeting was it discussed how

10   tracking was then currently being used with these

11   principals?  You've just said that he wished that --

12   your recollection was -- and I don't want to put words

13   in your mouth --

14   A        Mm-hmm.

15   Q        -- but that George Frazier said to you on the

16   phone I wish I would have stood my ground and put into

17   place formal procedures before we did any more

18   tracking, words to that effect, correct?

19   A        Yes.

20   Q        Now, at that meeting was it discussed that

21   tracking was used for things like locating students

22   who hadn't paid insurance?

23   A        I don't remember that that item was

24   specifically discussed.

B & R SERVICES FOR PROFESSIONALS, INC.

CAROL CAFIERO-VOLUME II                              48

1    Q         What was discussed about how tracking was

2    used?

3    A         I recall the principal saying that we want to

4    keep using the system because it has helped us recover

5    laptops.  George Frazier's stance was we really should

6    have a policy in place and we should stop everything

7    until we do have a policy in place.  So the

8    principals, assistant principal and Mr. Frazier

9    continued to discuss it.  The principals were on the

10   side of keeping it going.  Mr. Frazier wanted to stop

11   and get a policy.

12   Q         Now, this was in -- when in November, do you

13   know?

14   A         It was November 10th.

15   Q         November 10th.  Was there anything discussed

16   at that meeting about the fact that what had been two

17   weeks ago, Blake Robbins' computer had been accessed

18   by the school at his home and that pictures and images

19   were downloaded, anything about that?

20   A         Nothing about Blake Robbins came up in that

21   meeting.

22   Q         Anything about there's problems, that we

23   recently took pictures of a kid at his home when it

24   was -- should not have been done, anything like that?

B & R SERVICES FOR PROFESSIONALS, INC.

CAROL CAFIERO-VOLUME II                49

1    A        Nothing.

2    Q        Any discussions of any problems that had

3    previously been experienced in terms of activating the

4    tracking when it was the wrong student's name,

5    anything like that discussed?

6    A        No, I don't recall that.

7    Q        So your recollection is there was generally

8    just a conversation in which the principals talked

9    about they liked the way tracking was -- was being

10   used and they wanted to continue to use it, and George

11   Frazier's position was we should stop using it until

12   we get a policy and procedures in place so that

13   everyone knows what they're doing and how to do it; is

14   that a fair statement?

15   A        That's fair.  And the principals especially,

16   they all -- when the -- during the discussion, they

17   were speaking intelligently about the product, the

18   TheftTrack product.  Nobody seemed to be unclear or

19   needed explanation of what is that you're talking

20   about.  Everybody seemed to be fully aware of what

21   their -- what they were talking about.

22   Q        So you didn't -- at the meeting it didn't

23   appear that anybody needed to be explained how the

24   system really worked, what it could do, its

B & R SERVICES FOR PROFESSIONALS, INC.



1   capabilities?  From the conversations, you were led to

2   believe that the principals who were there understood

3   all of that?

4   A       Yes.

5   ████████████████████████████████████████████████

6   ███████████████  --

7   ██████████████████████████████████████████████

8   ████████████

9   ████████████████████████████████████████████

10  ███████████████████████

11  ███████████████████████████████████████████

12  ███████████████████████

13  █████████████████

14  ██████████████████████████████████████████████

15  ██████████████  -

16  █████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ██████████████████████████████████████████

20  █████████████

21  ██████████████

22  ██████████████████████████████████████████████

23  █████████████████████████████████████████████

24  ██████████████████████████████████████████

CAROL CAFIERO-VOLUME II                           294

1    Q        Okay.

2    A        Is that --

3             MR. HALTZMAN:   I didn't write the

4    report?  Don't look at me.

5             THE WITNESS:  Well, that's a

6    discrepancy in the report that I'd like to

7    get on the record.

8    BY MR. MANDRACCHIA:

9    Q        Okay.  And then you have on the L-3 report,

10   page 16.

11   A        Yes.

12   Q        I guess on that report it says that on

13   February --

14   A        Do you want me to --

15   Q        February -- go ahead, you explain it.

16   A        This is the L-3 report prepared for Ballard

17   Spahr, page 16.  At the bottom of the page, the

18   paragraph titled LANrev February 18, 2010 record

19   deletion.

20            MR. HALTZMAN:  Okay.

21   A        The paragraph indicates that data had been

22   deleted from the LANrev databases as observed by a

23   difference in the file size between February 18th and

24   19th, and I did not delete any data from the LANrev

B & R SERVICES FOR PROFESSIONALS, INC.

CAROL CAFIERO-VOLUME II                    295

1   databases.  I don't know who did or could have, but I

2   did not delete anything.

3                    MR. HALTZMAN:  What page are you

4           referring to?

5                    MR. MANDRACCHIA:  Page 16.

6                    THE WITNESS:  Page 16 at the bottom.

7                    MR. MANDRACCHIA:  Here, do you want

8           to see it?

9                    MR. HALTZMAN:  I have it.

10                   MR. LANTIERI:  The L-3.

11                   MR. HALTZMAN:  This is the L-3

12          report, right?

13                   THE WITNESS:  Yes.

14                   MR. HALTZMAN:  I have the L-3 report,

15          part of the appendix and page --

16                   MR. MANDRACCHIA:  I have it

17          highlighted.

18                   MR. HALTZMAN:  Okay.

19  BY MR. HALTZMAN:

20  Q      Okay.  What this report is saying, Mrs.

21  Cafiero, is that somebody, according to this report,

22  deleted tracking records, i.e., the pictures?

23  A      That's the way I read it.

24  Q      That's how you read it?

              B & R SERVICES FOR PROFESSIONALS, INC.

CAROL CAFIERO—VOLUME II

296

1    A        That's how I read it and I'm stating that it

2    was not me.  I did not delete anything.

3    Q        Okay.  It doesn't say in the L-3 report that

4    it was you who did it, it just says somebody deleted

5    something?

6    A        That's correct.

7    Q        And you just want to make it clear that it

8    wasn't you?

9    A        Correct.

10   Q        But Michael Perbix also had access to the

11   system, correct?

12   A        Yes.

13              MR. MANDRACCHIA:  I have no further

14   questions.

15              MR. HALTZMAN:  Thank you again for

16   your time.

17              THE WITNESS:  You're welcome.

18              MR. HALTZMAN:  Best of luck.

19              THE WITNESS:  Thank you.

20              THE VIDEOGRAPHER:  This completes the

21   videotaped deposition.  The time is 4:48.

22   We're now going off the record.

23                     *  *  *

24

r

B & R SERVICES FOR PROFESSIONALS, INC.

# EXHIBIT "B"

# Ballard Spahr
LLP

1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
TEL 215 665 8500
FAX 215.864 8999
www.ballardspahr.com

Henry E Hockeimer, Jr
Direct 215 864.8204
Fax 215 864.8999
hockeimerh@ballardspahr.com

July 29, 2010

*Via Facsimile*

Honorable Jan E. DuBois
United States District Court for the
Eastern District of Pennsylvania
12613 United States Courthouse
601 Market Street
Philadelphia, PA 19106

Re   Blake J. Robbins, et al , v. Lower Merion School District, et al , No. 10-665

Dear Judge DuBois:

We are writing to apprise you of the Lower Merion School District's ("LMSD") efforts to notify affected students that LMSD had remotely captured and recovered images from their LMSD-issued laptops and to provide the affected students and their parents/guardians an opportunity to view such images  Our internal investigation found that during the 2008-2009 and 2009-2010 school years, the TheftTrack feature was activated 177 times on One-to-One program laptops.  Of those 177 activations, 101 of those activations involved use of the IP address-tracking feature, meaning that activations did not result in the collection of any images  Of the remaining activations, 36 resulted in images that were recovered after an exhaustive investigation by LMSD's computer forensic consultant.

Pursuant to this Court's Order of May 14, 2010, we met with Chief Magistrate Judge Thomas J Rueter, plaintiffs' counsel, and counsel for the American Civil Liberties Union to discuss and develop appropriate procedures to protect the interests of all affected persons. We and plaintiffs' counsel subsequently met with Judge Rueter on a number of occasions to finalize the process  These discussions resulted in the form Order issued by Judge Rueter on May 14, 2010, pursuant to which LMSD provided notice of the image-viewing process to the affected students and parents/guardians

On May 14, 2010, we sent letters via Certified Mail to thirty-five (35) affected students and their parents/guardians advising them of a date and time on which they could view the recovered images at the Federal Courthouse in Philadelphia [1]  We provided each student with a response form to be

---

[1]   One student and his parents/guardians were not included in the initial round of notice because the District did not have a current mailing address. That student and his parents/guardians were notified of the image-viewing process by letter dated June 8, 2010

Honorable Jan E. DuBois
July 29, 2010
Page 2

returned to us indicating whether or not the students and/or parents/guardians wished to view the images, and if so whether they intended to do so at the scheduled date and time, or if the proposed viewing date and time was inconvenient and they needed to reschedule.

Of the thirty-six (35) students and parents/guardians who were sent notices on May 14: six (6) appeared on the scheduled date/time and viewed the recovered images; four (4) returned consent forms declining to view the images; seven (7) requested to be rescheduled; five (5) students' letters were returned to Ballard Spahr as unclaimed; and one (1) student's letter was returned to Ballard Spahr due to a bad address.

After consultation with Judge Rueter and counsel for plaintiffs, between June 8, 2010 and June 10, 2010, we sent follow-up letters, via Federal Express, to twenty-six (26) students and parents/guardians. Of those four (4) students and/or their parents/guardians appeared on the scheduled date and time and viewed the images;[2] two (2) students and their parents/guardians declined to view the images; three (3) students and their parents/guardians requested to be rescheduled; one (1) student's letter was returned as unclaimed; and one (1) student's letter was not delivered due to lack of a current mailing address.

On June 23, 2010, after further consultation with Judge Rueter and plaintiffs' counsel, Judge Rueter's law clerk, Denise Speranza, attempted to contact the parents/guardians of the two (2) students for whom letters had been returned as unclaimed or undeliverable due to a bad address. Ms. Speranza reported that the parent of the student whose letter was returned as unclaimed confirmed that we had sent the letter to the correct address, and asked that we resend it. Ms. Speranza further reported that all of the possible telephone numbers found provided for the student whose letter was returned as undeliverable due to a bad address were out of service, with no forwarding telephone numbers available. We made additional attempts to locate the student's current mailing address and telephone number by Internet searches but were unsuccessful.

Finally, on July 7, 2010, we sent a third round of notices to five (5) students and their parents/guardians advising them that they could view the recovered images during evening hours at LMSD's administration building. Of those, four (4) viewed the recovered images and one (1) did not appear and neither the student nor the student's parents or guardians have requested to be rescheduled.

In summary, there were thirty-six (36) affected students, in addition to Blake J. Robbins, for whom images were recovered via the TheftTrack feature. Of the affected students, fourteen (14) students and/or their parents/guardians viewed the recovered images; six (6) students and their parents/guardians advised the District that they declined to view the images; fifteen (15) students and their parents/guardians did not respond to either of two rounds of notice of the opportunity to view the recovered images; and one (1) student, for whom LMSD was unable to locate a current mailing address or telephone number, did not receive notice regarding the recovered images.

---

[2]     Two (2) students opted not to view the images but had no objection to allowing their parents/guardians to view the images. Each of those students executed a consent form allowing their parents or guardians to view the images.

Honorable Jan E. DuBois
July 29, 2010
Page 3

Please let us know if the Court would like further information about the image-viewing process.

Very truly yours,

Henry E. Hockeimer, Jr.

LMC/

cc.     Chief Magistrate Judge Thomas J. Rueter
        Mark S. Haltzman, Esq
        Michael J. Boni, Esq.
        Mary Catherine Roper, Esq.

# EXHIBIT "C"

# SHERRY LOWE JOHNSON



## Long relationships and total dedication.

SDlowejohnson@lammrubenstone.com

### PRACTICE AREAS
Lending and Equipment Leasing in Bankruptcy Litigation, Commercial Litigation, Complex Debt Restructuring and Employment Law

### BIOGRAPHY
Ms. Lowe is a Partner with Lamm Rubenstone LLC. She was born and raised in Indiana and has been a resident of Pennsylvania since 1988.

### EXPERIENCE
Sherry Lowe specializes in all aspects of lending and equipment leasing in Bankruptcy, Litigation, Commercial Litigation (including Lender's Liability Claims) and complex Debt Restructuring. In addition, she represents employers and management in employment-related litigation, counsels on employment-related issues, and conducts labor audits, seminars and training.

### BAR ADMISSIONS
Supreme Court of Pennsylvania, U.S. District Court for the Western, Eastern and Middle District of Pennsylvania, U.S. Court of Appeals 3rd Circuit, Supreme Court of the United States, Pro Hac Admission in Delaware, Indiana, Illinois, Massachusetts, Maryland, Mississippi, New Hampshire, New Jersey, Ohio, Virginia

### EDUCATION
JD  University of Pittsburgh School of Law 1992
BA  Purdue University 1988



## LAMM RUBENSTONE LLC.

**TREVOSE:**
3600 Horizon Blvd.
Suite 200
Trevose, PA 19053

Phone: 215.638.9330
Fax: 215.638.2867

**ALLENTOWN:**
1275 Glenlivet Drive
Suite 100
Allentown, PA 18106

Phone: 610.706.4300
Fax: 610.706.4343

**NEW JERSEY:**
Commerce Center Suite 195
1820 Chapel Avenue West
Cherry Hill, NJ 08002

Phone: 856.488.8006
Fax: 856.488.5690

# EDWARD H. RUBENSTONE





## Long relationships and total dedication.

ERubenstone@lammrubenstone.com

### PRACTICE AREAS

All aspects of Civil and Commercial Litigation; Medical Malpractice and Personal Injury Litigation; Estate Litigation; General Business Representation.

### BIOGRAPHY

Ed Rubenstone is a founding partner of the predecessor firm Lamm Rubenstone LLC. Ed was born and raised in Philadelphia. Ed is married with two children and has lived in Springfield Township for 30 years. Ed served as Adjunct Professor of Law at Rutgers University Law School and Temple University School of Law. He is active in the Bucks County Bar Association and served on its Board of Directors and was elected President in 1997.

### EXPERIENCE

Ed began his career serving as a law clerk in the United States District Court for the Eastern District of Pennsylvania. He then entered private practice, specializing in the area of trial law, securities litigation, creditors' rights and bankruptcy. In 1979, he began practicing white-collar criminal and complex civil litigation and joined the predecessor firm of Lamm Rubenstone in 1984. Ed handles a wide-range of civil, commercial, complex personal injury cases and has represented numerous municipalities and government agencies in a variety of matters. He continues to handle numerous pieces of complex litigation and is currently serving as co-counsel in two class actions, one against Independence Blue Cross and the other on behalf of all persons killed during the 9/11 terrorist attacks.

### BAR ADMISSIONS

Admitted to the Bar in Pennsylvania

### EDUCATION

JD  Georgetown University Law Center 1974
BA  Lafayette College 1970



LAMM RUBENSTONE LLC.

**TREVOSE:**
3600 Horizon Blvd.
Suite 200
Trevose, PA 19053

Phone: 215.638.9330
Fax: 215.638.2867

**ALLENTOWN:**
1275 Glenlivet Drive
Suite 100
Allentown, PA 18106

Phone: 610.706.4300
Fax: 610.706.4343

**NEW JERSEY:**
Commerce Center Suite 195
1820 Chapel Avenue West
Cherry Hill, NJ 08002

Phone: 856.488.8006
Fax: 856.488.5690

# DEBRA KLEBANOFF





## Long relationships and total dedication.

DKlebanoff@lammrubenstone.com

### PRACTICE AREAS

Debtor and Creditors' Rights, Commercial Litigation, Contract Law, Real Estate, Constructions, Bankruptcy, Class Actions, Insurance and Consumer Regulation.

### BIOGRAPHY

Debra Klebanoff has over 25 years experience as a commercial litigator, representing diverse clients in a wide variety of areas including debtor and creditor rights, contract disputes, business torts, restrictive covenants, real estate, construction, bankruptcy, class actions, insurance and consumer regulation. She began her career teaching English and then became a Regulations Analyst for the Federal Reserve Bank, where she counseled member banks on compliance with consumer regulations.

### EXPERIENCE

Debra began practicing law at the Philadelphia firm of Wolf, Block, Schorr and Solis-Cohen, where she became a partner in 1991. In 1998, she withdrew from the firm to raise her three children and maintain her law practice on a solo and contract basis. Debra has also taught upper level Civil Procedure at Temple Law School. She joined Lamm Rubenstone in 2007.

### BAR ADMISSIONS

Debra is a member of the Pennsylvania Bar, the United States District Court for the Eastern District of Pennsylvania and the United States Court of Appeals for the Third Circuit.

### EDUCATION

JD  Temple University School of Law 1983
BA  Pennsylvania State University 1975



**LAMM RUBENSTONE** LLC.

| TREVOSE: | ALLENTOWN: | NEW JERSEY: |
|---|---|---|
| 3600 Horizon Blvd. | 1275 Glenlivet Drive | Commerce Center Suite 195 |
| Suite 200 | Suite 100 | 1820 Chapel Avenue West |
| Trevose, PA 19053 | Allentown, PA 18106 | Cherry Hill, NJ 08002 |
| Phone: 215.638.9330 | Phone: 610.706.4300 | Phone: 856.488.8006 |
| Fax: 215.638.2867 | Fax: 610.706.4343 | Fax: 856.488.5690 |

# STEPHEN DAVID





## Long relationships and total dedication.

SDavid@lammrubenstone.com



### PRACTICE AREAS

All aspects of Personal Injury Law and General Litigation.

### BIOGRAPHY

Steve David is an Equity Partner who joined the Firm of Lamm Rubenstone LLC (known formerly as Groen, Laveson, Goldberg & Rubenstone) in 1993. Steve has concentrated his practice in personal injury law for nearly 30 years. Steve studied philosophy in graduate school at the Hebrew University of Jerusalem. While living in Jerusalem he met his wife Ahuva, a soldier in the Israeli army. The large photograph in his office of his wife aiming a rifle never fails to impress his visitors. Steve returned to the States to finish his graduate degree in Philosophy and attend law school. Steve's three children all majored in Philosophy; two are practicing lawyers in Boston and Washington, D.C. and the third is in law school.

### EXPERIENCE

Before joining the Firm, Steve was a law clerk for the Philadelphia County Court of Common Pleas and went on to practice for several years in Philadelphia. From 1990 to 1994, he taught undergraduates in the Department of Legal and Real Estate Studies at Temple University. Over the years, Steve has successfully tried or settled over a thousand personal injury cases.

### BAR ADMISSIONS

Admitted to the Bar in Pennsylvania; the Supreme Court of Pennsylvania; United States District Court, Eastern District of Pennsylvania; United States Court of Appeals, Third Circuit

### EDUCATION

JD Temple University 1976
MA Hebrew University of Jerusalem and Temple University 1975
BA Temple University (magna cum laude) 1970



**LAMM RUBENSTONE** LLC.

**TREVOSE:**
3600 Horizon Blvd.
Suite 200
Trevose, PA 19053

Phone: 215.638.9330
Fax: 215.638.2867

**ALLENTOWN:**
1275 Glenlivet Drive
Suite 100
Allentown, PA 18106

Phone: 610.706.4300
Fax: 610.706.4343

**NEW JERSEY:**
Commerce Center Suite 195
1820 Chapel Avenue West
Cherry Hill, NJ 08002

Phone: 856.488.8006
Fax: 856.488.5690

# JENNIFER D. GOULD





## Long relationships and total dedication.

JGould@lammrubenstone.com

## PRACTICE AREAS
Creditors' Rights, Complex Debt Restructuring, Commercial Litigation, Bankruptcy

## BIOGRAPHY
Jennifer was born and raised in Philadelphia. She is married and resides in Bucks County

## EXPERIENCE
Jennifer is a Partner with Lamm Rubenstone LLC. She is a member of the Creditors' Rights and Litigation Departments whose practice is focused on representation of financial institutions and equipment lessors in loan workout, foreclosure, bankruptcy and other litigation matters.

## BAR ADMISSIONS
Philadelphia and Bucks County Bar Associations
Pennsylvania and New Jersey State and Federal Courts

## EDUCATION
JD  Villanova University School of Law 1997
BS  Millersville University of Pennsylvania 1992, magna cum laude – Business Administration - Finance



**LAMM RUBENSTONE LLC.**

**TREVOSE:**
3600 Horizon Blvd.
Suite 200
Trevose, PA 19053

Phone: 215.638.9330
Fax: 215.638.2867

**ALLENTOWN:**
1275 Glenlivet Drive
Suite 100
Allentown, PA 18106

Phone: 610.706.4300
Fax: 610.706.4343

**NEW JERSEY:**
Commerce Center Suite 195
1820 Chapel Avenue West
Cherry Hill, NJ 08002

Phone: 856.488.8006
Fax: 856.488.5690

LOCATIONS | CONTACT US | HOME

**TREVOSE OFFICE**
3600 Horizon Blvd. Suite 200
Trevose, PA 19053
215.638.9330

**PHILADELPHIA OFFICE**
1608 Walnut Street, Suite 804
P.O. Box 15
Philadelphia, PA 19103
215.638.9330

**ALLENTOWN OFFICE**
1275 Glenlivet Drive Suite 100
Allentown, PA 18106
610.706.4300

**NEW JERSEY OFFICE**
Commerce Center Suite 100
1800 West Chapel Avenue
Cherry Hill, New Jersey 08002

856.488.8000

ABOUT US   AREAS OF PRACTICE   ATTORNEY PROFILES   CLIENT LIST   IN THE NEWS   NEWSLETTER   ARTICLES   REQUEST INFO

## ATTORNEY PROFILES

### Michael Trainor



Download vcard

**PRACTICE AREAS**
Creditors' Rights, Commercial Litigation

**BIOGRAPHY**
Native of the Delaware Valley, Mike joined the law firm of Lamm Rubenstone in 2009 as an attorney whose practice focuses on Commercial Loan Documentation and Creditors Rights.

**EXPERIENCE**
Mr. Trainor began his career as an attorney with a Philadelphia area law firm after graduation from Villanova University School of Law. Mike has represented local and regional banks in commercial loan documentation matters and also has experience in defense litigation.

**BAR ADMISSIONS**
Mr. Trainor is admitted to practice in the Commonwealth of Pennsylvania (2008)

**EDUCATION**
Juris Doctorate from Villanova University School of Law, 2008

Bachelor of Science from La Salle University, 2004 Magna Cum Laude

# Exhibit "D"

Law Offices

# LAMM RUBENSTONE LLC
Tax I.D. #23-2295378

**PLEASE REMIT TO:**
3600 Horizon Boulevard, Suite 200
Trevose, PA  19053
(215) 638-9330

                                        August 24, 2010
        Michael E. Robbins and Holly S.
        437 Hidden River Road
        Penn Valley , PA 19072-1112

        Re: v. Lower Merion School District, et al.
        I.D. 16608-00003- MSH              Invoice # 848116

        For Services Rendered Through August 24, 2010

        Previous Balance                    $  418,850.60

        Current Fees              16,940.00

        Total Due                           $  435,790.60

| Timekeeper | Hours | Rate/Hour | Amount |
|---|---|---|---|
| Frank Schwartz | 15.5 | $ 275.00 | $   4,262.50 |
| Debra Klebanoff | 8.7 | $ 275.00 | $   2,392.50 |
| Mark S. Haltzman | 24.2 | $ 425.00 | $  10,285.00 |

**DUE AND PAYABLE UPON RECEIPT**
**VISA*MASTERCARD*AMERICAN EXPRESS ACCEPTED**

Law Offices

# LAMM RUBENSTONE LLC
Tax I.D. #23-2295378

August 24, 2010
Invoice # 848116
Page 2

Michael E. Robbins and Holly S.

Re: v. Lower Merion School District, et al.
I.D. 16608-00003 - MSH

| Date | Description of Services | Atty | Hours | Amount |
|------|-------------------------|------|-------|--------|
| 08-06-10 | Meet and confer conference call re: Motion for Award of Intgerim Attorney's Fees (.4) | FS | 0.4 | 110.00 |
| 08-09-10 | Email Hank Hockeimer re: breakdown of John's time; review response; email to Hank Hockeimer re: Judge's Order. | MSH | 1.3 | 552.50 |
| 08-13-10 | Review Defendants Brief in Opposition to Motion for Interim Fees; legal research re: cases cited in Brief in Opposition | FS | 2.8 | 770.00 |
| 08-13-10 | Telephone conference with Law Clerk of Judge DuBois regarding Reply Brief to Opposition to Fees; begin detailed review of Ballard Response to prepare Reply Brief. | MSH | 3.4 | 1,445.00 |
| 08-16-10 | Conference call with Judge Dubois and all counsel re: reply to fee petition; Legal research re: support for recovery of computer consultant fees and other issues raised; Draft Memorandum to M. Haltzman re: recovery of computer consultant fees. | FS | 4.8 | 1,320.00 |
| 08-16-10 | Conference with Judge DuBois re: Response to Motion for Interim Fees; review case law on various issues | | | |

**DUE AND PAYABLE UPON RECEIPT**
**VISA\*MASTERCARD\*AMERICAN EXPRESS ACCEPTED**

Law Offices

# LAMM RUBENSTONE LLC

Tax I.D. #23-2295378

August 24, 2010
Invoice # 848116
Page 3

Michael E. Robbins and Holly S.

Re: v. Lower Merion School District, et al.
I.D. 16608-00003 - MSH

| Date | Description of Services | Atty | Hours | Amount |
|------|------------------------|------|-------|--------|
| | including issue of consultant fees under 1983, 1981 and class actions; review of Cafiero deposition re: efforts to put in place policies and procedures to refute allegations in Opposition Motion. | MSH | 4.2 | 1,785.00 |
| 08-17-10 | Revise Memorandum re: recovery of consulting fees; Conference with M. Haltzman re: issues to be raised in Reply Brief; Legal research re: cases cited in Brief in Opposition | FS | 3.4 | 935.00 |
| 08-17-10 | Review research in connection with responding to various issues raised in Opposition Motion; draft portions of Response. | MSH | 3.2 | 1,360.00 |
| 08-18-10 | Draft section of Reply to Defendants  Memorandum of Law in Opposition to Motion for Interim Attorney's Fees; Conference with M. Haltzman re: Reply | FS | 4.1 | 1,127.50 |
| 08-18-10 | Draft Reply to opposition to interim fee petition,begin researching issue whether prevailing party entitled to attorneys fees incurred after date of preliminary injunctive relief and draft section for reply brief; additional research on issue | | | |

**DUE AND PAYABLE UPON RECEIPT**
**VISA*MASTERCARD*AMERICAN EXPRESS ACCEPTED**

Law Offices
# LAMM RUBENSTONE LLC
Tax I.D. #23-2295378


August 24, 2010
Invoice # 848116
Page 4


Michael E. Robbins and Holly S.

Re: v. Lower Merion School District, et al.
I.D. 16608-00003 - MSH


| Date | Description of Services | Atty | Hours | Amount |
|------|------------------------|------|-------|--------|
| | of recovery of consulting fees and review and revise draft section; Begin to review and revise reply brief on interim fees petition. | DK | 4.9 | 1,347.50 |
| 08-18-10 | Draft additional sections of Reply to Defendants' Opposition to Attorneys' Fees; review cases regarding same and cases cited by Defendants. | MSH | 4.2 | 1,785.00 |
| 08-19-10 | Research and revise consulting fees section of reply brief in support of attorneys fees;   Review and revise reply brief. | DK | 1.3 | 357.50 |
| 08-19-10 | Review draft of Reply; conference with associate regarding same; review cases and articles to add to Reply. | MSH | 2.3 | 977.50 |
| 08-20-10 | Additional research on various issues addressed in reply brief including entitlement to fees for opposition to motion for intervention; Review and revise reply brief in support of attorneys' fees. | DK | 2.5 | 687.50 |
| 08-20-10 | Review, revise and finalize Reply Memorandum. | MSH | 5.6 | 2,380.00 |
| | | Total Fees | $ | 16,940.00 |

**DUE AND PAYABLE UPON RECEIPT**
**VISA*MASTERCARD*AMERICAN EXPRESS ACCEPTED**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **BLAKE J. ROBBINS**, a Minor, by his Parents and Natural Guardians, **MICHAEL E. ROBBINS** and **HOLLY S. ROBBINS**, Individually, and on Behalf of all Similarly Situated Persons,<br>                                            Plaintiffs,<br><br>                    v.<br><br>**LOWER MERION SCHOOL DISTRICT**,<br>                    and<br>**THE BOARD OF DIRECTORS OF THE LOWER MERION SCHOOL DISTRICT**,<br>                    and<br>**CHRISTOPHER W. McGINLEY**,<br>Superintendent of Lower Merion School District,<br>                                            Defendants. | CIVIL ACTION<br><br><br><br><br><br>**NO. 2:10-cv-00665-JD** |

## CERTIFICATE OF SERVICE

I hereby certify that on the date written below the foregoing Plaintiffs' Amended Reply to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Interim Fees was filed electronically and is available for viewing and downloading from the ECF system, which also electronically served same on the following:

Arthur Makadon, Esquire
makadon@ballardspahr.com
aleardi@ballardspahr.com
congerm@ballardspahr.com
electronicservice@ballardspahr.com
hill@ballardspahr.com

Henry E. Hockeimer, Jr.
Paul Lantieri, III, Esquire
William B. Igoe, Esquire
hockeimerh@ballardspahr.com
lantierip@ballardspahr.com
collinsv@ballardspahr.com
igoew@ballardspahr.com

**LAMM RUBENSTONE LLC**

By: _____
        Mark S. Haltzman, Esquire (#38957)
        Frank Schwartz, Esquire (#52729)
        3600 Horizon Boulevard, Suite 200
        Trevose, PA  19053-4900
        215-638-9330 / 215-638-2867 Fax

DATED: August 24, 2010

415016-1